IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EBUDDY TECHNOLOGIES B.V., §
§
   *Plaintiff*, §
§    C.A. No. 20-cv-1501-MN
§
V. §
§
LINKEDIN CORPORATION, §    JURY TRIAL DEMANDED
§
§
   *Defendant*. §

### FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, eBuddy Technologies B.V. (hereinafter, "EBT" or "Plaintiff"), by and through

its undersigned counsel, hereby respectfully files this First Amended Complaint against

Defendant, LinkedIn Corporation (hereinafter, "LinkedIn" or "Defendant"), as follows:

### PARTIES

1. Plaintiff eBuddy Technologies B.V. is a private limited liability company

incorporated under the laws of the Netherlands.

2. Upon information and belief, Defendant LinkedIn is a corporation organized and

existing under the laws of the State of Delaware, with a place of business at 2029 Stierlin Court,

Mountain View, California 94043, and can be served through its registered agent, Corporation

Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

### NATURE OF THE ACTION

3. This is a civil action for patent infringement to stop Defendant's infringement of

United States Patent Nos. 8,510,395 (the "'395 Patent"; attached hereto as Exhibit 1), 9,584,453

(the "'453 Patent"; attached hereto as Exhibit 2), 8,230,135 (the "'135 Patent"; attached hereto as

Exhibit 3), and 8,402,179 (the "'179 Patent"; attached hereto as Exhibit 4) (collectively, the

"Patents-in-Suit").

4.  EBT alleges that LinkedIn directly and indirectly has infringed and/or continues to infringe the Patents-in-Suit by, *inter alia*, making, using, offering for sale, selling, importing, using (including in connection with internal uses and/or demonstrations), and/or inducing such actions, including in connection with providing the infringing products and instructions/specifications for their use, including as detailed herein.

5.  LinkedIn has had actual and/or constructive notice of the infringements alleged herein, including as detailed herein.

6.  EBT seeks damages and other relief for LinkedIn's infringement of the Patents-in-Suit, including as detailed herein.

## JURISDICTION AND VENUE

7.  This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

8.  This Court has personal jurisdiction over LinkedIn, including because LinkedIn is a Delaware corporation; LinkedIn has minimum contacts within the State of Delaware; LinkedIn has purposefully availed itself of the privileges of conducting business in the State of Delaware; LinkedIn regularly conducts business within the State of Delaware; and Plaintiff's cause of action arises directly from LinkedIn's business contacts and other activities in the State of Delaware, including at least by virtue of LinkedIn's infringing methods, systems, computer-readable media, and products, which have been, and are currently, at least practiced, made, and/or used in the State of Delaware. Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to Constitutional Due Process and the Delaware Long Arm Statute. Defendant is subject to this Court's general personal jurisdiction due at least to its continuous and systematic business contacts in Delaware, including related to operations

conducted in Delaware and the infringements alleged herein. Further, on information and belief, LinkedIn is subject to this Court's specific jurisdiction, including because LinkedIn has committed patent infringement in the State of Delaware, including as detailed herein. In addition, LinkedIn induces infringement of the Patents-in-Suit by customers and/or infringing users located in Delaware. Further, on information and belief, LinkedIn regularly conducts and/or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from goods and services provided to persons and/or entities in Delaware.

9.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b), including because LinkedIn resides in the State of Delaware at least by virtue of the fact that it is incorporated in this state and at least some of the direct and/or indirect infringement of the Patents-in-Suit occurs in this District.

## THE PATENTS-IN-SUIT

10. EBT is the owner of all right, title, and interest in the Patents-in-Suit, including the right to sue for past, present, and future infringement thereof and to collect damages for any such past, present, or future infringement. On information and belief and to the extent necessary and at all relevant times, LinkedIn has had at least constructive notice of the Patents-in-Suit. See 35 U.S.C. § 287.  The inventions disclosed and claimed in the '395 and '453 Patents comprising, *inter alia*, contact aggregation between different messaging services, provide numerous benefits over any prior systems or methods. The inventions disclosed and claimed in the '135 and '179 Patents comprising, *inter alia*, event notification, provide numerous benefits over any prior systems, methods, or non-transitory computer-readable media.

## A. The Claims Of The '395, '453, '135, And '179 Patents Are Directed To Patentable Subject Matter

11. Including as set forth in the DECLARATION OF DR. RAJEEV SURATI  (attached hereto as Exhibit 5), which is incorporated herein by reference as if fully set forth herein, the

claims of the '395, '453, '135, and '179 patents are directed to patentable subject matter. Further, for ease of reference and clarity, the matters asserted in said Declaration are likewise asserted herein.

**B.   The '395 And '453 Patents**

### 1.   Overview of the '395 and '453 Patents

12. The '395 Patent is entitled "Contact List Display System And Method." Application No. 12/774,700, filed on May 5, 2010 and which issued as U.S. Patent No. 8,510,395 is a continuation of Application No. 11/637,316 (filed on December 11, 2006) and claims priority to Provisional Application No. 60/748,988 filed on December 9, 2005. The '395 Patent issued on August 13, 2013. The earliest non-provisional application in its priority chain is Application No. 11/637,316, filed on December 11, 2006.

13. The '453 Patent is entitled "Contact List Display System And Method." Application No. 13/941,354, filed on July 12,2013 and which issued as U.S. Patent No. 9,854,453, is a continuation of Application No. 12/774,700 (which issued as the '395 Patent) which was filed May 5, 2010 and which claims priority to provisional and non-provisional filings dated as far back as December 9, 2005. The '453 Patent issued on August 13, 2013. The earliest non-provisional application in its priority chain is Application No. 11/637,316, filed on December 11, 2006.

14. As the '453 Patent is a continuation of the application for the '395 Patent, the specification of the '453 Patent is essentially identical to the shared specification of the '395 Patent. Thus, for ease of reference, most specification references herein to either the '395 or '453 Patent will apply equally to the other.

a.   *Overview of Prosecution of the '395 and '453 Patents*

15. During prosecution of the '395 Patent, and as part of Appl. No. 11/637,316, on May

18, 2009, the patent examiner rejected then pending claims 1-20 under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 7,496,379 ("Kaplan").

16. On August 8, 2009, the applicants amended the claims and argued that the cited Kaplan reference did not render the claims, as amended, unpatentable.

17. On November 5, 2009, the examiner issued a final rejection maintaining his rejection of then pending claims 1-20 in view of Kaplan.

18. The applicants filed continuation application, Appl. No. 12/774,700 on May 5, 2010.

19. On April 20, 2011, the examiner issued a final rejection rejecting then pending claims 1-20 under 35 U.S.C. 102(e) as being anticipated by Kaplan.

20. On July 19, 2011, the applicants again amended the claims and argued that the cited Kaplan reference did not render the claims, as amended, unpatentable. However, in an advisory action dated July 26,2011, the examiner did not enter the proposed amendments, claiming that they raised new matter.

21. On September 16, 2011, applicants filed a request for continued examination ("RCE"). As part of the RCE filing, the previously unentered amendments were entered.

22. On October 16, 2012, the examiner rejected then pending claims 1-8, 10-16 and 18-20 under 35 U.S.C. 103(a) as being unpatentable over the cited Kaplan reference.

23. On January 15, 2013, applicants amended the claims and traversed the examiner's rejections. On February 7, 2013, the examiner issued a notice of allowance.

24. On February 21, 2013, the applicants filed an RCE and submitted therewith an information disclosure statement. On March 3, 2013, the examiner issued a second notice of allowance.

25. During prosecution of the '453 Patent, on July 17, 2015, the patent examiner rejected then pending claims 1-20 under 35 U.S.C. § 101 as being directed to non-statutory subject

matter. The examiner also rejected then pending claims 1-20 under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 7,496,379 ("Kaplan").

26. On November 17, 2015, the applicants amended the claims and argued that they were not unpatentable in view of 35 U.S.C. § 101 and that the cited prior art did not anticipate the amended claims.

27. On February 25, 2016, the patent examiner issued a final office action again rejecting the then pending claims under 35 U.S.C. § 101 as being directed to non-statutory subject matter. The examiner also rejected then pending claims 1-20 under 35 U.S.C. § 102(e) as being anticipated by Kaplan, but on new grounds. The patent examiner also rejected the claims for non-statutory double patenting and obviousness-type double patenting over claims 1-11 of the '395 Patent.

28. On April 25, 2016, the applicants filed an response after final amending the claims and arguing were not unpatentable in view of 35 U.S.C. § 101 and that the cited prior art did not anticipate the amended claims.

29. On May 10, 2016, the patent examiner issued an advisory action maintaining his prior rejections under 35 U.S.C. § 101 and 35 U.S.C. § 102, as well as his rejections for double patenting.

30. On August 24, 2016, applicants and the patent examiner had an interview "during which the Examiner and Applicants' representative discussed the rejections of claims 1-12. More specifically, possible amendments to claim 7 were discussed to overcome the rejections of claims 7-12 under 35 U.S.C. § 101. It was agreed that the above amendments would overcome the rejections of claims 7-12 under 35 U.S.C. § 101. Additionally, it was agreed that a terminal disclaimer would overcome the double patenting rejections with respect to claims 1-12."

31. On August 25, 2016, applicants filed a terminal disclaimer and also amended the

claims and argued that the then pending claims were not unpatentable in view of 35 U.S.C. § 101 and that the cited prior art did not anticipate the amended claims. Specifically, the applicants "amended claims 1, 2, 4, and 7 as proposed by the Examiner, and cancelled claims 9 and 13-20. New claims 21-25 provide non-transitory computer readable medium claims consistent with the allowable method claims 7, 8, and 10-12."

32. On September 16, 2016, the patent examiner issued a notice of allowance.

b.   _Overview of the Unconventional '395 and '453 Patented Inventions and the Conventional Technology at the Time_

33. At the time of the '395 and '453 patented inventions, two main forms of direct electronic communication were electronic mail and instant messaging. Ex. 5 at ¶ 42. Generally, instant messaging differed from electronic mail in that conversations through instant messaging could happen in real time and often included presence information, including indications regarding whether a specific user was online and available to chat and real-time updates as to whether a user was typing and what the user typed. '395/1:25-33; Ex. 5 at ¶ 42. A user's corresponding list of other users comprises that user's contact list. '395/1:30; Ex. 5 at ¶ 42. Instant messaging systems further included the ability for users to set status messages, similar to a telephone answering machine. '395/1:36-39; Ex. 5 at ¶ 42.

34. Instant messaging systems at the time of the '395 and '453 Patents comprised a contact list. '395/1:28-30; Ex. 5 at ¶ 43. An example of conventional architecture, if a user actually used multiple messaging services, is as follows:



35. Maintenance of a conventional user's contact list(s), including maintenance of an aggregated contact list across multiple messaging services, if done at all, was typically a manual process which could be cumbersome and time consuming, including because each instant messaging service used its own proprietary protocols and formats for maintaining contact lists. Ex. 5 at ¶ 44. A user could add a contact to their contact list in a particular messaging system by, for example, locating the other contact in the messaging system and specifically requesting that user's contact information. Ex. 5 at ¶ 44. Including because each different messaging system has its own contact list, it was particularly cumbersome to add contacts from one messaging service to another where a contact was not an existing member of a particular messaging service. Ex. 5 at ¶ 44. In that case, a user may not be able to add the contact at all or may have to take additional steps to request that the contact create an account or otherwise register with the particular messaging service before being added to the contact list. Ex. 5 at ¶ 44. These proprietary protocols and formats were typically not compatible or transferrable from one messaging system to another. Ex. 5 at ¶ 44. Thus, a user may be required to manually add contacts from one messaging service to another messaging service in order to maintain contacts, including between different messaging systems. Ex. 5 at ¶ 44.

36. At the time of the '395 and '453 inventions reflected in the issued claims (the

"patented inventions"), the most common, conventional and practical way to aggregate contacts was by manually typing each name and/or e-mail address (and/or other contact information) into the user's contact list, or search for and then pick the contact, who would then later be notified of the request and then could choose to opt in. Ex. 5 at ¶ 45. This often required users to install and maintain multiple, separate local – and often closed and proprietary – applications which required cumbersome, manual processes for maintaining consistent aggregate contact lists across devices. Ex. 5 at ¶ 45. Further, the closed, proprietary local applications often did not even permit the user to access any file containing a list of contacts or otherwise manually transfer contact lists between devices. Ex. 5 at ¶ 45. Nor could the user be guaranteed that an aggregate contact list file from one device would be compatible on a second device. Ex. 5 at ¶ 45. Thus, this often resulted in the user having to manually enter the same contacts on multiple devices for the various different messaging systems the user used. Ex. 5 at ¶ 45.

37. The "SUMMARY" section of the '395 and '453 Patents states, in part, as follows:

A technique for contact list aggregation across a plurality of different networks involves logging into low level networks through a high level network. A system constructed according to the technique may include a network interface coupled to the different low level networks. The system may further include a contact aggregation engine coupled to the network interface and a network contacts database. In operation the system logs into one or more of the low level networks (or facilitates login for a user). The network contacts database may include some information about contacts associated with the networks from, by way of example but not limitation, previous logins or data explicitly entered by a user. To the extent that the data in the network contacts database is not current, the contact aggregation engine updates the networks contacts database contact information, then provides an aggregated contact list including the contact information to a display device.

A method according to the technique may include logging into a high level network and displaying contacts from the one or more low level networks in an aggregated contact list. The method may further include logging into the one or more low level networks.

'395/1:61-2:16; Ex. 5 at ¶ 46.

38. The '395 and '453 claimed inventions have advantages over conventional systems

and methods, including that they allow a user's contact list from multiple instant messaging services to be aggregated into a single contact list and allows the aggregated contact list to be consistently updated in real time across the user's devices, including from a network contacts database. '395/8:59-67; Ex. 5 at ¶ 47. In some embodiments, this includes aggregation of contacts from a high-level messaging service and one or more low level messaging services. '395/8:59-67; Ex. 5 at ¶ 47.

39. At the time of the '395 and '453 patented inventions, there were no iPhones (which first appeared in 2007) or Android devices (which first appeared in 2008), and one of the most commonly used mobile devices was BlackBerry phones. Ex. 5 at ¶ 48. Thus, it was uncommon for most mobile devices used for messaging to have screen sizes of more than about two inches, like those of BlackBerry and Nokia devices. Ex. 5 at ¶ 48. In fact, the shared specification specifically notes that "[t]he information available on a mobile phone display is less than that of a full screen display, such as is available on, for example, a laptop display." '395/7:44-46; Ex. 5 at ¶ 48. Additionally, mobile devices saw limited, fragmented usage, with most people having only a (non-mobile) desktop computer at home or the office. Ex. 5 at ¶ 48. Furthermore, at that time few, if any, and certainly not widely used, mobile phones allowed multiple applications such as messaging applications to be open or allowed switching between such applications. Ex. 5 at ¶ 48.

40. Moreover, at that time, in order to be able to install applications on a device, especially a work device, the user would need administrative rights on that device. Ex. 5 at ¶ 49. For most users using a work device or someone else's device, for example, one at a school or library, that would not be the case, including because the owner of the device could both prohibit the installation of applications and prohibit certain types of network communications. Ex. 5 at ¶ 49. A server-based application, including the inventions described in the '395 and '453 Patents,

avoids both of these limitations by operating using a network connection, for example, a web connection, and, for example, a browser (which the user's employer, library or school had to allow) not requiring installation of a local, standalone messaging application. Ex. 5 at ¶ 49.

41. Further limitations on network and Internet availability existed at the time, where broadband was growing, but not ubiquitous, and thus the expectation one's network services available to a computer at the time were often insufficient to reliably support continuous connectivity and high bandwidth network activity. Ex. 5 at ¶ 50. Similarly, for mobile devices, mobile data and internet connectivity was not ubiquitous as it is today. Ex. 5 at ¶ 50. At that time, a user would be motivated to minimize mobile data usage because of high cost and limited bandwidth. Ex. 5 at ¶ 50. Nor would a messaging service provider typically have considered having a user use their mobile device or mobile data for web-based applications. Ex. 5 at ¶ 50. As a result, it was conventional to store, example, contact lists, including aggregated contact lists, locally rather than at a network server or web server, or across multiple, different systems. Ex. 5 at ¶ 50.

42. As a result, as noted above, for those conventional messaging applications which provided only a singular service, these limitations were less problematic due to the singular service connections. Ex. 5 at ¶ 51. However, due to these technological limitations, the convention for multi-service local applications was to locally store contact information and serve only as a hand-off between the user's device and each separate messaging service. Ex. 5 at ¶ 51. The patented inventions are unconventional in this regard because they went against the conventional method of locally storing the information for each of the user's messaging services and corresponding contact lists, and instead stored them on the server for retrieval by the user, regardless of where or how the user accessed the web application. Ex. 5 at ¶ 51.

43. There were also no network independent app stores which provided ease of

11

distribution, so instant messaging services had to make separate applications coded for each type of device they wanted to support and they often had to certify them per mobile network provider. Ex. 5 at ¶ 52. Thus, the conventional way of providing mobile versions of desktop applications would have been to simply make a version of the application for each type of mobile device and get them onto each wireless providers' network. Ex. 5 at ¶ 52. This was incredibly difficult because this was a highly fragmented market, and the limited availability of inexpensive mobile data – meant that when any messaging service updated its protocols, it would require the user take the cumbersome steps of loading or installing the newer version for the user to be able to continue use of the messaging service. Ex. 5 at ¶ 52.

44. At that time, people often transitioned or moved between their computers (for example, between a work or office computer and a home computer), and browsers providing a rich standardized user interface such as AJAX were still relatively new, meaning there was little, if any, standardization across browsers. Ex. 5 at ¶ 53.

45. Consequently, the convention at the time was to create and code your own application, rather than relying on any web-based application especially if the underlying application required server push technology. Ex. 5 at ¶ 54. However, even this was unconventional at the time, including due to the limited resources available on mobile devices. Ex. 5 at ¶ 54. As the convention was separate, proprietary applications, this meant that a user was required to install a different application for each messaging system they used. Ex. 5 at ¶ 54. The '395 and '453 patented inventions took an unconventional approach to this by providing a single "one-stop-shop" for all of the user's messaging systems accessible through a single, non-installed web application. Ex. 5 at ¶ 54.

46. Network-, server- and/or web-based applications that worked with multiple messaging services, rather than locally installed client applications for messaging services, were

unconventional at this time, including in view of the conventional technology available described herein, and further including because of the noted limited resources of conventional technology and focus of conventional messaging service providers. Ex. 5 at ¶ 55. Through use of the claimed inventions of the '395 and '453 Patents, devices with a browser, regardless of which browser, could be used to access your favorite messaging networks, as well as ensure that all of the user's contacts for each of these networks were available from any device. Ex. 5 at ¶ 55.

47. Local clients or applications required the user to periodically update the client or application. Ex. 5 at ¶ 56. By using the network-based methods and systems described in the '395 and '453 Patents, any updates could be done at the network or server and the user was ensured they were always accessing the latest version and protocols via the web application. Ex. 5 at ¶ 56. This is due to the server-based operation of the '395 and '453 patented inventions. '395/Figs. 1 & 2; 2:49-64; 3:10-51; 5:1-36; Ex. 5 at ¶ 56. System 100 provides the web application for the claimed multi-service messaging network. '395/2:49-50; Ex. 5 at ¶ 56.

48. In one embodiment, the '395 and '453 patent inventions comprise server 104 in communication with IM server 106 for each messaging service and client 114-N for each of the users of the multi-service system. '395/2:50-64; Ex. 5 at ¶ 57. Server 104 may comprise a single server or a combination of servers working in tandem. '395/3:10-14; Ex. 5 at ¶ 57. For example, at least in one embodiment disclosed in Figure 1, server 104 comprises a hardware-based server comprising high CPU throughput capabilities, large amounts of RAM for handling a large number of users, and thread pools for thread sharing. '395/3:14-23; Ex. 5 at ¶ 57. Because a multi-service network would necessarily require communication with a large number of users (for example, users from each of the supported messaging services), the multiple servers set up, including various role-specific sub-servers, would further assist in handling such large amounts of communication, including over the minimal bandwidth at the time. '395/3:10-32; Ex. 5 at ¶

13

57.

49. By providing server 104 as the intermediary between clients 114 and IM servers 106, server 104 acts as a carrier of the data from users to the IM network 108 and vice versa. '395/3:33-44; Ex. 5 at ¶ 58. This, in turn requires the unconventional handling of multiple different proprietary messaging services by server 104, including handling communications under each messaging service's respective protocols and formats. '395/3:64-4:12; Ex. 5 at ¶ 58. Furthermore where the network connection to the client is potentially somewhat unreliable and lower bandwidth say over a wireless network the logging into the multiple services at the web server represents an architectural improvement over doing it local to the client. Ex. 5 at ¶ 58. In this way the added communications overhead of logging into many networks is done on a far more reliable network resulting in much less likelihood a user would get logged off of a service because multiple are running on the device and furthermore a diminished amount of traffic is transferred onto the client as needed. Ex. 5 at ¶ 58. Thus, the server-based management of multiple logins results in a smoother and better user experience. Ex. 5 at ¶ 58.

50. On the other hand, as noted herein, the convention at the time of the '395 and '453 patented inventions was a single messaging service provider handling only its respective messaging service. Ex. 5 at ¶ 59. This was due to, for example, conventional messaging service providers seeking to only invest resources in managing their own service and seeking to grow their service by requiring users to join their service to communicate with others on the service. Ex. 5 at ¶ 59. Additionally, conventional messaging service providers sought to avoid the hassle of having to manage fixes and changes to multiple messaging services and were primarily interested in having users use or adopt their proprietary system. Ex. 5 at ¶ 59. This could result in users having to maintain separate contact lists for each separate messaging service they used and could become quite cumbersome and time consuming as the user used more messaging services.

Ex. 5 at ¶ 59.

51. Another issue created by the use of multiple, often proprietary messaging services was incompatibility of contact lists between the services themselves and also incompatibility or accessibility of the contact list files on certain devices. Ex. 5 at ¶ 60. For example, at the time of the '395 and '453 inventions, it would have been conventional to copy a contact list, including an aggregated contact list file, from multiple messaging services, between devices of a similar type. Ex. 5 at ¶ 60. If one tried to do it between different types of devices such as a desktop app and a mobile device it would have been unconventional and if it was possible it would have been a cumbersome and technically involved process. Ex. 5 at ¶ 60. As a result, a user may have still been required to manually copy contact lists or manually enter individual contacts (including entering such contacts multiple times if the user was using multiple messaging services) where copying of a list was not possible, between separate different types of devices. Ex. 5 at ¶ 60. On the other hand, the claimed inventions provide an architectural solution wherein a single server obtains the user's contact lists from multiple instant messaging services to present an aggregated list of all of the user's contacts accessible from that server via, for example, a web browser. Ex. 5 at ¶ 60. Thus the architecture proposed by the patents was an improvement over the conventional similar device application solution. Ex. 5 at ¶ 60.

52. Similar to the embodiment of Figure 1 of the '395 and '453 Patents, the embodiment of Figure 2 likewise comprises a centralized server, server 206, which is in communication with multiple clients 214, 202, and 210, of multiple different IM networks 212, 204, and 208. '395/5:1-7; Ex. 5 at ¶ 61. As with the above embodiment, server 206 provides the ability to read and interpret protocols and formatting of one IM network and make that available to clients on a different IM network. '395/5:8-36; Ex. 5 at ¶ 61. Due to this, the '395 and '453 patented inventions provide for communications between different client types, such as desktops and

mobile devices, which may not have a specific application for any given messaging service and/or may not be able to install such applications. '395/5:37-49; Ex. 5 at ¶ 61.

53. In these configurations, the centralized nature of the server permits for an aggregated contact list to be maintained and displayed. '395/5:50-63; 3; 6:14-44; Ex. 5 at ¶ 62. Specifically, as shown in the embodiment of Figure 3, server 304 comprises network login engine 310-N for each supported messaging service (*i.e.*, low level network 302-N) which stores the login information of the user for each of said low level networks for connecting to these low level networks. '395/6:1-13; Ex. 5 at ¶ 62. Thus, including via network login engine 310-N, server 304 may log into each of the user's low level networks to permit instant messaging communications, as well as access by server 304 to the user's contact data associated with each such network. '395/6:13-19; Ex. 5 at ¶ 62.

54. Each of the user's low level network contact data is aggregated into an aggregated contact list, which may be further aggregated with a contact list for the messaging service of server 304, if one is provided. '395/6:20-34; Ex. 5 at ¶ 63. Specifically, '395 and '453 Figures 5 and 6, and the associated specification language, disclose flowcharts depicting the methods for aggregation of the user's contacts. '395/Figs. 5 and 6; 8:10-9:61; Ex. 5 at ¶ 63. As a result, including as noted herein, the user is able to see all of the user's contacts from all of the user's joined messaging services by server 304 providing the aggregated contact data to the user's device for display. '395/Figs. 4A-4B; 6:34-7:9; & 7:41-46; Ex. 5 at ¶ 63.

55. Another unconventional and inventive aspect of the claimed inventions of the '395 and '453 Patents includes the use of a remote user profile database for instant messaging login onto multiple instant messaging networks (for example, '395/Claim 4; Fig. 3; & 6:30-34; Ex. 5 at ¶ 64. The user profile permitted user-specific information (for example, information used by the network login engine to login or facilitate login to the one or more networks), to be stored at the

network or server to allow contact information to be retrieved and an up-to-date aggregate contact list can be maintained, without requiring the user to enter such information each time they use the system. Ex. 5 at ¶ 64. For example, the system may maintain user login information for at least each low-level network which may then be used to, for example, by the network login engine to login or facilitate login to one or more networks, including one or more low-level networks. Ex. 5 at ¶ 64. This allows, for example, the user to provide login information once, and the system to login on behalf of the user at the server without further user action to maintain an up-to-date aggregate contact list, including by the system accessing the low-level network using the stored information and retrieving the user's contact list for that network to update the user's high level network contact list. Ex. 5 at ¶ 64. In 2006, the convention was to not store such information at the server for the server to use upon a single login, including due to security limitations and privacy concerns the relating to the notion of storing instant messaging client passwords on a server to be used by the server instead of on a local device. Ex. 5 at ¶ 64. The convention was localized storage of such information to allow login to multiple servers from the local device. Ex. 5 at ¶ 64.

## 2.  The '395 and '453 Patents are not Directed to an Abstract Idea.

56. The claims of the '395 and '453 Patents neither describe nor claim a concept nor a generic method or computerized system. Ex. 5 at ¶ 65. Instead, the '395 and '453 claims address, among other things, a persistent problem with messaging systems at the time of the invention whereby aggregation of contacts from a plurality of messaging services was unavailable and/or was cumbersome (for example, manually copying or transferring contact files from one messaging service (where such copying or transfer was even possible) to another messaging service); prone to potential errors (for example, manually inputting contacts could result in input errors); an inability to maintain a contact list, including an aggregated contact list, across or

17

between multiple user devices and subject to compatibility problems (for example, because contact lists were typically maintained in a proprietary format from messaging service to messaging service, a contact list from one messaging service was not usable or accessible by another messaging service). Ex. 5 at ¶ 65. The patented inventions enable a substantial improvement in messaging systems, including their functionality and utility. Ex. 5 at ¶ 65.

57. Further, the convention at the time was to use only a single messaging service due to not only limited computing and network resources but also because, as noted above, one could not switch between applications on a mobile phone. Ex. 5 at ¶ 66. The specific claimed inventions of the '395 and '453 Patents disclose unconventional systems and methods which solve these limitations, including, without limitation, by providing a server and web application capable of handling all inbound and outbound connections from the multiple messaging services. Ex. 5 at ¶ 66.

58. The claimed invention required substantial resources on the server side to run. Ex. 5 at ¶ 67. At the time, a single instant messaging system was far cheaper to maintain, including because every time you added a messaging system to the server was required to maintain an additional connection for each user on that additionally added system to each of the other systems to maintain a presence with the other systems. Ex. 5 at ¶ 67. IM systems had many of millions of users, so every time you added an instant messaging system to be handled by the network (from N to N+1) you decreased the potential users of an IP address, which was a very expensive proposition at the time. Ex. 5 at ¶ 67. It was far less expensive resource wise to handle this on a local client where one needed to only maintain N+1 connections. Ex. 5 at ¶ 67. With desktop applications with reliable connectivity to the network this was the conventional solutions at the time. Ex. 5 at ¶ 67.

59. As a result, the convention was singular messaging services due to the noted resource

limitations requiring messaging service providers to focus on a single network, rather than multiple. Ex. 5 at ¶ 68.

60. The claims of the '395 and '453 Patents claim unconventional systems and methods which provide a network server to connect to multiple separate, proprietary messaging services to provide, including via a web application, both an aggregated contact list for all of the user's messaging services and communications between users of all of the supported messaging services. Ex. 5 at ¶ 69. At the time, this was unconventional, including because it required significantly more resources at the network server to communicate with and manage the increased network traffic resulting from multiple users using multiple messaging services (as opposed to a single user using multiple messaging services locally). Ex. 5 at ¶ 69.

61. The patented inventions of the '395 Patent provide systems for contact aggregation involving a first network associated with a first messaging service provider and a second network associated with a second messaging service provider that specify, for example, "a contact aggregation engine coupled to the network login engine and the network contacts database," which specifies the mechanism by which contacts from the first and second messaging services are accessed (e.g., the network login engine) and aggregated, including that, as noted herein, the network login engine uses the user's login information for each first and second network to which the user is a member to login or facilitate login to each such network, wherein this login information may be stored at the network or web server to allow contact information to be retrieved and an up-to-date aggregate contact list can be maintained, without requiring the user to enter such information each time they use the system. Ex. 5 at ¶ 70. Including as noted herein, this, in turn, permits the user to login and access multiple of the user's contact lists from a central web or network application. '395/Figs. 5 & 6; 6:1-19; 6:34-7:9; & 8:10-9:61; Ex. 5 at ¶ 70. The particular system further specifies "a web server coupled to the network contacts database" that,

for example, allows aggregations of contacts at the network and makes the aggregated contact list available from the network and which specifies that the server provides a web application wherein, by logging into, or otherwise using, the web application, to access the user's various first and second messaging service networks, the user's contact data from the first and second messaging services is aggregated into an aggregated contact list, which may be further aggregated with a contact list for the messaging service of the server. '395/Claims 1 & 2; Ex. 5 at ¶ 70. Including as noted herein, this, in turn, provides a server-side web application which is device-independent for the user to access all of the user's contact information regardless of source network. '395/Fig. 3; 5:50-63; & 6:34-7:9. Ex. 5 at ¶ 70.

62. These limitations disclose a particular architecture and way in which contact aggregation can be accomplished from a first network associated with a first messaging service provider and a second network associated with a second messaging service, including the specific way contact aggregation is accomplished, including to provide an aggregated contact list that is stored at the network (for example, the web server) and is therefore available via the network, including via a web-based application or browser – as opposed to using conventional methods to aggregate contacts such as those described in the '395 Patent and herein. Ex. 5 at ¶ 71. An example of such architecture and functionality is as follows:

20



Ex. 5 at ¶ 71.

      63. The patented inventions of the '453 Patent provide systems for contact aggregation involving a plurality of low level networks associated with a plurality of messaging service providers that specify, for example, "a contact aggregation engine coupled to the network login engine and the network contacts database," which specifies the mechanism by which contacts from the plurality of low level networks are accessed (for example, the network login engine) and aggregated, including that, as noted herein, the network login engine uses the user's login information for each plurality of low level networks to which the user is a member to login or facilitate login to each such network, wherein this login information may be stored at the network or server to allow contact information to be retrieved and an up-to-date aggregate contact list can be maintained, without requiring the user to enter such information each time they use the system. Ex. 5 at ¶ 72. Including as noted herein, this, in turn, permits the user to login and access multiple of the user's contact lists from a central web or network application. '453/Figs. 5 & 6; 6:5-23; 6:38-7:13; & 8:18-10:4; Ex. 5 at ¶ 72. The particular system further specifies "a server coupled to the network contacts database" that, for example, allows aggregations of contacts at the network and makes the aggregated contact list available from the

network and which specifies that the server provides a server application wherein, by logging into, or otherwise using, the server application, to access the user's various low level messaging service networks, the user's contact data from the low level networks is aggregated into an aggregated contact list, which may be further aggregated with a contact list for the messaging service of the server. '453/Claims 1 & 2. Ex. 5 at ¶ 72. Including as noted herein, this, in turn, provides a server-side web application which is device-independent for the user to access all of the user's contact information regardless of source network. '453/Fig. 3; 5:52-60; & 6:38-7:13; Ex. 5 at ¶ 72.

64. These limitations disclose a particular architecture and way in which contact aggregation can be accomplished from a plurality of low level networks associated with a plurality of messaging services, including the specific way contact aggregation is accomplished, including to provide an aggregated contact list that is stored at the network (for example, the server) and is therefore available via the network, including via a server-based application or a browser – as opposed to using conventional methods to aggregate contacts such as those described in the '453 Patent and herein. Ex. 5 at ¶ 73. An example of such architecture and functionality is set forth above with respect to the '395 Patent. Ex. 5 at ¶ 73.

65. Similarly, patented inventions of the '395 Patent and '453 Patents provide methods for contact aggregation involving a high-level network and a first low level network associated with a first messaging service provider and a second low level network associated with a second messaging service provider, that specifies for example, "obtaining a first contact list associated with the first messaging service provider," "obtaining a second contact list associated with the second messaging service provider" and "maintaining an aggregated contact [list] that comprises the first contact list and the second contact list". '395/Claim 7; Ex. 5 at ¶ 74. The methods further provide for contact aggregation involving a high-level network and a plurality of low level

networks, that specifies for example, "obtaining a first contact list associated with the plurality of low level networks," "maintaining a second contact list associated with the high level network," "maintaining a contact list associated with the plurality of low level networks for the plurality of messaging services," and "displaying contacts from the plurality of low level networks and the high level network in an aggregated contact list, the contacts retrieved by logging into the high level network." '353/Claim 7; Ex. 5 at ¶ 74. These limitations disclose a particular way in which contact aggregation can be accomplished from a first network associated with a first messaging service provider and a second network associated with a second messaging service or from the plurality of low level networks, including the specific way contact aggregation is accomplished including to provide an aggregated contact list that comprises the first contact list and the second contact list (or the high level network and the plurality of low level networks) and may be, for example, made available via the high level network and is therefore available via the network, including via a web-based and/or server-based application or a browser – as opposed to using conventional methods to aggregate contacts such as those described in the '395 and '453 Patents and herein. Ex. 5 at ¶ 74.

   a. _The '395 and '453 Claims are Directed to Innovative Computer- and Network-Based Systems and Methods._

66. None of the elements that comprise the claimed system or that are described in the claims of the '395 and '453 Patents are abstract. Ex. 5 at ¶ 75. Including as described herein and in the '395 and '453 Patents, the computer, contact aggregation engine, network login engine, web server, server and interfaces are physical or tangible things known to a person of ordinary skill in the art ("POSITA") in light of the specification; and in view of the technological solutions and unconventionality noted herein. '395/3:10-32; Ex. 5 at ¶ 75.

67. As exemplified by claim 1, the subject claims of the '395 Patent are directed to:

1. A system comprising:

a network login engine;

a network contacts database embodied in one or more non-transitory computer readable mediums;

a web server coupled to the network contacts database;

a contact aggregation engine coupled to the network login engine and the network contacts database;

wherein, in operation, the contact aggregation engine:

> controls the network login engine to login or facilitate login to a first network associated with a first messaging service provider and a second network associated with a second messaging service provider,
>
> updates the networks contacts database with contact information obtained from the first messaging service provider and the second messaging service provider,
>
> maintains an aggregated contact list that comprises a first contact list associated with the contact information from the first messaging service provider and a second contact list associated with the contact information from the second messaging service provider,
>
> stores the aggregated contact list in a non-transitory computer readable medium at the web server, and
>
> provides the aggregated contact list to a display device.

'395/Claim 1; Ex. 5 at ¶ 76.

68. As exemplified by claim 7, the subject claims of the '395 Patent are directed to:

7. A method comprising:

> joining a high level network;
>
> joining a first low level network associated with a first messaging service provider and a second low level network associated with a second messaging service provider;
>
> obtaining a first contact list associated with the first messaging service provider;
>
> obtaining a second contact list associated with the second messaging service provider;
>
> maintaining an aggregated contact that comprises the first contact list and the second contact list;
>
> logging into the high level network;
>
> displaying the aggregated contact list.

'395/Claim 7; Ex. 5 at ¶ 77.

69. As exemplified by claim 1, the subject claims of the '453 Patent are directed to:

1. system for contact list aggregation across a plurality of different networks comprising:

> a network interface;
>
> a network login engine coupled to the network interface;

a network contacts database embodied in one or more non-transitory computer-readable mediums;

a server coupled to the network contacts database;

a contact aggregation engine coupled to the network login engine and the network contacts database;

wherein, in operation, the contact aggregation engine controls the network login engine to login or facilitate login to a plurality of low level networks associated with a plurality of messaging services through a high level network using the network interface to access contact information from the plurality of messaging services, updates the networks contacts database based on the contact information associated with the plurality of low level networks to create an aggregated contact list, stores the aggregated contact list in a non-transitory computer-readable medium at the server, and provides the aggregated contact list including the contact information to a display device.

'453/Claim 1; Ex. 5 at ¶ 78.

70. As exemplified by claim 7, the subject claims of the '453 Patent are directed to:

7. A method for contact list aggregation across a plurality of different networks comprising:

joining a high level network;

joining a plurality of low level networks associated with a plurality of messaging services through the high level network;

obtaining a first contact list associated with the plurality of low level networks;

maintaining a second contact list associated with the high level network maintaining a contact list associated with the plurality of low level networks for the plurality of messaging services;

logging into the high level network;

displaying contacts from the plurality of low level networks and the high level network in an aggregated contact list, the contacts retrieved by logging into the high level network.

'453/Claim 7; Ex. 5 at ¶ 79.

71. As exemplified by claim 12, the subject claims of the '453 Patent are directed to:

12. A non-transitory computer readable medium comprising executable instructions, the instructions being executable by a processor to perform a method for contact list aggregation across a plurality of different networks, the method comprising:

joining a high level network;

joining a plurality of low level networks associated with a plurality of messaging services through the high level network;

obtaining a first contact list associated with the plurality of low level networks;

maintaining a second contact list associated with the high level network;
maintaining a contact list associated with the plurality of low level networks
   for the plurality of messaging services;
logging into the high level network;
displaying contacts from the plurality of low level networks and the high
   level network in an aggregated contact list, the contacts retrieved by
   logging into the high level network.

'453/Claim 12; Ex. 5 at ¶ 80.

72. Claim 1 of the '395 Patent, quoted above, is exemplary. Ex. 5 at ¶ 81. A POSITA would understand that the language of the '395 and '453 claims is not directed merely to a method of generically or conventionally aggregating contacts. Ex. 5 at ¶ 81. Rather, it comprises the specific aspects noted herein which provided the noted inventive, technological solutions to the problems faced by the inventors. Ex. 5 at ¶ 81. Specifically, as noted herein, the claimed inventions provide inventive, unconventional, and technological solutions to the conventional problems of accessing multiple contacts lists from multiple messaging services in a server-based web application which facilitates the user's access to multiple networks and an aggregated contact list of all of the user's contacts from such networks. Ex. 5 at ¶ 81. None of the elements that comprise the claimed device are abstract, as all of the computer, network contacts database, contact aggregation engine, network login engine, web server and network interfaces ('395/Figures 1-3 and 7 (and associated description in the specification)) are physical or tangible things known to a POSITA in light of the specification; and in view of the technological solutions and unconventionality noted herein. Ex. 5 at ¶ 81.

   b. *The '395 and '453 Claimed Inventions Could not be Done Manually or in One's Head.*

73. A POSITA would understand that the claimed solutions could not be done manually, including because they necessarily require implementation via a specialized, or specially programmed, computer, including one or more networks, a contacts database, a web server, and, further, including at least login or facilitating login to a first network…and a second network

26

('395/Claim 1; Figs. 3 & 5-6; 2:11-15; 5:50-6:13; & 8:10-9:17); and joining a high level network, joining a first low level network … and a second low level network and logging into the high level network ('395/claim 7; Fig. 3; 5:64-6:13; & 6:35-44), nor can they be performed in a person's head. Ex. 5 at ¶ 82. Furthermore, for example, the constant open connectivity required for receiving presence information between the server and each of the connected messaging services is not something that could be done manually or in one's head. Ex. 5 at ¶ 82.

74. A POSITA would understand that the claimed solutions could not be done manually, including because they necessarily require implementation via a specialized, or specially programmed, computer, including one or more networks, a contacts database, a server, and, further, including at least login or facilitating login to plurality of low level networks associated with a plurality of messaging services through a high level network using the network interface to access contact information from the plurality of messaging services; updating the networks contacts database based on the contact information associated with the plurality of low level networks to create an aggregated contact list ('453/Claims 1 and 12; Figs. 3 & 5-6; 2:5-10; 5:52-6:17); and joining a high level network, joining a plurality of low level networks associated with a plurality of messaging services through the high level network and logging into the high level network ('453/Claim 7. 3; 6/1-17; & 6/38-47), nor can they be performed in a person's head. Ex. 5 at ¶ 83. Furthermore, for example, the constant open connectivity required for receiving presence information between the server and each of the connected messaging services is not something that could be done manually. Ex. 5 at ¶ 83.

### 3. *The '395 and '453 Claimed Inventions Provide Innovative, Unconventional Concepts and Technological Solutions.*

a. *The '395 and '453 Claimed Inventions Provide Technological Solutions to Technological Problems.*

75. The technical problems addressed by the claimed inventions of '395 and '453 Patents

include aggregation of contacts from a plurality of messaging services, which, at the time of the '395 and '453 patented inventions, was difficult or cumbersome, including because, as noted herein, aggregation of contacts from a plurality of messaging services at that time was unavailable and/or was cumbersome (for example, requiring manually copying or transferring contact files from one messaging service (where such copying or transfer was even possible) to another messaging service); prone to potential errors (for example, manually inputting contacts could result in input errors); an inability to maintain a contact list, including an aggregated contact list or consistent contact list, across or between multiple user devices and subject to compatibility problems (for example, because contact lists were typically maintained in a proprietary format from messaging service to messaging service, a contact list from one messaging service was not usable or accessible by another messaging service), including via a network and/or in conjunction with the use of a web browser. Ex. 5 at ¶ 84.

76. Technical solutions provided by the claimed inventions of the '395 and '453 Patents to the technical problems faced include permitting or facilitating logging in, including from a high-level network, to first, second, or plurality of networks associated with a first, second, and/or plurality of low-level messaging services, including through one or more network login engines; acquiring, including through or with a contact aggregation engine, contact information from the first, second and/or plurality of low level networks associated with the first, second and/or plurality of messaging services and aggregating the contacts associated with the first, second and/or plurality of low level networks associated with the first, second and/or plurality of messaging services with the contact from and/or associated with the high level network and storing contacts in a network contacts database which is coupled to a web server. '395/Figs. 3 & 5-6; 5:50-6:12; 6:34-7:9; 8:10-41; & 9:18-61; Ex. 5 at ¶ 85. Including as noted herein, this, in turn, provides a web application which is device-independent for the user to access all of the

28

user's contact information regardless of source network and access and communicate with the user's contacts from each of the user's messaging services. '395/Figs. 3 & 5-6; 5:50-6:12; 6:34-7:9; 8:10-41; & 9:18-61; Ex. 5 at ¶ 85.

77. The inventions claimed in the '395 and '453 Patents further represent specific improvements in the functionality and capabilities of computer networking, databases, and messaging services and networks, including in regard to instant messaging services, systems, and network databases, including a network contacts database. Ex. 5 at ¶ 86. The inventions claimed in the '395 and '453 Patents, for example, improve the functionality of contact database systems, for example, by facilitating or allowing contacts from a first, second and/ or plurality of networks, including low level networks, (for example, messaging services or systems) to be aggregated into an aggregated contact list maintained or stored in the networks contact database. '395/1:61-2:15; Ex. 5 at ¶ 86. Including as described in the '395 and '453 Patents, and as noted herein, the claimed inventions include unconventional and inventive technological solutions to the technical problems that existed at the time, including to increasing and/or improving, for example, ease-of-use, accuracy, and efficiency in contact acquisition and management of contact databases. Ex. 5 at ¶ 86. For example, the claimed inventions of the '395 and '453 Patents, including as described herein, provide technical solutions that improve computer and database technology, including for aggregating contacts across a plurality of networks, including by aggregating a user's contacts through the user of a single network-based application and/or web service. Ex. 5 at ¶ 86. In this way, the claimed inventions of the '395 and '453 Patents reduce the use of the user's computing device and resources thereon, including the use of the user's network traffic – which, as noted herein, was highly limited at the time of the patented inventions, especially on mobile networks – because the user is not required to run multiple applications, including multiple local applications, or access multiple web services simultaneously. Ex. 5 at ¶

86. As noted herein, specifically with respect to mobile devices, it was often not possible to run multiple messaging clients at the same time and, even where it was, it would require a significant amount of bandwidth, which was often not available. Ex. 5 at ¶ 86. The inventions of the '395 and '453 Patents provide a technical solution to this problem by requiring only a single connection. Ex. 5 at ¶ 86.

b. *The '395 and '453 Claimed Inventions Provide Unconventional Solutions.*

78. Including as noted herein, what was conventional at the time comprised, for example, entering contact information manually for each of the user's contacts, manually copying a contact file from one messaging service to another. Ex. 5 at ¶ 87. Another conventional way of maintaining contacts was manually copying the user's contacts file from one device to another device used by the user which made it difficult or laborious to maintain consistent aggregated contacts lists between devices. Ex. 5 at ¶ 87.

79. These improvements include permitting users to use a singular messaging system which provides the user's contacts from all of the user's other messaging systems, which enables this over network or web-based systems, meaning the user's contacts are available in their aggregated form in any location and from any device that the user desires and to furthermore organize them better as a whole. Ex. 5 at ¶ 88. By leveraging network and web-based systems, the patented invention improved upon the conventional methods of locally stored contact lists and/or proprietary contact lists which could not be accessed by systems other than the specific system that created the contact list. Ex. 5 at ¶ 88.

80. Unconventional solutions provided by the claimed inventions of the '395 Patent include at least logging in to and/or facilitating logging in to a first, second, or plurality of low level messaging networks from a centrally-located high level network via a web application to retrieve, via a contact aggregation engine, the user's contact information from each of said

networks and store them in an aggregated list for access by the user via the web application regardless of where the user was located or what device the user operated to access the aggregated contact list. Ex. 5 at ¶ 89.

81. The '395 and '453 patented inventions further provided unconventional solutions by permitting the login and/or facilitating the login to multiple of the user's messaging services via server-based web application so that the user was able to access all of the user's messaging services via the single, device-independent web application. Ex. 5 at ¶ 90. Including as noted herein, it was unconventional to have a server-based and/or network-based application-neutral content application, as opposed to the conventional local application-specific, proprietary contacts lists that – if the contacts could even be ported or aggregated at all – had to be manually aggregated via a file exported from one local application and then imported into another local application and may not even be cross-platform transferrable. Ex. 5 at ¶ 90. Similarly, it was unconventional to have a web-based or server-based application-neutral content application, for the reasons noted above. Ex. 5 at ¶ 90.

82. Further, the asserted claims of the '395 and '453 Patents claim unconventional systems and methods which provide a centralized server to connect to multiple separate, proprietary messaging services to provide, for example via a web application, both an aggregated contact list for all of the user's messaging services and maintaining or storing the aggregated contact list in a network contacts database accessible via the web server or server. Ex. 5 at ¶ 91.

c.   _The '395 and '453 Claimed Inventions Provide Substantial Benefits._

83. The claimed contact aggregation systems and methods of the '395 and '453 Patents provide the benefits of aggregating a user's contacts from a network/web server from a plurality of networks associated with a plurality of messaging services and maintaining the aggregated contact list at a network contacts database, coupled to a web server. '395/Claim 1; Ex. 5 at ¶ 92.

The claimed contact aggregation systems and methods of the '395 Patent also provide the benefits of aggregating a user's contacts from a high-level network from a plurality of low-level networks and maintaining the aggregated contact list at a network contacts database, coupled to a web server. '395/claim 7; Ex. 5 at ¶ 92. This allows, for example, a user to access their aggregated contacts from different devices. Ex. 5 at ¶ 92.

84. In addition, conventional systems and methods required manual updating, including manually copying or transferring contacts or contact lists or contact files between different user devices. Ex. 5 at ¶ 93. The claimed inventions of the '395 and '453 Patents allow, for example, contacts to be aggregated in a content-neutral and screen space saving manner accessible across a number of different devices, as contrasted with state of the art application-specific contact lists. Ex. 5 at ¶ 93. It allowed devices with lower bandwidth and intermittent internet connectivity, such as wireless or mobile devices, to work reliably with simultaneously connected instant messaging systems because the connectivity to the instant messaging systems was done on a reliably connected server. Ex. 5 at ¶ 93.

    d.   *The '395 and '453 Claimed Inventions Provide Inventive Solutions*

85. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and contact aggregation, and further in consideration of the '395 and '453 Patent specifications, the prosecution history and cited prior art, a POSITA would understand that the claimed "network login engine…network contacts database, web server and contact aggregations engine [for] control[ling] the network login engine to login or facilitate login to a first…and a second network associated with a first…and second messaging service provider[s to] update[] the networks contacts database with contact information obtained from [each] messaging service provider; maintain[] an aggregated contact list that comprises a…contact list associated with the contact information from [each of the] messaging service

provider[s]; [and] stor[ing] the aggregated contact list…at the web server," including based on the use of a centralized server and device-independent web application, and including in combination with the claims of the '395 Patent, as a whole, is an inventive technological solution, including in view of the benefits and unconventional solutions this involves and contributes to. '395/Claim 1; Figs. 3 & 5-6; 1:61-2:15; 5:50-6:44; & 8:10-9:61; Ex. 5 at ¶ 94.

86. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and contact aggregation, and further in consideration of the '395 and '453 Patent specifications, the prosecution history and cited prior art, a POSITA would understand that the claimed "joining a high level network…joining a first low level network associated with a first messaging service provider and a second low level network associated with a second messaging service provider…obtaining a first contact list associated with the first messaging service provider; obtaining a second contact list associated with the second messaging service provider; maintaining an aggregated contact that comprises the first contact list and the second contact list" including based on the use of a centralized server and device-independent web application, and including in combination with the claims of the '395 Patent, as a whole, is an inventive technological solution, including in view of the benefits and unconventional solutions this involves and contributes to. '395/Claim 1; Figs. 3 & 5-6; 1:61-2:15; 5:50-6:44; & 8:10-9:61; Ex. 5 at ¶ 95.

87. For example, using certain technology claimed in the '395 and '453 Patents, (for example, the network login engine and the contact aggregation engine in conjunction with the network contacts database and web server or server), it becomes possible to, among other things, add the contacts from each of the user's messaging networks or services to a aggregated contact list maintained at or by another network or service which the user may access from a device-neutral web application. '395/Figs. 3 & 5-6; 5:50-6:12; 6:34-7:9; 8:10-41; & 9:18-61; Ex. 5 at ¶

96.

88. The '395 and '453 claimed inventions comprise inventive improvements over prior technologies in order to overcome problems, including those technical problems noted herein, related to computer networks and database management (for example, related to messaging service providers) including in combination with the aggregation of contacts from multiple messaging service providers, and ability to access and communicate with the user's contacts from each such messaging service providers, including via a network which is accessible via a web browser or similar functionality. Ex. 5 at ¶ 97. For example, the claimed inventions provide inventive solutions related to the conventional issues and inefficiencies (for example, as described herein) that were related to logging into and/or facilitating the login to a plurality of low-level networks (for example, messaging service providers) from a high-level network to obtain and aggregate contacts between such networks into an aggregated contact list that is stored or maintained in a networks contact database and which may be accessible via a network (for example, the Internet) such as through a web server. Ex. 5 at ¶ 97.

89. The '395 and '453 patented inventions further provide inventive improvements in IM network architecture, including because the unconventional multiserver-server-client architecture and shifting of communications and workload to a centralized server improve over the conventional, proprietary singular server-client architecture. Ex. 5 at ¶ 98. As noted herein, unlike conventional systems which only comprised a single server for the specific instant messaging service to connect to each client, the patented inventions utilize a multiserver-server-client architecture. Ex. 5 at ¶ 98. Including as noted herein, in so doing, the claimed inventions reduce the workload of clients and the servers of each individual instant messaging service by providing for various tasks to be run and take place on the centralized intermediary server. Ex. 5 at ¶ 98. Specifically, a POSITA would understand that the imposition of the web server between

the various instant messaging servers and/or between these instant messaging servers and each user client is inventive as an improvement in IM network architecture. Ex. 5 at ¶ 98.

## C.  The '135 and '179 Patents

### 1.  Overview of the '135 and '179 Patents

90. The '135 Patent is entitled "Event Notification System And Method." Application No. 13/165,709, filed June 21, 2011. The '709 Application issued on July 24, 2012 as U. S. Patent No. 8,230,135, which is a divisional of non-provisional Application No. 11/637,514, filed December 11, 2006. The '135 Patent also claims priority to Provisional Application No. 60/748,988, filed on December 9, 2005.

91. The '179 Patent shares a common title with the '135 Patent – "Event Notification System and Method." Application No. 13/554,996, filed on July 20, 2012, and which issued on March 19, 2013 as U. S. Patent No. 8,402,179 Patent is a continuation of the '135 Patent. The '135 Patent and the '179 Patent share an essentially identical specification.

92. As the '179 Patent is a continuation of the application for the '135 Patent, the specification of the '179 Patent is virtually identical to the shared specification of the '135 Patent. Thus, for ease of reference, most specification references herein to either the '135 or '179 Patents will apply equally to the other.

a.  *Overview of Prosecution of the '135 and '179 Patents*

93. During prosecution of the '135 Patent, on November 11, 2010, the patent examiner rejected then pending claims 1-20 under 35 U. S. C. § 101 as being directed to non-patentable subject matter and under 35 U. S. C. § 103(a) as being unpatentable over U. S. Published Application No. 2004/0015547 ("Griffin") in view of U. S. Published Application No. 2001/0026231 ("Satoh").

94. On March 12, 2012, the applicant amended the claims and argued that these claims

were directed to patentable subject matter and that the cited combination of Griffin and Satoh did not render the claims, as amended, unpatentable.

95. With regard to the rejection under 35 U. S. C. § 101, applicants noted their response to the patent examiner's rejection that claim 1 was amended "to recite, in relevant part, 'providing …at least one of [a] plurality of character strings in [a] title array to a process executed by a processor.'" Similarly, the applicants pointed out that claim 11 was amended "to recite in relevant part, 'a means for providing … at least one of [a] plurality of character strings in [a] title array to a process executed by a processor.'"

96. With regard to the rejection under 35 U. S. C. § 103(a), applicants pointed out that neither Griffin nor Satoh, either alone or in combination, taught, suggested or rendered obvious "'associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device;…providing an alternative title based on the at least one of the plurality of character strings to the process; [and] using the alternative title as a tile in association with the process,' as recited in [amended] claim 1." The applicants further noted that conventional Griffin did not teach, suggest or render obvious "'means for associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device; … means for providing an alternative title based on the at least one of the plurality of character strings to the process; [and] means for using the alternative title as a title in association with the process,' as recited in [amended] claim 11. "

97. On May 24, 2012, the patent examiner issued a notice of allowance stating that "Examiner notes that applicant's arguments filed on 3/12/2012 are persuasive…."

98. The '179 Patent, which was filed on July 20, 2012, is a continuation of the '135

Patent. The examiner did not reject any of the as-filed claims and, on January 11, 2013, the examiner issued a notice of allowance.

     b.   *Overview of the Unconventional '135 and '179 Patented Inventions and the Conventional Technology at the Time*

   99. In December 2006, options for informing or alerting a user of a messaging system, including an instant messaging system, of an event or message were limited, restricted and/or intrusive. Ex. 5 at ¶ 108. For example, when a user received a new event notification (for example, that the user had received a new message), the user was conventionally alerted by the system generating a noise, opening a pop-up window or using highlighted or blinking text. '135/5:30-38; Ex. 5 at ¶ 108. In addition, certain devices, such as mobile devices, had limited notification capabilities for notifying a user of an event or message. '135/5:20-38; Ex. 5 at ¶ 108. Generating noises, pop-up windows or using text effects, such as blinking, could be distracting or intrusive for the user. Ex. 5 at ¶ 108.

   100.   In addition, these conventional methods for providing event notifications (for example, noises and distracting text effects), could provide only a limited amount of information about a particular event. Ex. 5 at ¶ 109. For example, a sound could notify the user of an event but would not provide any details about the event (for example, whether there was a single event or multiple events, who a message was from, etc.). Ex. 5 at ¶ 109. Because of the limited information conveyed by conventional notification capabilities, a user was required to switch to a different application or window to determine the specific nature and/or details of the event (such as determining the number of new messages or the identity of the person sending the message), thereby interrupting the work or task of the user. Ex. 5 at ¶ 109. Further, pop-up windows (to the extent the user's system or device was even capable of using or configured to use a pop-up window) and flashing text could be distracting and/or intrusive to the user and may only have a limited duration. Ex. 5 at ¶ 109. Lastly over time multiple events could arrive over a short period

of time that would require informing a user. Ex. 5 at ¶ 109. Changing the message immediately only when the event arrived, limited the chance to inform the user of the new event. Ex. 5 at ¶ 109.

101.    Including text in the titlebar or taskbar was known. Ex. 5 at ¶ 110. However, in December 2006, the text included in the titlebar was limited to a single string of characters, for example, to identify the state of the browser or application (for example, the website the user was accessing or the name of the application). '135/7:3-11; Ex. 5 at ¶ 110. Certain applications could also indicate, for example, that a new message had been received through the use of an icon in the titlebar. '135 File History (March 12, 2012 response); Ex. 5 at ¶ 110. However, including as described by the *Griffin* reference cited by the patent examiner during prosecution of the '135 Patent, such applications were limited to a single line of text and used only a single icon to provide an event notification. '135 File History (March 12, 2012 response); Ex. 5 at ¶ 110.

102.    Further, in December 2006, different user devices provided different functionality, including related to event notification and also imposed different types of restrictions for event notification. '135/5:20-27; Ex. 5 at ¶ 111. For example, a desktop computer may not have been capable of producing a sound for notification. Ex. 5 at ¶ 111. Certain devices and applications on those devices had inferior capabilities, including the inability to open a pop-up windows or flashing windows. '135/5:54-63; Ex. 5 at ¶ 111. Even where such functionality was available, it could require technical or complicated configuration changes (for example, to the browser), for which the user may not have the ability or permissions to accomplish. Ex. 5 at ¶ 111.

103.    The user's environment could also impose limitations on the type of acceptable event notifications. Ex. 5 at ¶ 112. For example, a user may not want distracting noises or pop-up windows while using certain applications or at work. '135/5:30-32; Ex. 5 at ¶ 112. A user that

receives many messages may not want frequently repeated noises or pop-up windows or other distracting notifications. '135/5:34-36; Ex. 5 at ¶ 112.

104.    Providing notifications serially and/or rotating through event notifications by sending and resending events over time from a server – as opposed to including event notifications in an array that comprises multiple notifications (for example, a character string comprising a title and a character string comprising an alternative title) – results in increased bandwidth usage and usage of system resources because the same notification is sent multiple times and that the server has to keep track of what is currently being displayed in the titlebar so it knows when to send these redundant change notices. Ex. 5 at ¶ 113. The claimed inventions of the '135 and '179 Patents improve the functionality, visual effectiveness and efficiency of event notification systems as described herein by eliminating the need to send and resend notifications including by providing for the use of an array as described in the '135 Patent, '179 Patent and herein. Ex. 5 at ¶ 113.

105.    The "SUMMARY" section of the '135 and '179 Patents states, in part, as follows:

> A technique for user notification involves modifying a title associated with a process to include information about an event that calls for user notification. A method according to the technique may include running a process, such as, by way of example but not limitation, an IM client process, a browser, or some other process that has a title associated therewith. The method may further include processing an event, such as by way of example but not limitation, a new mail event, a new instant message event, a reminder event, a calendar event, or some other event, and generating a string of characters that includes information associated with the event. The method may further include displaying the string of characters as a title associated with the process. A system constructed according to the technique may include a client, a title array, an event processing engine, and a title provisioning engine.

'135/1:62-2:9; Ex. 5 at ¶ 114.

106.    With reference to the embodiment shown in Figure 7 (which shows a flowchart of an example of a method for displaying programmed text titles; '135/2:28-29), in module 702 an event that calls for user notification is processed. '135/9:18-19; Ex. 5 at ¶ 115.

107.    At module 704, a first string of characters associated with the event is generated. '135/9:23-24; Ex. 5 at ¶ 116. At this point, there may or may not be a second, third, etc. string of characters associated with the event generated, as well. '135/9:24-26; Ex. 5 at ¶ 116.

108.    At module 706, the first string of characters is stored in an array, which may also include other stings of characters associated with other events, or the first string of characters (and second, third, etc. string of characters) associated with the event may replace all current characters strings of the array. '135/9:27-32; Ex. 5 at ¶ 117.

109.    At module 708, the first string of characters is provided from the array to a process that may include an IM client operating in a Windows® environment. '135/9:33-37; Ex. 5 at ¶ 118. Alternatively, the first string of characters could be provided to replace the title of a browser with the title associated with the event. '135/1:64-67; 7:17-23; Ex. 5 at ¶ 118.

110.    At module 710, the first string of characters is used as a title in association with the process. '135/9:38-40; Ex. 5 at ¶ 119.

111.    At module 712, a second string of characters is provided from the array to the process. '135/9:50-51; Ex. 5 at ¶ 120. The second string of characters could be associated with the same event as the first string of characters, an earlier event (where the second string remains in the array), or a later event (where the second string replaces or is in addition to strings associated with the last processed event). '135/9:51-56; Ex. 5 at ¶ 120. The second string of characters could also be unassociated with an event. '135/9:56-57; Ex. 5 at ¶ 120.

112.    At module 714, the second string of characters is used as a title in association with the process. '135/9:61-62; Ex. 5 at ¶ 121.

113.    With reference to the embodiment shown at Figure 5, at 502, a browser is opened. '135/7:1-2; Ex. 5 at ¶ 122. Next, at 504, a title associated with the state of the browser is displayed in association with the browser. '135/7:3-4; Ex. 5 at ¶ 122. The state of the browser

may include, for example, a current site for which the browser is displaying a page, as is shown in Figures 3A and 3C. '135/7:5-7; Ex. 5 at ¶ 122.

114.    At module 506, an event trigger is received. '135/7:12-13; Ex. 5 at ¶ 123. The event trigger is associated with an event that calls for notifying a user. '135/7:13-15; Ex. 5 at ¶ 123. For example, the event trigger may include receipt of a new instant message. '135/7:15-16; Ex. 5 at ¶ 123.

115.    At module 508, a title associated with the event is displayed in association with the browser. '135/7:17-19; Ex. 5 at ¶ 124. Thus, the title associated with the state of the browser is replaced by the title associated with the event. '135/7:19-21; Ex. 5 at ¶ 124.

116.    Next, at module 510, it is determined whether to close the browser. '135/7:24-26; Ex. 5 at ¶ 125. If the browser is not to be closed (510-N), then the flowchart 500 continues to decision point 512 where it is determined whether to continue to display the title associated with the event. '135/7:26-29; Ex. 5 at ¶ 125. If so (512-Y), then the flowchart 500 loops back to module 508, as described previously. '135/7:29-30; Ex. 5 at ¶ 125. If not (512-N), then the flowchart 500 loops back to module 504, as described previously. '135/7:30-32; Ex. 5 at ¶ 125.

117.    With reference to the embodiment shown at Figure 6, an event received on the interface 612 (from either the input device 602 or the network 604) is provided to the event processing engine 614 for processing. '135/8:4-6; Ex. 5 at ¶ 126.

118.    Advantageously, data associated with the event can also (or in the alternative) be provided to the title provisioning engine 616. '135/8:11-13; Ex. 5 at ¶ 127. The title provisioning engine 616 inputs title strings, which are strings of characters, to the title array 618. '135/8:14-16; Ex. 5 at ¶ 127. The title array 618 includes N−1 title array strings, embodied in a computer-readable medium, which are referenced (for illustrative purposes) as title array string [0] to title array string [N]. '135/8:16-19; Ex. 5 at ¶ 127.

119.    A given event may cause the title provisioning engine 616 to rewrite the entire title array 618 with title strings associated with the most recent events. '135/8:20-22; Ex. 5 at ¶ 128. Alternatively, a given event may cause the title provisioning engine 616 to append title strings to the end of the title array 618. '135/8:22-24; Ex. 5 at ¶ 128. In one embodiment, the title provisioning engine 616 updates the current title array 618 by adding new data associated with an event, excluding redundant data (for example, data that is already represented in the title array 618). '135/8:24-28; Ex. 5 at ¶ 128.

120.    The multiplexer 620 selects one of the title array strings for provisioning to the client 622. '135/8:29-30; Ex. 5 at ¶ 129. The multiplexer 620 receives a control signal from the title provisioning engine 616 to accomplish this task. '135/8:30-32; Ex. 5 at ¶ 129.

121.    Including as noted above, the patent specification teaches specifically how the technology improvement of the event notification systems and methods of the '135 and '179 Patents is achieved. Ex. 5 at ¶ 130. Among other innovations, the invention is able to provide to a process (such as a browser), via a title array (for example, 706), a character string associated with an event (for example, 704) for display in a titlebar or taskbar and an alternative title (for example, 712, 714) for display in a taskbar or titlebar. Ex. 5 at ¶ 130. Further, the disclosed algorithms do not display a title in the titlebar or taskbar that identifies the state of the browser or application but rather provide character strings related to a received event. Ex. 5 at ¶ 130. Thus, the invention details how the improved event notification systems and methods can be realized and how its functionality can be accomplished. Ex. 5 at ¶ 130. The patent claims recite how to implement the improved event notification systems and methods. Ex. 5 at ¶ 130. Furthermore, the claims require a non-conventional and non-generic method in order to allow for the system to provide an event notification comprising a title array for provisioning for display in a titlebar or taskbar comprising a plurality of character strings, including where at least one of the character

strings provides an alternative title. Ex. 5 at ¶ 130. Thus, the patents describe an application specific order of steps for use in a system that is not a generic or conventional arrangement. Ex. 5 at ¶ 130.

122.    For example, as set forth above with regard Figure 7, the steps are performed in a relative order:



FIG. 7

Ex. 5 at ¶ 131.

123.    The claimed inventions of the '135 and '179 Patents have advantages including that they allow a user to be notified of an event through use of the taskbar or titlebar thereby providing a more effective and less intrusive notification. '135/35-38; Ex. 5 at ¶ 132.

124.    Another advantage of the '135 and '179 claimed inventions is that they permit the user to view notifications in the titlebar or taskbar without having to leave the window or application in which the user is working. '135/7:41-52; Ex. 5 at ¶ 133. Further, in the case of a messaging application, for example, providing an event notification in the titlebar or taskbar may

cause it to stand out from other applications the user may have open at the time. '135/6:13-16; Ex. 5 at ¶ 133.

125.   The claimed inventions of the '135 and '179 Patents have the additional advantage that they use an array to provide a title and an alternative title for the titlebar or taskbar. '135/Claims 1 & 11; 8:11-28; '179/Claims 1 & 11; 8:15-32; Ex. 5 at ¶ 134. The use of an array to provide a title and alternative title is advantageous, including because it can provide more information to the user such as the number of messages a user has received (for example in a first title character string) and the identities of the people that sent unviewed message (for example, in a second title character string). '135/9:1-15; Ex. 5 at ¶ 134. Further, through the use of an array (including comprising a plurality of character strings), multiple event notifications may be presented to the user, for example, such that a prior event notification (if it remains in the array) may continue to be shown to the user even though additional notifications or information may be included as character strings in the array. Ex. 5 at ¶ 134. In this way, event notifications may be maintained (and not discarded or lost) when a new notification arrives. '135/8:20-28; Ex. 5 at ¶ 134. Additionally, new event notifications would not need to be maintained at the server, for example, awaiting transmission and/or display to the user or acknowledgement of the earlier notification. Ex. 5 at ¶ 134.

126.   Further advantages of the claimed inventions of the '135 and '179 Patents include the use of a title array, including with a plurality of character strings and including an alternative title, can provide more information to the user including by cycling through the character strings in the title array. Ex. 5 at ¶ 135. In this way, if a user receives messages from multiple senders, for example, the identities of the senders may be included in the character strings in the array and displayed or scrolled through the taskbar or titlebar thereby providing additional information about an event or set of events. Ex. 5 at ¶ 135. Further, the title array allows previous event

notifications to remain available for display (for example, by leaving the associated character string(s) in the array) so that event notification information is not lost at the user's device when a new event notification is received. Ex. 5 at ¶ 135. In this way, the user does not have to constantly monitor the titlebar or taskbar, thus making the event notifications even less intrusive or distracting. Ex. 5 at ¶ 135. This has the further advantage that event notifications do not have to be maintained at the server. Ex. 5 at ¶ 135. Further, the claimed inventions of the '135 and '179 Patents may time multiplex the display of notifications onto the limited screen space titlebar/taskbar through the use of an array because it increases the information content related to event notifications available through that screen space over time without requiring additional resources from the server. Ex. 5 at ¶ 135.

127.    An additional advantage of the '135 and '179 claimed inventions is displaying event notifications in the taskbar, including as described herein. Ex. 5 at ¶ 136. When displayed in the taskbar (including as opposed to display in a titlebar), the notifications may remain visible to the user even when the user is in another application or when the user's browser, for example, is minimized and the titlebar may not be visible. Ex. 5 at ¶ 136.

128.    At the time of the '135 and '179 patented inventions, it was not known or conventional to provide an event notification in a titlebar or taskbar using an array, including to provide an alternative title. Ex. 5 at ¶ 137.

129.    Although the text in a titlebar or taskbar could be changed (for example, to show the name of a website or application), the use of an array to provide both a title and an alternative title, is more efficient, including at the network/server level (for example, it would require less processing and less network bandwidth) than conventional titlebar provisioning techniques. Ex. 5 at ¶ 138.

130.    The use of an array to provide a plurality of character strings for provisioning for

45

display in a titlebar or taskbar permits the system to provide more information to a user about an event or multiple events as opposed to the single, static titles used in conventional titlebar provisioning techniques. Ex. 5 at ¶ 139.

### 2. The '135 and '179 Claims are not Directed to an Abstract Idea.

131.    The claims of the '135 and '179 Patents neither describe nor claim a concept nor a generic method or computerized system. Ex. 5 at ¶ 140. Instead, the '135 and '179 claims address, among other things, a persistent problem with messaging systems at the time of the invention whereby event notifications were distracting, intrusive, limited by the functionality of the user's device and/or system and did not typically or conventionally provide information related to a specific event. '135/5:30-38; Ex. 5 at ¶ 140. The patented inventions enable a substantial improvement in messaging systems, including their effectiveness, functionality, and utility. Ex. 5 at ¶ 140.

132.    Prior to the invention, event notifications typically involved the use of intrusive and/or distracting pop-up windows or sounds, or the use of intrusive and/or distracting text effects on the titlebar (for example, blinking or flashing text) for providing event notification. '135/5:20-38; Ex. 5 at ¶ 141. Additionally, and as described above, these event notifications did not provide the user with very much information about the event itself or if they did pop-up with a separate notification window they were too distracting to the user, rather they were directed to simply notifying the user an event had occurred. Ex. 5 at ¶ 141.

133.    The claimed inventions of the '135 Patent provide a particular method and system for event notification that require, for example, "associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device" which specifies how an event notification is provided and the specific data structure used to accomplish it. '135/Claim 1;

Ex. 5 at ¶ 142. The particular methods and systems further require "providing the at least one of the plurality of character strings in the title array to a process executed by a processor" which specifies the information that can be provided for display. '135/Claim 1; Ex. 5 at ¶ 142. The particular method and systems also require "providing an alternative title based on the at least one of the plurality of character strings to the process" and "using the alternative title as a title in association with the process" which further specifies additional information that may be provided for display and how such additional information is provided. '135/Claim 1; Ex. 5 at ¶ 142. These limitations disclose a particular way in which an event notification can be displayed, including the specific information to be displayed and the data structure used to provide the information – as opposed to using conventional methods to display event notifications such as those described in the '135 Patent and herein. Ex. 5 at ¶ 142.

134.    The claimed inventions of the '179 Patent provide a particular method and system for event notification that require, for example, "generating an event notification for the event" and "storing the event notification in an array" which specifies how an event notification is provided and the specific data structure used to accomplish it. '179/Claim 1; Ex. 5 at ¶ 143. The particular methods and systems further require "using the event notification as a title in association with the process" which specifies the information that can be provided for display. '179/Claim 1; Ex. 5 at ¶ 143. The particular method and systems also require "providing an alternative title from the array to the process" and "using the alternative title as a title in association with the process" which further specifies additional information that may be provided for display. '179/Claim 1; Ex. 5 at ¶ 143. These limitations disclose a particular way in which an event notification can be displayed, including the specific information to be displayed and the data structure used to provide the information – as opposed to using conventional methods to display event notifications such as those described in the '179 Patent and herein. Ex. 5 at ¶ 143.

a. *The '135 and '179 Claims are Directed to Innovative Computer- and Network-Based Systems and Methods.*

135.    None of the elements that comprise the claimed system or that are described in the claims method are abstract. Ex. 5 at ¶ 144. Including as described herein and in the '135 and '179 Patents, the computer, event processing engine, title provisioning engine and interfaces are physical or tangible things known to a POSITA in light of the specification; and in view of the technological solutions and unconventionality noted herein. Ex. 5 at ¶ 144.

136.    As exemplified by claim 1, the subject claims of the '135 Patent are directed to:

1. A method comprising:
    receiving information of an event that calls for user notification;
    generating an event notification for the event;
    associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device;
    providing the at least one of the plurality of character strings in the title array to a process executed by a processor;
    providing an alternative title based on the at least one of the plurality of character strings to the process;
    using the alternative title as a title in association with the process.

'135/Claim 1; Ex. 5 at ¶ 145.

137.    As exemplified by claim 11, the subject claims of the '135 Patent are directed to:

11. A system comprising:
    a means for receiving information of an event that calls for user notification;
    a means for generating an event notification for the event;
    a means for associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device;
    a means for providing the at least one of the plurality of character strings in the title array to a process executed by a processor;
    a means for providing an alternative title based-on the at least one of the plurality of character strings to the process;
    a means for using the alternative title as a title in association with the process.

'135/Claim 11; Ex. 5 at ¶ 146.

138.    As exemplified by claim 1, the subject claims of the '179 Patent are directed to:

1. A method comprising:
    processing an event that calls for user notification;
    generating an event notification for the event;
    storing the event notification in an array;
    providing the event notification from the array to a process executed by a
        processor;
    using the event notification as a title in association with the process;
    providing an alternative title from the array to the process;
    using the alternative title as a title in association with the process.

'179/Claim 1; Ex. 5 at ¶ 147.

139.    As exemplified by claim 11, the subject claims of the '179 Patent are directed to:

11. A system comprising:
    a means for processing an event that calls for user notification;
    a means for generating an event notification for the event;
    a means for storing the event notification in an array;
    a means for providing the event notification from the array to a process;
    a means for using the event notification as a title in association with the
        process;
    a means for providing an alternative title from the array to the process;
    a means for using the alternative title as a title in association with the
        process.

'179/Claim 11; Ex. 5 at ¶ 148.

140.    Claim 1 of the '135 Patent, quoted above, is exemplary. Ex. 5 at ¶ 149. A POSITA would understand that the language of the '135 and '179 claims is not directed merely to a method of providing a generic or conventional event notification to a user. Ex. 5 at ¶ 149. Rather, they comprise the aspects noted herein which provided inventive, technological solutions to the problems faced by the inventors. Ex. 5 at ¶ 149. None of the elements that comprise the claimed device are abstract, as all of the computer, event processing engine, title provisioning engine and interfaces are physical or tangible things known to a POSITA in light of the specification; and in view of the technological solutions and unconventionality noted herein. Ex. 5 at ¶ 149.

b.   *The '135 and '179 Claimed Inventions Could not be Done Manually or in One's Head.*

141.   A POSITA would understand that the claimed solutions could not be done manually including because they necessarily require implementation via a computer processor including to receive and process event notifications, associating the event notification with at least one of a plurality of character strings in a title array, providing character strings to a process executed by a processor, a display device including a titlebar or taskbar ('135/Claim 1); a means for receiving information of an event that calls for user notification; a means for generating an event notification for the event; a means for associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device; a means for providing the at least one of the plurality of character strings in the title array to a process executed by a processor; a means for providing an alternative title based-on the at least one of the plurality of character strings to the process; a means for using the alternative title as a title in association with the process ('135/Claim 11); to process an event, generate an event notification, store the event notification in an array, provide the event notification to a process executed by a processor ('179 Patent/Claim 1); and/or a means for processing an event that calls for user notification; a means for generating an event notification for the event; a means for storing the event notification in an array; a means for providing the event notification from the array to a process; a means for using the event notification as a title in association with the process; a means for providing an alternative title from the array to the process; a means for using the alternative title as a title in association with the process ('179/Claim 11). Ex. 5 at ¶ 150. Nor can they be performed in a person's head. Ex. 5 at ¶ 150.

3. **The '135 and '179 Claimed Inventions Provide Innovative, Unconventional Concepts and Technological Solutions.**

a. *The '135 Claimed Inventions Provide Technological Solutions To Technological Problems.*

142.    The technical problems addressed by the '135 and '179 Patents include those noted herein, including intrusive and/or distracting pop-up windows or sounds and the use of distracting text effects (for example, blinking or flashing windows) for providing event notification, as well as the inability of certain devices or applications to provide the certain notifications due to technical limitations, for example, no sound, or a need to configure an application or device which might be difficult for a user or beyond his or her abilities or permissions. '135/5:30-38; Ex. 5 at ¶ 151. Conventional event notification methods, such as those described herein, were also limited in the amount of information they could provide about an event. Ex. 5 at ¶ 151. For example, the user may be notified by a sound that an event had occurred, but would have no information about the specific nature of that event (for example, if a new message had been received or who the message was from). Ex. 5 at ¶ 151. Conventional methods further required the user to check the window and/or application to determine whether there is a relevant event (such as a message from a relevant person). '135/7:42-52; Ex. 5 at ¶ 151. Further, titlebar/taskbar messaging that did exist was limited in information bandwidth that it provided based on the prior art by not having a means to time multiplex the screen area the title and taskbar took up. Ex. 5 at ¶ 151.

143. Technical solutions provided by the claimed inventions of the '135 Patent and '179 Patent to technical problems faced include associating an event notification with a plurality of character strings in a title array, providing a character string from the array to the event notification process, such as an instant messaging application or browser and providing an alternative title from the title array to the event notification process. Ex. 5 at ¶ 152. Technical

solutions provided by the claimed inventions of the '135 and '179 Patents further include providing improved and more effective user notification methods that make it easier and more efficient for users to visualize and navigate through multiple notifications; providing for more efficient, uninterrupted and less bandwidth dependent handling of notifications locally by the browser; including, for example, by providing a title array comprising a plurality of character strings for display in a titlebar or taskbar of a display device and further including providing an alternative title from the title array. '135/5:20-38; 5/54-62; Ex. 5 at ¶ 152.

b. *The '135 and '179 Claimed Inventions Provide Unconventional Solutions.*

144. Including as noted herein, what was conventional at the time comprised notifying a user of an event with a pop-up window or noise, or the use of distracting flashing windows and/or text effects on the titlebar. '135/5:30-38; Ex. 5 at ¶ 153. It was also conventional to provide, for example, a single icon on the titlebar or taskbar to indicate an event, including as shown in the *Griffin* reference described herein. Ex. 5 at ¶ 153. For example, as described in the file history of the '135 Patent. Ex. 5 at ¶ 153. '135 File History (March 12, 2012 response). Ex. 5 at ¶ 153. However, a user at work may not want to play a noise or have a popup window show up every time a message is received. '135/5:31-32; Ex. 5 at ¶ 153. Further, a user may want or benefit from more subtle and information notifications, including, for example, without having to stop her other activities to close pop-up windows. Ex. 5 at ¶ 153. In addition, the user's device may lack functionality to provide conventional event notifications, for example, sounds or pop-up windows. Ex. 5 at ¶ 153.

145. Unconventional solutions provided by the claimed inventions of the '135 and '179 Patents include at least providing an event notification in the titlebar or taskbar including through the use of an array comprising a plurality of character strings and including an alternative title. Ex. 5 at ¶ 154.

146. At the time of the '135 and '179 claimed inventions, it was not conventional to provide event notifications, including through the use of an array and including an alternative title, in the titlebar or taskbar. Ex. 5 at ¶ 155.

    c.     *The '135 and '179 Claimed Inventions Provide Substantial Benefits.*

147. An advantage of notifying a user of an event in a titlebar or taskbar (including as opposed to using a sound or pop-up window) is that it provides a more effective, higher information content over time, and subtle notification to the user, for example, no frequent and/or intrusive ping-sound or pop-up windows. '135/5:20-38; 5:54-63; Ex. 5 at ¶ 156. As set forth above, the specification of the '135 and '179 Patents states that "a user at work may not want to play a noise or have a popup window show up every time a message is received." '135/5:31-32; Ex. 5 at ¶ 156.

148. The claimed inventions of the '135 and '179 Patents permit a user to receive more effective (for example, by conveying a greater amount of information) event notifications in the titlebar or taskbar without having to stop or interrupt other activities and also eliminates distracting notifications such as from noises or, for example, distracting text or visual effects such as blinking of the titlebar, taskbar or window. Ex. 5 at ¶ 157. Furthermore by time multiplexing the titlebar/taskbar space more information content can be shown over time. Ex. 5 at ¶ 157.

149. The claimed inventions of the '135 and '179 Patents provide additional information to the user, including by providing notifications in the title bar (for example, with a string of characters which may be used to indicate the number of messages a user has received and/or the identity of a person sending a message to the user) and including by providing an alternative title. Ex. 5 at ¶ 158.

150. Further, the use of an array comprising a plurality of character strings related to an

event for display in a titlebar or taskbar provides a user with more detailed information about a particular event in a less intrusive and/or distracting way. Ex. 5 at ¶ 159. For example, a character string displayed in a titlebar may include information about the number of messages a user has received and an alternative title may provide additional information about the identity of the sender of a message. Ex. 5 at ¶ 159. In this way, the user may be able to determine whether the event requires an immediate response or is of particular importance without having to stop the user's current task and/or without having to switch to another window or application to determine whether the event is of particular importance. Ex. 5 at ¶ 159.

     d.   *The '135 and '179 Claimed Inventions Provide Inventive Solutions.*

151. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '135 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device" including based on an event notification and including in combination with the other claim elements of the '135 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 160.

152. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '135 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "providing the at least one of the plurality of character strings in the title array to a process executed by a processor" including in combination with the other claim elements of the '135 Patent as a whole is an inventive technological solution, including in view of the benefits

and unconventional solution this involves and contributes to. Ex. 5 at ¶ 161.

153. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '135 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "providing an alternative title based on the at least one of the plurality of character strings to the process" including in combination with the other claim elements of the '135 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 162.

154. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '135 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "using the alternative title as a title in association with the process" including in combination with the other claim elements of the '135 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 163.

155. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '179 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "providing the event notification from the array to a process executed by a processor" including in combination with the other claim elements of the '179 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 164.

156. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of

the '179 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "using the event notification as a title in association with the process" including in combination with the other claim elements of the '179 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 165.

157. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '179 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "providing an alternative title from the array to the process" including in combination with the other claim elements of the '179 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 166.

158. Consistent with the above discussion, including the problems solved that had been faced by conventional messaging systems and event notification, and further in consideration of the '179 Patent specification, the prosecution history and cited prior art, a POSITA would understand that "using the alternative title as a title in association with the process" including in combination with the other claim elements of the '179 Patent as a whole is an inventive technological solution, including in view of the benefits and unconventional solution this involves and contributes to. Ex. 5 at ¶ 167.

159. The avoidance of intrusive or distracting pop-windows, noises or text effects was unconventional and inventive. Ex. 5 at ¶ 168. Further, the use of an array to provide a string of characters for display in a titlebar or taskbar as well as an alternative title for display in a taskbar or titlebar was inventive. Ex. 5 at ¶ 168.

**D.  The Claims of the Patents-in-Suit do not Unreasonably Preempt their Respective Fields.**

160. Including as noted herein, the '395 Patent and '453 Patent do not claim merely the abstract idea of "aggregating contact lists" that provides no inventive concept. Ex. 5 at ¶ 169. Instead, the '395 Patent and '453 Patent claim specific methods and systems for contact aggregation, including from a first and second messaging system and/or by a high-level network from a plurality of low-level networks (for example, messaging services), including via a contact aggregation engine that controls a network login engine to facilitate login to the low-level networks to update the contact database with contact information from the low-level networks and wherein an aggregated contact list is maintained or stored at the network contacts database (including as described in detail herein) where infringement of the patent claims can be readily avoided while still practicing the alleged abstract idea proposed by LinkedIn, given that the patent claims do not read on the alleged abstract idea. Ex. 5 at ¶ 169. Indeed, the claims of these patents do not aggregate contacts as in the prior art but instead aggregate contacts by a high-level network from a plurality of low-level networks as discussed extensively herein. Ex. 5 at ¶ 169.

161.  For example, "aggregating contact lists" may be practiced outside of the limited scope of the patent claims at least by:

    a.  The use of a system such as that described in the Kaplan reference (U.S. Patent No. 7,496,379), cited by the patent examiner;

    b.  The use of locally stored contacts, including those maintained for each of the user's messaging systems;

    c.  The use of proprietary and/or non-standardized contact files which can be combined by the user; or

    d.  The use of a single messaging system maintained locally at the user's device.

Ex. 5 at ¶ 170.

162.  Including as noted herein, the '135 Patent and '179 Patent do not claim merely the abstract idea of "notifying a user of an event in the title of a display" that provides no inventive

concept. Ex. 5 at ¶ 171. Instead, the '135 Patent and '179 Patent claim highly specific combinations of event notification methods and systems including associating an event notification with a plurality of character strings in an array and providing an alternative title based on the plurality of characters strings (including as described in detail herein) where infringement of the patent claims can be readily avoided while still practicing the alleged abstract idea proposed by Defendants. Ex. 5 at ¶ 171.

163.   For example, "notifying a user of an event in the title of a display," may be practiced outside of the limited scope of the patent claims at least by:

a.   The use of a system such as that described in the Griffin reference (U.S. Publication No. 2004/0015547), cited by the patent examiner;

b.   The use of an audible sound or noise;

c.   The use of a pop-up window; or

d.   The use of intrusive or distracting flashing or text effects.

Ex. 5 at ¶ 172.

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 8,510,395

164.   Plaintiff is the owner of the '395 Patent and it has all substantial rights to the '395 Patent, including the right and standing to sue and recover damages for past, present, and future infringement of the patent.

165.   Claim 1 of the '395 Patent covers a system comprising "a network login engine; a network contacts database embodied in one or more non-transitory computer readable mediums; a web server coupled to the network contacts database; a contact aggregation engine coupled to the network login engine and the network contacts database; wherein, in operation, the contact aggregation engine: controls the network login engine to login or facilitate login to a first network associated with a first messaging service provider and a second network associated with a second messaging service provider, updates the networks contacts database with contact

information obtained from the first messaging service provider and the second messaging service provider, maintains an aggregated contact list that comprises a first contact list associated with the contact information from the first messaging service provider and a second contact list associated with the contact information from the second messaging service provider, stores the aggregated contact list in a non-transitory computer readable medium at the web server, and provides the aggregated contact list to a display device."

166.    Claim 7 of the '395 Patent covers a method comprising "joining a high level network; joining a first low level network associated with a first messaging service provider and a second low level network associated with a second messaging service provider; obtaining a first contact list associated with the first messaging service provider; obtaining a second contact list associated with the second messaging service provider; maintaining an aggregated contact [list] that comprises the first contact list and the second contact list; logging into the high level network; displaying the aggregated contact list."

167.    LinkedIn has infringed, and is now infringing, the '395 patent, including at least claims 1 and 7, in this judicial district and elsewhere, in violation of 35 U.S.C. § 271 through actions comprising the practicing, without authority from Plaintiff, systems and methods for obtaining and aggregating contact information from a plurality of messaging services providers via LinkedIn's LinkedIn Application system, including as claimed in the '395 asserted claims. On information and belief, LinkedIn practices the claimed methods and provides the claimed systems with and via its LinkedIn Application system comprising www.linkedin.com.

168.    Without limitation, the accused system comprising the LinkedIn Application system that comprises a network login engine, a network contacts database, a web server and a contact aggregation engine, wherein the contact aggregation controls the network login engine to controls the network login engine to login or facilitate login to a first network associated with a

first messaging service provider and a second network associated with a second messaging service provider, updates the networks contacts database with contact information obtained from the first messaging service provider and the second messaging service provider, maintains an aggregated contact list that comprises a first contact list associated with the contact information from the first messaging service provider and a second contact list associated with the contact information from the second messaging service provider, stores the aggregated contact list in a non-transitory computer readable medium at the web server, and provides the aggregated contact list to a display device.

169.    Without limitation and for example, the accused instrumentality comprising the LinkedIn Application system that practices said systems and methods to permit a user to login via the LinkedIn Application to a first and second messaging service provider, obtain a first contact list from the first messaging service provider and a second contact list from the second messaging service provider, and updating the network contacts.

170.    Further, the LinkedIn Application comprises systems and methods which permit a user to login via the LinkedIn Application to a first and second messaging service provider, obtain a first contact list from the first messaging service provider and a second contact list from the second messaging service provider, and update the network contacts.

171.    For example, the LinkedIn Application permits a user to join multiple networks associated with respective messaging service providers which interact with, *inter alia*, APIs of LinkedIn and the other networks:



*See, e.g.*, LinkedIn User Import Contacts page at https://www.linkedin.com/mynetwork/import-contacts/?transactionId=



*See,    e.g.*,    LinkedIn    User    Manage    Syncing    Settings    page    at https://www.linkedin.com/mynetwork/settings/manage-syncing/

**Contact and Calendar Information**

We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including sending invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.,* LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy

**Syncing Contacts from Other Address Books and Sources**

LinkedIn Contacts Manager can regularly synchronize your contacts from Google Calendar and Google Contacts. Learn more about the **privacy of the information you sync**.

**Note:** If you're syncing a company email account, make sure you're in compliance with your corporate IT security policy first.

To sync contacts:

1. Click the 🔗 **My Network** icon at the top of your LinkedIn homepage.
2. Click **Contacts** under **Manage my network** on the left rail.
3. Click 🔲 **Manage synced contacts** near the top right corner of the page.
4. Click **Sync** next to any source under the **Contacts** section to sync your contacts.

**Notes:**

- You will be prompted to login to the source account and give permission to process the sync.
- If you change your password for one of these sources, go back to this page and click **Change** to update it on LinkedIn.

To import a contacts file:

1. Click the 🔗 **My Network** icon at the top of your LinkedIn homepage.
2. Click **Contacts** under **Manage my network** on the left rail.
3. Click ➕ **Add more contacts** on the right rail.
   **Note:** You'll be redirected to a page where you can enter the source you want to import the contacts from.

**Note:** If you'd like to import a CSV file from a source that's not listed on the Contacts Settings page, import the file using the **Outlook Contacts CSV** option. This option is a workaround and may not work for all sources.

**Important:** Synced contacts are not automatically invited to connect with you on LinkedIn.

Learn more about **deleting imported contacts**, and why **old sources may be missing from the Contacts Syncing page**.

Last updated: 8 months ago

*See, e.g.,* LinkedIn Help – Syncing Contacts from Other Address Books and Sources at https://www.linkedin.com/help/linkedin/answer/1278

1.



*See,       e.g.,*       Google       Sign-In       Request       page       at https://accounts.google.com/o/oauth2/v2/auth/identifier?client_id=802926523257.apps.googleusercontent.com&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&scope= https%3A%2F%2Fwww.google.com%2Fm8%2Ffeeds%20profile%20email

172.     For example, the LinkedIn Application obtains a contact list from each of the user's said connected networks for aggregating, maintaining, and displaying:



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/



*See, e.g.,* User LinkedIn Manage Your Contacts page at https://www.linkedin.com/mynetwork/contacts/

### Viewing and Managing Your Email Contacts

If you've enabled address book syncing, we'll periodically import and store details about your address book contacts to suggest relevant contacts for you to connect with, to show you relevant updates, and for other uses explained in our **Privacy Policy**.

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See, e.g.,* LinkedIn Help – Viewing and Managing Your Email Contacts at https://www.linkedin.com/help/linkedin/answer/98247

### LinkedIn Contacts Manager - Overview

Bring together all the contacts from your address books, emails, calendars, and your LinkedIn network by using **LinkedIn Contacts Manager**. Collecting and storing all your contacts in one place will help to keep them up to date.

**Note:** Your **contacts and connections** aren't the same thing.

You can begin using LinkedIn Contacts Manager by **importing and inviting your email contacts**, **creating and uploading a contacts file**, and **syncing contacts from other sources**. Currently, you can only sync Google Calendar and Google Contacts, so **old sources may be missing**.

Once you've synced and imported your contacts, you can **delete specific contacts** to remove them from your LinkedIn Contacts Manager address book. If you've accidentally sent invitations to the contacts you imported, you can **withdraw the invitations**.

LinkedIn takes your privacy and the security of your data seriously. Learn more about the **privacy of your information in LinkedIn Contacts Manager**, and how you can **access your account data**.

Last updated: 7 months ago

*See, e.g.,* LinkedIn Help – LinkedIn Contacts Manager – Overview at https://www.linkedin.com/help/linkedin/answer/91972

173. The LinkedIn Application comprises a network login engine. For example, an engine for use by the user to log into the user's LinkedIn account and/or the user's social media

or other networks or, if the user does not presently have a LinkedIn account, they may create a new account:



*See, e.g.*, LinkedIn Login page at <u>https://www.linkedin.com/login</u>





# Welcome, IP!

Let's start your profile, connect to people you know, and engage with them
on topics you care about.

Country/Region *

City/District *

Next



Your profile helps you discover the
right people and opportunities

Most recent job title *

Attorney

Most recent company *

IP Lit

Industry *

Law Practice

There are 3527937 members in the same
industry on LinkedIn.

I'm a student

Continue



*See, e.g.*, LinkedIn Signup page at https://www.linkedin.com/signup/cold-join

174.    Further, the LinkedIn Application permits the user to login to a number of different networks, and the user may further connect said network to the user's LinkedIn account, which interacts with APIs of LinkedIn and these other networks and redirects the user to these other networks for signing in:



*See, e.g.*, LinkedIn User Import Contacts page at https://www.linkedin.com/mynetwork/import-contacts/?transactionId=

67



See,        *e.g.*,        LinkedIn        User        Manage        Syncing        page
https://www.linkedin.com/mynetwork/settings/manage-syncing/





*See,        e.g.,*        Google        Sign-In        Request        page        at
https://accounts.google.com/o/oauth2/v2/auth/identifier?client_id=802926523257.apps.googleus
ercontent.com&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&sc
ope= https%3A%2F%2Fwww.google.com%2Fm8%2Ffeeds%20profile%20email

175.    The LinkedIn application comprises a network contacts database embodied in one

or more non-transitory computer readable mediums. For example, the LinkedIn Application

comprises an address book comprising at least the user's LinkedIn contacts embodied in, for

example, a hard drive and/or other ROM and/or, at a minimum, RAM, for storing the user's

contact list in said database on LinkedIn's servers:

### LinkedIn Contacts Manager - Overview

Bring together all the contacts from your address books, emails, calendars, and your LinkedIn network by using **LinkedIn Contacts Manager**. Collecting and storing all your contacts in one place will help to keep them up to date.

**Note:** Your **contacts and connections** aren't the same thing.

You can begin using LinkedIn Contacts Manager by **importing and inviting your email contacts**, **creating and uploading a contacts file**, and **syncing contacts from other sources**. Currently, you can only sync Google Calendar and Google Contacts, so **old sources may be missing**.

Once you've synced and imported your contacts, you can **delete specific contacts** to remove them from your **LinkedIn Contacts Manager address book**. If you've accidentally sent invitations to the contacts you imported, you can **withdraw the invitations**.

LinkedIn takes your privacy and the security of your data seriously. Learn more about the **privacy of your information in LinkedIn Contacts Manager**, and how you can **access your account data**.

Last updated: 7 months ago

*See,    e.g.,*    LinkedIn    Help    –    LinkedIn    Contacts    Manager    –    Overview    at

https://www.linkedin.com/help/linkedin/answer/91972

### Viewing and Managing Your Email Contacts

If you've enabled address book syncing, we'll periodically import and store details about your address book contacts to suggest relevant contacts for you to connect with, to show you relevant updates, and for other uses explained in our **Privacy Policy**.

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See, e.g.*, LinkedIn Help – Viewing and Managing Your Email Contacts at https://www.linkedin.com/help/linkedin/answer/98247

### Contact and Calendar Information

We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.*, LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy

### Syncing Contacts from Other Address Books and Sources

**LinkedIn Contacts Manager** can regularly synchronize with your contacts from Google Calendar and Google Contacts. Learn more about the **privacy of the information you sync**.

**Note:** If you're syncing a company email account, make sure you're in compliance with your corporate IT security policy first.

To sync contacts:

1. Click the 👥 **My Network** icon at the top of your LinkedIn homepage.
2. Click **Contacts** under **Manage my network** on the left rail.
3. Click ▯▯ **Manage synced contacts** near the top right corner of the page.
4. Click **Sync** next to any source under the **Contacts** section to sync your contacts.

   **Notes:**
   - You will be prompted to login to the source account and give permission to process the sync.
   - If you change your password for one of these sources, go back to this page and click **Change** to update it on LinkedIn.

To import a contacts file:

1. Click the 👥 **My Network** icon at the top of your LinkedIn homepage.
2. Click **Contacts** under **Manage my network** on the left rail.
3. Click ➕ **Add more contacts** on the right rail.
   **Note:** You'll be redirected to a page where you can enter the source you want to import the contacts from.

**Note:** If you'd like to import a CSV file from a source that's not listed on the Contacts Settings page, import the file using the **Outlook Contacts CSV** option. This option is a workaround and may not work for all sources.

**Important:** Synced contacts are not automatically invited to connect with you on LinkedIn.

Learn more about **deleting imported contacts**, and why **old sources may be missing from the Contacts Syncing** page.

Last updated: 8 months ago

*See, e.g.*, LinkedIn Help – Syncing Contacts from Other Address Books and Sources at https://www.linkedin.com/help/linkedin/answer/1278



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/



*See, e.g.*, LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

   176. The LinkedIn Application comprises a web server coupled to the network contacts database. For example, the LinkedIn Application comprises a web server connected to the LinkedIn contact database:





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com

177.    The LinkedIn Application comprises a contact aggregation engine coupled to the network login engine and the network contacts database. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager which permits LinkedIn's servers to aggregate the user's contacts and is coupled to the LinkedIn login engine and to the storage medium comprising the user's LinkedIn contacts:

### LinkedIn Contacts Manager - Overview

Bring together all the contacts from your address books, emails, calendars, and your LinkedIn network by using LinkedIn Contacts Manager. Collecting and storing all your contacts in one place will help to keep them up to date.

**Note**: Your contacts and connections aren't the same thing.

You can begin using LinkedIn Contacts Manager by importing and inviting your email contacts, creating and uploading a contacts file, and syncing contacts from other sources. Currently, you can only sync Google Calendar and Google Contacts, so old sources may be missing.

Once you've synced and imported your contacts, you can delete specific contacts to remove them from your LinkedIn Contacts Manager address book. If you've accidentally sent invitations to the contacts you imported, you can withdraw the invitations.

LinkedIn takes your privacy and the security of your data seriously. Learn more about the privacy of your information in LinkedIn Contacts Manager, and how you can access your account data.

Last updated: 7 months ago

*See, e.g.*, LinkedIn Help – LinkedIn Contacts Manager – Overview at https://www.linkedin.com/help/linkedin/answer/91972

### Viewing and Managing Your Email Contacts

If you've enabled address book syncing, we'll periodically import and store details about your address book contacts to suggest relevant contacts for you to connect with, to show you relevant updates, and for other uses explained in our Privacy Policy.

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See, e.g.*, LinkedIn Help – Viewing and Managing Your Email Contacts at https://www.linkedin.com/help/linkedin/answer/98247

### Contact and Calendar Information

We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.*, LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy



*See, e.g.*, LinkedIn Help – Syncing Contacts from Other Address Books and Sources at
https://www.linkedin.com/help/linkedin/answer/1278





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com







*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

178.    In operation, the contact aggregation engine (*see* above) controls the network login engine to login or facilitate login to a first network associated with a first messaging service provider and a second network associated with a second messaging service provider. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including facilitating the user logging into and associating the user's various social media and/or other networks, including via APIs of LinkedIn and/or APIs of the user's social media and/or other networks:





*See, e.g.*, LinkedIn User Import Contacts page at https://www.linkedin.com/mynetwork/import-contacts/?transactionId=



*See,          e.g.*,          Google          Sign-In          Request          page          at https://accounts.google.com/o/oauth2/v2/auth/identifier?client_id=802926523257.apps.googleusercontent.com&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&scope= https%3A%2F%2Fwww.google.com%2Fm8%2Ffeeds%20profile%20email



*See, e.g.,* Yahoo! Sign-In Request page at
https://api.login.yahoo.com/oauth2/request_auth_fe?client_id=dj0yJmk9S0c3Y2RXVmw1RTQx
JmQ9WVdrOVlYWmxXbWxDTXpBbWNHbzlNQS0tJnM9Y29uc3VtZXJzZWNyZXQmeD02
MA--
&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&scope=openid%
20sdpp-w%20sdct-r&sec=true&response_type=code&state=5ef8e091-7714-423c-a57b-
f607710145fb&nonce=6612439201265914688&guccounter=1&guce_referrer=aHR0cHM6Ly9s
b2dpbi55YWhvby5jb20v&guce_referrer_sig=AQAAADx0ox5D1DZWYJqN1T31M8wjeY72W
Hnm5USj7t1-
994XN4dtTs9wXZPxbFnm9LuyM26LTbfNgpUgeh89NDgcnS2xsBPJoIiDu6onlExDhf7tsoQ-
EJKVkkqOu2ac4W3pj3P34o_G23xo8DLX4pMAqIKiP6olGZjJKhodFpcMc2yR

179. In operation, the contact aggregation engine (*see* above) updates the networks contacts database with contact information obtained from the first messaging service provider and the second messaging service provider. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including updating the networks contacts database with contact information obtained from the first messaging service provider and the second messaging service provider, including obtaining and importing the contacts of the first network onto LinkedIn's servers after

the user logs in to the first network and the contacts of the second network onto LinkedIn's servers after the user logs in to the second:



*See, e.g.*, LinkedIn Help – Syncing Contacts from Other Address Books and Sources at https://www.linkedin.com/help/linkedin/answer/1278





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

180. In operation, the contact aggregation engine (*see* above) maintains an aggregated contact list that comprises a first contact list associated with the contact information from the first messaging service provider and a second contact list associated with the contact information from the second messaging service provider, stores the aggregated contact list in a non-transitory computer readable medium at the web server, and provides the aggregated contact list to a display device. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including maintaining an aggregated contact list that comprises a first contact list associated with the contact information from the first messaging service provider and a second contact list associated with the contact information from the second messaging service provider, stores the aggregated contact list in a non-transitory computer readable medium at the web server, and provides the aggregated contact list to a display device:



**LinkedIn Contacts Manager - Overview**

Bring together all the contacts from your address books, emails, calendars, and your LinkedIn network by using **LinkedIn Contacts Manager**. Collecting and storing all your contacts in one place will help to keep them up to date.

**Note:** Your **contacts and connections** aren't the same thing.

You can begin using LinkedIn Contacts Manager by **importing and inviting your email contacts**, **creating and uploading a contacts file**, and **syncing contacts from other sources**. Currently, you can only sync Google Calendar and Google Contacts, so **old sources may be missing**.

Once you've synced and imported your contacts, you can **delete specific contacts** to remove them from your LinkedIn Contacts Manager address book. If you've accidentally sent invitations to the contacts you imported, you can **withdraw the invitations**.

LinkedIn takes your privacy and the security of your data seriously. Learn more about the **privacy of your information in LinkedIn Contacts Manager**, and how you can **access your account data**.

Last updated: 7 months ago

*See, e.g.*, LinkedIn Help – LinkedIn Contacts Manager – Overview at https://www.linkedin.com/help/linkedin/answer/91972

**Viewing and Managing Your Email Contacts**

If you've enabled address book syncing, we'll periodically import and store details about your address book contacts to suggest relevant contacts to connect with, to show you relevant updates, and for other uses explained in our **Privacy Policy.**

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See, e.g.,* LinkedIn Help – Viewing and Managing Your Email Contacts at https://www.linkedin.com/help/linkedin/answer/98247

**Contact and Calendar Information**

We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.,* LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy



*See, e.g.,* LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

181.   In operation, the contact aggregation engine (*see* above) stores the aggregated contact list in a non-transitory computer readable medium at the web server. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including storing the user's aggregated contact list on LinkedIn's servers:



*See, e.g.*, LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

    182.    In operation, the contact aggregation engine (*see* above) provides the aggregated contact list to a display device. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including providing the user's aggregated contact list stored on LinkedIn's servers to the user's device for display to the user:





*See, e.g.*, LinkedIn Login page at https://www.linkedin.com/login



*See, e.g.*, LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

183.    LinkedIn has directly infringed, and continues to directly infringe, the claims of the '395 Patent, including at least those noted above, including by making and using the LinkedIn Application in violation of 35 U.S.C. § 271(a). Further, including at least to the extent LinkedIn provides and/or supplies software running on a user's computer, the direct infringement of users that occurs in connection with LinkedIn's applications and/or web services occurs under the direction or control of LinkedIn.

184.    Additionally, or in the alternative, since receiving notice of the '395 patent, including if necessary from this suit, LinkedIn has induced, and continues to induce, infringement of the '395 Patent in this judicial district, and elsewhere, by actively inducing direct infringement of the '395 Patent, including by knowingly and actively aiding or abetting infringement by users, by and through at least instructing and encouraging the use of the LinkedIn products and software noted herein, including the LinkedIn Application system. Such aiding and abetting comprises providing software, web servers, and/or instructions regarding the use and/or operation of the LinkedIn Application system, applications, and web servers in an infringing manner. Such induced infringement has occurred since LinkedIn became aware of the '395 Patent, at a minimum, as noted above, and the knowledge and awareness that such actions by users comprise infringement of the '395 Patent.

185.    LinkedIn has had at least constructive notice of the '395 Patent since at least its issuance. LinkedIn will have been on actual notice of the '395 Patent since, at the latest, the service of this Complaint. By the time of trial, LinkedIn will have known and intended (since receiving such notice) that its continued actions would actively induce the infringement of the asserted claims of the '395 Patent.

186.    The LinkedIn Application system clearly meets the asserted claim limitations in their normal and expected usage. On information and belief, normal and expected usage of the LinkedIn Application system by customers and/or end users satisfies the claim limitations for direct infringement. Further, at minimum, the provision of products, systems and/or functionalities clearly capable of such infringing usage and/or provision of instructions/specifications for such infringing usage constitutes inducement of directly infringing usage.

187.    Further, as noted above, LinkedIn is being made aware of infringement of the

'395 Patent through use of the LinkedIn Application system at least via the infringement allegations set forth herein. Such direct and induced infringement has been and remains clear, unmistakable and inexcusable. On information and belief, LinkedIn knew or should have known of the clear, unmistakable and inexcusable direct and induced infringing conduct at least receiving notice of the '395 Patent. Thus, on information and belief, Defendants have, since receiving notice of the '395 Patent, specifically intended to induce direct infringement by customers and/or end users.

188.   EBT believes and contends that, at a minimum, LinkedIn's knowing and intentional post-suit continuance of its unjustified, clear, and inexcusable infringement of the '395 Patent since receiving notice of its infringement of the '395 Patent, is necessarily willful, wanton, malicious, in bad-faith, deliberate, conscious and wrongful, and it constitutes egregious conduct worthy of a finding of willful infringement. Accordingly, since at least receiving notice of this suit, LinkedIn has willfully infringed the '395 Patent.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 9,584,453

189.   Plaintiff is the owner of the '453 Patent and it has all substantial rights to the '453 Patent, including the right and standing to sue and recover damages for past, present, and future infringement of the patent.

190.   Claim 1 of the '453 Patent covers a system comprising "a network interface; a network login engine coupled to the network interface; a network contacts database embodied in one or more non-transitory computer-readable mediums; a server coupled to the network contacts database; a contact aggregation engine coupled to the network login engine and the network contacts database; wherein, in operation, the contact aggregation engine controls the network login engine to login or facilitate login to a plurality of low level networks associated with a plurality of messaging services through a high level network using the network interface

to access contact information from the plurality of messaging services, updates the networks contacts database based on the contact information associated with the plurality of low level networks to create an aggregated contact list, stores the aggregated contact list in a non-transitory computer-readable medium at the server, and provides the aggregated contact list including the contact information to a display device."

191.    LinkedIn has infringed, and is now infringing, the '453 patent, including at least claim 1, in this judicial district and elsewhere, in violation of 35 U.S.C. § 271 through actions comprising the practicing, without authority from Plaintiff, systems and methods for obtaining and aggregating contact information from a plurality of messaging services providers via LinkedIn's LinkedIn Application system, including as claimed in the '453 asserted claims. On information and belief, LinkedIn practices the claimed methods and provides the claimed systems with and via its LinkedIn Application system comprising www.linkedin.com.

192.    Without limitation, the accused system comprising the LinkedIn Application system comprises a network interface; a network login engine coupled to the network interface; a network contacts database embodied in one or more non-transitory computer-readable mediums; a server coupled to the network contacts database; a contact aggregation engine coupled to the network login engine and the network contacts database; wherein, in operation, the contact aggregation engine controls the network login engine to login or facilitate login to a plurality of low level networks associated with a plurality of messaging services through a high level network using the network interface to access contact information from the plurality of messaging services, updates the networks contacts database based on the contact information associated with the plurality of low level networks to create an aggregated contact list, stores the aggregated contact list in a non-transitory computer-readable medium at the server, and provides the aggregated contact list including the contact information to a display device.

193.    For example, the accused instrumentality comprising the LinkedIn Application system that practices said systems and methods permits a user to login via the LinkedIn Application to a first and second messaging service provider, obtain a first contact list from the first messaging service provider and a second contact list from the second messaging service provider, and update the network contacts.

194.    The LinkedIn Application comprises a network interface. For example, the LinkedIn Application comprises ethernet, fiber, and/or other network connectivity for facilitating LAN, WAN, and/or other network activity:



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/

195.    The LinkedIn Application comprises a network login engine coupled to the network interface. For example, the LinkedIn Application comprises the LinkedIn login webservice comprising an engine for use by the user to log into the user's LinkedIn account

and/or the user's social media or other networks coupled to the LinkedIn servers:





*See, e.g.*, LinkedIn Login page at https://www.linkedin.com/login



*See, e.g.,* LinkedIn User Import Contacts page at https://www.linkedin.com/mynetwork/import-contacts/?transactionId=





See,        *e.g.*,        LinkedIn        User        Manage        Syncing        page
https://www.linkedin.com/mynetwork/settings/manage-syncing/





*See,*        *e.g.*,        Google        Sign-In        Request        page        at
https://accounts.google.com/o/oauth2/v2/auth/identifier?client_id=802926523257.apps.googleus
ercontent.com&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&sc
ope= https%3A%2F%2Fwww.google.com%2Fm8%2Ffeeds%20profile%20email









*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com





*See, e.g.*, LinkedIn Desktop Website at [https://www.linkedin.com/mynetwork/](https://www.linkedin.com/mynetwork/)



*See, e.g.*, LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

196.    The LinkedIn Application comprises a network contacts database embodied in one or more non-transitory computer readable mediums. For example, the LinkedIn Application comprises an address book comprising at least the user's LinkedIn contacts embodied in, for example, a hard drive and/or other ROM and/or, at a minimum, RAM, for storing the user's contact list in said database:

**LinkedIn Contacts Manager - Overview**

Bring together all the contacts from your address books, emails, calendars, and your LinkedIn network by using LinkedIn Contacts Manager. Collecting and storing all your contacts in one place will help to keep them up to date.

**Note:** Your contacts and connections aren't the same thing.

You can begin using LinkedIn Contacts Manager by importing and inviting your email contacts, creating and uploading a contacts file, and syncing contacts from other sources. Currently, you can only sync Google Calendar and Google Contacts, so old sources may be missing.

Once you've synced and imported your contacts, you can delete specific contacts to remove them from your LinkedIn Contacts Manager address book. If you've accidentally sent invitations to the contacts you imported, you can withdraw the invitations.

LinkedIn takes your privacy and the security of your data seriously. Learn more about the privacy of your information in LinkedIn Contacts Manager, and how you can access your account data.

Last updated: 7 months ago

*See,   e.g.,*   LinkedIn   Help   –   LinkedIn   Contacts   Manager   –   Overview   at https://www.linkedin.com/help/linkedin/answer/91972

**Viewing and Managing Your Email Contacts**

If you've enabled address book syncing, we'll periodically import and store details about your address book contacts to suggest relevant contacts for you to connect with, to show you relevant updates, and for other uses explained in our Privacy Policy.

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See,   e.g.,*   LinkedIn   Help   –   Viewing   and   Managing   Your   Email   Contacts   at https://www.linkedin.com/help/linkedin/answer/98247

**Contact and Calendar Information**

We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.*, LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

197.   The LinkedIn Application comprises a server coupled to the network contacts

database. For example, the LinkedIn Application comprises a server connected to the LinkedIn

contact database:





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com

198.    The LinkedIn Application comprises a contact aggregation engine coupled to the network login engine and the network contacts database. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager which provides LinkedIn's servers to aggregate the user's contacts coupled to the LinkedIn login engine and to the storage medium comprising the user's LinkedIn contacts:

### LinkedIn Contacts Manager - Overview

Bring together all the contacts from your address books, emails, calendars, and your LinkedIn network by using **LinkedIn Contacts Manager**. Collecting and storing all your contacts in one place will help to keep them up to date.

**Note:** Your **contacts and connections** aren't the same thing.

You can begin using LinkedIn Contacts Manager by **importing and inviting your email contacts**, **creating and uploading a contacts file**, and **syncing contacts from other sources**. Currently, you can only sync Google Calendar and Google Contacts, so **old sources may be missing**.

Once you've synced and imported your contacts, you can **delete specific contacts** to remove them from your LinkedIn Contacts Manager address book. If you've accidentally sent invitations to the contacts you imported, you can **withdraw the invitations**.

LinkedIn takes your privacy and the security of your data seriously. Learn more about the **privacy of your information in LinkedIn Contacts Manager**, and how you can **access your account data**.

Last updated: 7 months ago

*See, e.g.*, LinkedIn Help – LinkedIn Contacts Manager – Overview at https://www.linkedin.com/help/linkedin/answer/91972

### Viewing and Managing Your Email Contacts

If you've enabled address book syncing, we'll periodically **import and store** details about your address book contacts to suggest relevant contacts for you to connect with, to show you relevant updates, and for other uses explained in our **Privacy Policy**.

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See, e.g.*, LinkedIn Help – Viewing and Managing Your Email Contacts at https://www.linkedin.com/help/linkedin/answer/98247

**Contact and Calendar Information**
We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.*, LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy

**Syncing Contacts from Other Address Books and Sources**

LinkedIn Contacts Manager can regularly synchronize with your contacts from Google Calendar and Google Contacts. Learn more about the privacy of the information you sync.

**Note:** If you're syncing a company email account, make sure you're in compliance with your corporate IT security policy first.

To sync contacts:

1. Click the 🔗 **My Network** icon at the top of your LinkedIn homepage.
2. Click **Contacts** under **Manage my network** on the left rail.
3. Click ⬚ **Manage synced contacts** near the top right corner of the page.
4. Click **Sync** next to any source under the **Contacts** section to sync your contacts.

**Notes:**

- You will be prompted to login to the source account and give permission to process the sync.
- If you change your password for one of these sources, go back to this page and click **Change** to update it on LinkedIn.

To import a contacts file:

1. Click the 🔗 **My Network** icon at the top of your LinkedIn homepage.
2. Click **Contacts** under **Manage my network** on the left rail.
3. Click ➕ **Add more contacts** on the right rail.
   **Note:** You'll be redirected to a page where you can enter the source you want to import the contacts from.

**Note:** If you'd like to import a CSV file from a source that's not listed on the Contacts Settings page, import the file using the **Outlook Contacts CSV** option. This option is a workaround and may not work for all sources.

**Important:** Synced contacts are not automatically invited to connect with you on LinkedIn.

Learn more about **deleting imported contacts**, and why **old sources may be missing from the Contacts Syncing page.**

Last updated: 8 months ago

*See, e.g.*, LinkedIn Help – Syncing Contacts from Other Address Books and Sources at https://www.linkedin.com/help/linkedin/answer/1278









*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com



*See, e.g.,* LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/



*See, e.g.,* LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

199.    In operation, the contact aggregation engine (*see* above) controls the network login engine to login or facilitate login to a plurality of low level networks associated with a plurality of messaging service services through a high level network. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including facilitating the user logging into and

associating the user's various social media and/or other networks, including via APIs of LinkedIn and/or APIs of the user's social media and/or other networks:



*See, e.g.*, LinkedIn User Import Contacts page at https://www.linkedin.com/mynetwork/import-contacts/?transactionId=



*See, e.g.*, Google Sign-In Request page at https://accounts.google.com/o/oauth2/v2/auth/identifier?client_id=802926523257.apps.googleusercontent.com&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&scope= https%3A%2F%2Fwww.google.com%2Fm8%2Ffeeds%20profile%20email



*See,       e.g.,*       Yahoo!       Sign-In       Request       page       at
https://api.login.yahoo.com/oauth2/request_auth_fe?client_id=dj0yJmk9S0c3Y2RXVmw1RTQx
JmQ9WVdrOVlYWmxXbWxDTXpBbWNHbzlNQS0tJnM9Y29uc3VtZXJzZWNyZXQmeD02
MA--
&redirect_uri=https%3A%2F%2Fwww.linkedin.com%2Fgenie%2Ffinishauth&scope=openid%
20sdpp-w%20sdct-r&sec=true&response_type=code&state=5ef8e091-7714-423c-a57b-
f607710145fb&nonce=6612439201265914688&guccounter=1&guce_referrer=aHR0cHM6Ly9s
b2dpbi55YWhvby5jb20v&guce_referrer_sig=AQAAADx0ox5D1DZWYJqN1T31M8wjeY72W
Hnm5USj7t1-
994XN4dtTs9wXZPxbFnm9LuyM26LTbfNgpUgeh89NDgcnS2xsBPJoIiDu6onlExDhf7tsoQ-
EJKVkkqOu2ac4W3pj3P34o_G23xo8DLX4pMAqIKiP6olGZjJKhodFpcMc2yR

200.    In operation, the contact aggregation engine (*see* above) uses the network

interface to access contact information from the plurality of messaging services. For example,

the LinkedIn Application comprises the LinkedIn Contacts Manager obtaining and importing the

contacts of the user's various added networks onto LinkedIn's servers via connection to the

servers of these other networks, including via APIs of LinkedIn and/or these other networks,

after the user logs in to the networks:











*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

201.    In operation, the contact aggregation engine (*see* above) updates the networks contacts database based on the contact information associated with the plurality of low level networks to create an aggregated contact list. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including creating and maintaining a combined, aggregated contact list using the user's imported contacts via the LinkedIn Contacts Manager, including maintaining a combined, aggregated contact list using the user's imported contacts via the LinkedIn Contacts Manager:



*See, e.g.*, LinkedIn Help – LinkedIn Contacts Manager – Overview at https://www.linkedin.com/help/linkedin/answer/91972

**Viewing and Managing Your Email Contacts**

If you've enabled address book syncing, we'll periodically import and store details about your address book contacts to suggest relevant people for you to connect with, to show you relevant updates, and for other uses explained in our **Privacy Policy**.

We save the contact data returned by your email provider. This could include names, birthdays, gender, locations, job titles, email addresses, phone numbers, websites, and notes.

*See, e.g.*, LinkedIn Help – Viewing and Managing Your Email Contacts at https://www.linkedin.com/help/linkedin/answer/98247

**Contact and Calendar Information**

We receive personal data (including contact information) about you when others import or sync their contacts or calendar with our Services, associate their contacts with Member profiles, scan and upload business cards, or send messages using our Services (including invites or connection requests). If you or others opt-in to sync email accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

Others may sync their contacts or calendar with our Services.

*See, e.g.*, LinkedIn Privacy Policy at https://www.linkedin.com/legal/privacy-policy



*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/

202. In operation, the contact aggregation engine (*see* above) stores the aggregated contact list in a non-transitory computer-readable medium at the server. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including storing the user's aggregated contact list on LinkedIn's servers:



*See, e.g.*, LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/





*See, e.g.*, LinkedIn Desktop Website at [https://www.linkedin.com/mynetwork/](https://www.linkedin.com/mynetwork/)



*See, e.g.*, LinkedIn Desktop Website at [https://www.linkedin.com/mynetwork/](https://www.linkedin.com/mynetwork/)

203.    In operation, the contact aggregation engine (*see* above) provides the aggregated

contact list including the contact information to a display device. For example, the LinkedIn Application comprises the LinkedIn Contacts Manager that performs steps while in operation for, *inter alia*, facilitating aggregation of contacts from multiple messaging service providers on multiple networks associated therewith, including providing the user's aggregated contact list stored on LinkedIn's servers, which comprises the user's LinkedIn contacts and imported contacts:





*See, e.g.*, LinkedIn Login page at https://www.linkedin.com/login



*See, e.g.*, LinkedIn User MyNetwork page at https://www.linkedin.com/mynetwork/





*See, e.g.*, LinkedIn Desktop Website at https://www.linkedin.com/mynetwork/.

204.    LinkedIn has directly infringed, and continues to directly infringe, the claims of the '453 Patent, including at least those noted above, including by at least making and using the LinkedIn Application in violation of 35 U.S.C. § 271(a).

205.    Additionally, or in the alternative, LinkedIn has induced, and continues to induce, infringement of the '453 Patent in this judicial district, and elsewhere, by actively inducing direct infringement of the '453 Patent, including by knowingly and actively aiding or abetting infringement by users, by and through at least instructing and encouraging the use of the LinkedIn products and software noted above, including the LinkedIn Application system. Such aiding and abetting comprises providing software, web servers, and/or instructions regarding the use and/or operation of the LinkedIn Application system, applications, and web servers in an infringing manner. Further, the direct infringement of users that occurs in connection with LinkedIn's applications and/or web services occurs under the direction or control of LinkedIn. Such induced infringement has occurred since LinkedIn became aware of the '453 Patent, at a minimum, as noted above, and the knowledge and awareness that such actions by users comprise infringement of the '453 Patent.

206.    LinkedIn has had at least constructive notice of the '453 Patent since at least its issuance. LinkedIn will have been on actual notice of the '453 Patent since, at the latest, the

service of this complaint. By the time of trial, LinkedIn will have known and intended (since receiving such notice) that its continued actions would actively induce the infringement of the asserted claims of the '453 Patent.

207.     The LinkedIn Application system clearly meets the asserted claim limitations in their normal and expected usage. On information and belief, normal and expected usage of the LinkedIn Application system by customers and/or end users satisfies the claim limitations for direct infringement. Further, at minimum, the provision of products, systems and/or functionalities clearly capable of such infringing usage and/or provision of instructions/specifications for such infringing usage constitutes inducement of directly infringing usage.

208.     Further, as noted above, LinkedIn was made aware of infringement of the '453 patent through use of the LinkedIn Application via the infringement allegations set forth in Plaintiff's Original Complaint, of which Defendants were aware at least as of the service of said Original Complaint. Such direct and induced infringement has been and remains clear, unmistakable and inexcusable. On information and belief, LinkedIn knew or should have known of the clear, unmistakable and inexcusable direct and induced infringing conduct at least since receiving notice of the '453 Patent. Thus, on information and belief, Defendants have, since receiving notice of the '453 Patent, specifically intended to induce direct infringement by customers and/or end users.

209.     EBT believes and contends that, at minimum, LinkedIn's knowing and intentional post-suit continuance of its unjustified, clear, and inexcusable infringement of the '453 Patent since receiving notice of its infringement of the '453 Patent, is necessarily willful, wanton, malicious, in bad-faith, deliberate, conscious and wrongful, and it constitutes egregious conduct worthy of a finding of willful infringement. Accordingly, since at least receiving notice of this

suit, LinkedIn has willfully infringed the '453 Patent.

### COUNT III – INFRINGEMENT OF U.S. PATENT NO. 8,230,135

210.    Plaintiff is the owner of the '135 Patent and it has all substantial rights to the '135 Patent, including the right and standing to sue and recover damages for past, present, and future infringement of the patent.

211.    Claim 1 of the '135 Patent covers a method comprising "receiving information of an event that calls for user notification; generating an event notification for the event; associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device; providing the at least one of the plurality of character strings in the title array to a process executed by a processor; providing an alternative title based on the at least one of the plurality of character strings to the process; using the alternative title as a title in association with the process."

212.    Defendant has infringed, and is now infringing, the '135 patent, including at least claim 1, in this judicial district and elsewhere, in violation of 35 U.S.C. § 271 through actions comprising the practicing of methods and/or providing of systems, without authority from Plaintiff, for notifying a user of the occurrence of events and notification apparatuses and functionality, including notifying a user of the occurrence of an event by modification of the user's browser title bar based on the specific event that has occurred, including as claimed in the '135 asserted claims. On information and belief, Defendant practices the claimed methods and provides the claimed systems with and via its LinkedIn Application system comprising www.linkedin.com.

213.    Without limitation, the accused instrumentality comprising the LinkedIn Application system that practices said systems and methods comprises receiving information of

an event that calls for user notification; generating an event notification for the event; associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device; providing the at least one of the plurality of character strings in the title array to a process executed by a processor; providing an alternative title based on the at least one of the plurality of character strings to the process; using the alternative title as a title in association with the process. For example, the LinkedIn Application system permits a user's device to notify the user, via the user's browser, that the user has notifications for an event, such as a new message and/or other posting on the LinkedIn website, including via updating, modifying, and/or otherwise altering the title bar of the user's browser, including instructing the user's browser to receive notifications regarding messages the user has received from other LinkedIn users and/or posting of other LinkedIn users.

214.    The LinkedIn Application receives information of an event that calls for user notification. For example, the LinkedIn Application receives information of an event that calls for user notification and it instructs and/or controls the user's browser on the user's device running code which receives code or other instructions from LinkedIn that the user has received a message from another LinkedIn user and/or a posting has been made by another LinkedIn user:





*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed





*See, e.g.,* Second LinkedIn User Feed page at https://www.linkedin.com/feed

```
MessageEvent
  isTrusted: false
  lastEventId: "null"
  origin: ""
▶ path: []
▶ ports: []
  returnValue: true
  source: null
  srcElement: null
  target: null
  timeStamp: 6400162.895000001
  type: "message"
  userActivation: null
▶ __proto__: MessageEvent
```

*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed



*See, e.g.*, LinkedIn User Notification page at https://www.linkedin.com/notifications

215.    The LinkedIn Application generates an event notification for the event. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which generates a notification to indicate to the user that the user has received a message from another LinkedIn user and/or a posting has been made by another LinkedIn user:







*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

216.   The LinkedIn Application associates the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which inputs the created notification into an array of title strings and inputs the created notification into an array of title strings which are specifically for use by the user's browser to display in the titlebar of the user's browser which is displayed on the display of the user's device:

```js
8415 define("ember-lifeline/poll-task", ["exports", "ember-lifeline/utils/get-task", "ember-lifeline/utils/disposable"],
8416   "use strict";
8417   Object.defineProperty(e, "__esModule", {
8418     value: !0
8419   })
8420   e._setRegisteredPollers = function(e) {
8421     a = e
8422   }
8423   e.setShouldPoll = function(e) {
8424     o = e
8425   }
8426   e.pollTask = function(e, r) {
8427     var r, m = arguments.length > 2 && void 0 !== arguments[2] ? arguments[2] : l(), u = (0,
8428     t.default)(e, r, "pollTask"), d = function() {
8429       return u.call(e, c)
8430     }, p = a.get(e)
8431     if (!p) {
8432       p = new Set
8433       a.set(e, p);
8434       (0,
8435       n.registerDisposable)(e, (function(e, t) {
8436         return function() {
8437           t.forEach(function(t) {
8438             s(e, t)
8439           }
8440           )
8441         }
8442       }
8443       )(e, p))
8444     }
8445     p.add(m)
8446     c = (function() {
8447       if (o)
8448         return o()
8449       return !Ember.testing
8450     }
8451     )() ? d : function() {
8452       i[m] = d
8453     }
8454     u.call(e, c)
8455     return m
8456   }
8457   e.cancelPoll = s
8458   e.queuedPollTasks = void 0
8459   var a = new WeakMap
8460   var o, r = 0
8461   var i = Object.create(null)
8462   e.queuedPollTasks = i
8463   function s(e, t) {
8464     var n
8465     if ("number" == typeof e || "string" == typeof e)
8466       n = e
8467     else {
8468       var o = a.get(e)
8469       n = t
8470       void 0 !== o && o.delete(n)
8471     }
8472     delete i[n]
8473   }
8474   function i() {
8475     return r++
8476   }
8477 })
```

```js
23397 var n=Ember.Service.extend({init:function(){this._super.apply(this,arguments)
23398 this._titles=[]
23399 this._loopNumber=0
23400 this._defaultDocumentTitle=""},addTitle:function(e){if(this._titles.length&&t.default){this.updateDefaultTitle(doc
23401 this._titles=[e,this._defaultDocumentTitle]}else this._titles.unshift(e)
23402 this._titles=this._titles.uniq()}
23403 if(!this._pollerEnabled)!0
23404 this.pollTask("_loopTitles","".concat("document-title-poller","_").concat(Date.now()))},resetTitle:function(){if(t
23405 this._loopNumber=0
23406 if(t.default&&this._defaultDocumentTitle){document.title=this._defaultDocumentTitle
23407 this._pollerEnabled=1}}},updateDefault:function(e){this._defaultDocumentTitle=e},getDefaultTitle:function(){r
23408 this._titles[n-1]=this._defaultDocumentTitle
23409 var a=this._titles[this._loopNumber%n]    a = "TS messaged you"
23410 t.default&&a&&(document.title=a)
23411 this._loopNumber++
23412 this._pollerEnabled&&this.runTask(e,1500)}})
23413 e.default=n}}
```

```js
2112 ...
2113 if(a&&ee()){Z(ie(e,t));{Array.isArray(n)||(0,r.isEmberArray)(n)}&&Z(ie(n,"[]"));{(0,r.isProxy)(n)}&&Z(ie(n,"content"))
2114 n=Se(n,r[i])}}return n}function Ne(e,t,n,i){if(!e.isDestroyed){if(Ae(t))return (function(e,t,n){var i=t.split(".",
2115 var a=Pe(e,i)    a = {enumerable: true, configurable: true, get: f, set: f}
2116 if(null!=a)return Ne(a,o,n)    o = "LinkedIn", n = "(1) LinkedIn"
2117 if(!r)throw new l.default("Property set failed: object in path "'+i.join(".")+'" could not be found.")}}(e,t,n,i)    i
2118 var o,a=(0,r.lookupDescriptor)(e,t),s=null===a?void 0:a.set    o = "LinkedIn", a = {enumerable: true, configurable: tr
2119 if(void 0!==s&&q.has(s)){e[t]=n    n = "(1) LinkedIn"
2120 return n}if((void 0!==o=e[t])||"object"!=typeof e||t in e||"function"!=typeof e.setUnknownProperty){e[t]=n}=n
2121 o!==n&&le(e,t)}else e.setUnknownProperty(t,n)
2122 return n}}function xe(){var Me=(function(e){(0,t.inheritsLoose)(i,e)
2123 function i(t){var n;(n=e.call(this)||this)._volatile=!1
2124 n._readOnly=!1
```

*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

217.    The LinkedIn Application provides the at least one of the plurality of character strings in the title array to a process executed by a processor. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which provides the entries in the titlebar array for use by the code on the user's browser which is run by the processor of the user's device:



## An Introduction to JavaScript

Let's see what's so special about JavaScript, what we can achieve with it, and which other technologies play well with it.

## What is JavaScript?

*JavaScript* was initially created to "make web pages alive".

The programs in this language are called *scripts*. They can be written right in a web page's HTML and run automatically as the page loads.

Scripts are provided and executed as plain text. They don't need special preparation or compilation to run.

In this aspect, JavaScript is very different from another language called Java.

Today, JavaScript can execute not only in the browser, but also on the server, or actually on any device that has a special program called the JavaScript engine.

The browser has an embedded engine sometimes called a "JavaScript virtual machine".

Different engines have different "codenames". For example:

- V8 – in Chrome and Opera.
- SpiderMonkey – in Firefox.
- ...There are other codenames like "Trident" and "Chakra" for different versions of IE, "ChakraCore" for Microsoft Edge, "Nitro" and "SquirrelFish" for Safari, etc.

The terms above are good to remember because they are used in developer articles on the internet. We'll use them too. For instance, if "a feature X is supported by V8", then it probably works in Chrome and Opera.

> ℹ️ **How do engines work?**
>
> Engines are complicated. But the basics are easy.
>
> 1. The engine (embedded if it's a browser) reads ("parses") the script.
> 2. Then it converts ("compiles") the script to the machine language.
> 3. And then the machine code runs, pretty fast.
>
> The engine applies optimizations at each step of the process. It even watches the compiled script as it runs, analyzes the data that flows through it, and further optimizes the machine code based on that knowledge.

## What can in-browser JavaScript do?

Modern JavaScript is a "safe" programming language. It does not provide low-level access to memory or CPU, because it was initially created for browsers which do not require it.

JavaScript's capabilities greatly depend on the environment it's running in. For instance, Node.js supports functions that allow JavaScript to read/write arbitrary files, perform network requests, etc.

In-browser JavaScript can do everything related to webpage manipulation, interaction with the user, and the webserver.

For instance, in-browser JavaScript is able to:

- Add new HTML to the page, change the existing content, modify styles.
- React to user actions, run on mouse clicks, pointer movements, key presses.
- Send requests over the network to remote servers, download and upload files (so-called AJAX and COMET technologies).
- Get and set cookies, ask questions to the visitor, show messages.
- Remember the data on the client-side ("local storage").

*See, e.g.*, An Introduction to JavaScript on JavaScript.info at https://JavaScript.info/intro

218. The LinkedIn Application provides an alternative title based on the at least one of the plurality of character strings to the process. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which provides the user's browser with titles for each of the entries in the titlebar, which is sent to the processor of the user's device for updating the HTML run and displayed by the user's browser:



```
23397  var n=Ember.Service.extend({init:function(){this._super.apply(this,arguments)
23398  this._titles=[]
23399  this._loopNumber=0
23400  this._defaultDocumentTitle=""},addTitle:function(e){if(!this._titles.length&&t.default){this.updateDefaultTitle(doc
23401  this._titles=[e,this._defaultDocumentTitle]}else this._titles.unshift(e)
23402  this._titles=this._titles.uniq()
23403  if(!this._pollerEnabled){this._pollerEnabled=!0
23404  this.pollTask("_loopTitles","".concat("document-title-poller","_").concat(Date.now()))}},resetTitle:function(){if(t
23405  this._loopNumber=0
23406  if(t.default&&this._defaultDocumentTitle){document.title=this._defaultDocumentTitle
23407  this._pollerEnabled=!1}}},updateDefaultTitle:function(e){this._defaultDocumentTitle=e},getDefaultTitle:function(){r
23408  this._titles[n-1]=this._defaultDocumentTitle
23409  var a=this._titles[this._loopNumber%n]    a = "TS messaged you"
23410  t.default&&a&&(document.title=a)
23411  this._loopNumber++
23412  this._pollerEnabled&&this.runTask(e,1500)}})
23413  e.default=n}}
23414  define("image-edit-base/components/he-img-edit" ["exports" "image-edit-base/components/picture-cropper" "image-edit
```

```
2112  void 0===(n=e[t])&&t:0||[t in e|| function !=typeof e.unknownProperty||(n=e.unknownProperty(t))
2113  if(a&&ee(){Z(ie(e,t));(Array.isArray(n)||(0,r.isEmberArray)(n))&&Z(ie(n,"[]");(0,r.isProxy)(n)&&Z(ie(n,"content"))
2114  n=Se(n,r[i])}return n}function Ne(e,t,n,i){if(!e.isDestroyed){if(Ae(t))return (function(e,t,n,r){var i=t.split(".")
2115  var a=Pe(e,i)    a = {enumerable: true, configurable: true, get: ƒ, set: ƒ}
2116  ●if(null!=a)●return Ne(a,o,n)  o = "LinkedIn", n = "(1) LinkedIn"
2117  if(!r)throw new l.default('Property set failed: object in path "'+i.join(".")+'" could not be found.')}(e,t,n,i)  i
2118  var o,a=(0,r.lookupDescriptor)(e,t),s=null===a?void 0:a.set    o = "LinkedIn", a = {enumerable: true, configurable: tr
2119  if(void 0!==s&&q.has(s)){e[t]=n    n = "(1) LinkedIn"
2120  return n}if(void 0!==(o=e[t])||"object"!=typeof e||t in e||"function"!=typeof e.setUnknownProperty){e[t]=n
2121  o!==n&&ie(e,t)}else e.setUnknownProperty(t,n)
2122  return n}}function xe(){var Me=function(e){(0,t.inheritsLoose)(i,e)
2123  function i(t){var n;(n=e.call(this)||this)._volatile=!1
2124  n. readOnly=!1
```

```
e.HOVI      Array(2)
e.HOVI     0: "TS messaged you"
funct:     1: "(1) LinkedIn"
define     []: (...)
e.def:     firstObject: (...)
var n      hasArrayObservers: (...)
e.def:     lastObject: (...)
define     length: 2
Object     ▸ __proto__ : Array(0)
Object
define
Object
e.def:
var n
this.
this._.....(tDocumentTitle="",addTitle:function(e){
this._titles=[e,this._defaultDocumentTitle]}else t
this._titles=this._titles.uniq()
```







*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

219.    The LinkedIn Application uses the alternative title as a title in association with the process. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which causes the user's browser to use the alternative title or titles as the titlebar for the user's browser by updating the HTML run and displayed by the user's

browser:







```
23397  var n=Ember.Service.extend({init:function(){this._super.apply(this,arguments)
23398  this._titles=[]
23399  this._loopNumber=0
23400  this._defaultDocumentTitle="",addTitle:function(e){if(!this._titles.length&&t.default){this.updateDefaultTitle(doc
23401  this._titles=[e,this._defaultDocumentTitle]else this._titles.unshift(e)
23402  this._titles=this._titles.uniq()
23403  if(!this._pollerEnabled=!0
23404  this.pollTask("_loopTitles","".concat("document-title-poller","_",").concat(Date.now()))},resetTitle:function(){if(t
23405  this._loopNumber=0
23406  if(t.default&&this._defaultDocumentTitle){document.title=this._defaultDocumentTitle
23407  this._pollerEnabled=!1}}},updateDefaultTitle:function(e){this._defaultDocumentTitle=e},getDefaultTitle:function(){r
23408  this._titles[n-1]=this._defaultDocumentTitle
23409  var a=this._titles[this._loopNumber%n]    a = "TS messaged you"
23410  t.default&&a&&(document.title=a)
23411  this._loopNumber++
23412  this._pollerEnabled&&this.runTask(e,1500)}})
23413  e.default=n}}
```

```
2113  if(a&&ee()){(Z(ie(e,t));(Array.isArray(n)||(0,r.isEmberArray)(n))&&Z(ie(n,"[]"));(0,r.isProxy)(n)&&Z(ie(n,"content"))
2114  n=Se(n,r[i])}return n}function Ne(e,t,n,i){if(!e.isDestroyed){if(Ae(t))return (function(e,t,n){var i=t.split("."),
2115  var a=Pe(e,i)    a = {enumerable: true, configurable: true, get: f, set: f}
2116  if(null!=a)  return Ne(a,o,n)    o = "LinkedIn", n = "(1) LinkedIn"
2117  if(!r)throw new l.default('Property set failed: object in path "'+i.join(".")+'" could not be found.'})}(e,t,n,i)  i
2118  var o,a=(0,r.lookupDescriptor)(e,t),s=null===a?void 0:a.set   o = "LinkedIn", a = {enumerable: true, configurable: tr
2119  if(void 0!==s&&q.has(s)){e[t]=n   n = "(1) LinkedIn"
2120  return n}if(void 0!==(o=e[t])||"object"!=typeof e||!t in e||"function"!=typeof e.setUnknownProperty){e[t]=n
2121  o!==n&&le(e,t)}else e.setUnknownProperty(t,n)
2122  return n}}function xe(e){}}var Me=(function(e){(0,t.inheritsLoose)(i,e)
2123  function i(t){var n;(n=e.call(this)||this)._volatile=!1
2124  n._readOnly=!1
```

```
2109  0
2110  function Se(e,t){var n,i=typeof e,o="object"===i,a=o||"function"===i
2111  if(Ae(t))return a?Pe(e,t):void 0
2112  void 0===(n=e[t])&&!o||!t in e||"function"!=typeof e.unknownProperty||((e.unknownProperty(t)))
2113  if(a&&ee()){(Z(ie(e,t));(Array.isArray(n)||(0,r.isEmberArray)(n))&&Z(ie(n,"[]"));(0,r.isProxy)(n)&&Z(ie(n,"content")))return n}functi
2114  n=Se(n,r[i])}return n}function Ne(e,t,n,i){if(!e.isDestroyed){if(Ae(t))return (function(e,t,n){var i=t.split("."),i=n.pop()  e = i
2115  var a=Pe(e,i)    a = {enumerable: true, configurable: true, get: f, set: f}
2116  if(null!=a)return Ne(a,o,n)    o = "(1) LinkedIn", n = "LinkedIn"
2117  if(!r)throw new l.default('Property set failed: object in path "'+i.join(".")+'" could not be found.'})}(e,t,n,i)   i = undefined, e
2118  var o,a=(0,r.lookupDescriptor)(e,t),s=null===a?void 0:a.set   o = "LinkedIn", a = {enumerable: true, configurable: true, get: f,
2119  if(void 0!==s&&q.has(s)){e[t]=n   o = "(1) LinkedIn"
2120  return n}if(void 0!==(o=e[t])||"object"!=typeof e||!t in e||"function"!=typeof e.setUnknownProperty){e[t]=n   o = "(1) LinkedIn"
2121  o!==n&&le(e,t)}else e.setUnknownProperty(t,n)
2122  return n}}function xe(e){}}var Me=(function(e){(0,t.inheritsLoose)(i,e)
2123  function i(t){var n;(n=e.call(this)||this)._volatile=!1
```

```
1890  c=(function(){if(    n
1891  return!Ember.test
1892  u.call(e,c)                 __OWNER__ember15963261611757356644145066__:
1893  return m}                   _defaultDocumentTitle: "(1) LinkedIn"
1894  e.cancelPoll=s              _loopNumber: 6
1895  e.queuedPollTasks           _pollerEnabled: true
1896  var a=new WeakMap           _super: f ()
1897  var o,r=0                   _titles: (2) ["TS messaged you", "(1) Link
1898  var i=Object.creat          isDestroyed: (...)
1899  e.queuedPollTasks           isDestroying: (...)
1900  function s(e,t){var         _debugContainerKey: (...)
1901  if("number"!=typeo          __proto__: f
1902  else{var o=a.get(
1903  n=t
1904  void 0!==o&&o.del
1905  define("ember-lif                            ls/disposable","ember-lifeline/utils/get-task"],function(e,t,n){"use
1906  Object.defineProp
1907  e._setRegistered
1908  e.runTask=function(t,t){var o=arguments.length>2&&void 0!==arguments[2]?arguments[2]:0
1909  if(e.isDestroying)return a
1910  var r=(0,n.default)(t,"runTask"),s=i(e),l=Ember.run.later((function(){s.delete(1)
1911  r.call(e)},o)
1912  s.add(l)
```

```
2101  u||!1===c?Object.defineProperty(e,t,{configurable:!0,enumerable:r,writable:!0,value:l}):l=t=!1}else{l=r
2102  Object.defineProperty(e,t,{configurable:!0,enumerable:...         function t){t.tag=(0,s.combine)(we(e,t.p
2103  t.lastRevision=(0,s.value)(t.tag)}))
2104  A.has(e)&&A.get(e).forEach((function(t){t.tag=...
2105  t.lastRevision=(0,s.value)(t.tag)}))}
2106  "function"==typeof e.didDefineProperty&&e.didD                     (e){return e.indexOf(".")}}
2107  function Ae(e){return"string"==typeof e&&-1!==...
2108  e.PROXY_CONTENT=Ce
2109  0
2110  function Se(e,t){var n,i=typeof e,o="object"===...
2111  if(Ae(t))return a?Pe(e,t):void 0
2112  void 0===(n=e[t])&&!o||!t in e||"function"!=typ...
2113  if(a&&ee()){(Z(ie(e,t));(Array.isArray(n))||(0,r...                    (n))&&Z(ie(n,"content"))return n}functi
2114  n=Se(n,r[i])}return n}function Ne(e,t,n,i){if(!e...                                  t.split(".",i=n.pop()   e = i
2115  var a=Pe(e,i)    a = {enumerable: true, configur...
2116  if(null!=a)return Ne(a,o,n)    o = "(1) LinkedIn
2117  if(!r)throw new l.default('Property set failed                 be found.'})}(e,t,n,i)   i = undefined, e
2118  var o,a=(0,r.lookupDescriptor)(e,t),s=null===...                        able: true, configurable: true, get: f,
2119  if(void 0!==s&&q.has(s)){e[t]=n   n = "(1) L
2120  return n}if(void 0!==(o=e[t])||"object"!=typeof  e||!t in e||"function"!=typeof e.setUnknownProperty){e[t]=n
2121  o!==n&&le(e,t)}else e.setUnknownProperty(t,n)
```

```
#document
  ▶ scripts: HTMLCollection(44) [script#tag…
  ▶ scrollingElement: html.atedeco.windows
  ▶ styleSheets: StyleSheetList (3) [CSSStyle…
    textContent: null
  ▶ timeline: DocumentTimeline {currentTime:
    title: "(1) LinkedIn"
    visibilityState: "visible"
    vlinkColor: ""
    wasDiscarded: false
    webkitCurrentFullScreenElement: null
    webkitFullscreenElement: null
    webkitFullscreenEnabled: true
    webkitHidden: false
```

*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

220.     Defendant has directly infringed, and continues to directly infringe, the claims of the '135 Patent, including at least those noted above, including by at least making and using the LinkedIn Application in violation of 35 U.S.C. § 271(a).

221.     LinkedIn has had at least constructive notice of the '135 Patent since at least its issuance. LinkedIn will have been on actual notice of the '135 Patent since, at the latest, the service of this complaint. By the time of trial, LinkedIn will have known and intended (since receiving such notice) that its continued actions would actively induce the infringement of the asserted claims of the '135 Patent.

222.     EBT believes and contends that, at minimum, LinkedIn's knowing and intentional post-suit continuance of its unjustified, clear, and inexcusable infringement of the '135 Patent since receiving notice of its infringement of the '135 Patent, is necessarily willful, wanton, malicious, in bad-faith, deliberate, conscious and wrongful, and it constitutes egregious conduct worthy of a finding of willful infringement. Accordingly, since at least receiving notice of this suit, LinkedIn has willfully infringed the '135 Patent.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 8,402,179

223.     Plaintiff is the owner of the '179 Patent and has all substantial rights to the '179 Patent, including the right and standing to sue and recover damages for past, present, and future

infringement of the '179 patent.

224.    Claim 1 of the '179 Patent covers a method comprising "processing an event that calls for user notification; generating an event notification for the event; storing the event notification in an array; providing the event notification from the array to a process executed by a processor; using the event notification as a title in association with the process; providing an alternative title from the array to the process; using the alternative title as a title in association with the process."

225.    Defendant has infringed, and is now infringing, the '179 Patent, including at least claim 1, in this judicial district and elsewhere, in violation of 35 U.S.C. § 271 through actions comprising the practicing of methods and/or providing of systems, without authority from Plaintiff, for notifying a user of the occurrence of events and notification apparatuses and functionality, including notifying a user of the occurrence of an event by modification of the user's browser title bar based on the specific event that has occurred, including as claimed in the '179 asserted claims. On information and belief, Defendant practices the claimed methods and provides the claimed systems with and via its LinkedIn Application system comprising www.linkedin.com.

226.    Without limitation, the accused instrumentality comprising the LinkedIn Application system that practices said systems and methods comprises processing an event that calls for user notification; generating an event notification for the event; storing the event notification in an array; providing the event notification from the array to a process executed by a processor; using the event notification as a title in association with the process; providing an alternative title from the array to the process; using the alternative title as a title in association with the process. For example, the LinkedIn Application system permits a user's device to notify the user, via the user's browser, that the user has notifications for an event, such as a new

message and/or other posting on the LinkedIn website, including via updating, modifying, and/or otherwise altering the title bar of the user's browser, including instructing the user's browser to receive notifications regarding messages the user has received from other LinkedIn users and/or posting of other LinkedIn users.

227.    The LinkedIn Application processes an event that calls for user notification. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which processes code or other instructions received from LinkedIn that the user has received a message from another LinkedIn user and/or a posting has been made by another LinkedIn user:





*See, e.g.*, LinkedIn User Feed page at  https://www.linkedin.com/feed



*See, e.g.*, Second LinkedIn User Feed page at https://www.linkedin.com/feed



*See, e.g.*, LinkedIn User Feed page at <u>https://www.linkedin.com/feed</u>





*See, e.g.*, LinkedIn User Notification page at <u>https://www.linkedin.com/notifications</u>

228.    The LinkedIn Application generates an event notification for the event. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which generates a notification to indicate to the user that the user has received a message from another LinkedIn user and/or a posting has been made by another LinkedIn user:







140

*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

229.    The LinkedIn Application stores the event notification in an array. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which inputs the created notification into an array of title strings:

*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

230.    The LinkedIn Application provides the event notification from the array to a process executed by a processor. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which provides the entries in the titlebar array for use by the code on the user's browser which is run by the processor of the user's device:

**What can in-browser JavaScript do?**

Modern JavaScript is a "safe" programming language. It does not provide low-level access to memory or CPU, because it was initially created for browsers which do not require it.

JavaScript's capabilities greatly depend on the environment it's running in. For instance, Node.js supports functions that allow JavaScript to read/write arbitrary files, perform network requests, etc.

In-browser JavaScript can do everything related to webpage manipulation, interaction with the user, and the webserver.

For instance, in-browser JavaScript is able to:

- Add new HTML to the page, change the existing content, modify styles.
- React to user actions, run on mouse clicks, pointer movements, key presses.
- Send requests over the network to remote servers, download and upload files (so-called AJAX and COMET technologies).
- Get and set cookies, ask questions to the visitor, show messages.
- Remember the data on the client-side ("local storage").

*See, e.g.*, An Introduction to JavaScript on JavaScript.info at https://JavaScript.info/intro

231.    The LinkedIn Application uses the event notification as a title in association with the process. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which inputs the created notification into an array of title strings for use by the user's browser to display in the titlebar of the user's browser, including with the HTML title tag processed by the user's browser:



*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

232.   The LinkedIn Application provides an alternative title from the array to the process. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which provides the user's browser with titles for each of the entries in the titlebar array, which is sent to the processor of the user's device for updating the HTML run and displayed by the user's browser:







*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed

233.    The LinkedIn Application uses the alternative title as a title in association with the process. For example, the LinkedIn Application instructs and/or controls the user's browser on the user's device running code which provides the user's browser with titles for each of the entries in the titlebar array, which is sent to the processor of the user's device for updating the HTML run and displayed by the user's browser:







*See, e.g.*, LinkedIn User Feed page at https://www.linkedin.com/feed.

234.   LinkedIn has directly infringed, and continues to directly infringe, the claims of the '179 Patent, including at least those noted above, including by at least making and using the LinkedIn Application in violation of 35 U.S.C. § 271(a).

235.   LinkedIn has had at least constructive notice of the '179 Patent since at least its issuance. LinkedIn will have been on actual notice of the '179 Patent since, at the latest, the service of this complaint. By the time of trial, LinkedIn will have known and intended (since receiving such notice) that its continued actions would actively induce the infringement of the asserted claims of the '179 Patent.

236.   EBT believes and contends that, at minimum, LinkedIn's knowing and intentional post-suit continuance of its unjustified, clear, and inexcusable infringement of the '179 Patent since receiving notice of its infringement of the '179 Patent, is necessarily willful, wanton, malicious, in bad-faith, deliberate, conscious and wrongful, and it constitutes egregious conduct worthy of a finding of willful infringement. Accordingly, since at least receiving notice of this suit, LinkedIn has willfully infringed the '179 Patent.

## DAMAGES

237.   By way of its infringing activities, LinkedIn has caused, and continues to cause, Plaintiff to suffer damages, and Plaintiff is entitled to recover from LinkedIn the damages sustained by Plaintiff as a result of LinkedIn's wrongful acts in an amount subject to proof at

trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

238.    LinkedIn's infringement of Plaintiff's rights under the Patents-in-Suit will continue to damage Plaintiff, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

239.    Plaintiff also requests that the Court make a finding that this is an exceptional case entitling Plaintiff to recover its attorneys' fees and costs pursuant to 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

240.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby respectfully requests a trial by jury of any issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, EBT hereby respectfully requests that this Court enter judgment in favor of EBT and against Defendant, and that the Court grant EBT the following relief:

A.  Judgment that Defendant has infringed and is infringing the Patents-in-Suit;

B.  Judgment that LinkedIn's post-notice infringement has been, and continues to be, willful, including that LinkedIn acted to infringe the Patents-in-Suit despite an objectively high likelihood that its actions constituted infringement of a valid patent and, accordingly, award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284;

C.  An award to Plaintiff of damages adequate to compensate Plaintiff for LinkedIn's infringement, together with pre-judgment and post-judgment interest, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses, and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

D.  A grant of a permanent injunction pursuant to 35 U.S.C. § 283, enjoining LinkedIn and

all persons, including its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation therewith, from making, using, offering to sell, or selling in the United States or importing into the United States any methods, systems, or computer readable media that directly or indirectly infringe any claim of the Patents-in-Suit, or any methods, systems, or computer readable media that are colorably different;

E. That this Court declare this to be an exceptional case and award Plaintiff reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

F. Any and all further relief for which Plaintiff may show itself justly entitled that this Court deems just and proper.

Dated: February 25, 2021                          Respectfully submitted,


Of Counsel:                                       FARNAN LLP

Steve Schlather                                   /s/ Brian E. Farnan
EDMONDS & SCHLATHER PLLC                          Brian E. Farnan (Bar No. 4089)
2501 Saltus St.                                   Michael J. Farnan (Bar No. 5165)
Houston, Texas 77003                              919 Market St., 12th Floor
Phone: (713) 364-2371                             Wilmington, DE 19801
Fax: (713)224-6651                                Telephone: (302) 777-0300
sschlather@ip-lit.com                             Fax: (302) 777-0301
                                                  bfarnan@farnanlaw.com
                                                  mfarnan@farnanlaw.com

                                                  *Attorneys for Plaintiff*