EXHIBIT A

1

1                        IN THE UNITED STATES DISTRICT COURT

2                        IN AND FOR THE DISTRICT OF DELAWARE

3

4                                          )
     EBUDDY TECHNOLOGIES B.V.,             )
5             Plaintiff,                    )    Civil Action No.
                                           )
6      v.                                   )    20-1501-RGA-CJB
                                           )
7                                          )
     LINKEDIN CORPORATION,                 )
8                                          )
              Defendant.                    )
9

10                               - - - -

11                               Wilmington, Delaware
12                               Wednesday, March 16, 2022
                                 Markman Hearing
13                               - - - -

14
     BEFORE:   HONORABLE CHRISTOPHER J. BURKE, Magistrate Judge
15

16   APPEARANCES:               - - -

17               FARNAN LLP
                 BY:  ROSEMARY J. PIERGIOVANNI, ESQ.
18                    -and-
                 EDMONDS & SCHLATHER PLLC
19               BY:   STEPHEN F. SCHLATHER, ESQ.
                      JOHN J. EDMONDS, ESQ.
20                       Counsel on behalf of Plaintiff

21

                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP
22               BY:   RODGER D. SMITH, II, ESQ.
                      -and-
23               PILLSBURY WINTHROP SHAW PITTMAN LLP
                 BY:   CHRISTOPHER KAO, ESQ.
24                    BROCK S. WEBER, ESQ.
                         Counsel on behalf of Defendant
25
                              Michele L. Rolfe, RPR, CRR

2

1                    - - - -

2             P R O C E E D I N G S

3             (REPORTER'S NOTE: The following Markman hearing

4    was held telephonically beginning at 11:30 a.m.)

5             THE COURT:  Good morning, everybody.  Welcome to

6    you all.  And as I know that both sides are on the line, as

7    well as our court reporter.  Let's go on the record.

8    Let me just first say a few things for the record.  And that

9    is that we're here this morning by way of video conference

10   for a claim construction hearing in the matter of eBuddy

11   Technologies BV versus LinkedIn Corporation.  Civil Action

12   No. 20-1501-RGA-CJB here in our court.

13            And before we go further, let's have counsel on

14   the line with us identify themselves for the record for each

15   side.

16            We'll start first with counsel for the

17   plaintiffs side.  And we'll begin there with Delaware

18   counsel.

19            MS. PIERGIOVANNI:   Good morning, Your Honor.

20   Rosemary Piergiovanni from Farnan on behalf of plaintiff

21   eBuddy Technologies.

22            I have with me today SteveE Schlather and John

23   Edmonds from Edmonds & Schlather.

24            MR. SCHLATHER:  Good morning, Your Honor.

25            MR. EDMONDS:  Good morning, Your Honor.

3

1             THE COURT:  Good to be with you all.

2             And we'll do the same for counsel on defense

3    side, again we'll begin with Delaware counsel.

4             MR. SMITH:  Good morning, Your Honor.  Rodger

5    Smith at Morris Nichols for the defendant LinkedIn.

6             I have with me this morning my co-counsel from

7    Pillsbury Winthrop, Christopher Kao and Brock Weber.

8             THE COURT:  All right.  And, again, good to see

9    you all.

10            And, counsel, before we begin with our claim

11   construction argument, let me just cover a couple of things

12   by way of procedure that may be helpful.

13            First, just to review the terms that the parties

14   have agreed to as to how we'll be conducting our hearing

15   today, three hours have been allotted at the parties

16   requests for arguments, but evenly between each side:

17   meaning each side gets 90 minutes.  We'll keep track of our

18   time on our end and I'll try to let you know when 30 minutes

19   and then 15 minutes are left, so you'll have a good sense of

20   when you're kind of on the later stages of your time for

21   your presentation.

22            Just keep in mind that, although I know you have

23   a lot you that you want to get through in terms of your

24   materials, there will also be some questions from the Court

25   so you kind of have to factor that in in terms of how much

4

1    time to allocate for each term as you're going through.

2             Also, the parties have agreed, and I appreciate

3    it, on how we'll take up the terms.  I believe we're doing

4    it based on the order that they were in the briefs and who

5    is going to go first.  And I think we're going to hear from

6    the plaintiff's side first on each term, then we'll have

7    defendant's side respond, and then I'll give each side a

8    chance for brief rebuttal if they like.

9             As I noted in a prior order, we're only going to

10   hear argument today on the first seven terms, that's

11   everything up through and including low level network.  Take

12   the other terms on the papers.  Should give us more time to

13   have a better, more detailed discussion of at least the

14   terms that the parties meant to address in the meat of the

15   hearing for today's argument.

16            And then a couple other quick things.  One is

17   that if you are speaking about a term, I'll ask that you

18   keep your video on, unless you have some kind of technical

19   difficulty.  But if you're not speaking, either if you're

20   waiting to speak, it's not your turn or if you're not going

21   to be speaking at all in the hearing, it's up to you as to

22   whether you keep your video monitor on or off.  It's fine to

23   turn it off if you don't want to be seen on video, it's up

24   to you.

25            Then, lastly, I have the parties slides that

5

1    they submitted.  I know often the parties want to use the

2    technology to go through their slides by sharing the screen,

3    and that's just fine.  But if for some reason that doesn't

4    work out or you don't want to do it that way, just know that

5    I've got the slides with me so if you say:  Judge, we can go

6    through these manually and, for example, now I want you to

7    turn to slide 12, we can do it that way, too.

8             All right.  So those are just the preliminary

9    things that I wanted to mention.  Otherwise, unless there's

10   any kind of procedural issues we need take up with before we

11   get started, I'm happy to turn to plaintiff's side to begin

12   their presentation and to talk about our first term.

13            MR. SCHLATHER:  Your Honor, Mr. Edmonds is going

14   to take up these first terms, but I'm going to be presenting

15   for our side so if it's okay with the Court, I'd like to go

16   ahead and share my screen for our slides.

17            THE COURT:  Sure, go ahead.

18            MR. SCHLATHER:  Thank you.

19            THE COURT:  I should say I know that sometimes,

20   before we get into the first term, parties may want to make

21   some introductory comments.  That's certainly fine.  The

22   best time to do that is before we take up the first term,

23   and then we'll be going on a term-by-term basis.  So we'll

24   hear argument on the first term from plaintiff side and then

25   defendant side and then rebuttal.  And then move on to term

6

1  two and so on.

2  Okay.  With that, I'll turn it over to

3  plaintiff's counsel.

4  MR. EDMONDS:  Thank you, Your Honor.  This is

5  John Edmonds speaking on behalf of the plaintiff.

6  And our first term is "event."  And the Surati

7  declaration that is at Exhibit JA -- or Joint Exhibit K does

8  a good job of laying the context for this term.  So I'm

9  going to start there.

10  The word -- and I'm not just going to read from

11  it, but following along, this is at page 7 starting at

12  paragraph 28 of the Surati declaration.

13  The context for event is event-based

14  programming, also called event-driven programming.  And the

15  definition that eBuddy has proposed is directly from a

16  textbook on this subject, that's the Faison book of which

17  the excerpts from that are an exhibit as well.

18  And to put it in context, Your Honor, the --

19  this event-driven programming involves an event that

20  triggers a notification.  Those are important terms to kind

21  of understand the concepts of it.

22  Also, an important thing to understand are that

23  they are conditions for events.  And the system detect all

24  kinds of conditions and events are those conditions that

25  trigger a notification.

7

1  THE COURT:  Mr. Edmonds, in your brief there

2  were, I think, a number of times where you said, Judge, with

3  regard to this term, you got to keep in mind the

4  event-driven programming context that's provided by the

5  patents when you look at this term.  How come you kept

6  saying that?  Was that just another way of saying, Judge,

7  keep in mind, this term "event" -- of course you're

8  construing it in the context of how it is used in this claim

9  or in this patent, not just in a vacuum; is that what you

10  meant by that?

11  MR. EDMONDS:  That's what we mean by that in the

12  sense that you could say that an event could be a carnival,

13  in my neck of the woods a rodeo, all kinds of things.

14  Here when we talk about "event," there's a well

15  understood term within the context of event-driven

16  programming.  And we see that context in the specification

17  when it talks about the event handler, event triggers and

18  other terms that are endemic to event-driven programming.

19  So, it's the -- so we get the word "event" correct.

20  And --

21  THE COURT:  Mr. Edmonds, you said that your

22  construction here is driven, or at least in part taken from

23  a textbook or kind of an extrinsic definition.  At times --

24  I can't recall if it's with regard to this term or others or

25  all -- the other side criticizes you for relying on

8

1  definitions that seem like they're generated from

2  publications that come well after the key date here, you

3  know.  And they say, like our definitions are -- you know,

4  come from '02, which is a few years before '06, which is the

5  key date.

6  Is there anything you want to say upfront just

7  to address the asserted concern that if it does come down

8  to, like, which dictionary definition or which textbook

9  definition is better, that yours are, in significant part,

10  drawn from ones that are 15 years after the key date?

11  MR. EDMONDS:  So with respect to this particular

12  term, the Faison book is from 2006, so that's not an issue

13  here.

14  THE COURT:  There are some others later that I

15  think are not necessarily so?

16  MR. EDMONDS:  That's correct.

17  And the issue there is that LinkedIn has not

18  come forward with any evidence or really any statement that

19  the definitions in those references have changed.  What

20  they're suggesting is that looking at the data alone makes a

21  reference authoritative as of the relevant date.

22  And our response to that is that was called into

23  question in LinkedIn's response.  And we addressed that in

24  the reply by pointing out -- we asserted that that was the

25  ordinary meaning as of 2006 in our brief, and then the

9

1  Surati declaration replied to the assertion -- the questions

2  raised in the response by pointing out that each of those

3  definitions would be applicable back in 2006.

4  So as the Court is aware, you know, a number of

5  references on the Internet aren't necessarily dated, they

6  just rescind, but that doesn't mean that they wouldn't have

7  been applicable at the time or those would have changed over

8  time.  And the Surati declaration we believe addresses that

9  or ties that down, so it should no longer be an issue.

10  THE COURT:  Understood.

11  And I guess, again, just by way of prelude, I

12  think mainly what we're going to talk about with regard to

13  this term relates to, kind of, can trigger a notification

14  part of your proposed construction.

15  But just to try to make sure in my mind I

16  understand what's probably not at issue or disputed,

17  sometimes the parties use different phraseology in their

18  constructions here.  Like theirs uses the phrase "action or

19  occurrence."  Yours uses both "detectible condition" and

20  "action or occurrence."

21  I guess my broad question that might make it

22  simple is:  Other than the kind of dispute related to the

23  trigger notification piece of yours, do you think there's

24  any other really material dispute between the parties in

25  terms of the language that they're using here?

10

1    MR. EDMONDS:  In terms of our primary, eBuddy's
2  primary definition, I think that the action or occurrence --
3  the detectible condition is taken directly from the Faison
4  reference.
5    And, so, in other words we're not here to change
6  the words that are being provided in an authoritative
7  definition from a text.  But in terms of the substance of
8  those, no, I don't think that the substance of the Court's
9  construction would change if it preferred action or
10  occurrence to detectible condition.
11    THE COURT:  Okay.  Let me let you continue.
12    MR. EDMONDS:  Okay.  So, getting then to the
13  meat of the issue that the Court noted, which was this "can
14  trigger" versus to which a program "might respond," which is
15  the latter being LinkedIn.
16    Again, the "can triggers" directly from the
17  Faison reference, and it is explained by the Faison
18  reference and also by the Surati declaration in the sense
19  that there are lots of conditions that an event-driven
20  system can detect, and then the conditions are sufficient to
21  trigger a notification is what is an "event" is.
22    So an "event" is something that can trigger it,
23  if the conditions are met.  And that's why we use the word
24  "can."
25    LinkedIn has said -- has misstated eBuddy's

11

1  position as saying that -- substituting the word "must" for
2  "can."  But eBuddy hasn't used the word "must," it has used
3  the word "can" consistent with the Faison reference.
4    THE COURT:  Mr. Edmonds, that was my big
5  question here.  In my notes I wrote down the defendant's big
6  issue seems to be that they believe the plaintiff's
7  construction requires that a system must respond to every
8  event, and, you know, in your construction it used the word
9  "can," and on page 8 of your brief I think at one point you
10  said something like, you know, a program, might not issue a
11  notification the first time that an event occurs; so that
12  would be an event that wasn't necessarily required to
13  trigger a notification.
14    So I wondered ultimately do we really have a
15  dispute here?  Because the big thing they -- it seemed like
16  they were concerned about, the "must," looks like wasn't
17  captured by your construction.  And I think you're saying
18  right now, right, we weren't saying "must," we're just
19  saying "can;" is that right?
20    MR. EDMONDS:  The second part of what the Court
21  said is correct, that we've not said "must," we've said
22  "can."
23    And the "can" is that if the conditions are met
24  for that notification to be triggered -- and certainly, as
25  we pointed out, something -- a condition could be that

12

1  something has to occur twice.  A condition could be -- on
2  the Faison reference at page 72, the beginning of it, it's
3  highlighted, it points out that a condition associated with
4  an event might be based on any number of predicates.  For
5  example, today is Tuesday, the time is 10:30, my cat licked
6  its left front paul for the seventh time in the last five
7  minutes.  And it says of those conditions, the one that
8  referred to as "event" are those that could trigger a
9  notification.  So...
10    But I think there still is dispute, though, and
11  the dispute is arises from the language that LinkedIn has
12  used; and this language of "might", might is to imprecise.
13  Anything -- a program might respond to any type of stimulus
14  or any type of data, so if one really reduces LinkedIn's
15  proposed construction to its full breadth, they are just
16  defining "event" as data.  Because a data could be something
17  to which a program might respond.  "Might" is a word that
18  implies some type of a happenstance, Your Honor.
19    And events -- event notifications that occur by
20  happenstance, they occur because the system is configured to
21  issue a notification when the event occurs if the proper
22  conditions for that event had occurred.  And so "might" just
23  leaves it to where the jury could conclude that anything
24  could -- is an event.  And that's too broad.
25    And then also the eBuddy's construction is tied

13

1  to a notification, which is what an event is all about.  An
2  event is something that can trigger a notification, it's not
3  something to which simply program might respond.
4    Program might respond to any number of different
5  inputs, which might be an event or which might be any type
6  of input.  And so, again, LinkedIn's proposed construction
7  is just overbroad and not limited to what an event really
8  is.  Especially in the context of what we think an event is
9  something -- an event is different programming, which has an
10  understanding in the art in the terms of you have triggers
11  for events and events are what -- or conditions are events
12  and events are what trigger notifications and how those
13  interact.  It's in not just anything.
14    Can I --
15    THE COURT:  Mr. Edmonds, let me just see if I
16  can summarize it to get your position correct.  Tell me if
17  this is right.
18    What you're saying is look, the defendant's
19  construction talks about an action or occurrence to which a
20  program might respond.  I think you're saying that's too
21  broad because there are certain actions or occurrences in a
22  computer context that a program might respond to that aren't
23  events.  Like, you know, that could include just pieces of
24  data that aren't events, computers respond to data all the
25  time.  We think the narrower and correct construction here

14

1  is that an "event" is something that can trigger a
2  notification, "can" meaning it's not required to.  There
3  could be programming conditions that suggest that something
4  that does qualify as an "event" doesn't automatically
5  trigger a notification, but it at least has to be a thing
6  that is capable of triggering a notification.
7              Is that the difference between an event on the
8  one hand and just mere data on the other, in your view?
9              MR. EDMONDS:  I think the Court summed it up.
10  Except I also think that -- I think the Court was
11  emphasizing the "might" and also there is this just the
12  respond -- an event has a certain type of result, which is
13  the notification.  Very consistent with the language in the
14  patent, but also just what event-driven programming is.  And
15  so it's not just any response, it's a notification that is
16  the response.
17              Yes.  But I think the Court correctly summed it
18  up.  And --
19              THE COURT:  And can you just tell me, if I'm
20  trying to understand -- you know, if I'm thinking in my head
21  of on the one hand a piece of data that a program might
22  respond to but that's not an event versus event, the thing
23  that makes it an event -- I know the thing that makes it an
24  event, in your view, that it is capable of triggering a
25  notification.  But just in practice, what does it mean to be

15

1  a thing that is capable of triggering a notification such
2  that it's not just data, but what's the difference?
3              MR. EDMONDS:  Sure.  So, if my colleague -- if
4  you could move down a little bit, Mr. Schlather, in the
5  Surati declaration.  These are getting into just kind of a
6  simplified version of what an event -- how event handling
7  works.
8              Events go into a cue, they -- typically there is
9  a loop in which an event handler is listening for events.
10  And the next page in the Surati declaration, it points to
11  how we have subscribers that subscribe to these
12  notifications.
13              So in the real world, Your Honor, that's how it
14  works in the sense that you have these event handlers, event
15  handlers are referenced in the specification.  You have
16  event cues, they're referenced in the specification.  You
17  have notification that are referenced in the specification.
18              And in the real world, the way it works is that
19  when an enemy that has subscribed to the notification
20  receives that notification, so it -- I know that LinkedIn
21  has accused eBuddy of focusing on a preferred embodiment,
22  but what we're focusing on is the proper understanding of
23  event in context, which is borne out by the language of the
24  specification itself, which is, as the Surati declaration
25  points out, is the language of event-drive programming, but

16

1  that's how it works in practice.
2              So you're listening for particular events, there
3  can be conditions for that event to trigger a notification,
4  that notification is triggered, that goes to the subscriber
5  of that notification.  That's how it works in the real
6  world.
7              THE COURT:  But I'm guessing that some of the
8  detail you just described, you know, in the real world you
9  could use a cue, for example: probably you wouldn't say that
10  level of detail is required by the claim here because -- and
11  so if we were just getting down to the very, very base of
12  what is required to make something an "event" that "can
13  trigger a notification," I mean it kind of sounds like
14  you're saying can trigger a notification in a sense that the
15  particular computer system is programmed such they are
16  trigger a notification.  It's probably not much more than;
17  is that right?
18              MR. EDMONDS:  I think that's a fair statement,
19  Your Honor.  And that's what the Faison text -- that's how
20  it describes it.  It just says that it is a detectible
21  condition that can trigger a notification.  And that's how
22  you would distinguish an event from something that's not an
23  event.  Because something that is not an event is incapable
24  of triggering a notification, something that's an event is
25  capable or can trigger a notification.

17

1              And I think that that's just -- as far as
2  eBuddy's alternative construction, that's just a wordier way
3  of saying something similar in terms of "can" means
4  configured to and the notification of something that is
5  triggered by the event, so there's some correspondence to
6  the action or occurrence that is the event.
7              But that's -- I think that's just an additional
8  detail that's really not needed, unless the Court felt that
9  additional detail was needed for clarification.
10              THE COURT:  Okay.  Anything further, Mr. Edmonds
11  on this first term?
12              MR. EDMONDS:  Yes.  Just so on the first term
13  then -- I won't go through all of the different references
14  in the specification that provide that context, but they're
15  quoted in our brief.  And so the Court will see the language
16  of the notifications and the language of event processing,
17  notifications, cues are all in there in the figures.
18              I will agree the issue of it -- there was a
19  critique by LinkedIn that -- really it's that kind of "must"
20  versus "can" saying that the computer would become
21  overwhelmed.  That was addressed in the Surati declaration
22  that -- appended to reply, which is Joint Appendix U, which
23  pointed out that that's really the whole purpose of
24  event-based programming that you don't get overwhelmed by
25  events, that's why you have these conditions for the events

18

1  that have to be met for the event to fire a notification.
2  So the confusion there with LinkedIn seems to be that there
3  can be a lot of predicates for events, a lot of conditions
4  there, but the number of events are managed by -- just
5  naturally what an event-driven system is designed to do is
6  to handle large amounts of data.  So to say it would
7  overwhelm a system, that's just not correct.
8          And then this idea of -- I'll call it
9  redundancy.  They say -- the word they use is "superfluous,"
10  and that's -- but superfluousness is not a word, is really
11  not a word, so I'll just say redundant.  But redundant means
12  -- I'm using it in the same vein.
13          That's not correct.  And that's a critic that's
14  made in, you know, more than one area.  And I think that
15  LinkedIn is just overstating the point in the sense that
16  here they're focusing on Claim 1 of the '179 patent.
17  There -- it requires generating an event notification and
18  there's nothing that's redundant about that from the nature
19  of an event itself.  Because one is requiring that event
20  notification actually be generated.  I could draw a claim
21  that just had, you know, receiving an event, and the claim
22  wouldn't require generating notification.
23          Claim 1 requires processing the event and
24  generating it, so there's nothing -- just because an event
25  is something that can result in a notification, here the

19

1  generating step -- there's nothing redundant about that.
2          In the same vein then providing the event
3  notification, there's nothing redundant about providing it,
4  that's just a step in a method claim.  And also that step
5  has specific limitations on the providing: the providing has
6  to be from an array -- from the array and not just kind of
7  any providing.  And so there's a lack of redundancy there.
8          Every time that there is a word that's used in a
9  construction, it's used in the claim does not mean there's a
10  redundancy.  The Court has to take a more serious inquiry
11  into it and say it's the functionality that's being
12  addressed in the method claim, is that redundant of the
13  definition; and here it's not.
14          And the same --
15          THE COURT:  And tell me at this point you're
16  saying, Mr. Edmonds, that, look, if the main concern was
17  event and our definition, our construction is redundant, for
18  example, of the generating an event notification for the
19  event limitation, it's not true because the latter, the
20  generating limitation actually requires that you generate a
21  notification.
22          Our construction for "event" does not require --
23  it says that all events don't necessarily trigger
24  notifications; an event is just simply something that's
25  capable of doing so.  So the extra add that the generating

20

1  limitation adds that means it's not redundant is that it
2  actually resulted in generation of a notification; is that
3  right?
4          MR. EDMONDS:  Correct, Your Honor.
5          THE COURT:  Got it.
6          Okay.  Anything further?
7          MR. EDMONDS:  No, Your Honor.  I think that sums
8  up -- I mean, I haven't gone through every single point, but
9  that sums up the high points we wanted to highlight for the
10  Court at this point.
11          THE COURT:  Okay.
12          All right then -- thank you.
13          Let me turn to defendant's counsel to get their
14  argument for this term.  And I guess, you know, by way of
15  prelude -- and I don't mean to cut off defendant's counsel
16  if they want to step back at first and talk about some more
17  general concepts, but the big threshold question I would
18  have here, obviously, is in the briefing it really did seem
19  like the key dispute was defendant thought that plaintiff's
20  construction required "must," you know, "must trigger a
21  notification," and I think at one point defendant was even
22  pointing to some language that plaintiff used in the brief
23  that suggested, you know, hey, plaintiff seems to be
24  conceding that it doesn't require "must," that's our point,
25  no "must."

21

1          And now plaintiff is confirming that the
2  construction doesn't require "must trigger notification," it
3  just says "can trigger notification."  So the threshold
4  question was:  Do we really have a dispute?
5          But that said, let me turn to defendant's
6  counsel to begin their presentation.
7          MR. WEBER:  Thank you, Your Honor.  This is
8  Brock Weber on behalf of defendant LinkedIn.
9          I'm sharing my screen myself, so let me know if
10  you can see that.
11          THE COURT:  Yes.
12          MR. WEBER:  The previous discussion you had with
13  plaintiff's counsel was helpful here.  I don't really
14  understand why this didn't come out during the parties'
15  meet-and-confer, but if plaintiff is conceding that an event
16  "can" or "might" trigger a notification, that does resolve
17  some of the dispute here.  That was not conceded earlier.
18          LinkedIn's primary dispute here was mostly with
19  requirements in plaintiff's alternative construction in
20  which they specified that the program is configured, is
21  configured to respond by issuing a notification
22  corresponding to an action or occurrence.
23          That language seemed to indicate and their
24  briefing seemed to indicate that they're saying that an
25  event by itself "must cause the issuance of a notification

22

1    corresponding to the action or occurrence."  That is too
2    limiting and there's no support for that construction.
3              But the plaintiff's primary construction "a
4    detectible condition of a system that can trigger
5    notification" is closer to the ordinary meaning of the bare
6    term event.
7              I would submit that that would be the correct
8    definition or an acceptable definition if instead of a
9    notification it said "can trigger a response."
10             Events do not need to trigger notifications.  An
11   event in a system can trigger other responses by the system
12   further processing or other actions, it does not need to
13   result in a notification.
14             Now, the claims go on to say in the event
15   patents that there is the generation of an event
16   notification.  That language would be rendered superfluous
17   if all events trigger notifications.
18             If the first part of the plaintiffs -- or what
19   they're characterized as their primary construction were to
20   be adopted, that is much closer and the "can" or "might"
21   language is key.  And notification is also too limiting: it
22   would be a response by the system.
23             THE COURT:  Tell me -- Mr. Weber, tell me this:
24   If as long as "can" means "can" not "must," and if their
25   construction had said:  A detectible condition of a system

23

1    that can trigger a response, including a notification --
2    like a notification is one type of response that an event
3    can trigger, but there might be other types of responses --
4    it sounds like that might be acceptable to you.
5              MR. WEBER:  Yeah, I think that would be.
6    "Including or such as a notification."
7              But there's no support to say it has to be a
8    notification.  That's not -- all systems do not issue
9    notifications on all events.
10             Now I would also submit that an action or
11   occurrence is not just simply data: an action or occurrence
12   indicates that something's happened.  And that's usually
13   some action on the part of a user, a mouse click, closing a
14   window.  This is what the Microsoft definition provides.  It
15   says, for example, key presses, button clicks or mouse
16   movements.  These are not simply just processing of data
17   occurring in the system, these are actions or occurrences,
18   something has happened.
19             And LinkedIn's definition for the Microsoft
20   Computer Dictionary is directly tied to these event
21   notifications buttons.  These event notification buttons
22   indisputably are depicting embodiments operating in the
23   Microsoft operating system.
24             Microsoft defined this term at the relevant time
25   period consistent with the LinkedIn's definition.

24

1    Plaintiff's proposed construction coming from some Faison
2    article has no real connection to these event patents.
3    These patents don't reference that article.  These patents
4    do not use the term "event-based programming," these patents
5    do not use the "event-driven programming."
6              There's no evidence to simply suggest that's the
7    correct definition for these patents.
8              And other of plaintiffs extrinsic evidence is
9    consistent with LinkedIn's proposal; that an event is an
10   action or occurrence that can be identified by a system.
11   That can be -- that can result in a response by the system.
12             It does not have to be the issuance of a
13   notification, however, that can happen, and that's what
14   these claims later says happened with an event.
15             THE COURT:  Can you tell me, again, like what's
16   a kind of response that an event might generate in a system
17   that is something other than triggering a notification?
18   Just walk me through how that would work.
19             MR. WEBER:  Sure.  A button click or a mouse
20   click could result in, you know, moving the cursor or
21   something.  It wouldn't result in necessarily a
22   notification, it certainly wouldn't necessarily result in
23   some notification popping up in the title of their process.
24             There can be, you know, a myriad of events that
25   can cause a system to respond in other ways besides

25

1    notification.  However, the Court was correct that in -- the
2    response can include or would be -- would include a
3    notification or that would be one example of a response by a
4    system.
5              THE COURT:  If an event is only something that
6    has to generate a response by your system, what would
7    distinguish an event from, like -- you know, the plaintiff
8    seems concerned about the idea of this being, you know, just
9    term -- you know, mere data, because computers respond to
10   data all the time.
11             What is the thing that distinguishes event from,
12   you know "mere data" in your mind?
13             MR. WEBER:  Yeah, that's the action or
14   occurrence portion of the definition, which they seem to
15   agree with in their alternative construction.
16             This is also the common meaning of the term
17   "event" in the art at the time frame as exemplified by the
18   Microsoft definition.  And the action or occurrence is not
19   simply just data, something happened.  A user did something
20   or an outside event came into the system, that's an action
21   or occurrence.  It's not simple calculations or data.
22             THE COURT:  Okay.  So -- all right.  We'll see
23   what the plaintiff has to say about in response to this, but
24   anything further that you wish to add?
25             MR. WEBER:  Sure.  I'd like to touch on the

26

1    notion that plaintiffs -- I suppose this would be mostly
2    applicable to their alternative construction that it would
3    render claim language superfluous if an action or occurrence
4    -- if an event on its own requires a system to be configured
5    to issue a notification, then there would be little need for
6    this Claim 1 of the '179 patent, for example, say that you
7    must generate a notification for the event and then provide
8    the event notification.  Providing is like issuing.
9            If the event on its own leads to a notification,
10   then why would this claim need to say that you need to
11   generate a notification for the event that comes into the
12   system?
13           THE COURT:  I thought we cleared up that problem
14   when we realize that they don't mean "must," they mean
15   "can."
16           I think the argument is that an event "can"
17   trigger notification.  There are such circumstances in which
18   it would not happen, I gather about programming in the
19   plaintiff's mind.  And so not redundant because the next
20   limitation generating requires the generating of an event
21   notification.
22           But event doesn't always require that, so the
23   generating line is adding something and the providing, you
24   know, was adding another piece, too; isn't that right, even
25   in your view?

27

1            MR. WEBER:  Yeah, that's correct.  That's why we
2    were addressing their alternative construction.
3            As I mentioned, their primary construction uses
4    the word "can" and if that means, as we all agree, that it
5    does not mean that "must" trigger a notification, then this
6    problem would be resolved.
7            Their primary construction, as I mentioned,
8    would be accurate if instead of "can lead to a notification"
9    would be "can lead to a system response, including
10   notification."  If that construction is adopted, then the
11   concern about rendering other claim language redundant or
12   superfluous would be resolved.
13           THE COURT:  And, Mr. Weber, just in your mind,
14   like what is the prototypical event?  Like, if you were
15   saying, Judge, in these patents you want to know what an
16   event really is -- like certainly what would qualify, it is
17   not the only thing, but the thing I can think of when I'm
18   thinking of an event it's blank, you know.  How would you
19   fill in that blank?
20           MR. WEBER:  Well, I would fill it in -- well,
21   the patent itself in the summary section of the
22   specification discusses what an event can be in very broad
23   language.  It says:  An event, such as by way of example,
24   but not limitation, is a new mail event, a new instant
25   message event, a reminder event, a calendar event or some

28

1    other event.
2            So the patent really discusses this term very
3    broadly; and certainly not in any specific limiting context,
4    as the plaintiff proposes or seemed to propose.
5            And, so, the typical event that I think these
6    patents were envisioning would be something like logging
7    into your instant message client and getting a notification
8    that your buddy is online.  Popping up to say, you know,
9    John Smith is available to chat if you want to chat.
10           THE COURT:  Or maybe like in my calendar at
11   10:00 I have an -- there's something listed and, boom, I'm
12   told -- I'm going to be told 10:00 event, you know, or --
13   events may be a bad word to use here.  But 10:00, the thing
14   that's in your calendar, that kind of notification, is that
15   also the case?
16           MR. WEBER:  Yeah.  A calendar event is
17   specifically called out, here's one of the nonlimiting
18   exhibits, so, exactly.  The meeting is coming up and you're
19   15 minutes out from the meeting, a notification could come
20   in for that calendar event.
21           THE COURT:  And then I guess so those all would
22   all be in your mind actions or occurrences.  But, again, to
23   the plaintiff's concern about data, couldn't you say the
24   receipt of data in a computer?  Like a computer received
25   data all the time from one part of it to other, that's not

29

1    an action or occurrence?
2            MR. WEBER:  Yeah.  I don't think it necessarily
3    is, but it could be.  The data coming in could be the result
4    of an action or occurrence.
5            So the data coming in could be, you know, as a
6    result of the user pressing a key on the keyboard.  And then
7    in your Word program you see that letter pop up
8    corresponding to the key, you know, that's the response from
9    the system.  I would not call that a notification, that
10   would be a response to an event.  I press the H key and the
11   H letter comes up in the Word document, that's not a
12   notification that's just how it processed it.
13           The incoming data would be the corresponding
14   code for the letter H coming into the processor.
15           THE COURT:  Okay.  Let me let you continue.
16   Anything further on this term?
17           MR. WEBER:  No, I think we covered it.  And I
18   think the discussion today has helped narrow the dispute.
19   Thank you, Your Honor.
20           THE COURT:  Thank you.  So Mr. Edmonds, I think,
21   unless -- I'm always hopeful.  I think probably at least
22   some of this dispute has been narrowed by what Mr. Weber
23   said: is that right in your mind but is there still a piece
24   of it that's remaining?
25           MR. EDMONDS:  Yes.  I think the part that still

**30**

1 remains is this notion of notification versus response
2 including notification, which is really just saying
3 response.
4 And, you know, one of the dangers -- and the
5 Federal Circuit has borne out of using dictionaries is that
6 sometimes they give kind of broad, generic definitions.
7 Both sides have relied on dictionaries and in
8 some cases that's kind of all that we have and that's what
9 we go with; and in some cases they're appropriate.
10 But here is a good example because a
11 Microsoft -- first of all, the notion that the Microsoft
12 Computer Dictionary would be authoritative for this patent
13 because in a preferred embodiment they're -- it's operating
14 in a Windows operating system is just simply an incorrect
15 notion.
16 But just taking the definition on its face, it
17 says see also event-driven programming. In other words, the
18 definition that their -- this kind of general definition,
19 again, imprecise definition that LinkedIn is relying on,
20 refers for more specificity to event-driven programming
21 and -- event-driven programming is really explained well by
22 the Faison book and by Dr. Surati.
23 The statement by LinkedIn's counsel, this kind
24 of technical explanation, you know, that's not evidence that
25 the Court should rely on, that's just argument by counsel.

**31**

1 LinkedIn had the opportunity to rebut the Surati declaration
2 or provide a textbook, something more specific than its
3 dictionary to try to bear out this notion of response,
4 including notification. And they didn't do that; they're
5 just relying on argument.
6 So I think what the Court should rely on is the
7 Surati declaration, which is step-by-step with the Faison
8 textbook on this subject that explains what an "event"
9 means. And here in the proper -- again, I think the proper
10 context is the event-driven programming, which is described
11 throughout the specification. The proper context is not
12 simply the fact that the screen shot shows a Microsoft
13 system.
14 THE COURT: And, Mr. Edmonds, I think -- the
15 first part of your construction, which I think because it's
16 one of two alternatives you provide you must be okay with,
17 the one that says "a detectible condition of a system that
18 can trigger a notification." First, I think you'd be
19 totally fine if I adopted that as the whole construction
20 here. I'm pretty sure.
21 And, two, I think Mr. Weber, based on what he
22 said, probably would agree that there's nothing incorrect
23 about it. I think his concern is that it's too broad
24 because it -- while it may be correct, it's not kind of
25 entirely -- it doesn't cover enough of what an event really

**32**

1 is.
2 And I think the assertion is the reason why we
3 need more words is because events can also generate
4 responses in a computer system that are something other than
5 the capability to trigger notifications.
6 Can events trigger responses in a system other
7 than generating notifications?
8 MR. EDMONDS: No. An event is defined as
9 something to which you can trigger a notification from that.
10 The statement by my colleague is over -- I think
11 they're not accusing us of being too broad, I think that
12 they're accusing us of being too narrow and that eBuddy --
13 actually LinkedIn's are the ones who are being too broad.
14 But the definition provided in the Faison, the
15 explanation provided by Dr. Surati show that you know what
16 an event is because that's something to which the system is
17 configured to issue a notification. And that's how event
18 processing works and that's what would distinguish an event
19 from just data; be it an action or occurrence, that's not
20 enough because that's just -- again, that could just be data
21 that's not an event, it's not tied to triggering a
22 notification if the right conditions are met.
23 And I think, and I just wanted to dispel a
24 little bit of maybe confusion. And fair enough if it's
25 eBuddy's doing, so be it, the alternative definition of

**33**

1 "configured" has to do with the conditions being met. So
2 it's really the same thing in the terms of "can." That if
3 conditions are met or the event to trigger a notification,
4 that's how what we know what the event is because it's a
5 configuration.
6 THE COURT: I guess maybe what I'm asking, and I
7 think you're right I may have decided it was assertedly
8 being too broad or too narrow, I may have flipped them. But
9 what if your construction was a detectible condition of a
10 system that must be capable of triggering a notification,
11 but could also trigger -- but could also result in some --
12 but provide some other response -- or, you know, like a
13 necessary thing about an event is that it's got to be
14 capable of triggering a notification -- not be a must, but
15 it's got to be capable of it. But to get a defendant's
16 concern could also generate some other response in a
17 program; would that be wrong?
18 MR. EDMONDS: I'm not sure that's what my friend
19 said, but I don't take objection to it in the sense that as
20 long as an event is an event -- in the sense that an event
21 is something that can trigger a notification if in theory a
22 program wanted to do something else with that event, trigger
23 some kind of additional response, I don't see why that would
24 be problematic, it would just be extra, but it's not wrong.
25 So I don't have an objection to that.

34

1    THE COURT:  Mr. Weber, if the construction was
2    something like that, you know, a detectible condition of a
3    system that must be capable of triggering a notification,
4    but -- and, you know, we could get the words right, but
5    might also trigger or result in some other response by a
6    program, wouldn't that get to the extra thing that you said
7    might be lacking from what their construction was?
8         MR. WEBER:  Thank you, Your Honor.
9         I think the problem there, frankly, is that
10   "must be configured to be able to issue a notification."
11   That part is just not correct.  There's not support for that
12   in intrinsic evidence.
13        THE COURT:  I should say -- not to confuse
14   things, but when I said "must," I meant "must be capable
15   of," meaning it doesn't have to trigger a notification, it's
16   just the kind of thing that at least could.
17        MR. WEBER:  I think "can trigger a
18   notification," as in plaintiff's primary construction, would
19   be more accurate.
20        I think the true ordinary meaning of just the
21   bear term event, not event-driven programming, which we are
22   not considering, is not used in the patents.
23        Just an event can trigger notification, but it's
24   more accurate to say that it can trigger a response in the
25   system which could include a notification.

35

1         There's no support in the intrinsic evidence and
2    it cannot be supplied by litigation-driven expert testimony
3    to supply a limitation that it must issue a notification or
4    must be capable of issuing a notification.  It can, but that
5    can be the system's response.
6         And, so, I think we are getting closer.
7    Plaintiff's primary construction would be acceptable if it
8    was "can result in a response from the system, including a
9    notification."  That's consistent with the ordinary meaning
10   of this term.
11        And the ordinary meaning of this term must
12   control because there's admittedly no evidence of
13   lexicography or disavow of claim scope and that that cannot
14   be supplied after the patent is issued by an expert
15   declaration.
16        The Microsoft definition reflects the ordinary
17   meaning of the term.  This extrinsic evidence has a tie,
18   it's not just attorney argument to the intrinsic evidence.
19        The Faison reference has no tie to this that's
20   referenced, there's no explicit tie to this.  And it's just
21   a cherry-picked reference for event-driven programming.
22        So, in sum, I think this is a little bit of a
23   lot to do about not much.  But an event could be a
24   detectible condition or you could use the phrase "action or
25   occurrence," which they've used in their alternative

36

1    construction that can trigger a response in the system,
2    including or such as a notification.
3         THE COURT:  Okay.
4         All right.  Why don't we move on just to make
5    sure we stay on time to our second term, which is "title
6    bar."  And let me again turn to plaintiff's counsel to
7    begin.
8         MR. EDMONDS:  Thank you, Your Honor.
9         So with respect to a title bar, the main dispute
10   between the parties is the bodies for maximizing, minimizing
11   or closing the window.  With respect to that, we point out
12   that a title bar -- the ordinary meaning of a title bar is
13   something that has the buttons, you may include them --
14   they're typically there are -- the definition proffered by
15   LinkedIn says most of them have them, but that a title bar
16   is something that has these buttons and you can -- they are
17   typically displayed most of the time.
18        With respect to that, we point out that
19   Microsoft has -- we cited another definition by Microsoft
20   that says that the buttons are there, as we believe that
21   they are there, it's just a question of whether they're --
22   it'd be typically that they'd be displayed or not.
23        So I think that's really the main issue there.
24   So if you --
25        THE COURT:  And let me just jump in to say when

37

1    I read --
2         MR. EDMONDS:  Yeah.
3         THE COURT:  -- these, this is another one where
4    I wasn't certain there was actually a dispute.
5         In other words, one question is:  In your
6    construction, it reads, you know, "...about the application,
7    typically its name or acted process," which I think pretty
8    clearly you were saying name or acted process is typically a
9    part of a title bar, but not necessarily every single time.
10   And then ",as well as buttons..."
11        I think one question was:  Does typically also
12   modify buttons?  In other words, in your construction were
13   you saying, look, a title bar typically has buttons, like
14   the ones I'm going to describe, but not 100 percent of time,
15   occasionally it might not; just saying typically it does.
16        I think the other side, if I was reading it
17   right, was viewing your construction as saying it required
18   buttons of those kinds every time.
19        But then when I read your brief, I wasn't so
20   sure that you were saying that.  And I think based on what I
21   just heard you used the word "typically" a few times, so I
22   guess the question is:  When it comes to the buttons, does
23   your construction require that a title bar must always have
24   buttons for minimizing, maximizing or closing the window
25   displaying the application or just that it typically does?

38

1    MR. EDMONDS:  It must happen that they were
2    typically displayed.
3        You can configure a title bar to display them or
4    not, but that is a fundamental requirement of a title bar.
5    And I defer the Court to a definition from PC Magazine, it
6    says it also has buttons that are clicked to minimize and
7    restore the window and makes the application.
8        Then also the definition from Microsoft itself,
9    which is at Joint Exhibit Q, which says, and I quote:
10   "Title bars contain at least three small buttons that
11   minimize, maximize or restore and close the windows
12   associated with title bar."  I think that the -- hopefully,
13   there was no ambiguity in our construction, but typically
14   was meant to modify the name or active process, not the
15   requirement of buttons.
16       I think the rub of the issue is that a title bar
17   is something that has these close, minimize, maximum
18   buttons, but they're typically displayed or as the
19   definition relied on by LinkedIn says "most."  But they're
20   there whether they are displayed or not.
21       So I think that sums up what the issue is.
22       I know --
23       THE COURT:  Let me just stop you because I'm
24   still not sure I'm clear.
25       MR. EDMONDS:  Yeah.

39

1        THE COURT:  It sounds like what you just said is
2    a title bar must have these buttons, but they need not
3    always be "displayed."  So you can have some world in which
4    a title bar has the buttons, but they are not displayed, so,
5    what, like you can't see them on the title bar?
6        MR. EDMONDS:  Yeah.
7        THE COURT:  How does that work?
8        MR. EDMONDS:  So title bar -- you can go in --
9    if you're an advanced programmer -- you know, that's why we
10   have some definitions that just say they have the buttons
11   and others that say they're typical, is because you can
12   configure a title bar and you can activate those buttons or
13   not, but the functionality is there.
14       If there was no facility for a close, minimize,
15   maximize, that might be a strip on a user interface, but it
16   wouldn't be a title bar, because it doesn't have that
17   capability.  That's --
18       THE COURT:  Actually, now that I'm hearing you,
19   I'm not even sure your construction -- I'm not sure your
20   construction is actually consistent with what you're saying.
21       So, like, when we look at your construction, it
22   says:  "A title bar is a bar at the top of a window for an
23   application which..."  and then the next word is "displays."
24   So the bar has to display information about the application.
25       And then it says:  "Typically its name or active

40

1    process."  So from that I take it, I don't think you
2    disagree, that a bar does not have to always display its
3    name or active process; it typically does, but doesn't
4    always have to.
5        Then we get to the rest, "as well as buttons."
6        So I think you told me that typically was not
7    meant to modify "as well as buttons."  And that would mean,
8    if you're right, that the title bar is a bar that displays
9    information about the application "...as well as buttons,"
10   meaning it always displays the buttons.  But I think just
11   now you said, no, we mean title bar, it's always got buttons
12   but sometimes they're not displayed.
13       So that sounds to me like you're saying
14   typically does modify the display of the buttons.  I guess
15   I'm just trying to understand what is the construction and
16   what does it mean.
17       MR. EDMONDS:  Okay.  Fair enough.
18       The buttons are there, but they can be
19   deactivated, so the word -- "typically" is not meant to
20   modify those.  If I deactivate the buttons, it's still a
21   title bar because I can reactivate the buttons.
22       If there's no facility for the buttons at all,
23   then it's not a title bar.  That's the difference.
24       So --
25       THE COURT:  But if the buttons are deactivated,

41

1    how can they be displayed?
2        MR. EDMONDS:  They're only displayed if
3    they're --
4        THE COURT:  Oh they're --
5        MR. EDMONDS:  Carried out.
6        THE COURT:  Oh, they are only displayed if they
7    are activated?
8        MR. EDMONDS:  Right.  So the PC Magazine
9    definition that says "it also has buttons" and the Microsoft
10   definition that says "the bar contains at least three small
11   buttons," you know, if you deactivated those buttons, then
12   they -- they could be -- they wouldn't be shown to the user,
13   you'd need to reactivate them for the buttons to reappear,
14   but it still has -- the buttons are part of the title bar,
15   whether they're displayed to the user or not.
16       So I think that's a fair criticism of our
17   construction to say that --
18       THE COURT:  Like the other --
19       MR. EDMONDS:  You only have to display the
20   buttons, if you deactivated them they would not necessarily
21   be displayed.  So a better wording with that would be which
22   has information about the application as well as buttons:
23   and then you could display the buttons or not depending on
24   whether the buttons are active, but there still has to be
25   that functionality as -- - I think that's borne out really

42

1 by all the definitions that everyone has.  That in order for
2 something to be typical, it has to be part of the
3 functionality there that you could activate or deactivate.
4 And some of the definitions just say it "contains" because
5 they just -- that is simply part of what a title bar is.
6         It has a title and it has these buttons, I could
7 charge the title, I could deactivate the buttons, but I'd
8 also have to be able to reactivate the buttons and I could
9 change the title back to what it originally was.
10        THE COURT:  How would you know a title bar has
11 buttons if know can't see it?
12        MR. EDMONDS:  Well, we know it has buttons if
13 you can't see them because there would be the capability of
14 reactivating them.
15        I mean, you -- let's just take a bar at -- I'm
16 looking at Teams, which the Court is, too, or, frankly, even
17 looking at the full version of Adobe, it has those --
18 there's that little dash and a square and an X, those are
19 kind of ubiquitous of what the symbols would be for those
20 minimize, maximize, close.
21        You could hide those buttons or -- well, really
22 you'd just be hiding them, but they would still -- they
23 would still be a title bar.  The difference would be if I
24 had just a program that didn't have a title bar and it just
25 had a bar in the program -- you know, if I had to hire a

43

1 programmer to come in and program from scratch to add these
2 buttons, well that's not a title bar.
3         But if I can activate or deactivate the buttons,
4 then that's a title bar.  So they don't have to always be
5 displayed, but they need to be -- for it to be a title bar,
6 it has to have the buttons: whether or not you've activated
7 them to be displayed or not.  I think that harmonizes all
8 four definitions that have been proffered, because two of
9 the definitions say "had the buttons," one said "they're
10 typically there," one says "mostly there."  And the
11 harmonizing of those is that they are there, you just don't
12 always display them.
13        THE COURT:  But if -- there are some definitions
14 that say buttons are typically in a title bar, I mean, can't
15 that be read or understood that in some cases they're just
16 not there at all, whether they're -- whether they're
17 displayed -- you know, that they are not displayed, they're
18 not -- they're not deactivated because they're just not
19 there.  Can't -- so the definitions that say "buttons are
20 typically there," can't those definitions allow for them not
21 being there at all in any form?
22        MR. EDMONDS:  They -- well, you know, then you
23 say well, which definition is the correct one?  Because the
24 PC Magazine says it has the buttons, the Microsoft
25 definition we're relying on says it contains the buttons.

44

1         And, so, then the question would be is there any
2 consistency between saying that it has the buttons and
3 saying that it typically includes the buttons.  And the
4 correct commoditization to that is that it typically
5 includes the buttons because the buttons can be hidden or
6 deactivated, but they're still there.  And that's consistent
7 with all four of the definitions.
8         So I don't --
9         THE COURT:  I guess when you have a fight about
10 claim construction and you get, like, a couple of
11 definitions, the side who wants the narrower construction,
12 it's hard for that side if, like, three of the four
13 definitions go forward, but one goes against it, or it's two
14 and two.  Because, in essence, as long as the definitions
15 themselves are all kind of like relevant in the art, at the
16 time, if half of them go broader and half of them go narrow,
17 you know, the side who is seeking the narrower is usually in
18 trouble, and -- because, you know, they've got it boxed out
19 the possibility that this thing can be broader.
20        And so, you know, I guess it may come up in
21 other terms, too, but if I'm not sure whether buttons have
22 to be included in a title bar every single time, and there
23 are some definitions that say -- or that seem to suggest,
24 you know, sometimes they don't have to be there: doesn't
25 that hurt your position?

45

1         MR. EDMONDS:  It would hurt our position if the
2 constructions were inconsistent, but I don't think they are
3 inconsistent because they're -- to say they are included --
4 typically included doesn't mean that they're not present in
5 the title bar, it just means that they are not displayed.
6         So I think a way to -- we use the word
7 "display," and when we talked about displaying the buttons,
8 they are -- the functionality is build into a title bar for
9 the minimize, maximize or closing, it's just that they --
10 you could say that they are typically displayed.  That would
11 be acceptable.  I think that would be consistent with all of
12 the definitions.
13        As long as the title bar has the buttons and
14 they are typically displayed, that would be consistent with
15 all and that would be fine with eBuddy in the sense that
16 that captures what a title bar is.
17        THE COURT:  And part of your construction that
18 says "typically its name or active process," I think based
19 on what you've just said now, what you mean is when it comes
20 to the name or active process, the name doesn't necessarily
21 have to be displayed, but it does have to be there
22 somewhere; is that -- just like the buttons: is that right?
23 Is that what you mean?
24        MR. EDMONDS:  No, I think that the title --
25 typically there is simply that the title would typically be

**46**

1 the name or the active proces.

2      I don't think that that's really a dispute in
3 terms of that -- a title is a title. I think the dispute is
4 over the buttons.

5      THE COURT: Because I read LinkedIn's
6 construction where they say that contains the name of the
7 window. And it sounded like one possible dispute here was
8 LinkedIn is saying every single time, 100 percent of the
9 time when it comes to a title bar, there will be a name in
10 that title bar.

11      Like -- at one point in their brief they said,
12 heck, the thing is called "title bar," so it's a bar that
13 100 percent of the time has a title in it, i.e., a name, I
14 think is what they are saying.

15      Whereas, yours seemed to be saying could have
16 title, could have a name, but maybe not all the time. So I
17 thought that was a dispute.

18      Do you think it's not?

19      MR. EDMONDS: When you put it in those terms, I
20 would say that it is. And I think the way to frame a
21 dispute would be part of what -- part of what these patents
22 are about is an alternative title and the alternate title is
23 not going to the name of the window. So, you know -- and it
24 says clearly --  the alternate title is a title bar. So
25 that's -- if the name of the window -- I agree with that.

**47**

1 It seems like an alternate title would be the name of the
2 window and that couldn't be correct. And plus the
3 windows -- the name of the Window comes from this computer
4 dictionary, the Microsoft Computer Dictionary, and it's
5 using the word "Window" because it's Window-specific. And I
6 think that should be a red flag for the Court as to whether
7 that kind of Window-specific definition is what the Court
8 should apply to claims that aren't limited to something
9 running in the Windows operating system, in which there's no
10 statement of specification that they are -- it's just a
11 screen shot, it's from a browser that's running in the
12 Windows.

13      But the word "Window" just -- that's kind of
14 Microsoft-specific and they might consider the window of
15 being kind of another way of stating title. It doesn't
16 appear to me that they're saying that the name of the Window
17 is different than the title that's just kind of something
18 that they're referring to that's the text that's displayed.

19      But if you use the word "title" in title bar, I
20 think it would be hard for the parties to disagree with
21 that. And I think that's really what eBuddy's tried to
22 accomplish.

23      THE COURT: Tell me -- I think what you're
24 saying, Mr. Edmonds there, is the question I had for
25 defendant. Let me read the question I was going to ask

**48**

1 them, so you can get a preview of it, but I think it is the
2 same thing you're saying which is -- and it relates to the
3 fact that in defendant's construction there is the phrase
4 "contains the name of the Window."

5      So my question was: Isn't part of the idea of
6 the invention that we're going to put the name of an event,
7 i.e., not the name of an application in the title bar. And
8 so does it always have to be "the name of the Window that's
9 in the title bar," i.e., isn't part of the idea of the
10 invention we're going to put something else in the title bar
11 instead of the name of the Window: say text relating to this
12 event, that's the whole point.

13      Is that what you were just saying?

14      MR. EDMONDS: Yes. To be a little more precise,
15 the alternative title is logically tied to the event in the
16 claims, but it's not necessarily the name of the event
17 itself.

18      But, yes, with that just, kind of, refinement,
19 what the Court said is correct in a sense that the
20 alternative title would take place, the alternative title
21 would not be the name of the Window, clearly it would be
22 something else. But unless it's saying the name of Windows
23 is whatever name in the Window, it could be the alternative
24 title. If it's that generic, then it doesn't seem to be
25 problematic, but I think that would probably be for LinkedIn

**49**

1 to explain exactly what they mean by name of the Window.

2      THE COURT: Okay. And I know --- we may also be
3 having another dispute about whether, you know, the title
4 bar has got to be substantially longer than it is wide. You
5 kept saying that in your brief, they kept not answering it.
6 I'll ask them in a second. Maybe they agree that it does
7 have to be and then that's not a third dispute we're having
8 here, but otherwise I think we've talked about the main
9 ones. But is there more you want to say about this term?

10      MR. EDMONDS: Just speaking to that briefly, I
11 guess the dichotomy is for title bar LinkedIn wants to use
12 some other language here about this band for task bar, which
13 we haven't gotten to yet.

14      They define task bar as a tool bar, so they use
15 the word "bar." It seems like everyone understands what the
16 word "bar" is. And, you know, to the extent there's now a
17 dispute over it that the Court should resolve it, and -- you
18 know we've cited -- and I don't think it's really been
19 refuted by LinkedIn that a bar is something that is longer
20 than it is wide.

21      One definition says "much longer," the other
22 says "relatively long." But it's longer than it is wide, so
23 it's not, you know, not necessarily just horizontal.

24      It's not clear to us why they -- why a bar just
25 can't be a bar, just like it is with a task bar. But to the

50

1    extent that there is a dispute over whether a bar needs to
2    be long and straight or relatively long, then the Court
3    could incorporate that in or just use the word "bar," which
4    is what we would say is what I think the jury would
5    understand what a bar is and what a bar isn't, as suggested
6    by LinkedIn's construction of task bar.
7          THE COURT:  I guess one last question about the
8    name or active process part of your construction, I think --
9    again, I thought in the briefs the other side was saying
10   "must include the name of the window."  You're saying
11   "typically the applications of name or active process is
12   listed, but not always."  I think in explaining why
13   "typically" you said, well, look, there might be something
14   else other than the name of the application, i.e., maybe
15   some text relating to alternative title.  I think it's in
16   there.
17         But one way or the other, do you agree that a
18   title bar has to include the name of something?  You know,
19   something that gets to title.  Like it couldn't have, like,
20   no text in, could it?
21         MR. EDMONDS:  No, it needs to have a -- title
22   means title.  And you can enter something into the -- when
23   the program is interacting with the interface and with the
24   operating system, but with the interface then it's going to
25   provide a title.  This is who I am, this is the title.  And

51

1    so the title could be -- it should have something to do with
2    the application, it's not just going to be, kind of willy
3    nilly words there.
4          The name of the window to me just seems like I'd
5    name the window and it's not necessarily tied to the
6    application itself.  Whereas, it's really information with
7    some kind of a nexus to the application.  I mean, typically
8    its name or the active process, but -- if there's nothing
9    there, then there's no title.
10         And, you know, the title could be what I assign
11   the title to be, but in the normal course, unless you put an
12   alternative title, then the title of the program -- it might
13   be its name, but it also might be, you know, something about
14   the program.  Again, the active process of the program, not
15   necessarily the name of it.  There could be kind of a
16   brand-name in the program and it might have the active
17   process there.
18         So I think information about the application
19   just gives it some type of, you know, reasonable nexus to
20   what would be in a title bar, but in essence the title is
21   what is in.  And you could change the title.
22         And I think as long as the Court's construction
23   captures that, then everybody should be -- would be okay
24   with that.  And it wouldn't be limited to the name of the
25   program.

52

1          THE COURT:  When you say "active process" is
2    that like a synonym for like thing that the application is
3    doing?
4          MR. EDMONDS:  The program.  It could be a thing
5    the program is doing or the program itself.
6          THE COURT:  Okay.
7          All right.  Let me turn to defendant's counsel
8    to get their argument as to this term.
9          MR. WEBER:  Thank you, Your Honor.
10         So there's a couple of problems here.  Number
11   one, I heard a complaint that ours was tied to just the
12   Windows environment.  That -- I don't understand that
13   complaint because the plaintiff's proposed construction says
14   that the title bar is a bar at a top of a window.  Our
15   construction also says that the title bar, as the name
16   connotes plainly, is just the name of a window.
17         Our term is the -- reflects -- our construction
18   reflects the ordinary construction of this very simple term
19   "title bar."
20         The name of the window is simply the title or
21   name that's placed in that portion of the window.  It's the
22   horizontal space or horizontal band or bar at the top of the
23   window.
24         Plaintiff's construction would seem to be
25   problematic with respect to placing an alternative title in

53

1    there.  If the information that must be displayed is
2    information about the application, their claims talk about
3    information displayed about an event.
4          LinkedIn's construction would be broad enough to
5    capture that functionality because a title bar is simply the
6    name of the window.  And the horizontal space, yes, it is
7    longer than it is wide, it's a band, these are not
8    complicated terms that a jury won't understand.
9          So that's my first point here is that there's no
10   dispute on a window, that's part of their construction as
11   well.  Their construction is problematic because it says it
12   displays information about the application, typically it's
13   name.  They've got that backwards.
14         If it displays information about the application
15   that would seem to be problematic with the claim
16   functionality in which titles are replaced with other text.
17         THE COURT:  So I think, Mr. Weber, what you're
18   saying is by name of the window, you didn't mean name of the
19   application or name of the program, necessarily, you just
20   meant, like, name of the window in the sense that, like,
21   whatever the text is in that window, that title bar, that's
22   what you're talking about: i.e., it can be text that relates
23   to the particular application or program that the window is
24   displaying, but it could also be text about, like, for
25   example, from an alternative title, a text about some other

54

1 event, etc.

2 And you think it's their construction that looks

3 limiting to just, like, text relating to an application,

4 etc.

5 Am I right so far?

6 MR. WEBER: Precisely. Title bar is simple.

7 It's a bar with a title. So the name is simply another word

8 for title bar. This is a -- as in LinkedIn's proposal, this

9 is a plain and ordinary meaning term.

10 They've imported a confusing and now

11 construction that they're walking back. And so that's the

12 second part that I'd like to address.

13 LinkedIn's construction, as Your Honor just

14 mentioned, just simply means the name of the window,

15 whatever that text would be. They say that it -- their

16 original construction is that this title bar displays and

17 must display buttons for minimizing, maximizing or closing

18 the window displaying the application.

19 They did not brief or ever mention before,

20 including in our meet-and-confer last Monday, the 7th, that

21 this meant that it could be such that those functionalities

22 are disabled or deactivated and still there, but not

23 displayed.

24 That argument is waived and is inconsistent with

25 their construction, number one.

55

1 Number two, there's no support for that.

2 There's no discussion in these event notification patents

3 about deactivating control buttons. There's no discussion

4 of that in the extrinsic evidence.

5 What the title bar is is simply a bar that

6 contains the name of the window and it can typically include

7 also these control buttons. What "typically" means in plain

8 English is that it does not have to remove those buttons.

9 And simply -- that's what LinkedIn's construction is

10 capturing, it's from the Microsoft Dictionary. Again, these

11 are Microsoft applications. Microsoft defined this term at

12 the relevant time period consistent with our construction.

13 And there's simply no support for plaintiff's construction,

14 including their own extrinsic evidence says that the control

15 buttons are typically displayed. That means not always.

16 And so, if the construction was the name of the

17 window and typically includes the close, minimize and

18 maximize buttons -- in other words, not always, but

19 sometimes -- that would be an acceptable construction and

20 that's what the title bar is.

21 THE COURT: So tell me, Mr. Weber, if I'm right

22 because you could read the plaintiff's constructions in

23 different ways, just as I was, I think, suggesting by my

24 questions.

25 One way you could have read it was that the

56

1 original construction says that a title bar is something

2 that displays information about the application as well as

3 buttons; meaning it displays buttons. In other words, that

4 the plaintiff's suggestion was that the title bar always

5 must display the buttons, 100 percent of the time.

6 And what I think part of your point there is if

7 that is what they are saying, which is what I think possibly

8 what you thought was in the briefs, here's arguments about

9 why no, a title bar doesn't always have to display buttons,

10 it can, but doesn't always have to.

11 And a second piece of your argument as to that

12 line of argument is to say well, if today plaintiff is

13 saying actually that's quite not right, we didn't mean

14 always displays buttons, we meant always has buttons, often

15 displays them. You're saying, hey, that argument wasn't

16 made in the briefs and, you know, we think it's waived and

17 otherwise there's not support for it.

18 And I think lastly you're saying if you would

19 have read plaintiff's original construction as having

20 typically modified buttons, i.e., displays information

21 typically ... buttons, then that construction would allow

22 for a world where you don't display button because they are

23 not and we think that's correct.

24 Is that all what you're saying?

25 MR. WEBER: That's correct, Your Honor.

57

1 During the parties meet-and-confer -- you had

2 that exactly correct.

3 During the parties meet-and-confer on the 7th, I

4 asked them preciously this question: Whether the term

5 "typically" modified the phrase regarding the buttons.

6 And they confirmed for me that it does not. And so that is

7 why we briefed this, this is why it's still before the Court

8 now. And there's no support for limiting it to a situation

9 in which those buttons must be displayed or even must be

10 present. Which I'm not really understanding what they mean

11 by that, that it could be deactivated, not displayed. I

12 don't know what means. I have not seen that in any of the

13 evidence. And so there's no support for it.

14 And, so, Your Honor summarized that correctly.

15 Title bar is something that contains the name of the window,

16 whether that name switches to something that reflects an

17 event or it could be something that switches to reflect

18 information about the application, that's what a title bar

19 is. Title bar can display control buttons, but does not

20 have to. That's what the extrinsic evidence and intrinsic

21 evidence support. And I'm not really understanding

22 plaintiff's new position, but, in any event, it's not

23 supported.

24 THE COURT: What you're saying is in the

25 meet-and-confer you asked the specific question, hey,

58

1  plaintiff, do you mean always displays buttons or do you
2  mean typically displays buttons?  And the response you got
3  was we mean always displays buttons.  And now you're saying
4  today we're hearing from plaintiff that actually no, what we
5  want the construction to mean is always has buttons, often
6  displays them, but sometimes they're hidden.  And that's
7  just inconsistent with the representation that was made at
8  the meet-and-confer, which is that the construction was
9  displayed button, always displays them; is that right?
10         MR. WEBER:  That's accurate.  And that's what
11  their proposed construction is in the brief.  It says:
12  "Displays information about the application as well as
13  buttons."  So it's saying displays those buttons and they
14  confirmed for me that typically not modifying that second
15  phrase about displaying the buttons.  But that -- in other
16  words, the buttons must be displayed.
17         THE COURT:  In terms of the buttons, if the
18  argument now -- and again you say it's waived, but if I were
19  to consider it that well, look the buttons have been to be
20  there 100 percent of time, sometimes they might be obscured
21  but they're there, I guess the argument must be that per the
22  patent title bars just have to absolutely have these buttons
23  for minimizing, maximizing and closing.  They've got to.
24  That's like an inherent characteristic of any title bar.  It
25  would be crazy to have a title bar that doesn't have them.

59

1         And, you know, it's true like at the top of my
2  Team screen does have them and lots of title bars do, but I
3  think your -- part of your reaction would be no, it's not
4  100 percent required.  You can have title bars that don't
5  have these buttons for minimizing, maximizing or closing.
6         Is there -- in support of that position,
7  anything more you want to say?
8         MR. WEBER:  Well, I won't go over too much, but
9  I would say, again, their own extrinsic evidence that -- I
10  think it's the Technopedia reference, it's Joint Appendix
11  Exhibit F, says that typically includes those buttons.
12  That's consistent with the Microsoft Dictionary definition
13  from the relevant time period.
14         And, again, these are displaying Microsoft
15  applications and Microsoft defined these.  It just means
16  that it has to have the name of the window and most have
17  these buttons but not all, and so that's what the accurate
18  definition is.  And including under their -- some of their
19  own evidence.
20         THE COURT:  If the Technopedia Dictionary helps
21  you here, are you okay with me using it, even if it's from a
22  different time period?
23         I know sometimes some of these dictionaries you
24  don't love because they may be from the present day, but it
25  sounds like here you'd be okay with me relying on it if it

60

1  helps you.
2         MR. WEBER:  No -- well, what I would say to that
3  is -- and we previewed this at the beginning.  Is that you
4  could show a later definition would have application to
5  patent consideration if there's evidence that the definition
6  hasn't changed.  And, so, here at the relevant time period
7  by a relevant piece of extrinsic evidence, Microsoft
8  Dictionary, it says that this thing has the name of a window
9  and typically has this other information on it.
10         Now, this later evidence from Technopedia
11  happens to be consistent with the correct definition from
12  the relevant time period.  So for this definition it's
13  consistent, but not for other ones.
14         And so for the other definitions, you have to go
15  to the relevant time period and with extrinsic evidence that
16  has it tied to the patent.
17         THE COURT:  So I think what you're saying is
18  that under the law if you want to try to use a dictionary
19  definition as extrinsic evidence in claim construction that
20  is indisputably from a time period other than the relevant
21  time period here where a POSITA would be trying to
22  understand the claims, you kind of have a burden to -- you
23  have a burden to demonstrate that the definition hasn't
24  changed before one can rely on it.  And you don't think the
25  plaintiff has, kind of, met that burden when it comes to

61

1  those dictionaries.
2         MR. WEBER:  That's precisely the case.
3         So that's -- you know, fundamental but Phillips,
4  the en banc decision from 2005, said that this information
5  has to be from the relevant time period.  So if it's not,
6  you know -- a per se burden -- you have a burden to show
7  the definition you're from proffering from present time has
8  any applicability to these patents.
9         THE COURT:  And, in this instance, I guess your
10  position would be, but, look, Judge even if you somehow
11  determine that as to say the definition you, know,
12  dictionary, they have met that burden.
13         In this case, that just demonstrates that we're
14  right, because that's an example of a definition -- if
15  you're going to consider it -- that appears to not require a
16  title bar to have these buttons in them, at least if you
17  read the definition on its face.
18         Is that what you're saying?
19         MR. WEBER:  Yes, exactly.  It's consistent with
20  the Microsoft definition and it just shows that their own
21  evidence doesn't support the position.
22         THE COURT:  And I guess last question here, I
23  couldn't tell from the briefing, we were having a third --
24  we're having a dispute about buttons, we're having -- well,
25  I think we're having a dispute about -- we may or may not be

62

1  having a dispute -- the dispute we have about name if there
2  is one is different than what I thought it is. And I think
3  you're saying, look, there's got to be a name, there's got
4  to be a title in there -- it does haven't to be the name of
5  a application, by saying name of window, that's not what we
6  meant. You just literally meant the title, the text in the
7  thing.
8           I'm not sure what dispute we're having there, if
9  any, but... Then the third piece was, you know, they want
10 title bar to mean horizontal bar or band. I think you said
11 at one point horizontal band, yes. But I think by that they
12 also mean a requirement that it's substantially longer than
13 it is wide. You agree that a title bar must be
14 substantially longer than it is wide?
15          MR. WEBER: You know, I think the term "band"
16 connotes that type of an orientation, yes.
17          THE COURT: Okay. So it sounds like no dispute
18 there.
19          MR. WEBER: No, I don't think the dispute on --
20 is the shape of this thing. It's a band at the top of the
21 window that includes the name of the window, and that's what
22 the evidence supports.
23          THE COURT: Mr. Weber, can I just ask, again
24 ultimately the right construction here the going to be
25 focused on intrinsic evidence, but it sometimes helps when

63

1  you know this, are some of the disputes we're having about
2  claims construction not necessarily infringement-related but
3  invalidity-related?
4           MR. WEBER: I believe so. Some of this,
5  honestly, is a little opaque to me why they're attempting to
6  import these limitations in. LinkedIn -- I would mention
7  that all the terms that we're considering here today were
8  proposed for construction by plaintiff.
9           And, so, in all these constructions you'll
10 notice a theme in which they're trying to import extra
11 limitations into these terms that are not justified in
12 LinkedIn's opinion. But that's why we're here.
13          So plaintiff proposed all these terms for
14 construction. LinkedIn is trying to remain true to the
15 actual intrinsic -- extrinsic evidence. And so when you
16 propose something like the title bar and event that goes
17 beyond that, we'll argue against it just because it's not
18 supported in the record. And so I think that some of this
19 will go to invalidity. I'm not sure of their game plan, but
20 that's, that's why we're here.
21          THE COURT: Okay.
22          All right. Anything further, Mr. Weber?
23          MR. WEBER: No, not on this term. Thank you.
24          THE COURT: Okay. Let me give a chance for
25 brief rebuttal before we finish it. Mr. Edmonds, I'll turn

64

1  back to you.
2           MR. EDMONDS: Thank you, Your Honor.
3           So with respect to the authority cited by
4  eBuddy, you know, an expert could say this is what -- this
5  term later in time, an expert can point to a reference, some
6  references are undated. In this instance, our expert has
7  pointed to an undated reference and this shows what it meant
8  at that time: and that meets Phillips. So that argument
9  really shouldn't take up a whole lot of the Court's time.
10 An expert can make the linkage between an undated definition
11 and the time of the patent, which has been done here.
12          THE COURT: Mr. Edmonds, you're saying any time
13 you actually rely on a definition that comes from a source
14 that postdates the '06 date, I'll find, in Mr. Surati's
15 declaration an assertion that the definition that you're
16 using is one that would have been just as viable to a person
17 in the skill of the art back in '06, and so that will be the
18 link that's needed to allow me to consider that later in
19 time definition: is that right?
20          MR. EDMONDS: Correct. In its response,
21 LinkedIn made the objection. And in our reply we closed the
22 loop by having Dr. Surati vouch for those definitions, which
23 have been proffered in the first instance in our opening
24 brief.
25          THE COURT: Anything you want to say if they

65

1  were to say, well, look since it was plaintiff's burden if
2  they wanted to make that link, they should have made it in
3  the opening brief, and -- you know, closing the loop in
4  later briefs is something that should not be counted
5  against.
6           MR. EDMONDS: Well, they didn't -- we didn't
7  anticipate that they would be objecting and saying that that
8  wasn't an appropriate definition because of -- it wasn't
9  dated. And they raised the objection, and in response to
10 the objection we closed the loop: that just seems what's
11 proper for a reply. We shouldn't have to anticipate an
12 objection that we weren't aware that they were going to
13 make.
14          THE COURT: Okay. Let me let you continue.
15          MR. EDMONDS: Okay. So going back to the
16 construction -- and my apologies to the Court if somehow I
17 threw some confusion in the mix.
18          But displays information about the application
19 ... as well as buttons. And it was pointed out, we said at
20 the meet-and-confer, that's what we meant and that is indeed
21 what we meant. And I think what's part of the confusion is
22 the word "typically" is used with respect to interactive
23 process and then you also see the word "typically" used in
24 one of these definitions, although typically is being used
25 twice and perhaps has muddied the water.

66

1    So if I may somewhat clarify some confusion I
2    might have added to the mix.  Our position is -- and our
3    position was, has been, remains that, as the Court
4    mentioned, in the title bar are buttons for minimizing,
5    maximizing or closing an application, as evidenced by the PC
6    Magazine definition as also evidenced by the Microsoft
7    definition, which is at Joint Exhibit Q.
8    And that where I use the word "typically," what
9    I was attempting to do for the Court is to harmonize when
10   you have a definition that talks about typically or mostly,
11   what that's speaking to is that although the buttons are
12   there to be to be displayed, they could be turned off.  And
13   that is what we mean by that.  And I think that harmonizes
14   all of those definitions.
15   If some tweaking was needed by the Court to make
16   that clearer, we invite the Court -- that is perfectly fine
17   and it could be that -- but, in any event, the buttons are
18   endemic to -- as we've seen in our construction and is borne
19   out by Exhibit Q and also Exhibit G.  The buttons must be
20   there, it's just a question of whether they are displayed;
21   and one reference talks "typically," one says "mostly."
22   If the Court was to go with Microsoft -- I'm
23   sorry, LinkedIn's definition or something like it, theirs is
24   missing part of the definition.
25   What they cite from Microsoft says:  Most title

67

1    bars contain boxes of buttons proposing and resizing, but
2    they left that off.
3    So, as the Court -- if the Court was saying,
4    well, the Court might go with the tech terms definition,
5    that's not that far off in that respect from the LinkedIn
6    definition, LinkedIn is just incomplete.
7    But our position and hopefully -- it hasn't
8    changed, our motion is that those buttons are endemic to a
9    title bar; and whether they're displayed or not, would be up
10   to the configuration which harmonizes those definitions.
11   And then there has to be this -- I think I
12   better understand, thanks to the comments by LinkedIn's
13   counsel, this name of the window.  Because it sounded like
14   the beginning maybe we both took it that that was meant to
15   be restrictive and that that was some specific name, and
16   LinkedIn has kind of clarified and says well, that's -- it
17   could really be anything you put the name in.
18   The problem with that is is that it now kind of
19   divorces a title from a title bar.  And the title bar is
20   something that has this title of the application, which
21   would be -- we put in information about the application, we
22   have to have some nexus to the application itself.
23   Now, when you put in an alternative title that
24   wouldn't necessarily, as counsel pointed out, the Court
25   pointed out and that we all agree, the alternative title

68

1    would not need to be information about the application.
2    Alternative title would be something that's generated
3    because of the event, but that doesn't -- I don't think that
4    that's in disharmony with the definition of a title bar.
5    But as we see it, as LinkedIn has now articulated it, is is
6    just a name -- the window -- so, for example, if I was
7    looking at a stock ticker and sees at the New York Stock
8    Exchange, one might call that a title bar because there's
9    information that's scrolling across the top of the window.
10   But that's not a title bar in this context, one of ordinary
11   skill in the art would not call that a title bar.
12   A title bar would need to have some type of a
13   title that displays information about the application is a
14   sufficient nexus to distinguish a title bar from a ticker
15   tape or from just anything that's at the top -- at the top
16   of an interface or an open window.  It wouldn't just be
17   anything.
18   THE COURT:  Let me just break those down,
19   because you're making two points there.  One you're talking
20   about the button issue and one you're talking about the name
21   issue.
22   On the button's issue, I think what they're
23   saying is the original construction says -- and I think
24   they're saying you confirmed this at the meet-and-confer, it
25   always displays buttons; it also displays buttons.

69

1    I think you're saying now that that
2    construction -- to the extent it says that -- is incorrect.
3    We didn't mean always displays buttons, we meant always has
4    buttons, typically displays them; am I right?
5    MR. EDMONDS:  No, I think there's a slight shift
6    there.
7    The word "always" is not in the construction,
8    it's "which displays buttons."  A title bar does display
9    buttons, there is no change in anybody's position.  It's
10   just that a title bar displays buttons that you could turn
11   off the buttons, but a title bar is something that displays
12   buttons, it's endemic in the title bar.
13   THE COURT:  How could a title -- how could the
14   use of -- in your construction it used the word -- you know,
15   let's be fair to the defendant, right, they have to know
16   what the dispute is so they can brief it so that when we're
17   ready to go in the hearing it's clear what are the other
18   side's position.
19   If your construction says "bar at the top of a
20   window for an application, which displays information... as
21   well as buttons."  You read that and you say, okay, they're
22   saying the bar displays things, including buttons.  It
23   displays them.  And by "displays," I mean, anybody's reading
24   of what displays means is you can see them.
25   I think when you're using the word "displays...

70

1   buttons," we didn't mean can always see them.  We just meant
2   are there, but sometimes could be hidden, such that you
3   can't see them.
4            Isn't that what you're saying?
5            MR. EDMONDS:  I think what we're -- a more
6   accurate recitation of what we're saying is that, you know,
7   horses wear saddles, horses -- it's endemic that a horse
8   wears a saddle.  A horse wouldn't not always need to wear a
9   saddle, but a horse is something that wears a saddle.
10          A title bar is something that displays buttons.
11   We didn't -- we never said always displays buttons.  And the
12   suggest at the meet-and-confer that we used the word
13   "always" is incorrect.
14          At the meet-and-confer, we confirmed that the
15   word "typically" did not modify buttons, which it doesn't.
16   But it does display buttons.  It's inherent with what a
17   title bar does, it's just not -- that functionality isn't
18   always turned on, but it's inherent that it does display
19   buttons.
20          THE COURT:  When you say "always displays...
21   buttons," even though you would allow that the functionality
22   is not always turned on, by displaying what you mean is --
23   by the word "displaying," you're including a scenario where
24   a person cannot see them because their not -- functionality
25   is not turned on; am I right?

71

1          MR. EDMONDS:  Another way of saying that would
2   be that it's capable of displaying buttons.
3          THE COURT:  Right.  Well, that is -- I mean, but
4   that is a very different thing than displays.  And I think
5   that's what the other side is saying, and I think -- I think
6   you're suggesting something that is different is the same:
7   capable of displaying is the same as displaying.  And I'm
8   saying they aren't the same.  And you're not acknowledging
9   that, you're kind of suggesting that they are.  And that's
10   the concern I have, because -- I just want to be clear about
11   what the record is here and what was presented and what was
12   discussed.
13          Mr. Weber was very clear this issue came up in
14   the meet-and-confer, and, I just want to be absolutely
15   crystal clear about what it is that was conveyed and what it
16   is that was not conveyed.  I don't want to be tricky about
17   it, I want to be very clear.
18          Is your view that when you proposed this
19   construction what a reasonable person would understand it to
20   mean is "capable of displaying," is that your view of what
21   your construction meant?
22          MR. EDMONDS:  I think it is -- displaying
23   buttons --
24          THE COURT:  Or are you now changing the
25   construction --

72

1          MR. EDMONDS:  We're not changing it, Your Honor,
2   I'm just suggesting that when we said "displays buttons"
3   that that doesn't -- we didn't have the word "always" --
4   LinkedIn has seemed to insert the word "always" to try to
5   make our construction something that it's not.  We didn't
6   say it always displays button.
7          THE COURT:  You can't just blame it on LinkedIn,
8   I'm inserting it.
9          MR. EDMONDS:  Understood.
10          THE COURT:  You know how claim construction
11   works, the words control.  And if the words denote always,
12   right -- if it's not -- if it's not always, they'll be words
13   that couch, right, they'll be couching words.  That's what
14   claim construction is all about.  There's be words like
15   "capable of" because the words matter.  I mean that's the
16   whole thing.
17          All right.  I think I understand at least where
18   you are on that piece.
19          MR. EDMONDS:  Okay.
20          THE COURT:  When it comes to the name issue, I
21   think maybe what you're saying is both sides agree there
22   must be text in the title bar and both sides agree that text
23   does not have to solely relate to the application or the
24   name of the application.  Because there are times, for
25   example, when an alternative title might be utilized where

73

1   the text in that title bar relates to something else.
2          But I think the issue you are raising was, but,
3   look, it doesn't mean any old text -- and then you're
4   talking about the New York Stock Exchange.  Like, there's
5   got to be something about it that amounts to a title as
6   opposed to just random numbers or letter or whatever.
7          Is that what you were getting at there?
8          MR. EDMONDS:  I think what we were getting at is
9   that -- before you get to the alternative title, a title bar
10   is something that has information about the application: it
11   could be the name, it could be -- it could be the name.  But
12   it needs to have some nexus to the application, it's not
13   some random information.  It's a title bar.
14          Now the claims also have this notion of an
15   alternative title that is placed in the title bar in lieu of
16   the title.  And if -- we don't read that as that that needs
17   to be the same type of information because it's an
18   alternative.
19          We don't read that as it's inconsistent with a
20   title bar in the first instance having information where --
21   about the application in the title just because you can take
22   an alternative title, it's a different type of information,
23   that's an alternative title.  That doesn't now negate it
24   being a title bar, it was a title bar to start with.
25          So I don't think it's necessary to just say open

74

1  season on what a title could be to accommodate the notion of
2  alternative title, because we -- because an alternative
3  title -- we changed the title with alternative title, that
4  wouldn't make it not a title bar you've already said okay, I
5  know what a title bar is now I put in alternative title.
6          THE COURT:  I promise this is my last question,
7  because we do need to move on.  But your original
8  construction said "which displays information about the
9  application, typically its name or active process."
10         I think when you read that, one might think that
11 means that the -- the text, the title in the title bar has
12 to always, 100 percent, be about the application:  i.e., the
13 type of window and what it's trying to do.
14         And, so, I think, if I'm right, the other side
15 is saying that's wrong, because sometimes the title piece of
16 title bar can be words that aren't necessarily about the
17 application, it can be words that are about something else
18 other than the application.
19         Do you disagree with that?
20         MR. EDMONDS:  I -- we don't disagree in the
21 sense the alternative title doesn't need to be about the
22 application.  But if you're saying what is a title bar, then
23 it needs to be information about the application.  And I
24 don't -- again, we don't think that's inconsistent with
25 saying we're going to modify that with an alternative title

75

1  and the alternative title does not need to be information
2  about the application.  Clearly, it is not.  As -- and I
3  don't think that those things are inconsistent because it's
4  an alternative title in the title bar, it's not the title.
5          THE COURT:  Okay.  So does a title -- after an
6  alternative title has been used, does the title bar still
7  have a title?
8          MR. EDMONDS:  It has what's been referred to as
9  an alternative title, which is something that -- you know
10 it's the alternative title because it was put in place of
11 the title, so you know that that's -- that's how you know it
12 was the alternative title.  But, no, it didn't -- if the
13 Court was going to -- if the Court thought its construction
14 was going to require the alternative title to be about the
15 application, then we would take exception to that, too.  But
16 I don't think that that step is required to get a proper
17 construction of title bar.
18         THE COURT:  Okay.  All right.  Gotcha.  Thank
19 you.
20         I'll give Mr. Weber a chance for brief rebuttal
21 on these issues.
22         MR. WEBER:  Thank you, Your Honor.  Just a
23 couple of points.
24         Their expert did not opine on any term except
25 "event" in his opening declaration.  It is their burden to

76

1  show that whatever extrinsic evidence they have if it's
2  outdated or present dated has relevance or shows what this
3  term would mean at the relevant time period.  And they did
4  not have any evidence for that in their opening position,
5  therefore, it's waived.  That's pretty clear.  It's not an
6  objection, it's pointing out an error in their position
7  under the law.
8          Number two, I think -- I'm a little confused
9  because this phrase is being changed from what we understood
10 it to mean.  I asked them whether typically modified the
11 rest of that verbiage?  And they said no.  So I think it was
12 pretty reasonable to assume that they meant that that title
13 bar must display those buttons.  There's no other verb in
14 that sentences except "displays."
15         And I would also pause --
16         THE COURT:  Mr. Weber, I should just say I can't
17 see you.  I can hear you that's fine, but for whatever
18 reason I can't see you.  I don't know if it is because your
19 video is not on or if it has to do with the sharing of the
20 screen on the plaintiff side or what.
21         MR. WEBER:  Okay.  My interface is showing that
22 my camera is on, so maybe it's --
23         THE COURT:  Maybe if plaintiff side could stop
24 sharing its screen.  Thank you.  I think they did.
25         Yeah, right now, Mr. Weber, I just have you as a

77

1  circle with BW in it.  But I can hear you just fine, but --
2  oh, now, you're up.
3          Okay, now I can see you.
4          MR. WEBER:  Okay.  I just had to redo it.  Okay.
5  Sorry about that.
6          THE COURT:  No problem.
7          MR. WEBER:  And then I think the way that I've
8  understood this is that plaintiff is conceding that its
9  definition of title bar where the alternative title is
10 displayed, according to the claim language, would be --
11 would be an inaccurate description of an alternative title.
12         In other words, their proposed construction is
13 inconsistent with the claim language on alternative title
14 being displayed in the title bar if, as their definition
15 plainly says, it displays information about the application.
16         And, so, with those rebuttals, I'm ready to move
17 on to the next term.
18         THE COURT:  Okay.  I know we have taken a lot of
19 time on the first two, so why don't we move forward.
20         And so I think the next term is "task bar"; is
21 that right, Mr. Edmonds?
22         MR. EDMONDS:  That's correct, Your Honor.
23         THE COURT:  All right.  I'll turn to it to
24 plaintiffs counsel then to address task bar.
25         MR. EDMONDS:  All right.  So task bar is another

78

1  term that's -- you know, someone just walking down the
2  street might understand it, it's similar of ordinary skill
3  does understand.  And we cited two definitions for that.
4        LinkedIn cited its own definition.  We have the
5  same issue with undated definitions that were -- the
6  objection was made and the linkage was provided in reply.
7  We continue that is proper.
8        I think that the main dispute between the
9  parties is whether it's this -- the definitions we have have
10  the task bar as a launching pad for applications, ours is
11  holder for icons and indicating running programs.
12        And I'm sure the Court has seen task bars many,
13  many times.  You can probably see one on your computer right
14  now.
15        So the definition that eBuddy has proffered is
16  basically directly from the Techopedia, which is this
17  launching pad and holder for icons.  And I think, as I read
18  LinkedIn's construction, they seem to agree with the
19  launching pad that would -- that would be their select
20  number of applications, but they don't acknowledge that task
21  bar is also a holder indicating running programs.  And so
22  there's something missing from their construction.
23        We point out --
24        THE COURT:  Mr. Edmonds, I'll just say that I
25  thought from reading the briefs that the only dispute was

79

1  about icons.  Like, I thought running programs was like a
2  synonym for active applications.  And like you I thought
3  launching pad was meant to get to -- you know, used to
4  select.  I thought it was just icon.  But you think it's
5  also running programs in your -- that you think is being
6  disputed?
7        MR. EDMONDS:  I think -- well, it's the holder
8  for icons and there's a -- holder for icons indicating
9  running programs.  So I think we're saying the same thing.
10  I think you said the dispute was holder for icons and their
11  icons indicate running programs, so I think that's -- I
12  think that is a dispute.  I think the Court's correct.  I
13  just phrased it just slightly differently.
14        THE COURT:  Okay.  So the big thing is that
15  these task bars have to have icons that relate to running
16  programs or active applications.  You have to have icons,
17  that's kind of the key thing: you think that's right?
18        MR. EDMONDS:  I think that's fundamental, yes,
19  and that's what those icons are.  I mean both of our
20  construction or the definitions proffered by eBuddy have
21  icons and Techopedia talks specifically about their icons
22  indicating the running programs, which is correct.
23        So with the definition that's been provided by
24  LinkedIn is very window specific.  It talks about Windows
25  9X, Windows CE, Windows NT and Windows 2000.  And again, the

80

1  claims aren't limited to something running in the Windows
2  operating system.  There is -- the referred embodiment
3  that's depicted as FireFox running on windows, but there's
4  no statement of patent that it's limited to windows.
5        And that seems to be the only support that
6  LinkedIn has provided is this one definition from a
7  Microsoft dictionary that, again, is very window-specific
8  because it seems -- it just says used in Windows 9X, Windows
9  CE, Windows NT and Windows 2000.  I'm reading from their
10  definition.  It's specific to windows.  It doesn't indicate
11  that it is applicable, broader than that.
12        So if the Court is choosing between definitions,
13  it would chose -- it should chose the ones that are not
14  limited to windows.  So...
15        And the ones that would, I think, be more
16  accurate in that even everyday experience would show that a
17  task bar has icons in it.  So I -- this -- LinkedIn also has
18  a critique where it says in a specification -- at about
19  columns 6, lines 1 through 6, says the task bar is simply
20  illustrative, but that's referring to a title bar.  It's
21  actually referring to information in the title bar, it's not
22  referring to the task bar at all.  And they cited that in
23  their -- it's in their slides with respect to supporting an
24  argument that they make with respect to task bar but doesn't
25  really support that argument at all.

81

1        So fortunately I don't think task bar requires
2  as much debate back and forth as task bar.  And I think that
3  the definitions proffered by eBuddy are more complete, more
4  accurate.  And the one that's proffered that LinkedIn is
5  clearly specific to Microsoft.
6        THE COURT:  Okay.  And I do want to note that
7  plaintiff is under 30 minutes, closer to 15 minutes.  I did
8  have ask a lot of questions, you know, as to one of those
9  terms.
10        I do have until 3 o'clock today.  And so, I do
11  have a little bit of extra bandwidth, so I'll try to give
12  both sides the opportunity to make all the arguments they
13  need.
14        My questions here are:  I know it's not the only
15  thing, but, you know, Figure D gets cited a few times and
16  the defendant always notes that the patent is pretty clear
17  it's just illustrative, right, it's embodiment.  If all I
18  had is Figure D and Figure D depicted something that's
19  consistent with your construction, but it was illustrative,
20  that wouldn't be enough to get the narrower construction,
21  would it or wouldn't it, in your view?
22        THE COURT:  No, that wouldn't be enough, Your
23  Honor.  It's not -- our construction of task bar, as well as
24  our construction of title bar is based on the ordinary
25  meaning of those terms, as borne out by proffered sources

82

1   and -- is consistent with specification.  If this example
2   was inconsistent, we would would be having a different
3   conversation.
4          But we're not claiming that Figure D is the end
5   all be all, we just pointed out that it's consistent with
6   the ordinary meaning.
7          THE COURT:  You cited in your briefs to A3 and 4
8   of the appendix, the reply selection of your brief, but, no,
9   like -- no highlighting or no -- like, where in those -- and
10  you don't have to answer this now, but perhaps before we end
11  or when we come back if there's a particular part of A3 or
12  4, I mean presumably somewhere in there it's going to be
13  saying -- using icon.  But if there's a particular part of
14  those exhibits that you want me to focus on, I just ask that
15  before we end our hearing that you just point those out to
16  me.
17         Thank you, Mr. Edmonds --
18         MR. EDMONDS:  I think.
19         THE COURT:  Well, I'll let you say it now if you
20  have it.
21         MR. EDMONDS:  I think I can, if I understand --
22  because I think we reference in -- they change from A to JA
23  and so -- oh, I see, A3 and A4, okay.  I see.
24         I will -- I will tie that in for the Court
25  before we end.  I'll let my colleagues look and I'll tie

83

1   that.
2          THE COURT:  In fact, that reminds me, before we
3   close, I want to make sure I say something about the
4   appendix because there's some issues with it and the parties
5   may want to do some additional work to tighten it up or to
6   help me with it, but I'll try to cover it before we close.
7          Okay.  Let me turn now to defense counsel.  I'll
8   turn to you, Mr. Weber, to have argument about this term.
9          MR. WEBER:  Thank you, Your Honor.  So I think
10  some of the disputes here are similar with the title bar
11  term.  So both parties agree these are terms of art, that
12  they have ordinary meanings.
13         And, so, what the law says and what we've
14  attempted to do is to get a definition that would capture
15  all title bars and all task bars; and it would be
16  plaintiff's burden as the party seeking to introduce
17  additional limitations to support those additional
18  limitations.
19         LinkedIn is not limiting this to do anything.
20  It's using the extrinsic evidence that has a tie to these
21  patents, while plaintiff is choosing to use obscure and
22  undated definitions.
23         And, so, Microsoft's definition, which is
24  directly tied to these patents, these are showing Microsoft
25  windows, says that this is simply a graphic tool bar and you

84

1   can pick one of the number of applications.
2          The dispute here, as the Court rightly
3   recognizes, is just whether it must indicate those running
4   applications with icons.  And, again, that is a typical way
5   to do it, but it is not the only way to do it, and it's not
6   part of the definition and must not be -- it's not the case
7   that it must be done that way.  Just like in the title bar,
8   it's not the case that it must display the control buttons.
9          And so, eBuddy has no evidence from the
10  intrinsic record to support its construction.  And, again,
11  it's extrinsic evidence --
12         THE COURT:  Well, it does say, Mr. Weber, that
13  -- it points to 3D, do you dispute that Figure 3D depicts
14  icons?
15         MR. WEBER:  Figure 3D does depict icons, that's
16  correct.  And as we've mentioned, that explicitly described
17  as an illustrative embodiment and not limiting.  And so,
18  what we need to do is find the definition that represents
19  the ordinary meaning of this term at the relevant time
20  period, and that's what LinkedIn has done.
21         EBuddy is suggesting additional limitations are
22  required and there's no support for that, because, as the
23  Court rightly recognized, you cannot limit or add
24  limitations just from an illustrative embodiment.  That's
25  black letter law.

85

1          And so, it's other -- extrinsic evidence is an
2   undated English dictionary and the random definition from an
3   undated Technopedia website.
4          LinkedIn respectfully submits that the Microsoft
5   definition has much more applicability here, including
6   because it's from the relevant time frame.
7          The additional evidence that plaintiff attempted
8   to submit is just additional extrinsic definitions that it
9   should have submitted in its opening brief to support its
10  position, so those should be disregarded.
11         But, in any event, that from 2017 to 2021 -- and
12  there's no evidence that those are the appropriate
13  definitions.
14         THE COURT:  Mr. Weber, on the Microsoft
15  definition piece that's come up a couple of times, can you
16  just put a final point on it for me?  Because the reason why
17  Microsoft computer dictionary definitions should get, kind
18  of, greater credit here, a harder look, is partly because
19  they're from the right time frame, but also because -- and
20  you're going to link it to the patent, is it that the patent
21  references Microsoft applications repeatedly, or is more
22  than that?  What is the Microsoft-related tie to the patents
23  that you think further strengthens the viability of the
24  Microsoft computer dictionary definitions here?
25         MR. WEBER:  Right.  It's undisputed that the

86

1  embodiments depicted in event notification patents are
2  running on a Microsoft environment and they're depicting
3  Microsoft application including Microsoft Excel.  And so
4  there's a direct tie to looking to a Microsoft definition
5  for these patents.
6           In addition, I would also note that the
7  Microsoft computer dictionary is more prominent, more used
8  in the field; and, therefore, it would be a more accurate
9  reflection of an ordinary meaning for these terms of art
10 than an English dictionary from the wrong time frame and
11 some random undated website.  It's a more reputable source,
12 in other words.
13          THE COURT:  And then the other question is:
14 Your destruction does have the phrase "graphic tool bar" and
15 I'm just trying to understand what is something that would
16 count as being a graphic tool bar but that would not be an
17 icon: what's the delta?
18          MR. WEBER:  Right.  So I think the potential
19 delta would be the tool bar itself is a graphic -- is a
20 graphically displayed tool bar.  So you can see indication
21 graphically of certain running applications.  They could be
22 depicted with, for example, icons or depicted, for example,
23 with a text window.  It doesn't have to be an icon.
24          But, again, here, you know, this is a large
25 dispute about something that's, I don't believe, incredibly

87

1  meaningful to the case.  LinkedIn just with title bar would
2  agree that the rest of the phrase could be "typically
3  includes control buttons for the title bar" and then
4  "typically includes icons for task bar," because that's the
5  accurate reflection of these ordinary meanings: the broader
6  meaning and then there's no support for limiting them or
7  adding limitations.
8           THE COURT:  Just smiling because that could be a
9  great title for a book about claim construction:  A large
10 dispute about something that may not end up being
11 meaningful.  You know we have those -- it strikes me
12 sometimes quite a lot.
13          Okay.  So, for example, while on my task bar
14 here I've got a like little icon that represents teams, like
15 a person, like a purple person with, like, a circle with a
16 T.  A graphic tool bar could for that application just have
17 the words "Microsoft" or "Teams" or something else, it would
18 still count and is not precluded by the patents: is what
19 you're saying.
20          MR. WEBER:  Exactly.  And on my task bar I see
21 an indication of a running date and time application, and
22 those are -- that's just texts, it's not an icon.  And so,
23 there's just no support for making it have to be icons.
24          THE COURT:  Okay.  Anything further, Mr. Weber?
25          MR. WEBER:  No, Your Honor.  Thank you.  That's

88

1  it for this term.
2           THE COURT:  Okay.  Mr. Edmonds, anything you'd
3  like to add by way of rebuttal?
4           MR. EDMONDS:  Yes, Your Honor.  My colleague
5  says that something doesn't have to be an icon, but the
6  proper construction of task bar is it it has to be -- is a
7  holder for icons.  And I think we all see icons at the
8  bottom.
9           With respect to -- I think we've beaten the
10 horse to death in terms of dictionaries, but I've -- the --
11 timing of the dictionary says that address, and this
12 notion that Microsoft is more prominent, the Microsoft
13 computer dictionary might -- one might consult with respect
14 to Microsoft, which is what the suggestion -- what this
15 definition suggests, because it specifically references
16 windows for its definition.
17          But, again, the suggestion that the
18 specification is limited to Microsoft application is simply
19 incorrect.
20          You did ask, Your Honor, for an A3 and A4, and I
21 didn't want to forget that.
22          In A3, which is also Joint Exhibit S, there's a
23 section adding, modifying icons and notification area.  And
24 we just really cited that to show that there are icons in
25 the task bar.  And then A4 is much shorter as Joint Exhibit

89

1  B, and that just begins by saying the notification area is
2  located at the right in the task bar, contains icons.  You
3  might find yourself selecting or pressing pretty often.  And
4  then lists those.
5           And then we were pointing out -- Microsoft
6  materials that are pointing out icons in the task bar, so we
7  have tied that.
8           Lastly, I just say that my colleague continues
9  to accuse eBuddy of adding additional limitations, but what
10 the Court is faced with is impeding contentions as to what
11 the understanding of a person of ordinary skill in the art
12 would be.  And whether the understanding of one of ordinary
13 skill in the art would have more limitations or less depends
14 on what -- if that's not adding limitations from
15 specification or what we seem to be accused of, it's a
16 question of which of these definitions are what someone of
17 ordinary skill in the art would understand.
18          And, again, we say that their Microsoft
19 definitions is Microsoft specific and incomplete.  And the
20 definitions proffered by eBuddy, which have been linked to
21 the correct time period, are more complete and more accurate
22 as to the specification.
23          THE COURT:  I guess, Mr. Edmonds, the one thing
24 I did think when I'm reading the briefs, and I asked
25 Mr. Weber about it earlier, it did strike me in many cases,

90

1 maybe almost all of them, the parties seeking the narrower
2 construction, the extra limitation, almost always that's the
3 defendant.  And they have a fight about whether they are
4 reporting limitations from the spec, etc.  Here it seemed
5 like it was the plaintiff a lot of the time that wanted
6 narrower, not the broader.
7        Do you think -- it's not saying it's bad or
8 good, I'm not even asking really why, but is that fair with
9 a lot of these terms that -- of the two competing
10 constructions often the plaintiff's construction has more
11 limitations or it's seeking the narrower construction?
12        MR. EDMONDS:  I think that that is probably a
13 generalization.  But I would say, you know, whether more
14 accurate would be narrower or in some ways they're just
15 different.  But, again, the Court's suspicion that -- maybe
16 the parties who more over validity than infringement is a
17 well-informed suspicion.  But, again, I don't think the
18 motivations for the parties are quite so relevant.  What is
19 ultimately relevant is whether the construction is correct.
20 And, you know, we believe we proffered the proper
21 constructions here.
22        THE COURT:  Fair enough.  I stress for the
23 record, as permitted by the case law, that the Court can be
24 informed about the underlying context that gives rise to the
25 particular claim construction dispute that is being

91

1 addressed because sometimes, the Federal Circuit would say,
2 that being informed about the underlying dispute can give a
3 better handle on exactly to the Court about what the dispute
4 really is and what's happen.  But as the law says, and as I
5 will be sure to do when I make the determination about whose
6 construction is correct, that's focused solely on the
7 extrinsic and intrinsic evidence before me and I'll
8 certainly only be doing that.
9        Mr. Weber, any further rebuttal?
10        MR. WEBER:  No, I think we've handle this one.
11 Thank you.
12        THE COURT:  Okay.  Our fourth term is
13 alternative title.  And I'll turn to plaintiff's counsel to
14 make argument here.
15        MR. EDMONDS:  Thank you, Your Honor.
16        We've done much of the work to get to
17 alternative title by already covering task bar and title
18 bar.  And I think the main issue here is just simply one of
19 context.
20        To say plain and ordinary meaning, as LinkedIn
21 does, just doesn't provide any grounding for this term, it
22 just leaves it wide open.  Proper context for the term is
23 that the alternative title is what's replacing the title,
24 and it can replace it in the title of task bar.
25        So that's -- and we specifically point to the

92

1 next slide, my friend Mr. Schlather Slide 23.  You know the
2 context for title here is the title associated with a
3 process; and that's what you'd find in a title bar or task
4 bar.  And that's why our definition has it grounded in those
5 notions so it's not just anything, any text.  And where you
6 would display the title is in the title bar or the task bar.
7        I don't know if my friends have really said any
8 other place that it would -- that the alternative title
9 could or would be, but the title we're talking about here is
10 the title that we've already converted in terms of the Court
11 construing.  And in the context of the patent you would --
12 the alternative title would be reflected in the title bar or
13 task bar.
14        So we just think that this is -- we submit this
15 is the proper context for giving this term a meaning that
16 has -- would be useful to the jury a correct meaning, it's
17 not just completely overbroad.
18        LinkedIn has said well alternative title doesn't
19 appear in the specification, therefore, you can't claim
20 lexicography or you can't claim context.  But the title
21 appears in the specification and it describes what an
22 alternative title is, and so that's why the word
23 "alternative title" is grounded in this notion of title,
24 which is what we would have in the title bar or the task
25 bar.  Because the word "alternative title" has the word

93

1 "title" in and that word is in the specification, so that's
2 where you get the context for it; it's not just something
3 that just hangs out there in the ether.
4        LinkedIn has also said that we contend that a
5 title bar and task bar is the same thing as the title,
6 that's just simply not our contention.  I don't see how
7 that's a fair reading of what we've contended.
8        But the alternative title is what would be
9 the -- replace the title in the title bar or the task bar,
10 the alternative title is not the title of the task bar
11 itself; that criticism is not well-founded.
12        THE COURT:  Thank you.
13        Mr. Edmonds, if you had to say that I think what
14 the dispute really here is is blank, how would you
15 crystallize it in one sentence?
16        MR. EDMONDS:  The dispute is that the word
17 "alternative title" -- we're not talking about titles of
18 mobilities, we're not talking about books, we're not talking
19 about titles of movies, we're talking about the title that
20 was -- the context that is the title we talked about in the
21 title bar and that's associated with the title
22 specification.
23        And the construction that eBuddy has proffered
24 provides proper context for that, so alternative title just
25 doesn't mean text or whatever plain and ordinary meaning

94

1    would mean -- there's no plain and ordinary meaning because
2    the word "title" is specific -- has specific usage in the
3    patent.  Again, it's a not a patent of mobility or a title
4    of a book, it's a specific kind of title, and that's what
5    has been done here.  So I think the dispute is that the
6    contextual -- the context provided by eBuddy's construction
7    gives this term a proper construction that's grounded in the
8    patent and that provides a sufficient balance for it so it's
9    not just anything.
10           THE COURT:  And how would you answer the concern
11   that your construction would be redundant in conjunction
12   with Claim 1 of the '135 patent, since the patent otherwise
13   talks about using the alternative title in a task bar or
14   title bar?
15           MR. EDMONDS:  So the -- again, so Claim 1 of the
16   '135 patent is a method claim.  And the -- you know, I could
17   have -- let's say I could have providing an alternative
18   title then I could leave it there, my claim could end there.
19           Using the alternative title, this is their claim
20   of the method claim, you have to do that to meet the method,
21   but that doesn't mean that that renders superfluous what an
22   alternative title is.  This claim requires actually using
23   the alternative title.
24           THE COURT:  But doesn't it tell you -- doesn't
25   it tell you using other words where it is going to use it?

95

1            And if it does, doesn't that suggest that the
2    right construction for just alternative title doesn't need
3    to include the where it gets used?  It just needs -- it
4    needs to just include something that's much more, kind of,
5    like, central.  You know, because we want to make sure we
6    specify where it gets used, the claim will do that if it
7    needs to.
8            MR. EDMONDS:  Well, the same claim has the event
9    notification -- like what I would also step three, which is
10   the associating step.  You're associating with character
11   strength for positioning the display of title bar or task
12   bar.  So it's not like this claim is not grounded in the
13   title that one would have in a title bar or a task bar.
14           And what we'd say is that the contextual
15   understanding of what the alternative title is is -- is not
16   a claim limitation itself, but it's a proper -- the term.
17           And I don't think there's anything to suggest
18   that this claim is broad, it's not grounded in title bar or
19   task bar:  it just simply is, as we can see in the
20   associating step.
21           But, you know, we would say again that the title
22   is something that the -- understood in context, it's not
23   just any title of anything.  It's not a title of mobility or
24   something like that.  And that the -- you have to understand
25   where that title goes, and that's part of the proper

96

1    construction of what that title is.
2            THE COURT:  Okay.  Let me hear from defendant's
3    side.  And I'll turn to their counsel.
4            MR. WEBER:  Thank you, Your Honor.
5            Are you able to see?
6            THE COURT:  I can, yes.
7            MR. WEBER:  Okay.  I think it's helpful to frame
8    where the dispute here lies, as you asked the plaintiff.
9            And so, alternative title -- those are just
10   plain English words that everybody knows what those mean.
11   If plaintiff's construction, therefore, just said text that
12   replaces a title, I think that would be more accurate of
13   what these English terms mean.
14           It is error to say in the title bar and task
15   bar, however, and that's where we have the problem.  We have
16   a problem for a couple of good reasons.
17           As tacitly conceded by plaintiff, the term
18   "alternative title" does not appear in the specification,
19   the written specification.  It's just the term used in the
20   claims.
21           And so, what the case law requires for
22   plaintiff's lexicography argument is that there be a clearly
23   set forth definition and a clearly expressed intent to set
24   forth that definition that cannot happen if the term is not
25   even used in the written specification.  There's not a

97

1    single case we could locate that has held in support of
2    plaintiff's position and they haven't cited one.  And so
3    lexicography is just a meritless basis on which to say the
4    title bar by itself must be placed in the title bar or task
5    bar.
6            THE COURT:  Mr. Weber, what are the stakes here?
7    Because let's assume -- because I was going to ask you,  you
8    say plain and ordinary meaning, but if I were to force you
9    to put into words what you think that plain and ordinary
10   meaning is, it sounds like what you would say is what you
11   just said which is it could be fine with text that replaces
12   a title.
13           But then the next step would be like so what are
14   we really disputing here.  It sounds like what you're saying
15   is we think that the plaintiff, through their construction,
16   is requiring just through the use of the words "alternative
17   title" that the text be put in a specific place or be used
18   somewhere.
19           And while that certainly can be the case, if
20   there are other words in the claim that accomplishes that,
21   we don't think the issue of where the alternative title goes
22   gets captured by the two words of this term.
23           Is that the deal?
24           MR. WEBER:  Yes, precisely:  that's the deal.
25           So the stakes, again, are not high.  Because

98

1  alternative title is used in the claims and the claim
2  specifically says that alternative title is placed in one
3  set of claims in the title of a process and another set of
4  claims in the title bar or task bar.  And so that will be
5  captured, if at all, by the claims and is definitely not
6  part of just an alternative title by itself, a term not used
7  in the specification.
8         THE COURT:  So is there even like -- like, it's
9  not the case that there are some claims where the term
10  "alternative title" exists, but there isn't that further
11  gloss.  Like every time it exists, the further gloss -- in
12  other words, what you're saying is the further gloss that
13  plaintiff wants to get in via its construction is always
14  found in these claims, wherever alternative title is used
15  one way or the other; is that right?
16         MR. WEBER:  That is correct for this set of
17  claims.
18         I don't think it's a requirement to say where
19  some alternative title must be.  But in these claims, for
20  instance, of the '135 patent it says that the alternative
21  title is used as a title in the title bar or task bar.  In
22  Claim 1 of the '179 patent it says using the alternative
23  title as a title in association with the process.
24         It would be inconsistent with Claim 1 of the
25  '179 patent to say that that must be a title bar or task

99

1  bar, but different term used in a different set of claims.
2         And so in the different set of claims, the '135
3  patent, saying that the alternative title by you itself must
4  be placed in a title bar or task bar renders meaningless or
5  superfluous the requirement in that claim that it be placed
6  in the title bar or task bar.  This is against very black
7  letter claim construction law, and that's the second basis
8  on which that their construction is incorrect.
9         Number one, there's no lexicography here.
10  Number two, it's inconsistent and would render superfluous
11  claim on which alternative title, plain English, it means
12  alternate a title.  And I think it would be fine to say a
13  text that replaces a title.  But the rest of their
14  construction is unsupportable.
15         THE COURT:  And can you go back, Mr. Weber, to
16  the picture of the '179 patent claim.  Like, there,
17  alternative title is used but task bar or title bar -- I
18  don't think -- is any of the other portions of the claim.
19         So, like, one question I was going to have for
20  you was:  When the '179 patent talks about providing an
21  alternative title from the array to the process, and then
22  using the alternative title in association with the process,
23  do you dispute that the alternative title there as to that
24  claim must be used in a title bar or task bar?  It sounds
25  like maybe you do.

100

1         MR. WEBER:  Um --
2         THE COURT:  Maybe you don't.
3         MR. WEBER:  I think it's unclear.  I think there
4  can be a title associated with the process that might not be
5  in the title bar.  I don't understand fully why they have
6  sets of claims that say in the title bar and in the title.
7         What I do know is that these terms are presumed
8  to have a different meaning.  And using alternative title as
9  a title is broader than saying using a title in a title bar
10  or task bar.
11         THE COURT:  All right.  It made me think that,
12  you know, maybe you don't think that's -- for Claim 1 of the
13  '179, you've got to use an alternative title in your method,
14  you've got to use it as a title.  It doesn't really
15  specifically say where you have to use it.  Like maybe the
16  method is infringed even if the alternative title isn't
17  actually used in a process in a task bar or title bar.
18  Maybe just the using of it, some intermediate way is enough.
19         Again, this would be backwards if we were really
20  worrying about an infringement dispute.  You know, you'd be
21  wanting more requirements.  Maybe for an invalidity dispute
22  it makes sense, maybe there's going to be a fight about
23  whether some piece of prior art has an alternative title; it
24  doesn't or I don't know.
25         But anyway, it sounds like you're saying, yeah,

101

1  this claim might not actually require someone to use an
2  alternative title in a title bar or task bar, it just
3  requires them to use it as a title: is that right?
4         MR. WEBER:  Yeah, it's a broader phrase by
5  definition.  And it could be in the title of a document
6  associated with the process, I suppose.
7         I'm just not sure.  I think there are examples.
8  But what I do know is these two patents use different terms:
9  one is just a title and the other one is a title bar and
10  task bar.
11         The case law is clear, you can't say that
12  alternative title by itself must be placed in the title bar
13  or task bar when some claims don't require that.  And the
14  ones that do that language would be not needed or
15  meaningless under plaintiff's definition.
16         THE COURT:  And then last question for you here
17  was the plaintiff a couple of time excerpted that portion at
18  column 6, I think it said lines 14 and 15, it uses the
19  phrase "changing of the text in the task bar and/or title
20  bar."  And I guess my question there is:  Do you disagree
21  that that text is meant to refer to an alternative title?
22  What do you think that text really refers to?
23         MR. WEBER:  You know, I think that it could.
24  The point there is that that cannot be lexicography because
25  you've not set forth a definition for the term you're trying

102

1  to construe.  There's no clear intent there.

2         And if that's the context, what the patent also

3  says about that is that those are expressly nonlimiting

4  embodiments.  And so while that piece of the written

5  specification may have applicability to this term, it cannot

6  define it and it cannot limit.

7         THE COURT:  Okay.  Anything further, Mr. Weber?

8         MR. WEBER:  No, Your Honor.  Thank you.

9         THE COURT:  Okay.  Mr. Edmonds, anything you

10  want to say by way of brief rebuttal?

11        MR. EDMONDS:  Yes, Your Honor.  It's not just a

12  matter of lexicography, it's also a matter of context.

13        And I think my friend was at a loss to point

14  out, and the Court was perhaps at a loss to point out where

15  alternative title -- where the title would be in the context

16  of this patent, other than in the title bar or task bar;

17  and, therefore, an alternative title could take the place of

18  the title.  And that really is -- the rub is that the only

19  proper contextual understanding of this is the word "title"

20  would be -- would have to have a nexus with the title bar

21  and task bar, and that's where alternative title needs to

22  have that same nexus.  Otherwise, it's just -- the term is

23  untethered and there's no nexus to the list by the patent.

24        THE COURT:  Can I just ask you briefly in that

25  regard -- and I doubt this is the way it's going to work out

103

1  in this case, but in the '179 patent in Claim 1, you know,

2  could you infringe the claim if the -- if the alternative

3  title was provided by the process, even if it didn't end up

4  getting to the point where it ever got used in a title bar

5  or task bar?

6         MR. EDMONDS:  No, and I think that that's the --

7  what -- I think the Court is getting at this superfluous

8  argument or redundancy argument that's suggested.

9         And to point to method claims and actually using

10  the title, that's not redundant of a proper construction of

11  alternative title.  It's just that this particular claim

12  requires using the alternative title, so you'd actually have

13  to use it in order to infringe the claim.

14        THE COURT:  So using the alternative title --

15        MR. EDMONDS:  I don't think they -- sorry.

16        THE COURT:  Using the alternative title there is

17  the thing that makes clear that the alternative title is

18  used in a task bar or title bar?

19        MR. EDMONDS:  No, I think the proper

20  construction alternative title itself would mean that the --

21  that the -- that it is text that replace the title in title

22  bar or task bar.  And once it's properly construed, then it

23  would fall into place when you -- if you're saying do they

24  infringe the claim, the question would be an alternative

25  title been provided, has an alternative title been used, and

104

1  that would require a proper construction of alternative

2  title, which we contend we've proposed.

3         THE COURT:  Okay.  Anything further,

4  Mr. Edmonds?

5         MR. EDMONDS:  No.  In the interest of time,

6  we'll -- thank you.

7         THE COURT:  All right.  Mr. Weber --

8         MR. EDMONDS:  And --

9         THE COURT:  I'm sorry.  I was just going to ask

10  Mr. Weber if he had any brief rebuttal.

11        MR. WEBER:  Two quick points because it concerns

12  the superfluous argument across the board.

13        And, so, plaintiff's argument seems to be look,

14  these claims require other limitations in addition to what

15  we're proposing.  That's -- that's not material, it

16  meaningless under the law.  It's indisputed that their

17  construction overlaps with limitations in the claim;

18  therefore, they would render those limitations, such as

19  where you're going to put the alternative title meaningless,

20  and it's highly disfavored.

21        Number two, on the spot we were able to come up

22  with where a title in association with a process could be.

23  It could be a title of a document in association with the

24  word "program process" running that document.

25        And, so, with that I'll leave the alternative

105

1  title term to the Court.

2         THE COURT:  Okay.  Then next term is contact

3  aggregation engine.

4         I will say that it looked to me -- just to set

5  the table, it looked like we were having two sets of

6  disputes or two buckets of disputes here.  The first related

7  to the use of the phraseology "updates... and provides..."

8  in the plaintiff's construction.

9         And the second looked like it had to do with the

10  last phraseology in the plaintiff's construction that said

11  that is stored on a network and not stored locally edition.

12        But if you -- if you don't disagree that those

13  aren't two buckets of disputes, great, let's talk about

14  whose right or whose wrong; if you do think there's other

15  disputes, just let me know.

16        Let me turn to plaintiff's counsel first.

17        MR. SCHLATHER:  Thank you, Your Honor.  Steve

18  Schlather for the plaintiff.  I'll attempt to cover the

19  remainder of the terms for our side.

20        THE COURT:  Okay.  Mr. Schlather.

21        MR. SCHLATHER:  Sure.  Also I am -- so I think

22  that's correct, Judge, that the dispute kind of falls into

23  those two buckets.

24        And with regard to the first, the specification

25  here is clear that what the contact aggregation engine is is

106

1  the system or software component that updates a networks
2  contact database information and provides an aggregated
3  contact list.  And we've sited that in our briefing and here
4  it's -- it's both in the abstract and the summary of the --
5  of these patents.  And so, I think it's very clear that that
6  that is the what the contact aggregation engine is.
7          The parties seem to address that an engine is a
8  system or software component, and that's really the extent
9  of their agreement.  But the patent itself makes clear that
10  what this system or software component that is called the
11  "contact aggregation engine" is is the software or system
12  component that updates a network's contact data contact
13  information and provides an aggregated contact list: that's
14  just what that is.
15          THE COURT:  And Mr. Schlather, if I were to
16  disagree with you that the material in the summary amounts
17  to clear lexicography, does that mean you don't prevail with
18  regard to this dispute about the inclusion of the
19  "provides... or updates" language in your construction?
20          MR. SCHLATHER:  No, Your Honor.  I think that
21  you can come at this from two ways.  I mean, I think the
22  lexicography is clear that the -- and the specification it
23  just -- it does define what the contact aggregation engine
24  is.  But you can also look at the context of the patents as
25  a whole and what they do, what they're trying to accomplish,

107

1  and then what they specifically call out as accomplishing
2  these different tasks.
3          And, so, here, again, what the patents describe
4  the contact aggregation engine as doing includes updating
5  the contacts database and providing the aggregated contact
6  list.  And that's, again, it's describe in the
7  specification, but it's also supported by the claims
8  themselves where it talks about certain functions that the
9  contact aggregation engine performs.
10          So I think there's two ways that you can come at
11  at.  And I think either way you end up with eBuddy's
12  proposed construction, but you could get there from either
13  direction.
14          THE COURT:  But as to the latter issue, I think
15  that goes to the other side's argument about redundancy.
16  And I guess on that point, if you look in Claim 1 on each of
17  the relevant patents, it's got updates and provides language
18  in it, just in other parts of the claim.
19          And, you know, as a result of that, they said,
20  look, so those portions of the construction for contact
21  aggegation engine -- again, the claims may not require
22  updates or providing, but just when they do, they talk about
23  it separately so, that talks you, Judge, that contact
24  aggregation engine in and of itself should not be construed
25  in a way that adds that update or provides phraseology.

108

1          And I think as to that redundancy argument, on
2  page 33 on your brief, I think you attempted to make an
3  argument that, no, it wouldn't be redundant because -- and I
4  think maybe you were pointing to, like, certain language
5  that's in the claims relating to updates and provides that
6  isn't quite in your construction.
7          But I wasn't sure I understood it, because it
8  generally did seem like anything you said in your
9  construction about updates and provides is basically like
10  covered by the claims elsewhere; is that right?
11          MR. SCHLATHER:  Well, I think what it shows in
12  the claims is a specific way of doing the updating or the
13  displaying.  And so, what you have is a -- what I would say
14  a general definition of the term "contact aggregation
15  engine" in the specification.  And then in the -- and that
16  includes that it does update and it does display.
17          And then in the claims what you have is the
18  specific way that it does that or the specific information
19  that it uses to do that.  And so, I don't think it renders
20  the claim language redundant or superfluous at all.  It just
21  is the claims, you know, provide the very specific way that
22  the updating or providing is done.
23          THE COURT:  Well, maybe another way to ask that
24  is:  What is the it, as it relates to the "updates... and
25  provides..." language that's in your construction, that

109

1  isn't called for by that that is in the claims?  What extra
2  do the claims require with regard to the updating and
3  providing that a contact aggregation engine does that is not
4  necessarily captured in your construction?
5          MR. SCHLATHER:  Right.  So, for instance, with
6  regard to updates in '395, Claim 1 it specifically says
7  where this information comes from, right.  So it updates the
8  context database with information that is obtained from the
9  first messaging service provider and a second messaging
10  service provider.
11          And then with regard to the '453, it talks about
12  updating it with information that's associated with the
13  plurality of low level networks to create an aggregated
14  contact list.
15          And so, again, I would say the contact
16  aggregation engine, as defined in the specification, talks
17  about what it does.  And then the claims just covers these
18  specific claimed methods or claimed mechanism by which the
19  contact aggregation engine does those things.
20          THE COURT:  Still would be pretty clunky,
21  though, if I adopted your construction, you know, we got to
22  the word "contact aggregation engine" in the claims, we
23  would be importing all of those words.  A lot if those
24  words, maybe not every one of them, but a lot of when it
25  comes to updates and provides piece would already be

110

1  captured in other parts of the claims, so we kind of would
2  be saying them later; isn't that kind of disfavored?
3        MR. SCHLATHER:  It may be, Your Honor, but the
4  issue here is -- and this is the problem that -- with
5  LinkedIn's construction is what they've proposed is just the
6  definition of an "engine."  And so -- but the disputed term
7  is "contact aggregation engine."  And so that contact
8  aggregation portion must have some meaning, and the meaning
9  that the patents give it is that it updates the networks
10 contacts database and it provides an aggregated contact
11 list.  And so, that's just what we have from the patent that
12 defines what this engine is, this specific engine.
13        And, so, just to leave it with, for instance,
14 what LinkedIn has proposed is just a system or software
15 component for performing the recited functions -- setting
16 aside that that gets really into more of a means plus
17 function type argument, which neither side has proposed
18 here, it also results in a situation where the definition of
19 the term changes depending on the language of the specific
20 claim that we're talking about; and that can't be the
21 correct answer that you have a term that changes meaning
22 depending on which term or which patent you're talking
23 about.
24        So, you know, I think in context and with regard
25 to lexicography, we are left with the -- the specification

111

1  just telling us what the contact aggregation engine is.  And
2  that's what we've proposed.
3        THE COURT:  And then with regard to the, you
4  know, the other disputed issue, which relates to the "that
5  is stored... part of your construction."
6        You know, for you to be correct it has to be
7  crystal clear that the patent indicates that the contact
8  aggregation engine stores an aggregated contact list on a
9  network and not locally.
10       And where is it -- in your view, where are the
11 words in the patent that make it clear that a contact
12 aggregation engine must, must, in all cases, store an
13 aggregated contact list on a network and not locally.
14       MR. SCHLATHER:  So the -- I think the -- again,
15 the -- if you read the patents in context, they relate to a
16 method of aggregating contacts through a high level network
17 from a -- two or more -- or a plurality of low level
18 networks.  And the contact aggregation engine is what the
19 patents describe as performing that functionality.
20       And, so, in the -- in the specification, we've
21 cited it in our briefing, as well as in our slides here, the
22 contact aggregation engine updates the network contact
23 database, and that alone points to a database that's related
24 to the network.
25       THE COURT:  I guess maybe to ask it in a

112

1  different way, if you were going to say, Judge, look if you
2  want to know for sure that in all instances a contact
3  aggregation engine described in this patent absolutely must
4  store the contact list not locally, but on a nonlocal
5  network, the words I'm going to point to to make it the
6  clearest, whether it's words in the claim or whether it is
7  words in a prior specification, if I was going to give you
8  one sentence, one piece, go right here and you'll see it's
9  indisputable, look at these words that the patent says that
10 make that clear, where would you point me?
11       MR. SCHLATHER:  Well, I could point you to --
12 certainly to the claims, both claim -- Claim 1 of both the
13 '395 and the '453 patents described that the contact list is
14 stored at the web server, in the case of the '395 patent or
15 at a server in the '453 patent.  So I think that just --
16       THE COURT:  That's what -- I thought you might
17 say that.  So, in your view, at the web server or at the
18 server means a non-local network; is that right?
19       MR. SCHLATHER:  Yes.
20       THE COURT:  If it does, if that covers that, why
21 does the definition for contact aggregation engine have to
22 cover the same piece or understanding as well?  Why doesn't
23 that other language in the claims get you there?
24       MR. SCHLATHER:  I think that it -- it's just to
25 be complete, Your Honor.  And the claims describe the

113

1  specific location of the -- of where the contacts would be
2  stored; for instance, a server or a web server.  In both
3  cases, those are nonlocal.  And so -- but the contact
4  aggregation engine itself could -- there could be other
5  places that it could be stored, those are just the two that
6  are in -- that are claimed, the two locations that are
7  specifically claimed versus being able to store it, you
8  know, other places on the network.
9        THE COURT:  And can -- in the world, I mean can
10 you have a server or a web server that is local?  Like, is
11 it possible to have a local server or a local web server?
12       MR. SCHLATHER:  Well, I don't -- I don't
13 specifically know the answer to that question, but I think
14 if you look at the context of how those terms are used in
15 these patents, they refer to web servers -- servers and web
16 servers in a nonlocal context.
17       THE COURT:  Where's the best place where it does
18 that?
19       MR. SCHLATHER:  So, if we look at -- the figures
20 illustrate that; for instance, Figure 1 shows server 104.
21 And so, that would be -- that would be an example of a
22 server.  And then there you have clients 114, which could
23 be -- which could be local computers or local machines.
24       THE COURT:  So you're saying server 104 that's
25 not local, the clients aren't local.

114

1    MR. SCHLATHER:  Right.

2    THE COURT:  Server 104 is a nonlocal.

3    Now, the parties fought about Figure 3, but
4  defendant's said hey, look, the contact aggregation engine
5  there is tied to a display, that could easily be a contact
6  aggregation engine that is located at a local place, a local
7  computer.

8    I think in your brief at one point it seemed
9  like you said, yeah, it's true, Figure 3 could depict that,
10 you could say that, but I'm just going to tell you why
11 otherwise in the patent that's not allowed.

12   Is that what you're saying?  Is it possible
13 understand Figure 3 as depicting a contact aggregation
14 engine that itself is local?

15   MR. SCHLATHER:  Well, I think read in the
16 context of the patents, I don't think that's what this
17 Figure 3 is showing.

18   What this is showing is a -- if anything,
19 something akin to server 104.  The argument that because
20 this figure shows a display 306 and has some sort of network
21 interface that that means it must be a local computer is
22 just incorrect.  There's no -- there's no description in the
23 patent at all that suggest that this is a local computer.
24 And it certainly -- no suggestion that this is a local
25 computer because it has a display or is connected to the

115

1  Internet.  Those servers routinely have those features as
2  well.

3    It would be akin to saying that because this
4  computer has a process or a memory, it must be a local
5  computer; well, that's just not the case.

6    THE COURT:  I guess my last set, Mr. Schlather,
7  is even if -- it could be the case that a contact
8  aggregation engine itself could be located locally, does
9  that necessarily mean that the contact aggregation engine
10 would have to store the contact list information locally?

11   In other words, could you have a world where you
12 have a contact aggregation engine that itself is located
13 locally, but stores the address information nonlocally?

14   Does that make any sense?

15   MR. SCHLATHER:  Well, I think that could -- that
16 could theoretically be possible.  I don't think that that is
17 what these patents are directed to.  But I suppose that you
18 could theoretically configure some system in that way, but
19 it would not be based on what -- on kind of the context and
20 description of what we have in the '395 and the '453
21 patents.

22   THE COURT:  Okay.  And so, I think what you're
23 saying is look, but for these patents that's not argument.
24 Argument is like, what were's talking about is contact
25 aggregation engine, which itself is located nonlocally and

116

1  relatedly stores address information nonlocally, i.e., on
2  the server or web server that is referenced in the claims:
3  is that fair?

4    MR. SCHLATHER:  Well, I would say it stores the
5  contacts at the network.  In certain cases it could be on
6  the server or the web server, but the contact aggregation
7  engine itself kind of as the standalone term wouldn't be
8  specifically limited to the server or the web server outside
9  of the context of Claims 1 -- Claim 1 in the '453 and the
10 '395 patent.

11   THE COURT:  Oh, so you're saying that server or
12 web server in the claims is a more specific portion of the
13 nonlocal network?

14   MR. SCHLATHER:  Yes.

15   THE COURT:  That's referenced in your
16 construction.

17   MR. SCHLATHER:  Yes.  And that's why -- and I
18 apologize if I wasn't clear on that.  That's why that
19 portion of the construction is not redundant or superfluous
20 because the construction says that it's stored on a network
21 and then Claims 1 of each of the patents then specify more
22 specifically where on the network it's stored; so, for
23 instance, at the server or at the web server.

24   THE COURT:  Okay.  Thank you, Mr. Schlather.  I
25 want to make sure defendant has enough time, because

117

1  plaintiff has used pretty much all its time.  I still want
2  to have some back and forth on the last few terms, of
3  course.

4    Let me turn to Mr. Weber for the defendant side
5  to hear his argument on contact aggregation engine.

6    MR. WEBER:  Thank you, Your Honor.  I think your
7  correct in where the dispute here lies, it's the first
8  section talking about what the contact aggregation engine
9  can do.

10   And, secondly, this requirement or alleged
11 requirement about remote storage.

12   I'll actually address the second one first
13 because it is more important.  The plaintiff forwards two
14 arguments:  Lexicography and context to import these
15 limitations into the contact aggregation engine on its own.

16   And so, what plaintiff is attempting to do is
17 say that there's a requirement for a separately claimed
18 term, aggregated contact list in the contact aggregation
19 engine.  It's not the case that you can support this with
20 vague statements about accessing context across networks,
21 what the law requires to import these limitations is clear
22 and unmistakable evidence that this is a claim requirement.

23   Plaintiff has not provided any of that.  They
24 have not provided it in their brief and they have not
25 provided it today during oral argument.  There is simply no

118

1    evidence in this specification that requires or states in
2    any certain language that an aggregated contact list must be
3    stored on a network and not locally.  Those words do not
4    appear; nothing like them does.
5            Plaintiff pointed to Figure 1 in the server 104
6    depicted therein.  This server 104 is not described at all
7    in respect to the embodiment describing the contact
8    aggregation engine.  The contact aggregation engine instead
9    uses a different term, it uses the term "computer."
10           So this specification is clearly making
11   distinctions between networks, which are described, servers,
12   which are described, and here a computer which includes the
13   contact aggregation engine as well as the network contacts
14   databases.  This is described as a computer and it is shown
15   connected directly to a display.  That is evidence that this
16   at least can a local computer, including the network
17   contacts database, in which this information is allegedly
18   stored; however, that's not even specified in the
19   specification.
20           Plaintiff says, oh, a display can be connected
21   to a server; they did not make that argument in the brief.
22   There is no evidence to support that contention.  You need
23   clear and unmistakable evidence to import this limitation
24   into this term and its complete ethnicity.
25           Instead, the specification in the case that this

119

1    would be contrary to what they're describing.  The
2    specification says that it's a computer that has a contact
3    aggregation engine and these network contacts databases;
4    that suggests that it could be stored locally.  And,
5    conversely, again, there is no discussion that it has to be
6    stored on a network and not locally.
7            I'll go back to the summary section of the
8    specification.  Plaintiff alleges that this provides a clear
9    and unmistakable definition for this term.  However, it's
10   undisputed that even this portion of the specification does
11   not include the language about remote storage the plaintiff
12   is attempting to import into this limitation, into this
13   term.  It's missing there, too.
14           There can be no definition if those words aren't
15   used.  The law requires clearly expressed intent to provide
16   a clear definition for something.  That's -- those words are
17   just not even there.  It cannot be lexicography.
18           In context, again, supports LinkedIn's position
19   that these are nonclaim requirements.  The embodiments do
20   not discuss this.  It instead suggests that it could be a
21   local computer.
22           THE COURT:  What about, Mr. Weber, the claims'
23   use of web server or server?  I think the suggestion is that
24   has to be understood to mean nonlocal and that because the
25   claims may be, at least in part, if not in total, that those

120

1    terms require nonlocal storage that help support the idea
2    that maybe that is also required by contact aggregation
3    engine, too.
4            Can a web server or server, as referenced in the
5    claims, be located locally?
6            MR. WEBER:  I'm not sure, as plaintiff was.  I
7    was confused by plaintiff's argument there that at first
8    they seem to indicate that the web server was the same thing
9    as a network.  In which case, it would be inconsistent to
10   require a contact aggregation engine on its own to require
11   the storage of an aggregated contact list --
12           THE COURT:  I'm sorry to interrupt you, I just
13   want to make sure that I get it.  What you're saying right
14   now is if it were true -- you're not sure if it could be
15   true or not, but if it were true, then it would devolve into
16   a redundancy defense on your part, at least as to the
17   definition of contact aggregation engine; am I right?
18           MR. WEBER:  That's true.  And if it's a more
19   specific implementation of a network, which is not supported
20   either, then why would the claim need to specify that the
21   contact aggregation engine stores it there if it's already a
22   requirement that it's stored not locally.  It does not
23   support their position.  It supports the contrary notion
24   that contact aggregation engine on its own does not require
25   the storage location one way or the other for an aggregated

121

1    contact list.  If that's going to be stored somewhere, it's
2    already specified in the claims.  They've said where it's
3    stored; that's not a part of the contact aggregation engine.
4    There's no definition for that term in the specification,
5    including in this specification that they point to, which
6    is, again, expressly described as exemplarily illustrative
7    and not limiting in scope.  Besides the fact that it doesn't
8    even include the language that plaintiff is trying to import
9    into this term.
10           THE COURT:  I think Mr. Schlather in response to
11   my question about that said, well, look the server or the
12   web server that are being talking about in the claims, they
13   are not local.  But the way it is not redundant is that you
14   could still store, if you had a contact aggregation engine,
15   material nonlocally just not on the server.  So they're
16   adding -- I guess that would be nonlocal storage in a -- I
17   guess in a computer, but not on the server that is not
18   local; is that possible?
19           MR. WEBER:  I think that's possible.  That's not
20   at all described in the specification.  There is nowhere in
21   the specification that it says that.
22           The specification does not say at all where the
23   aggregated contact list is stored.  So while that might be
24   theoretically possible in the real world, that is not stated
25   in the specification; therefore, there could be no

122

1  unmistakable evidence that that's a claimed requirement for
2  the bare term "contact aggregation engine."
3         THE COURT:  And, Mr. Weber, can I ask you a
4  question just about, like, my sense was from the briefing
5  that maybe what's going on the -- one of the reasons why
6  we're having a dispute here, and maybe with the next set of
7  terms, is 101 related.  And, obviously, there was discussion
8  in the 101 context about whether or not claims require
9  nonlocal storage of contact info.  And I guess, like,
10 what -- if that was all this was about, if this wasn't just
11 about claim construction of contact aggregation engine,
12 let's just get the right construction for that term, but
13 let's like totally address 101, then the leaving open the
14 possibility that web server or server requires nonlocalness
15 would still kick out that 101 issue -- you know, wouldn't
16 resolve it, it could be still hanging out there, right?
17        Because even if plaintiff loses this term, it
18 could still argument yeah, but web server or server means
19 nonlocal, etc.  I guess, whether that's true or not, like,
20 is your point, Judge, look, just focus on what's the right
21 construction for this term.  And so, if an argument is,
22 well, the nonlocalness of the storage might be conveyed by
23 web server or server, that may be a good argument for us
24 because all we're saying it's just not -- contact
25 aggregation engine doesn't have anything to do with where

123

1  it's stored: is that what you're saying?
2         MR. WEBER:  You know, yeah, I think that's
3  accurate.  I think that they would still argue that storage
4  at a web server would be remote and then we could address
5  whether that saves the claims under 101 at a later stage.
6         Here the dispute is whether the contact
7  aggregation engine requires storage in a network, seemingly
8  separate thing, and nonlocally.  And there's just -- under
9  black letter claim construction law, there is just no
10 support for that position.
11        And so, that's why LinkedIn, you know, can't
12 accept it because it's wrong as a matter of law, it's wrong
13 as a matter of this record.  And, yeah, it was a basis on
14 which I think the claims were upheld at a pleading stage,
15 and, so, it's another reason to contest it.
16        I think that you're right that the plaintiff
17 would still argue from what storage regarding the web
18 server, it's just -- it is absolutely not a requirement with
19 contact aggregation engine or high level network.
20        THE COURT:  And both -- and computers,
21 obviously, can be local computers or nonlocal.  It's really
22 just a reference to where is the user I guess really or --
23 the user you're talking about.
24        And same thing, networks can be both local and
25 nonlocal, right.  I mean, you could have a network of

124

1  computers both at the location where you're talking about
2  where someone is accessing something and you got a network
3  of computers at some remote location, too, right.  Just
4  using the term "network" doesn't necessarily connote
5  nonlocalness or a computer: is that right?
6         MR. WEBER:  I think that's accurate.
7         I mean, I think it's, you know, again important
8  the recognize what the specification says.  And so, it
9  describes networks, it describes servers.  But then when it
10 talks about the contact aggregation engine, that's just a
11 computer.  There's no evidence that that has to be remote
12 and that computer also contains those network contacts
13 databases.
14        And so, I think you're right that just saying
15 "network" does not mean remote by itself and "computer"
16 certainly doesn't.
17        Second, just the label "network contacts
18 database" doesn't necessarily mean that that's located on a
19 network.  It can just be designating the source from which
20 those contacts came.  Those contacts came from a network, so
21 it's a networks contact database stored locally; and
22 certainly no evidence that it must be stored nonlocally.
23        THE COURT:  And what did you want to say about
24 the updates and provides issue?
25        MR. WEBER:  Right.  I think that one is an

125

1  easier argument and less meaningful, because, as you
2  previewed with the plaintiff, the claims already talk about
3  updating contacts database and already talk about providing
4  an aggregation contact list.
5         The point here is, again, they don't have
6  evidence for lexicography because the parties -- I heard
7  Mr. Schlather say that the specification says what the
8  contact aggregation is.  That's not true.
9         The parties agree that an engine is a system or
10 a component.  All the portion -- the portion of the
11 specification that Mr. Schlather points to doesn't say what
12 it is, it says what it can do.  And that's different.
13        And so, the parties already agree what this
14 thing is.  The claim says what it can do, and that's the
15 claim requirement.  Here, there's no lexicography, again,
16 from this portion of the specification, which also says that
17 it's illustrative and not limiting.  And plaintiff's
18 construction would render claim language superfluous.
19        Their point seems to be again because the claim
20 requires additional limitations that this argument doesn't
21 apply, but that's not the case law.  The case law says if
22 there's limitations that overlap with their construction, it
23 would render those limitations meaningless.  In other words,
24 why would you have to set forth if contact aggregation
25 engine by itself already required that.  That's highly

126

1  disfavored.

2       THE COURT:  Maybe you'd still have to, like --

3  you'd still have to use some more words along the way, but

4  your point would be normally since contact aggregation

5  engine already did most of the work, it already connotes,

6  you know, updates the networks that to the extent that

7  there's extra words, it would be written differently.  It

8  would be, you know, something like and that and the updating

9  that the contact aggregation engine does includes, blah,

10  blah, blah or something like that.  If you were really

11  trying to avoid totally redundancy.

12       MR. WEBER:  I think that would help them.  Here

13  the situation is just even more apparent.  Their

14  construction says that the contact aggregation engine

15  updates a networks contact database contact information.

16  Well, the claim language says the same thing:  Updates the

17  networks contacts database with contact information.

18       The next part of their proposed construction

19  says "The contact aggregation engine must provided an

20  aggregated contact list."  Well, that claim language says

21  that the contact aggregation engine provides the aggregated

22  contact list.  There's complete overlap.

23       THE COURT:  Okay.  I hear you.  I think I want

24  to make sure -- I want to make sure we get argument in for

25  the last -- well, there's two terms left.  They really

127

1  devolve into one argument, so I want to make sure we get to

2  that.

3       But is there anything further, Mr. Weber, that

4  you would add?

5       MR. WEBER:  No.  I think I'm good on that one.

6  Thank you, Your Honor.

7       THE COURT:  Okay.  To make sure we do get robust

8  argument on our last terms, the last two terms are "high

9  level network" and "low level network."  And to a great

10  degree in the briefs the parties seem to agree that the

11  arguments about the low level network devolve from the

12  arguments about high level network, so let's just take them

13  both other.

14       And let me turn to plaintiff's counsel, and I'll

15  ask counsel to brief with its argument and then we'll make

16  sure we get a good back and forth.

17       MR. SCHLATHER:  Thank you, Your Honor.  So I

18  agree that these two terms are intertwined and very related.

19       So the term "high level network," it doesn't

20  have a plain meaning.  This is a term that was coined by the

21  patentees here in these patents.  And so, when we look at

22  the patents as a whole to determine what a high level

23  network is -- and since we're talking about both how it's

24  distinguished from a low level network.  The first thing

25  I'll point out is that Linkedin's proposal would give the

128

1  same meaning to both of these terms, which is rarely, if

2  ever, correct to use the Federal Circuit's language.

3       But here, what the high level network is is what

4  we've said in our construction, it's an IM network, so we

5  agree on that.  But to distinguish it from the low level

6  network, the high level network is one that joins or has

7  joined another IM network; for instance, a low level network

8  to access the contact list of that network.

9       And the specification and the claims both make

10  that clear that that is what the high level network does.

11  Including that the specification in the claims talk about

12  joining the low level networks through the high level

13  network, for example.  Or facilitating log-in to the low

14  level networks to the high level network.  So that's the

15  first half of that term.

16       And just like contact aggregation engine, we

17  also have a second half which talks about storing the

18  aggregated contact list nonlocally at the high -- which is

19  the one of the things that the high level network does.

20  And, again, that's borne out in both the specification and

21  the claims.

22       THE COURT:  On that regard, Mr. Schlather.  In

23  your view, is a high level network always nonlocal?

24       MR. SCHLATHER:  Yes.

25       THE COURT:  It's like a synonym.  High level

129

1  network is a synonym for like nonlocal network.

2       MR. SCHLATHER:  Well, I think it's a network as

3  distinguished from a local computer.

4       And so, if it's sitting here on my laptop, my

5  laptop may be connected to a network, but it's not the

6  network.  And, so, you know, I think, yes, that a high level

7  network is nonlocal.

8       THE COURT:  I mean, I was asking Mr. Weber, I

9  mean can't you have a network in a "local location?"

10       In other words, if local means the place where

11  the user is, surely you could have a network of computers at

12  the place where the user is.

13       How come network itself is a synonym for

14  nonlocal?  Can't you have local networks?

15       MR. SCHLATHER:  Well, I think maybe local -- I

16  would say that -- and if we look at, for instance, Figure 1

17  of the patents, right, so we have the -- we have the network

18  102 and its access with server 104, but the local computer

19  -- I guess, systems or computers, whichever term you want to

20  use would be synonymous with the clients here.

21       And so, I think that's just a -- as I understand

22  it, a person of ordinary skill in the art would understand

23  that local means not necessarily a geographic location so

24  much as a local -- the clients -- you know, I don't have a

25  better description for it other than kind of the client's

130

1    computer, the client computer.
2         THE COURT:  Like where the client's are users?
3    Clients are, I guess, maybe a better word to use.
4         MR. SCHLATHER:  End user might be synonymous for
5    that.
6         So when we're talking about local versus
7    network, that's the distinction, I think, that we're making
8    on that.
9         THE COURT:  I guess on the two -- again, there's
10   two buckets here, there's the joins and has joined part of
11   then construction and then there's the stores... part.
12        On the first, other than your argument about
13   plurality being in the '453 patents, Claim 1, wouldn't the
14   claim language there be otherwise be redundant with your
15   joins or otherwise has joined conclusion?
16        MR. SCHLATHER:  With regard to Claim 1, it's
17   talking about the joining and the facilitate -- or the --
18   yeah, Claim 1 of the '453, Your Honor?
19        THE COURT:  Yes.
20        MR. SCHLATHER:  Sorry.
21        THE COURT:  One of your arguments was, that,
22   well, you know, they made a redundancy argument as to that
23   claim.  And I think in response you said, well, was kind of
24   similar to the arguments we have been having about prior
25   terms, well, the claim also includes some other language

131

1    that's in the same spot like plurality.  Plurality is
2    different, it's not included in our construction so that
3    doesn't show that the claim isn't necessarily redundant of
4    our definition for high level network.
5         And I was just saying other than plurality,
6    though, does that claim --
7         MR. SCHLATHER:  I think that --
8         THE COURT:  -- what's in your construction as to
9    joins or has joined.
10        MR. SCHLATHER:  So, the joining and has joined
11   relates to what the -- yeah, I think that is -- for that
12   claim, that is what it comes down to.  It just is broader
13   than what we have in our construction, in our proposed
14   construction, so...  Especially for that claim, that kind of
15   is what it comes down to.
16        THE COURT:  What's your response to defendant's
17   argument that your lexicography section of the patent, i.e.,
18   the summary section, doesn't even explicitly say that a high
19   level network has to join another IM network in order to
20   access its contacts list?
21        MR. SCHLATHER:  Well, I think what the case law
22   says on that is that the lexicography must appear with
23   reasonable clarity.  And so -- and I think if you read these
24   patents, it absolutely say in multiple places that
25   describe that the -- that the -- the low level networks are

132

1    joined by or joined through the high level network.
2         THE COURT:  And I guess the last question I have
3    here is -- just be mindful of time -- similar to the
4    question I asked you as to the last term:  If you were going
5    to say, Judge, if there was one set of words in this patent,
6    whether it's found in a claim or it's found in the
7    specification, that just makes it absolutely clear that a
8    high level network must, absolutely, in all circumstances,
9    store the aggregated contact list in nonlocal storage
10   locations, it's these words, these are the words you would
11   like look; what would be the best place in the patent to
12   show me them?
13        MR. SCHLATHER:  So, one example would be in the
14   claims.  Again, they talk about you access the aggregated
15   contact list through the high level network.  And I think
16   that brings it to the finest point.  Although, it's also
17   described in the summary, and we've cited that both in our
18   brief and in our slides where it talks about --
19        THE COURT:  But that wouldn't --
20        MR. SCHLATHER:  Sorry go ahead.
21        THE COURT:  I mean, that's just saying part of
22   the claims that uses the words "high level network."  I
23   mean, is there some other part of the claims or
24   specification that especially conveys that that high
25   network is storing its stuff in a nonlocal storage location?

133

1         MR. SCHLATHER:  So, for instance, the summary,
2    again, talks about a technique for contact list aggregation
3    across a plurality of different networks that involves
4    logging into the low level networks through the high level
5    network, and that's the way that the contacts of the low
6    level networks are accessed and maintained at the high level
7    network.  That's kind of what that talks about.
8         THE COURT:  Okay.
9         All right.  Mr. Schlather, let me -- for a
10   second time, let me turn to your colleague on the other
11   side, Mr. Weber, and let him respond.
12        Actually, Mr. Weber, one initial question I
13   would have for you is just to the argument about how your
14   construction for high level network is the exact same as
15   your construction for low level network.  If I ultimately
16   was uncomfortable having two different terms with the exact
17   same construction, is there an add that you would add to one
18   or the other of them or both that would avoid that problem,
19   but that otherwise wouldn't interfere with your -- the
20   thrust behind what you're doing here?
21        MR. WEBER:  Yeah, that makes sense.
22        I think some of the trouble here is that these
23   patents don't really say what these things do.  And so,
24   there's no actual implementation details.  I think the
25   parties agree what these networks are, which is the point of

134

1    claim construction.  The claims tell you what to do with
2    them, if anything.  And so, you know, Claim 7 of the '395
3    patent says you join a high level network, you join a first
4    and then a second low level networks, you obtain contacts
5    from those two low level networks, and then apparently after
6    joining a high level network you log into it and then you
7    display a aggregated contact list.
8           The claims provide, you know, the operational
9    difference between those two terms, but the parties already
10   agree what they are.  They are IM networks.  And if one is
11   high level and the other is low level, the distinction
12   between those is provided by the claims.
13          The claims tell you why they are lower level
14   versus a high level network.
15          THE COURT:  Okay.  I mean, I guess at base, if
16   you absolutely had to have more words, in your view, it
17   would be something like you would literally either just call
18   it high level network IM network or low level IM network?
19   Or you'd say something like the definition for low level
20   network would be IM network that is different than the high
21   level network or something like that.  It would be something
22   as benign as that, probably; am I right?
23          MR. WEBER:  Yeah.  I think that would be a good
24   way to handle it; a high level IM network and a low level IM
25   network, respectively.  And then the operational differences

135

1    provided by the claims.
2           THE COURT:  Okay.  Well, let me let you address
3    the meat of the plaintiff's arguments, though.
4           MR. WEBER:  Okay.  A lot of this is based on
5    similar evidence, as we've talked about: that lexicography
6    and contacts based argument, neither would to limit this term
7    in the fashion that they are proposing to import all these
8    limitations.
9           Again, for lexicography there must be a clearly
10   set forth definition and a clear expressed intent to set
11   forth that definition.  Here the portion of the
12   specifications that they point to does not even use the
13   language that they're trying to import into this term, so
14   the lexicography test just cannot be met.  And that's
15   especially the case with a remote storage component of their
16   proposed construction.
17          This fails for the exact same reasons that we
18   discussed for the contact aggregation engine.  There's just
19   simply no evidence and plaintiff still can't point to any
20   that clearly and unmistakably sets forth that it's a
21   requirement that aggregated contact list is stored
22   nonlocally and on a network, let alone that this is a
23   requirement for a high level network, low level network, any
24   claim term contact aggregation engine.  That evidence is
25   just simply missing.

136

1           And as we've already discussed, the patent
2    specification, especially in Figure 3, and the related
3    description seemed to contradict plaintiff's position;
4    certainly do not support it.
5           So there's no lexicography.  And on the point
6    about context, here they're pointing to an embodiment in
7    these patents in supporting their position, but it is
8    contrary to other claim construction principles to use
9    embodiments to import limitations.  Especially whereas here
10   the specification expressly describes those embodiments as
11   exemplary and not limiting in scope.  There's just no
12   context here or lexicography to support their construction.
13          And a second reason to reject their
14   constructions is that it would render claim language
15   superfluous.  Plaintiff can't identify any difference
16   between their construction and claim requirements other than
17   plurality.  I don't think plaintiff would be saying that
18   their construction is limited to just a single low level
19   network just because because they were talking about a low
20   level network and their construction.  It would overlap with
21   this requirement, plurality or not.
22          And so, that would again be highly disfavored to
23   import limitations that are already claim limitations.
24          So, I mean, that's really the gist.  We've gone
25   over a lot of this evidence, and it just -- it does not

137

1    support lexicography or context for any of these terms.
2           THE COURT:  Okay.  I don't think I have
3    questions.  It just reminds me of one question for the
4    plaintiff side.  And, Mr. Schlather, let me ask you on the
5    last thing that Mr. Weber said, which is if -- as to the, I
6    guess, it's the '453, if the claims reference to the fact
7    that a high level network uses a network interface to access
8    contact information from a plurality of messaging services,
9    the plurality was a key piece of why, in your view, your
10   construction for both high and low level network isn't
11   redundant, particularly as to low level network.
12          Mr. Weber says, yeah, but I'm sure the plaintiff
13   does not mean that it would be restricted to just one low
14   level network to grab that contact info from: is that wrong?
15   The plurality captured even by your construction maybe for
16   low level network.
17          MR. SCHLATHER:  I think that for high level
18   network, as the -- kind of the term should be construed, it
19   could be.  And then the claims then made clear that what is
20   required for infringement of the patents is that it, you
21   know, joined and accessed contact list from a plurality of
22   low level networks, so I think that's the distinction.
23          THE COURT:  Okay.  And, Mr. Schlather, anything
24   else you wanted to say by way of brief rebuttal?
25          MR. SCHLATHER:  Well, I would say that what I

138

1  have heard here is any real significant discussion of how,
2  you know, calling a -- the high level network, you know,
3  construing that as the high level IM network and then low
4  level network as a low level IM network, I don't think
5  really adds much of anything to the analysis here.
6          And what I haven't heard from the LinkedIn side
7  is, you know, what -- what are -- there's still no
8  explanation of what these networks are in the context of the
9  patents.  We've set -- eBuddy has set forth what it believes
10 these networks are as described in the patent.  But simply
11 leaving it to high level IM network and low level IM network
12 doesn't seem to advance the ball much and doesn't help the
13 jury understand how these networks are interrelated.
14         THE COURT:  Fair enough.
15         Mr. Weber, anything you want to say by way of
16 brief response to that?
17         MR. WEBER:  Yeah, it's -- I think the problem
18 that LinkedIn is butting up against on that point is just
19 that we can't rewrite the patents to help this problem.  The
20 patents just simply don't support their definition.  And the
21 claims provide any operational difference between a high
22 level low level network, and we just -- we can't supply the
23 evidence that's not there.
24         THE COURT:  It sounds like, Mr. Weber, tell me
25 if I'm right -- and, again, ultimately the constructions are

139

1  what they are based on the principles of claim construction
2  and extrinsic evidence.  It sounds like what you're saying
3  is that for a lot of these terms plaintiff proposed them,
4  LinkedIn is not even sure exactly why we're fighting these
5  fights.  And so, like, a few times you've said something
6  like, look, ultimately, LinkedIn just feels like you can't
7  construe the term this way, because it's not provided by the
8  claims.  It sounds like sometimes it is a lot of I'm not
9  even sure why this is really going to be relevant or not, or
10 what -- you know, what the other side might do with this,
11 but separate and apart from that, this is the right
12 construction.
13         Again, is that, in your view, at least, is that
14 kind of where things stand in terms of where these disputes
15 are coming from?
16         MR. WEBER:  Yeah, I think in general that's
17 accurate.  I mean, we've pointed out a couple of spots where
18 we know that there's been a dispute on the merits.  So on
19 101 we talked about storage, and it's simply not a claim
20 requirement.
21         We've also, I can surmise maybe on title bar in
22 relation to some prior art that has it certainly in the
23 title associated with the process in which they might
24 argument well, it doesn't have these control buttons, that
25 might be important.  But, in general, LinkedIn is trying to

140

1  remain true to the intrinsic evidence and well-established
2  claim principles on all of these terms that plaintiff
3  proposed.
4          THE COURT:  And, of course, I'm not suggesting
5  that LinkedIn is correct and the plaintiff incorrect,
6  obviously that will all come about -- you know, I'll try to
7  make a determination about when I do the constructions.
8          But what I would say, just for what it's worth,
9  it strikes me that on the 101 issue, to the extent that a
10 key issue there is whether or not local storage of the
11 contact information is required by the claims, it strikes me
12 that, at least today, I think we've heard that there might
13 be additional claim term language that aren't a part of our,
14 you know, terms for construction that may also be said to
15 convey that requirement -- again, maybe disputed.
16         So I'm not, you know -- so this is neither here
17 nor there, but it's just to say that if claim construction
18 was meant to fully address all relevant illegability issues
19 such that at some later date if it was going to get teed up
20 at summary judgment, it could or a trial.  I wonder whether
21 we've really accomplished that.  If we haven't accomplished
22 it, I don't know what that means for the Court down the
23 line, something the parties probably should be thinking
24 about and talking about.
25         Also, just before I go, I wanted to remind you

141

1  to say so the joint appendix -- and, look, I understand it's
2  hard when the Court is asking you all to put together a
3  combined brief, because you've got to merge all these things
4  and combined appendix, and I'm sure both sides have come up
5  with their own exhibits for the appendix and then somehow
6  you have to merge them and it is great difficulty.  I was
7  there as an associate and doing that very thing.
8          As it happens, though, there's some stuff about
9  the appendix that I think is a little off.  Like -- I don't
10 think there's anything that could be done about this, but
11 each exhibit as an exhibit letter, but then there's some
12 separate overlapping, I think, controlling exhibit letter
13 that's meant to overcome that; like, it's Exhibit A1 not
14 Exhibit J.  That's fine.  It's confusing but it's fine.
15         But like sometimes in here I think there's two
16 Exhibits A's, like one of them I think has the Kao
17 declaration and one of them doesn't.  The Surati
18 declaration, I think in parts, the plaintiff's brief is
19 citing to like Paragraphs 40 or something, unless I'm
20 reading it wrong I don't think there's a 40 something.
21         So it's all to say, look, if nothing changed,
22 we'll take it, we'll use it, we'll figure it out.  But the
23 parties might want to like further review the appendix and
24 meet-and-confer, and if there is any kind of additional
25 clarity they want to bring to the record about things that

142

1    were cited in the joint brief and where they are in the
2    appendix, or where they're meant to be, I'll ask that the
3    parties, to the extent they feel the need to do so, that
4    they could make a joint submission, say, a letter of no more
5    than five single-spaced pages, that provides any additional
6    clarity or information about -- to the extent it's needed,
7    just to confirm, you know, what citations made in the brief,
8    how they relate to documents in the appendix.
9            It may be that you talk about it and you say I
10   don't know that there is anything more we can do.  But I
11   just ask that it be joint, in one place, non-argumentative,
12   you know, just factual; and that it be, say, let's say ten
13   days from today's date.  How about that?
14           So, within ten days from today's date, I'll look
15   for -- if it is to be submitted -- a follow-up providing any
16   additional clarity about where the materials in the joint
17   appendix that are cited in the brief are really found.
18           Okay?
19           With all that said, before we end our hearing,
20   anything further I need to clear up from a procedural
21   perspective before we move forward?
22           On the plaintiff side, Mr. Edmonds and
23   Mr. Schlather.
24           MR. SCHLATHER:  Nothing further from the
25   plaintiff, Your Honor.  Thank you for your time.

143

1            THE COURT:  And, Mr. Weber, on defendant's side?
2            MR. WEBER:  No.  I would just note that there
3    was a discovery teleconference set in this case for March
4    21st, the parties' submitted a joint letter to request
5    cancellation of that hearing.  I just wanted to point that
6    out since we have not submitted briefs on that and have
7    resolved the dispute for now.
8            THE COURT:  Okay.  You submitted a letter saying
9    it's resolved, but I think we must have -- did we not issue
10   an order taking the matter off the calendar?  It's not on my
11   calendar now so usually that means we would have issued some
12   kind of order.  If it was for the -- you said it was March
13   21st, Mr. Weber?
14           MR. WEBER:  I believe there was a hearing and I
15   believe the joint letter was submitted March 4th.
16           THE COURT:  Okay.
17           MR. WEBER:  Maybe I just didn't get the notice,
18   I thought that it was still on.
19           THE COURT:  Maybe we did or didn't, but if -- it
20   looks like -- I don't have anything on the 21st now
21   regarding this matter, so we certainly have taken it off of
22   our calendar.  And I think you're telling me if there was a
23   dispute, it's gone.  So if for some reason on the docket we
24   didn't issue an order saying no more discovery dispute
25   teleconference, I'm saying it now so you don't have to worry

144

1    about what the deal is.  Okay?
2            MR. WEBER:  Great.  Appreciate it.  Thank you,
3    Your Honor.
4            THE COURT:  Thank you for the arguments, they
5    were very helpful.  I'll take it under advisement and try to
6    issue a decision as soon as we can.
7            Wish everybody continued health and safety.  And
8    unless there's anything further, we'll go off the record and
9    end our video conference today.
10           Thanks everybody.  I appreciate it.
11           MR. WEBER:  Thank you, Your Honor.
12           MR. SCHLATHER:  Thank you, Your Honor.
13           MR. EDMONDS:  Thank you.
14           (Whereupon, the following proceeding concluded
15   at 2:59 p.m.)
16           I hereby certify the foregoing is a true
17   and accurate transcript from my stenographic notes in the
18   proceeding.
19               /s/ Michele L. Rolfe, RPR, CRR
                  U.S. District Court
20
21
22
23
24
25

**'**

**'02** [1] - 8:4
**'06** [3] - 8:4, 64:14, 64:17
**'135** [4] - 94:12, 94:16, 98:20, 99:2
**'179** [8] - 18:16, 26:6, 98:22, 98:25, 99:16, 99:20, 100:13, 103:1
**'395** [6] - 109:6, 112:13, 112:14, 115:20, 116:10, 134:2
**'453** [8] - 109:11, 112:13, 112:15, 115:20, 116:9, 130:13, 130:18, 137:6

**/**

**/s** [1] - 144:19

**1**

**1** [22] - 18:16, 18:23, 26:6, 80:19, 94:12, 94:15, 98:22, 98:24, 100:12, 103:1, 107:16, 109:6, 112:12, 113:20, 116:9, 116:21, 118:5, 129:16, 130:13, 130:16, 130:18
**100** [7] - 37:14, 46:8, 46:13, 56:5, 58:20, 59:4, 74:12
**101** [7] - 122:7, 122:8, 122:13, 122:15, 123:5, 139:19, 140:9
**102** [1] - 129:18
**104** [7] - 113:20, 113:24, 114:2, 114:19, 118:5, 118:6, 129:18
**10:00** [3] - 28:11, 28:12, 28:13
**10:30** [1] - 12:5
**114** [1] - 113:22
**11:30** [1] - 2:4
**12** [1] - 5:7
**14** [1] - 101:18
**15** [5] - 3:19, 8:10, 28:19, 81:7, 101:18
**16** [1] - 1:12

**2**

**20-1501-RGA-CJB** [2] - 1:6, 2:12
**2000** [2] - 79:25, 80:9
**2005** [1] - 61:4
**2006** [3] - 8:12, 8:25, 9:3
**2017** [1] - 85:11
**2021** [1] - 85:11
**2022** [1] - 1:12
**21st** [3] - 143:4, 143:13, 143:20
**23** [1] - 92:1
**28** [1] - 6:12
**2:59** [1] - 144:15

**3**

**3** [6] - 81:10, 114:3, 114:9, 114:13, 114:17, 136:2
**30** [2] - 3:18, 81:7
**306** [1] - 114:20
**33** [1] - 108:2
**3D** [3] - 84:13, 84:15

**4**

**4** [2] - 82:7, 82:12
**40** [2] - 141:19, 141:20
**4th** [1] - 143:15

**6**

**6** [3] - 80:19, 101:18

**7**

**7** [2] - 6:11, 134:2
**72** [1] - 12:2
**7th** [2] - 54:20, 57:3

**8**

**8** [1] - 11:9

**9**

**90** [1] - 3:17
**9X** [1] - 79:25, 80:8

**A**

**A's** [1] - 141:16
**a.m** [1] - 2:4
**A1** [1] - 141:13
**A3** [5] - 82:7, 82:11, 82:23, 88:20, 88:22
**A4** [3] - 82:23, 88:20,

88:25
**able** [5] - 34:10, 42:8, 96:5, 104:21, 113:7
**absolutely** [8] - 58:22, 71:14, 112:3, 123:18, 131:24, 132:7, 132:8, 134:16
**abstract** [1] - 106:4
**accept** [1] - 123:12
**acceptable** [5] - 22:8, 23:4, 35:7, 45:11, 55:19
**access** [5] - 128:8, 129:18, 131:20, 132:14, 137:7
**accessed** [2] - 133:6, 137:21
**accessing** [2] - 117:20, 124:2
**accommodate** [1] - 74:1
**accomplish** [2] - 47:22, 106:25
**accomplished** [2] - 140:21
**accomplishes** [1] - 97:20
**accomplishing** [1] - 107:1
**according** [1] - 77:10
**accurate** [17] - 27:8, 34:19, 34:24, 58:10, 59:17, 70:6, 80:16, 81:4, 86:8, 87:5, 89:21, 90:14, 96:12, 123:3, 124:6, 139:17, 144:17
**accuse** [1] - 89:9
**accused** [2] - 15:21, 89:15
**accusing** [1] - 32:11, 32:12
**acknowledge** [1] - 78:20
**acknowledging** [1] - 71:8
**acted** [2] - 37:7, 37:8
**action** [20] - 9:18, 9:20, 10:2, 10:9, 13:19, 17:6, 21:22, 22:1, 23:10, 23:11, 23:13, 24:10, 25:13, 25:18, 25:20, 26:3, 29:1, 29:4, 32:19, 35:24
**Action** [2] - 1:5, 2:11
**actions** [4] - 13:21, 22:12, 23:17, 28:22
**activate** [3] - 39:12, 42:3, 43:3

**activated** [2] - 41:7, 43:6
**active** [16] - 38:14, 39:25, 40:3, 41:24, 45:18, 45:20, 46:1, 50:8, 50:11, 51:8, 51:14, 51:16, 52:1, 74:9, 79:2, 79:16
**actual** [2] - 63:15, 133:24
**add** [8] - 19:25, 25:24, 43:1, 84:23, 88:3, 127:4, 133:17
**added** [1] - 66:2
**adding** [7] - 26:23, 26:24, 87:7, 88:23, 89:9, 89:14, 121:16
**addition** [2] - 86:6, 104:14
**additional** [15] - 17:7, 17:9, 33:23, 83:5, 83:17, 84:21, 85:7, 85:8, 89:9, 125:20, 140:13, 141:24, 142:5, 142:16
**address** [13] - 4:14, 8:7, 54:12, 77:24, 88:11, 106:7, 115:13, 116:1, 117:12, 122:13, 123:4, 135:2, 140:18
**addressed** [4] - 8:23, 17:21, 19:12, 91:1
**addresses** [1] - 9:8
**addressing** [1] - 27:2
**adds** [3] - 20:1, 107:25, 138:5
**admittedly** [1] - 35:12
**Adobe** [1] - 42:17
**adopted** [4] - 22:20, 27:10, 31:19, 109:21
**advance** [1] - 138:12
**advanced** [1] - 39:9
**advisement** [1] - 144:5
**aggegation** [1] - 107:21
**aggregated** [19] - 106:2, 106:13, 107:5, 109:13, 110:10, 111:8, 111:13, 117:18, 118:2, 120:11, 120:25, 121:23, 126:20, 126:21, 128:18, 132:9, 132:14, 134:7, 135:21
**aggregating** [1] - 111:16

**aggregation** [64] - 105:3, 105:25, 106:6, 106:11, 106:23, 107:4, 107:9, 107:24, 108:14, 109:3, 109:16, 109:19, 109:22, 110:7, 110:8, 111:1, 111:8, 111:12, 111:18, 111:22, 112:3, 112:21, 113:4, 114:4, 114:6, 114:13, 115:8, 115:9, 115:12, 115:25, 116:6, 117:5, 117:8, 117:15, 117:18, 118:8, 118:13, 119:3, 120:2, 120:10, 120:17, 120:21, 120:24, 121:3, 121:14, 122:2, 122:11, 122:25, 123:7, 123:19, 124:10, 125:4, 125:8, 125:24, 126:4, 126:9, 126:14, 126:19, 126:21, 128:16, 133:2, 135:18, 135:24
**agree** [21] - 17:18, 25:15, 27:4, 31:22, 46:25, 49:6, 50:17, 62:13, 67:25, 72:21, 72:22, 78:18, 83:11, 87:2, 125:9, 125:13, 127:10, 127:18, 128:5, 133:25, 134:10
**agreed** [2] - 3:14, 4:2
**agreement** [1] - 106:9
**ahead** [3] - 5:16, 5:17, 132:20
**akin** [2] - 114:19, 115:3
**alleged** [1] - 117:10
**allegedly** [1] - 118:17
**alleges** [1] - 119:8
**allocate** [1] - 4:1
**allotted** [1] - 3:15
**allow** [4] - 43:20, 56:21, 64:18, 70:21
**allowed** [1] - 114:11
**almost** [2] - 90:1, 90:2
**alone** [3] - 8:20, 111:23, 135:22
**alternate** [4] - 46:22, 46:24, 47:1, 99:12

**alternative** [101] - 17:2, 21:19, 25:15, 26:2, 27:2, 32:25, 35:25, 46:22, 48:15, 48:20, 48:23, 50:15, 51:12, 52:25, 53:25, 67:23, 67:25, 68:2, 72:25, 73:9, 73:15, 73:18, 73:22, 73:23, 74:2, 74:3, 74:5, 74:21, 74:25, 75:1, 75:4, 75:6, 75:9, 75:10, 75:12, 75:14, 77:9, 77:11, 77:13, 91:13, 91:17, 91:23, 92:8, 92:12, 92:18, 92:22, 92:23, 92:25, 93:8, 93:10, 93:17, 93:24, 94:13, 94:17, 94:19, 94:22, 94:23, 95:2, 95:15, 96:9, 96:18, 97:16, 97:21, 98:1, 98:2, 98:6, 98:10, 98:14, 98:19, 98:20, 98:22, 99:3, 99:11, 99:17, 99:21, 99:22, 99:23, 100:8, 100:13, 100:16, 100:23, 101:2, 101:12, 101:21, 102:15, 102:17, 102:21, 103:2, 103:11, 103:12, 103:14, 103:16, 103:17, 103:20, 103:24, 103:25, 104:1, 104:19, 104:25
**alternatives** [1] - 31:16
**ambiguity** [1] - 38:13
**amounts** [3] - 18:6, 73:5, 106:16
**analysis** [1] - 138:5
**AND** [1] - 1:2
**answer** [4] - 82:10, 94:10, 110:21, 113:13
**answering** [1] - 49:5
**anticipate** [2] - 65:7, 65:11
**anyway** [1] - 100:25
**apart** [1] - 139:11
**apologies** [1] - 65:16
**apologize** [1] - 116:18
**apparent** [1] - 126:13
**appear** [5] - 47:16, 92:19, 96:18, 118:4, 131:22
**APPEARANCES** [1] -

1:16
**appended** [1] - 17:22
**appendix** [10] - 82:8, 83:4, 141:1, 141:4, 141:5, 141:9, 141:23, 142:2, 142:8, 142:17
**Appendix** [2] - 17:22, 59:10
**applicability** [3] - 61:8, 85:5, 102:5
**applicable** [4] - 9:3, 9:7, 26:2, 80:11
**application** [52] - 37:6, 37:25, 38:7, 39:23, 39:24, 40:9, 41:22, 48:7, 50:14, 51:2, 51:6, 51:7, 51:18, 52:2, 53:2, 53:12, 53:14, 53:19, 53:23, 54:3, 54:18, 56:2, 57:18, 58:12, 60:4, 62:5, 65:18, 66:5, 67:20, 67:21, 67:22, 68:1, 68:13, 69:20, 72:23, 72:24, 73:10, 73:12, 73:21, 74:9, 74:12, 74:17, 74:18, 74:22, 74:23, 75:2, 75:15, 77:15, 86:3, 87:16, 87:21, 88:18
**applications** [11] - 50:11, 55:11, 59:15, 78:10, 78:20, 79:2, 79:16, 84:1, 84:4, 85:21, 86:21
**apply** [2] - 47:8, 125:21
**appreciate** [3] - 4:2, 144:2, 144:10
**appropriate** [3] - 30:9, 65:8, 85:12
**area** [3] - 18:14, 88:23, 89:1
**argue** [3] - 63:17, 123:3, 123:17
**argument** [52] - 3:11, 4:10, 4:15, 5:24, 20:14, 26:16, 30:25, 31:5, 35:18, 52:8, 54:24, 56:11, 56:12, 56:15, 58:18, 58:21, 64:8, 80:24, 80:25, 83:8, 91:14, 96:22, 103:8, 104:12, 104:13, 107:15, 108:1, 108:3, 110:17, 114:19, 115:23, 115:24,

117:5, 117:25, 118:21, 120:7, 122:18, 122:21, 122:23, 125:1, 125:20, 126:24, 127:1, 127:8, 127:15, 130:12, 130:22, 131:17, 133:13, 135:6, 139:24
**argumentative** [1] - 142:11
**arguments** [10] - 3:16, 56:8, 81:12, 117:14, 127:11, 127:12, 130:21, 130:24, 135:3, 144:4
**arises** [1] - 12:11
**array** [3] - 19:6, 99:21
**ARSHT** [1] - 1:21
**art** [13] - 13:10, 25:17, 44:15, 64:17, 68:11, 83:11, 86:9, 89:11, 89:13, 89:17, 100:23, 129:22, 139:22
**article** [2] - 24:2, 24:3
**articulated** [1] - 68:5
**aside** [1] - 110:16
**asserted** [2] - 8:7, 8:24
**assertedly** [1] - 33:7
**assertion** [3] - 9:1, 32:2, 64:15
**assign** [1] - 51:10
**associate** [1] - 141:7
**associated** [8] - 12:3, 38:12, 92:2, 93:21, 100:4, 101:6, 109:12, 139:23
**associating** [3] - 95:10, 95:20
**association** [4] - 98:23, 99:22, 104:22, 104:23
**assume** [2] - 76:12, 97:7
**attempt** [1] - 105:18
**attempted** [3] - 83:14, 85:7, 108:2
**attempting** [4] - 63:5, 66:9, 117:16, 119:12
**attorney** [1] - 35:18
**authoritative** [3] - 8:21, 10:6, 30:12
**authority** [1] - 64:3
**automatically** [1] - 14:4
**available** [1] - 28:9
**avoid** [2] - 126:11,

133:18
**aware** [2] - 9:4, 65:12

**B**

**B.V** [1] - 1:4
**backwards** [2] - 53:13, 100:19
**bad** [2] - 28:13, 90:7
**balance** [1] - 94:8
**ball** [1] - 138:12
**banc** [1] - 61:4
**band** [7] - 49:12, 52:22, 53:7, 62:10, 62:11, 62:15, 62:20
**bandwidth** [1] - 81:11
**bar** [236] - 36:6, 36:9, 36:12, 36:15, 37:9, 37:13, 37:23, 38:3, 38:4, 38:12, 38:16, 39:2, 39:4, 39:5, 39:8, 39:12, 39:16, 39:22, 39:24, 40:2, 40:8, 40:11, 40:21, 40:23, 41:10, 41:14, 42:5, 42:10, 42:15, 42:23, 42:24, 42:25, 43:2, 43:4, 43:5, 43:14, 44:22, 45:5, 45:8, 45:13, 45:16, 46:9, 46:10, 46:12, 46:24, 47:19, 48:7, 48:9, 48:10, 49:4, 49:11, 49:12, 49:14, 49:15, 49:16, 49:19, 49:24, 49:25, 50:1, 50:3, 50:5, 50:6, 50:18, 51:20, 52:14, 52:15, 52:19, 52:22, 53:5, 53:21, 54:6, 54:7, 54:8, 54:16, 55:5, 55:20, 56:1, 56:4, 56:9, 57:15, 57:18, 57:19, 58:24, 58:25, 61:16, 62:10, 62:13, 63:16, 66:4, 67:9, 67:19, 68:4, 68:8, 68:10, 68:11, 68:12, 68:14, 69:8, 69:10, 69:11, 69:12, 69:19, 69:22, 70:10, 70:17, 72:22, 73:1, 73:9, 73:13, 73:15, 73:20, 73:24, 74:4, 74:5, 74:11, 74:16, 74:22, 75:4, 75:6, 75:17, 76:13, 77:9, 77:14, 77:20, 77:24, 77:25, 78:10, 78:21, 80:17, 80:19, 80:20,

80:21, 80:22, 80:24, 81:1, 81:2, 81:23, 81:24, 83:10, 83:25, 84:7, 86:14, 86:16, 86:19, 86:20, 87:1, 87:3, 87:4, 87:13, 87:16, 87:20, 88:6, 88:25, 89:2, 89:6, 91:17, 91:18, 91:24, 92:3, 92:4, 92:6, 92:12, 92:13, 92:24, 92:25, 93:5, 93:9, 93:10, 93:21, 94:13, 94:14, 95:11, 95:12, 95:13, 95:18, 95:19, 96:14, 96:15, 97:4, 97:5, 98:4, 98:21, 98:25, 99:1, 99:4, 99:6, 99:17, 99:24, 100:5, 100:6, 100:9, 100:10, 100:17, 101:2, 101:9, 101:10, 101:12, 101:13, 101:19, 101:20, 102:16, 102:20, 102:21, 103:4, 103:5, 103:18, 103:22, 139:21
**bare** [2] - 22:5, 122:2
**bars** [9] - 38:10, 58:22, 59:2, 59:4, 67:1, 78:12, 79:15, 83:15
**base** [2] - 16:11, 134:15
**based** [13] - 4:4, 6:13, 12:4, 17:24, 24:4, 31:21, 37:20, 45:18, 81:24, 115:19, 135:4, 135:6, 139:1
**basis** [4] - 5:23, 97:3, 99:7, 123:13
**bear** [2] - 31:3, 34:21
**beaten** [1] - 88:9
**become** [1] - 17:20
**BEFORE** [1] - 1:14
**begin** [6] - 2:17, 3:3, 3:10, 5:11, 21:6, 36:7
**beginning** [4] - 2:4, 12:2, 60:3, 67:14
**begins** [1] - 89:1
**behalf** [5] - 1:20, 1:24, 2:20, 6:5, 21:8
**behind** [1] - 133:20
**believes** [1] - 138:9
**benign** [1] - 134:22
**best** [3] - 5:22, 113:17, 132:11

**better** [7] - 4:13, 8:9, 41:21, 67:12, 91:3, 129:25, 130:3
**between** [13] - 3:16, 9:24, 14:7, 36:10, 44:2, 64:10, 78:8, 80:12, 118:11, 134:9, 134:12, 136:16, 138:21
**beyond** [1] - 63:17
**big** [5] - 11:4, 11:5, 11:15, 20:17, 79:14
**bit** [4] - 15:4, 32:24, 35:22, 81:11
**black** [3] - 84:25, 99:6, 123:9
**blah** [3] - 126:9, 126:10
**blame** [1] - 72:7
**blank** [3] - 27:18, 27:19, 93:14
**board** [1] - 104:12
**bodies** [1] - 36:10
**book** [5] - 6:16, 8:12, 30:22, 87:9, 94:4
**books** [1] - 93:18
**boom** [1] - 28:11
**borne** [6] - 15:23, 30:5, 41:25, 66:18, 81:25, 128:20
**bottom** [1] - 88:8
**boxed** [1] - 44:18
**boxes** [1] - 67:1
**brand** [1] - 51:16
**brand-name** [1] - 51:16
**breadth** [1] - 12:15
**break** [1] - 68:18
**brief** [33] - 4:8, 7:1, 8:25, 11:9, 17:15, 20:22, 37:19, 46:11, 49:5, 54:19, 58:11, 63:25, 64:24, 65:3, 69:16, 75:20, 82:8, 85:9, 102:10, 104:10, 108:2, 114:8, 117:24, 118:21, 127:15, 132:18, 137:24, 138:16, 141:3, 141:18, 142:1, 142:7, 142:17
**briefed** [1] - 57:7
**briefing** [6] - 20:18, 21:24, 61:23, 106:3, 111:21, 122:4
**briefly** [2] - 49:10, 102:24
**briefs** [10] - 4:4, 50:9, 56:8, 56:16, 65:4,

78:25, 82:7, 89:24, 127:10, 143:6
**bring** [1] - 141:25
**brings** [1] - 132:16
**broad** [11] - 9:21, 12:24, 13:21, 27:22, 30:6, 31:23, 32:11, 32:13, 33:8, 53:4, 95:18
**broader** [8] - 44:16, 44:19, 80:11, 87:5, 90:6, 100:9, 101:4, 131:12
**broadly** [1] - 28:3
**Brock** [2] - 3:7, 21:8
**BROCK** [1] - 1:24
**browser** [1] - 47:11
**buckets** [4] - 105:6, 105:13, 105:23, 130:10
**buddy** [1] - 28:8
**build** [1] - 45:8
**burden** [9] - 60:22, 60:23, 60:25, 61:6, 61:12, 65:1, 75:25, 83:16
**BURKE** [1] - 1:14
**but..** [1] - 62:9
**butting** [1] - 138:18
**button** [6] - 23:15, 24:19, 56:22, 58:9, 68:20, 72:6
**button's** [1] - 68:22
**buttons** [126] - 23:21, 36:13, 36:16, 36:20, 37:12, 37:13, 37:18, 37:22, 37:24, 38:6, 38:10, 38:15, 38:18, 39:2, 39:4, 39:10, 39:12, 40:5, 40:7, 40:9, 40:10, 40:11, 40:14, 40:18, 40:20, 40:21, 40:22, 40:25, 41:9, 41:11, 41:13, 41:14, 41:20, 41:22, 41:23, 41:24, 42:6, 42:7, 42:8, 42:11, 42:12, 42:21, 43:2, 43:3, 43:6, 43:9, 43:14, 43:19, 43:24, 43:25, 44:2, 44:3, 44:5, 44:21, 45:7, 45:13, 45:22, 46:4, 54:17, 55:3, 55:7, 55:8, 55:15, 55:18, 56:3, 56:5, 56:9, 56:14, 56:20, 56:21, 57:5, 57:9, 57:19, 58:1, 58:2, 58:3, 58:5, 58:13, 58:15,

58:16, 58:17, 58:19, 58:22, 59:5, 59:11, 59:17, 61:16, 61:24, 65:19, 66:4, 66:11, 66:17, 66:19, 67:1, 67:8, 68:25, 69:3, 69:4, 69:8, 69:9, 69:10, 69:11, 69:12, 69:21, 69:22, 70:1, 70:10, 70:11, 70:15, 70:16, 70:19, 70:21, 71:2, 71:23, 72:2, 76:13, 84:8, 87:3, 139:24
**buttons ..** [1] - 37:10
**BV** [1] - 2:11
**BW** [1] - 77:1
**BY** [4] - 1:17, 1:19, 1:22, 1:23

## C

**calculations** [1] - 25:21
**calendar** [8] - 27:25, 28:10, 28:14, 28:16, 28:20, 143:10, 143:11, 143:22
**camera** [1] - 76:22
**cancellation** [1] - 143:5
**cannot** [10] - 35:2, 35:13, 70:24, 84:23, 96:24, 101:24, 102:5, 102:6, 119:17, 135:14
**capability** [3] - 32:5, 39:17, 42:13
**capable** [15] - 14:6, 14:24, 15:1, 16:25, 19:25, 33:10, 33:14, 33:15, 34:3, 34:14, 35:4, 71:2, 71:7, 71:20, 72:15
**capture** [2] - 53:5, 83:14
**captured** [6] - 11:17, 97:22, 98:5, 109:4, 110:1, 137:15
**captures** [2] - 45:16, 51:23
**capturing** [1] - 55:10
**carnival** [1] - 7:12
**carried** [1] - 41:5
**case** [24] - 28:15, 61:2, 61:13, 84:6, 84:8, 87:1, 90:23, 96:21, 97:1, 97:19, 98:9, 101:11, 103:1, 112:14, 115:5,

115:7, 117:19, 118:25, 120:9, 125:21, 131:21, 135:15, 143:3
**cases** [7] - 30:8, 30:9, 43:15, 89:25, 111:12, 113:3, 116:5
**cat** [1] - 12:5
**CE** [2] - 79:25, 80:9
**central** [1] - 95:5
**certain** [8] - 13:21, 14:12, 37:4, 86:21, 107:8, 108:4, 116:5, 118:2
**certainly** [14] - 5:21, 11:24, 24:22, 27:16, 28:3, 91:8, 97:19, 112:12, 114:24, 124:16, 124:22, 136:4, 139:22, 143:21
**certify** [1] - 144:16
**chance** [3] - 4:8, 63:24, 75:20
**change** [6] - 10:5, 10:9, 42:9, 51:21, 69:9, 82:22
**changed** [6] - 8:19, 9:7, 60:6, 60:24, 67:8, 74:3, 76:9, 141:21
**changes** [2] - 110:19, 110:21
**changing** [3] - 71:24, 72:1, 101:19
**character** [1] - 95:10
**characteristic** [1] - 58:24
**characterized** [1] - 22:19
**charge** [1] - 42:7
**chat** [2] - 28:9
**cherry** [1] - 35:21
**cherry-picked** [1] - 35:21
**choosing** [2] - 80:12, 83:21
**chose** [2] - 80:13
**Christopher** [1] - 3:7
**CHRISTOPHER** [2] - 1:14, 1:23
**circle** [2] - 77:1, 87:15
**Circuit** [2] - 30:5, 91:1
**Circuit's** [1] - 128:2
**circumstances** [2] - 26:17, 132:8
**citations** [1] - 142:7
**cite** [1] - 66:25
**cited** [14] - 36:19, 49:18, 64:3, 78:3,

78:4, 80:22, 81:15, 82:7, 88:24, 97:2, 111:21, 132:17, 142:1, 142:17
**citing** [1] - 141:19
**Civil** [1] - 2:11
**civil** [1] - 1:5
**claim** [83] - 2:10, 3:10, 7:8, 16:10, 18:20, 18:21, 18:23, 19:4, 19:9, 19:12, 26:3, 26:10, 27:11, 35:13, 44:10, 53:15, 60:19, 72:10, 72:14, 77:10, 77:13, 87:9, 90:25, 92:19, 92:20, 94:16, 94:18, 94:19, 94:20, 94:22, 95:6, 95:8, 95:12, 95:16, 95:18, 97:20, 98:1, 99:5, 99:7, 99:11, 99:16, 99:18, 99:24, 101:1, 103:2, 103:11, 103:13, 103:24, 104:17, 107:18, 108:20, 110:20, 112:6, 112:12, 117:22, 120:20, 122:11, 123:9, 125:14, 125:15, 125:18, 125:19, 126:16, 126:20, 130:14, 130:23, 130:25, 131:3, 131:6, 131:12, 131:14, 132:6, 134:1, 135:24, 136:8, 136:14, 136:16, 136:23, 139:1, 139:19, 140:2, 140:13, 140:17
**Claim** [16] - 18:16, 26:6, 94:12, 94:15, 98:22, 98:24, 100:12, 103:1, 107:16, 109:6, 112:12, 116:9, 130:13, 130:16, 130:18, 134:2
**claimed** [6] - 109:18, 113:6, 113:7, 117:17, 122:1
**claiming** [1] - 82:4
**claims** [65] - 22:14, 24:14, 47:8, 48:16, 53:2, 60:22, 63:2, 73:14, 80:1, 96:20, 98:1, 98:3, 98:4, 98:5, 98:9, 98:14,

98:17, 98:19, 99:1, 99:2, 100:6, 101:13, 103:9, 104:14, 107:7, 107:21, 108:5, 108:10, 108:12, 108:17, 108:21, 109:1, 109:2, 109:17, 109:22, 110:1, 112:12, 112:23, 112:25, 116:2, 116:12, 119:25, 120:5, 121:2, 121:12, 122:8, 123:5, 123:14, 125:2, 128:9, 128:11, 128:21, 132:14, 132:22, 132:23, 134:1, 134:8, 134:12, 134:13, 135:1, 137:6, 137:19, 138:21, 139:8, 140:11

**Claims** [2] - 116:9, 116:21

**claims'** [1] - 119:22

**clarification** [1] - 17:9

**clarified** [1] - 67:16

**clarify** [1] - 66:1

**clarity** [4] - 131:23, 141:25, 142:6, 142:16

**clear** [30] - 38:24, 49:24, 69:17, 71:10, 71:13, 71:15, 71:17, 76:5, 81:16, 101:11, 102:1, 103:17, 105:25, 106:5, 106:9, 106:17, 106:22, 111:7, 111:11, 112:10, 116:18, 117:21, 118:23, 119:8, 119:16, 128:10, 132:7, 135:10, 137:19, 142:20

**cleared** [1] - 26:13

**clearer** [1] - 66:16

**clearest** [1] - 112:6

**clearly** [11] - 37:8, 46:24, 48:21, 75:2, 81:5, 96:22, 96:23, 118:10, 119:15, 135:9, 135:20

**click** [3] - 23:13, 24:19, 24:20

**clicked** [1] - 38:6

**clicks** [1] - 23:15

**client** [2] - 28:7, 130:1

**client's** [2] - 129:25, 130:2

**clients** [5] - 113:22, 113:25, 129:20, 129:24, 130:3

**close** [7] - 38:11, 38:17, 39:14, 42:20, 55:17, 83:3, 83:6

**closed** [2] - 64:21, 65:10

**closer** [4] - 22:5, 22:20, 35:6, 81:7

**closing** [9] - 23:13, 36:11, 37:24, 45:9, 54:17, 58:23, 59:5, 65:3, 66:5

**clunky** [1] - 109:20

**co** [1] - 3:6

**co-counsel** [1] - 3:6

**code** [1] - 29:14

**coined** [1] - 127:20

**colleague** [5] - 15:3, 32:10, 88:4, 89:8, 133:10

**colleagues** [1] - 82:25

**column** [1] - 101:18

**columns** [1] - 80:19

**combined** [2] - 141:3, 141:4

**coming** [6] - 24:1, 28:18, 29:3, 29:5, 29:14, 139:15

**comments** [2] - 5:21, 67:12

**commoditization** [1] - 44:4

**common** [1] - 25:16

**competing** [1] - 90:9

**complaint** [2] - 52:11, 52:13

**complete** [5] - 81:3, 89:21, 112:25, 118:24, 126:22

**completely** [1] - 92:17

**complicated** [1] - 53:8

**component** [7] - 106:1, 106:8, 106:10, 106:12, 110:15, 125:10, 115:15

**computer** [33] - 13:22, 16:15, 17:20, 28:24, 32:4, 47:3, 78:13, 85:17, 85:24, 86:7, 88:13, 114:7, 114:21, 114:23, 114:25, 115:4, 115:5, 118:9, 118:12, 118:14, 118:16, 119:2,

119:21, 121:17, 124:5, 124:11, 124:12, 124:15, 129:3, 129:18, 130:1

**Computer** [3] - 23:20, 30:12, 47:4

**computers** [9] - 13:24, 25:9, 113:23, 123:20, 123:21, 124:1, 124:3, 129:11, 129:19

**conceded** [2] - 21:17, 96:17

**conceding** [3] - 20:24, 21:15, 77:8

**concepts** [2] - 6:21, 20:17

**concern** [8] - 8:7, 19:16, 27:11, 28:23, 31:23, 33:16, 71:10, 94:10

**concerned** [2] - 11:16, 25:8

**concerns** [1] - 104:11

**conclude** [1] - 12:23

**concluded** [1] - 144:14

**conclusion** [1] - 130:15

**condition** [13] - 9:19, 10:3, 10:10, 11:25, 12:1, 12:3, 16:21, 22:4, 22:25, 31:17, 33:9, 34:2, 35:24

**conditions** [17] - 6:23, 6:24, 10:19, 10:20, 10:23, 11:23, 12:7, 12:22, 13:11, 14:3, 16:3, 17:25, 18:3, 32:22, 33:1, 33:3

**conducting** [1] - 3:14

**confer** [12] - 21:15, 54:20, 57:1, 57:3, 57:25, 58:8, 65:20, 68:24, 70:12, 70:14, 71:14, 141:24

**conference** [2] - 2:9, 144:9

**configuration** [2] - 33:5, 67:10

**configure** [3] - 38:3, 39:12, 115:18

**configured** [8] - 12:20, 17:4, 21:20, 21:21, 26:4, 32:17, 33:1, 34:10

**confirm** [1] - 142:7

**confirmed** [4] - 57:6, 58:14, 68:24, 70:14

**confirming** [1] - 21:1

**confuse** [1] - 34:13

**confused** [2] - 76:8, 120:7

**confusing** [2] - 54:10, 141:14

**confusion** [5] - 18:2, 32:24, 65:17, 65:21, 66:1

**conjunction** [1] - 94:11

**connected** [4] - 114:25, 118:15, 118:20, 129:5

**connection** [1] - 24:2

**connote** [1] - 124:4

**connotes** [3] - 52:16, 62:16, 126:5

**consider** [4] - 47:14, 58:19, 61:15, 64:18

**consideration** [1] - 60:5

**considering** [2] - 34:22, 63:7

**consistency** [1] - 44:2

**consistent** [17] - 11:3, 14:13, 23:25, 24:9, 35:9, 39:20, 44:6, 45:11, 45:14, 55:12, 59:12, 60:11, 60:13, 61:19, 81:19, 82:1, 82:5

**construction** [180] - 2:10, 3:11, 7:22, 9:14, 10:9, 11:7, 11:8, 11:17, 12:15, 12:25, 13:6, 13:19, 13:25, 17:2, 19:9, 19:17, 19:22, 20:20, 21:2, 21:19, 22:2, 22:3, 22:19, 22:25, 24:1, 25:15, 26:2, 27:2, 27:3, 27:7, 27:10, 31:15, 31:19, 33:9, 34:1, 34:7, 34:18, 35:7, 36:1, 37:6, 37:12, 37:17, 37:23, 38:13, 39:19, 39:20, 39:21, 40:15, 41:17, 44:10, 44:11, 45:17, 46:6, 48:3, 50:6, 50:8, 51:22, 52:13, 52:15, 52:17, 52:18, 52:24, 53:4, 53:10, 53:11, 54:2, 54:11, 54:13, 54:16, 54:25, 55:9, 55:12, 55:13, 55:16, 55:19, 56:1, 56:19, 56:21, 58:5, 58:8, 58:11, 60:19, 62:24, 63:2,

63:8, 63:14, 65:16, 66:18, 68:23, 69:2, 69:7, 69:14, 69:19, 71:19, 71:21, 71:25, 72:5, 72:10, 72:14, 74:8, 75:13, 75:17, 77:12, 78:18, 78:22, 79:20, 81:19, 81:20, 81:23, 81:24, 84:10, 87:9, 88:6, 90:2, 90:10, 90:11, 90:19, 90:25, 91:6, 93:23, 94:6, 94:7, 94:11, 95:2, 96:1, 96:11, 97:15, 98:13, 99:7, 99:8, 99:14, 103:10, 103:20, 104:1, 104:17, 105:8, 105:10, 106:19, 107:12, 107:20, 108:6, 108:9, 108:25, 109:4, 109:21, 110:5, 111:5, 116:16, 116:19, 116:20, 122:11, 122:12, 122:21, 123:9, 125:18, 125:22, 126:14, 126:18, 128:4, 130:11, 131:2, 131:8, 131:13, 131:14, 133:14, 133:15, 133:17, 134:1, 135:16, 136:8, 136:12, 136:16, 136:18, 136:20, 137:10, 137:15, 139:1, 139:12, 140:14, 140:17

**constructions** [9] - 9:18, 45:2, 55:22, 63:9, 90:10, 90:21, 136:14, 138:25, 140:7

**construe** [1] - 102:1, 139:7

**construed** [3] - 103:22, 107:24, 137:18

**construing** [3] - 7:8, 92:11, 138:3

**consult** [1] - 88:13

**contact** [101] - 105:2, 105:25, 106:2, 106:3, 106:6, 106:11, 106:12, 106:13, 106:23, 107:4, 107:5, 107:9, 107:20, 107:23,

108:14, 109:3, 109:14, 109:15, 109:19, 109:22, 110:7, 110:10, 111:1, 111:7, 111:8, 111:11, 111:13, 111:18, 111:22, 112:2, 112:4, 112:13, 112:21, 113:3, 114:4, 114:5, 114:13, 115:7, 115:9, 115:10, 115:12, 115:24, 116:6, 117:5, 117:8, 117:15, 117:18, 118:2, 118:7, 118:8, 118:13, 119:2, 120:2, 120:10, 120:11, 120:17, 120:21, 120:24, 121:1, 121:3, 121:14, 121:23, 122:2, 122:9, 122:11, 122:24, 123:6, 123:19, 124:10, 124:21, 125:4, 125:8, 125:24, 126:4, 126:9, 126:14, 126:15, 126:17, 126:19, 126:20, 126:21, 126:22, 128:8, 128:16, 128:18, 132:9, 132:15, 133:2, 134:7, 135:18, 135:21, 135:24, 137:8, 137:14, 137:21, 140:11

**contacts** [18] - 107:5, 110:10, 111:16, 113:1, 116:5, 118:13, 118:17, 119:3, 124:12, 124:17, 124:20, 125:3, 126:17, 131:20, 133:5, 134:4, 135:6
**contain** [2] - 38:10, 67:1
**contains** [9] - 41:10, 42:4, 43:25, 46:6, 48:4, 55:6, 57:15, 89:2, 124:12
**contend** [2] - 93:4, 104:2
**contended** [1] - 93:7
**contention** [2] - 93:6, 118:22
**contentions** [1] -

89:10
**contest** [1] - 123:15
**context** [47] - 6:8, 6:13, 6:18, 7:4, 7:8, 7:15, 7:16, 13:8, 13:22, 15:23, 17:14, 28:3, 31:10, 31:11, 68:10, 90:24, 91:19, 91:22, 92:2, 92:11, 92:15, 92:20, 93:2, 93:20, 93:24, 94:6, 95:22, 102:2, 102:12, 102:15, 106:24, 109:8, 110:24, 111:15, 113:14, 113:16, 114:16, 115:19, 116:9, 117:14, 117:20, 119:18, 122:8, 136:6, 136:12, 137:1, 138:8
**contextual** [3] - 94:6, 95:14, 102:19
**continue** [4] - 10:11, 29:15, 65:14, 78:7
**continued** [1] - 144:7
**continues** [1] - 89:8
**contradict** [1] - 136:3
**contrary** [3] - 119:1, 120:23, 136:8
**control** [9] - 35:12, 55:3, 55:7, 55:14, 57:19, 72:11, 84:8, 87:3, 139:24
**controlling** [1] - 141:12
**conversation** [1] - 82:3
**conversely** [1] - 119:5
**converted** [1] - 92:10
**convey** [1] - 140:15
**conveyed** [3] - 71:15, 71:16, 122:22
**conveys** [1] - 132:24
**CORPORATION** [1] - 1:7
**Corporation** [1] - 2:11
**correct** [38] - 7:19, 8:16, 11:21, 13:16, 13:25, 18:7, 18:13, 20:4, 22:7, 24:7, 25:1, 27:1, 31:24, 34:11, 43:23, 44:4, 47:2, 48:19, 56:23, 56:25, 57:2, 60:11, 64:20, 77:22, 79:12, 79:22, 84:16, 89:21, 90:19, 91:6, 92:16, 98:16, 105:22, 110:21, 111:6,

117:7, 128:2, 140:5
**correctly** [2] - 14:17, 57:14
**correspondence** [1] - 17:5
**corresponding** [4] - 21:22, 22:1, 29:8, 29:13
**couch** [1] - 72:13
**couching** [1] - 72:13
**Counsel** [2] - 1:20, 1:24
**counsel** [25] - 2:13, 2:16, 2:18, 3:2, 3:3, 3:6, 3:10, 6:3, 20:13, 20:15, 21:6, 21:13, 30:23, 30:25, 36:6, 52:7, 67:13, 67:24, 77:24, 83:7, 91:13, 96:3, 105:16, 127:14, 127:15
**count** [2] - 86:16, 87:18
**counted** [1] - 65:4
**couple** [9] - 3:11, 4:16, 44:10, 52:10, 75:23, 85:15, 96:16, 101:17, 139:17
**course** [4] - 7:7, 51:11, 117:3, 140:4
**court** [2] - 2:7, 2:12
**COURT** [174] - 1:1, 2:5, 3:1, 3:8, 5:17, 5:19, 7:1, 7:21, 8:14, 9:10, 10:11, 11:4, 13:15, 14:19, 16:7, 17:10, 19:15, 20:5, 20:11, 21:11, 22:23, 24:15, 25:5, 25:22, 26:13, 27:13, 28:10, 28:21, 29:15, 29:20, 31:14, 33:6, 34:1, 34:13, 36:3, 36:25, 37:3, 38:23, 39:1, 39:7, 39:18, 40:25, 41:4, 41:6, 41:18, 42:10, 43:13, 44:9, 45:17, 46:5, 47:23, 49:2, 50:7, 52:1, 52:6, 53:17, 55:21, 57:24, 58:17, 59:20, 60:17, 61:9, 61:22, 62:17, 62:23, 63:21, 63:24, 64:12, 64:25, 65:14, 68:18, 69:13, 70:20, 71:3, 71:24, 72:7, 72:10, 72:20, 74:6, 75:5, 75:18, 76:16, 76:23, 77:6, 77:18, 77:23, 78:24,

79:14, 81:6, 81:22, 82:7, 82:19, 83:2, 84:12, 85:14, 86:13, 87:8, 87:24, 88:2, 89:23, 90:22, 91:12, 93:12, 94:10, 94:24, 96:2, 96:6, 97:6, 98:8, 99:15, 100:2, 100:11, 101:16, 102:7, 102:9, 102:24, 103:14, 103:16, 104:3, 104:7, 104:9, 105:2, 105:20, 106:15, 107:14, 108:23, 109:20, 111:3, 111:25, 112:16, 112:20, 113:9, 113:17, 113:24, 114:2, 115:6, 115:22, 116:11, 116:15, 116:24, 119:22, 120:12, 121:10, 122:3, 123:20, 124:23, 126:2, 126:23, 127:7, 128:22, 128:25, 129:8, 130:2, 130:9, 130:19, 130:21, 131:8, 131:16, 132:2, 132:19, 132:21, 133:8, 134:15, 135:2, 137:2, 137:23, 138:14, 138:24, 140:4, 143:1, 143:8, 143:16, 143:19, 144:4
**Court** [50] - 3:24, 5:15, 9:4, 10:13, 11:20, 14:9, 14:10, 14:17, 17:8, 17:15, 19:10, 20:10, 25:1, 30:25, 31:6, 38:5, 42:16, 47:6, 47:7, 48:19, 49:17, 50:2, 57:7, 65:16, 66:3, 66:9, 66:15, 66:16, 66:22, 67:3, 67:4, 67:24, 75:13, 78:12, 80:12, 82:24, 84:2, 84:23, 89:10, 90:23, 91:3, 92:10, 102:14, 103:7, 105:1, 140:22, 141:2, 144:19
**Court's** [5] - 10:8, 51:22, 64:9, 79:12, 90:15
**cover** [5] - 3:11, 31:25,

83:6, 105:18, 112:22
**covered** [2] - 29:17, 108:10
**covering** [1] - 91:17
**covers** [2] - 109:17, 112:20
**crazy** [1] - 58:25
**create** [1] - 109:13
**credit** [1] - 85:18
**critic** [1] - 18:13
**criticism** [2] - 41:16, 93:11
**criticizes** [1] - 7:25
**critique** [2] - 17:19, 80:18
**CRR** [2] - 1:25, 144:19
**crystal** [2] - 71:15, 111:7
**crystallize** [1] - 93:15
**cue** [2] - 15:8, 16:9
**cues** [2] - 15:16, 17:17
**cursor** [1] - 24:20
**cut** [1] - 20:15

### D

**dangers** [1] - 30:4
**dash** [1] - 42:18
**data** [26] - 8:20, 12:14, 12:16, 13:24, 14:8, 14:21, 15:2, 18:6, 23:11, 23:16, 25:9, 25:10, 25:12, 25:19, 25:21, 28:23, 28:24, 28:25, 29:3, 29:5, 29:13, 32:19, 32:20, 106:12
**database** [12] - 106:2, 107:5, 109:8, 110:10, 111:23, 118:17, 124:18, 124:21, 125:3, 126:15, 126:17
**databases** [3] - 118:14, 119:3, 124:13
**date** [9] - 8:2, 8:5, 8:10, 8:21, 64:14, 87:21, 140:19, 142:13, 142:14
**dated** [3] - 9:5, 65:9, 76:2
**days** [2] - 142:13, 142:14
**deactivate** [4] - 40:20, 42:3, 42:7, 43:3
**deactivated** [8] - 40:19, 40:25, 41:11, 41:20, 43:18, 44:6, 54:22, 57:11

**deactivating** [1] - 55:3
**deal** [3] - 97:23, 97:24, 144:1
**death** [1] - 88:10
**debate** [1] - 81:2
**decided** [1] - 33:7
**decision** [2] - 61:4, 144:6
**declaration** [16] - 6:7, 6:12, 9:1, 9:8, 10:18, 15:5, 15:10, 15:24, 17:21, 31:1, 31:7, 35:15, 64:15, 75:25, 141:17, 141:18
**defendant** [11] - 3:5, 5:25, 20:19, 20:21, 21:8, 47:25, 69:15, 81:16, 90:3, 116:25, 117:4
**Defendant** [2] - 1:8, 1:24
**defendant's** [13] - 4:7, 11:5, 13:18, 20:13, 20:15, 21:5, 33:15, 48:3, 52:7, 96:2, 114:4, 131:16, 143:1
**defense** [3] - 3:2, 83:7, 120:16
**defer** [1] - 38:5
**define** [3] - 49:14, 102:6, 106:23
**defined** [5] - 23:24, 32:8, 55:11, 59:15, 109:16
**defines** [1] - 110:12
**defining** [1] - 12:16
**definitely** [1] - 98:5
**definition** [96] - 6:15, 7:23, 8:8, 8:9, 10:2, 10:7, 19:13, 19:17, 22:8, 23:14, 23:19, 23:25, 24:7, 25:14, 25:18, 30:16, 30:18, 30:19, 32:14, 32:25, 35:16, 36:14, 36:19, 38:5, 38:8, 38:19, 41:9, 41:10, 43:23, 43:25, 47:7, 49:21, 59:12, 59:18, 60:4, 60:5, 60:11, 60:12, 60:19, 60:23, 61:7, 61:14, 61:17, 61:20, 64:10, 64:13, 64:15, 64:19, 65:8, 66:6, 66:7, 66:10, 66:23, 66:24, 67:4, 67:6, 68:4, 77:9, 77:14, 78:4, 78:15, 79:23, 80:6, 80:10, 83:14, 83:23, 84:6, 84:18,

85:2, 85:5, 85:15, 86:4, 88:15, 88:16, 92:4, 96:23, 96:24, 101:5, 101:15, 101:25, 108:14, 110:6, 110:18, 112:21, 119:9, 119:14, 119:16, 120:17, 121:4, 131:4, 134:19, 135:10, 135:11, 138:20
**definitions** [38] - 8:1, 8:3, 8:19, 9:3, 30:6, 39:10, 42:1, 42:4, 43:8, 43:9, 43:13, 43:19, 43:20, 44:7, 44:11, 44:13, 44:14, 44:23, 45:12, 60:14, 64:22, 65:24, 66:14, 67:10, 78:3, 78:5, 78:9, 79:20, 80:12, 81:3, 83:22, 85:8, 85:13, 85:17, 85:24, 89:16, 89:19, 89:20
**degree** [1] - 127:10
**DELAWARE** [1] - 1:2
**Delaware** [3] - 1:11, 2:17, 3:3
**delta** [2] - 86:17, 86:19
**demonstrate** [1] - 60:23
**demonstrates** [1] - 61:13
**denote** [1] - 72:11
**depict** [2] - 84:15, 114:9
**depicted** [6] - 80:3, 81:18, 86:1, 86:22, 118:6
**depicting** [3] - 23:22, 86:2, 114:13
**depicts** [1] - 84:13
**describe** [6] - 37:14, 107:3, 107:6, 111:19, 112:25, 131:25
**described** [13] - 16:8, 31:10, 84:16, 112:3, 112:13, 118:6, 118:11, 118:12, 118:14, 121:6, 121:20, 132:17, 138:10
**describes** [5] - 16:20, 92:21, 124:9, 136:10
**describing** [2] - 118:7, 119:1
**description** [5] - 77:11, 114:22,

115:20, 129:25, 136:3
**designating** [1] - 124:19
**designed** [1] - 18:5
**destruction** [1] - 86:14
**detail** [4] - 16:8, 16:10, 17:8, 17:9
**detailed** [1] - 4:13
**details** [1] - 133:24
**detect** [2] - 6:23, 10:20
**detectable** [1] - 31:17
**detectible** [9] - 9:19, 10:3, 10:10, 16:20, 22:4, 22:25, 33:9, 34:2, 35:24
**determination** [2] - 91:5, 140:7
**determine** [2] - 61:11, 127:22
**devolve** [3] - 120:15, 127:1, 127:11
**dichotomy** [1] - 49:11
**dictionaries** [5] - 30:5, 30:7, 59:23, 61:1, 88:10
**Dictionary** [7] - 23:20, 30:12, 47:4, 55:10, 59:12, 59:20, 60:8
**dictionary** [13] - 8:8, 31:3, 47:4, 60:18, 61:12, 80:7, 85:2, 85:17, 85:24, 86:7, 86:10, 88:11, 88:13
**difference** [7] - 14:7, 15:2, 40:23, 42:23, 134:9, 136:15, 138:21
**differences** [1] - 134:25
**different** [26] - 9:17, 13:4, 13:9, 17:13, 47:17, 55:23, 59:22, 62:2, 71:4, 71:6, 73:22, 82:2, 90:15, 99:1, 99:2, 100:8, 101:8, 107:2, 112:1, 118:9, 125:12, 131:2, 133:3, 133:16, 134:20
**differently** [2] - 79:13, 126:7
**difficulty** [2] - 4:19, 141:6
**direct** [1] - 86:4
**directed** [1] - 115:17
**direction** [1] - 107:13
**directly** [7] - 6:15,

10:3, 10:16, 23:20, 78:16, 83:24, 118:15
**disabled** [1] - 54:22
**disagree** [7] - 40:2, 47:20, 74:19, 74:20, 101:20, 105:12, 106:16
**disavow** [1] - 35:13
**discovery** [2] - 143:3, 143:24
**discuss** [1] - 119:20
**discussed** [3] - 71:12, 135:18, 136:1
**discusses** [2] - 27:22, 28:2
**discussion** [8] - 4:13, 21:12, 29:18, 55:2, 55:3, 119:5, 122:7, 138:1
**disfavored** [4] - 104:20, 110:2, 126:1, 136:22
**disharmony** [1] - 68:4
**dispel** [1] - 32:23
**display** [27] - 38:3, 39:24, 40:2, 40:14, 41:19, 41:23, 43:12, 45:7, 54:17, 56:5, 56:9, 56:22, 57:19, 69:8, 70:16, 70:18, 76:13, 84:8, 92:6, 95:11, 108:16, 114:5, 114:20, 114:25, 118:15, 118:20, 134:7
**displayed** [36] - 36:17, 36:22, 38:2, 38:18, 38:20, 39:3, 39:4, 40:12, 41:1, 41:2, 41:6, 41:15, 41:21, 43:5, 43:7, 43:17, 45:5, 45:10, 45:14, 45:21, 47:18, 53:1, 53:3, 54:23, 55:15, 57:9, 57:11, 58:9, 58:16, 66:12, 66:20, 67:9, 77:10, 77:14, 86:20
**displaying** [14] - 37:25, 45:7, 53:24, 54:18, 58:15, 59:14, 70:22, 70:23, 71:2, 71:7, 71:20, 71:22, 108:13
**displays** [40] - 39:23, 40:8, 40:10, 53:12, 53:14, 54:16, 56:2, 56:3, 56:14, 56:15, 56:20, 58:1, 58:2, 58:3, 58:6, 58:9,

58:12, 58:13, 65:18, 68:13, 68:25, 69:3, 69:4, 69:8, 69:10, 69:11, 69:20, 69:22, 69:23, 69:24, 70:10, 70:11, 71:4, 72:2, 72:6, 74:8, 76:14, 77:15
**displays..** [2] - 69:25, 70:20
**dispute** [58] - 9:22, 9:24, 11:15, 12:10, 12:11, 20:19, 21:4, 21:17, 21:18, 29:18, 29:22, 36:9, 37:4, 46:2, 46:3, 46:7, 46:17, 46:21, 49:3, 49:7, 49:17, 50:1, 53:10, 61:24, 61:25, 62:1, 62:8, 62:17, 62:19, 69:16, 78:8, 78:25, 79:10, 79:12, 84:2, 84:13, 86:25, 87:10, 90:25, 91:2, 91:3, 93:14, 93:16, 94:5, 96:8, 99:23, 100:20, 100:21, 105:22, 106:18, 117:7, 122:6, 123:6, 139:18, 143:7, 143:23, 143:24
**disputed** [5] - 9:16, 79:6, 110:6, 111:4, 140:15
**disputes** [7] - 63:1, 83:10, 105:6, 105:13, 105:15, 139:14
**disputing** [1] - 97:14
**disregarded** [1] - 85:10
**distinction** [3] - 130:7, 134:11, 137:22
**distinctions** [1] - 118:11
**distinguish** [5] - 16:22, 25:7, 32:18, 68:14, 128:5
**distinguished** [2] - 127:24, 129:3
**distinguishes** [1] - 25:11
**District** [1] - 144:19
**DISTRICT** [2] - 1:1, 1:2
**divorces** [1] - 67:19
**docket** [1] - 143:23
**document** [4] - 29:11, 101:5, 104:23, 104:24
**documents** [1] - 142:8

**done** [7] - 64:11, 84:7, 84:20, 91:16, 94:5, 108:22, 141:10
**doubt** [1] - 102:25
**down** [10] - 8:7, 9:9, 11:5, 15:4, 16:11, 68:18, 78:1, 131:12, 131:15, 140:22
**Dr** [3] - 30:22, 32:15, 64:22
**draw** [1] - 18:20
**drawn** [1] - 8:10
**drive** [1] - 15:25
**driven** [17] - 6:14, 6:19, 7:4, 7:15, 7:18, 7:22, 10:19, 14:14, 18:5, 24:5, 30:17, 30:20, 30:21, 31:10, 34:21, 35:2, 35:21
**during** [4] - 21:14, 57:1, 57:3, 117:25

**E**

**easier** [1] - 125:1
**easily** [1] - 114:5
**eBuddy** [17] - 2:10, 2:21, 6:15, 11:2, 15:21, 32:12, 45:15, 64:4, 78:15, 79:20, 81:3, 84:9, 84:21, 89:9, 89:20, 93:23, 138:9
**EBUDDY** [1] - 1:4
**eBuddy's** [8] - 10:1, 10:25, 12:25, 17:2, 32:25, 47:21, 94:6, 107:11
**edition** [1] - 105:11
**edmonds** [1] - 5:13
**Edmonds** [23] - 2:23, 6:5, 7:1, 7:21, 11:4, 13:15, 17:10, 19:16, 29:20, 31:14, 47:24, 63:25, 64:12, 77:21, 78:24, 82:17, 88:2, 89:23, 93:13, 102:9, 104:4, 142:22
**EDMONDS** [72] - 1:18, 1:19, 2:25, 6:4, 7:11, 8:11, 8:16, 10:1, 10:12, 11:20, 14:9, 15:3, 16:18, 17:12, 20:4, 20:7, 29:25, 32:8, 33:18, 36:8, 37:2, 38:1, 38:25, 39:6, 39:8, 40:17, 41:2, 41:5, 41:8, 41:19, 42:12, 43:22, 45:1, 45:24, 46:19,

48:14, 49:10, 50:21, 52:4, 64:2, 64:20, 65:6, 65:15, 69:5, 70:5, 71:1, 71:22, 72:1, 72:9, 72:19, 73:8, 74:20, 75:8, 77:22, 77:25, 79:7, 79:18, 82:18, 82:21, 88:4, 90:12, 91:15, 93:16, 94:15, 95:8, 102:11, 103:6, 103:15, 103:19, 104:5, 104:8, 144:13
**either** [5] - 4:19, 107:11, 107:12, 120:20, 134:17
**elsewhere** [1] - 108:10
**embodiment** [8] - 15:21, 30:13, 80:2, 81:17, 84:17, 84:24, 118:7, 136:6
**embodiments** [6] - 23:22, 86:1, 102:4, 119:19, 136:9, 136:10
**emphasizing** [1] - 14:11
**en** [1] - 61:4
**end** [12] - 3:18, 82:4, 82:10, 82:15, 82:25, 87:10, 94:18, 103:3, 107:11, 130:4, 142:19, 144:9
**endemic** [5] - 7:18, 66:18, 67:8, 69:12, 70:7
**enemy** [1] - 15:19
**engine** [66] - 105:3, 105:25, 106:6, 106:7, 106:11, 106:23, 107:4, 107:9, 107:21, 107:24, 108:15, 109:3, 109:16, 109:19, 109:22, 110:6, 110:7, 110:12, 111:1, 111:8, 111:12, 111:18, 111:22, 112:3, 112:21, 113:4, 114:4, 114:6, 114:14, 115:8, 115:9, 115:12, 115:25, 116:7, 117:5, 117:8, 117:15, 117:19, 118:8, 118:13, 119:3, 120:3, 120:10, 120:17, 120:21, 120:24,

121:3, 121:14, 122:2, 122:11, 122:25, 123:7, 123:19, 124:10, 125:9, 125:25, 126:5, 126:9, 126:14, 126:19, 126:21, 128:16, 135:18, 135:24
**English** [6] - 55:8, 85:2, 86:10, 96:10, 96:13, 99:11
**enter** [1] - 50:22
**entirely** [1] - 31:25
**environment** [2] - 52:12, 86:2
**envisioning** [1] - 28:6
**error** [2] - 76:6, 96:14
**especially** [5] - 13:8, 132:24, 135:15, 136:2, 136:9
**Especially** [1] - 131:14
**ESQ** [6] - 1:17, 1:19, 1:19, 1:22, 1:23, 1:24
**essence** [2] - 44:14, 51:20
**established** [1] - 140:1
**etc** [4] - 54:1, 54:4, 90:4, 122:19
**ether** [1] - 93:3
**ethnicity** [1] - 118:24
**evenly** [1] - 3:16
**event** [157] - 6:6, 6:13, 6:14, 6:19, 7:4, 7:7, 7:12, 7:14, 7:15, 7:17, 7:18, 7:19, 10:19, 10:21, 10:22, 11:8, 11:11, 11:12, 12:4, 12:8, 12:16, 12:19, 12:21, 12:22, 12:24, 13:1, 13:2, 13:5, 13:7, 13:8, 13:9, 14:1, 14:4, 14:7, 14:12, 14:14, 14:22, 14:23, 14:24, 15:6, 15:9, 15:14, 15:16, 15:23, 15:25, 16:3, 16:12, 16:22, 16:23, 16:24, 17:5, 17:6, 17:16, 17:24, 18:1, 18:5, 18:17, 18:19, 18:21, 18:23, 18:24, 19:2, 19:17, 19:18, 19:19, 19:22, 19:24, 21:15, 21:25, 22:6, 22:11, 22:14, 22:15, 23:2, 23:20, 23:21, 24:2, 24:4,

24:5, 24:9, 24:14, 24:16, 24:16, 25:5, 25:7, 25:11, 25:17, 25:20, 26:4, 26:7, 26:8, 26:9, 26:11, 26:16, 26:20, 26:22, 27:14, 27:16, 27:18, 27:22, 27:23, 27:24, 27:25, 28:1, 28:5, 28:12, 28:16, 28:20, 29:10, 30:17, 30:20, 30:21, 31:8, 31:10, 31:25, 32:8, 32:16, 32:17, 32:18, 32:21, 33:3, 33:4, 33:13, 33:20, 33:22, 34:21, 34:23, 35:21, 35:23, 48:6, 48:12, 48:15, 48:16, 53:3, 54:1, 55:2, 57:17, 57:22, 63:16, 66:17, 68:3, 75:25, 85:11, 86:1, 95:8
**event-based** [3] - 6:13, 17:24, 24:4
**event-drive** [1] - 15:25
**event-driven** [15] - 6:14, 6:19, 7:4, 7:15, 7:18, 10:19, 14:14, 18:5, 24:5, 30:17, 30:20, 30:21, 31:10, 34:21, 35:21
**events** [24] - 6:23, 6:24, 12:19, 13:11, 13:12, 13:23, 13:24, 15:8, 15:9, 16:2, 17:25, 18:3, 18:4, 19:23, 22:10, 22:17, 23:9, 24:24, 28:13, 32:3, 32:6
**everyday** [1] - 80:16
**evidence** [50] - 8:18, 24:6, 24:8, 30:24, 34:12, 35:1, 35:12, 35:17, 35:18, 55:4, 55:14, 57:13, 57:20, 57:21, 59:9, 59:19, 60:5, 60:7, 60:10, 60:15, 60:19, 61:21, 62:22, 62:25, 63:15, 76:1, 76:4, 83:20, 84:9, 84:11, 85:1, 85:7, 85:12, 91:7, 117:22, 118:1, 118:15, 118:22, 118:23, 122:1, 124:11, 124:22, 125:6, 135:5, 135:19, 135:24, 136:25, 138:23, 139:2, 140:1

**evidenced** [2] - 66:5, 66:6
**exact** [3] - 133:14, 133:16, 135:17
**exactly** [7] - 28:18, 49:1, 57:2, 61:19, 87:20, 91:3, 139:4
**example** [20] - 5:6, 12:5, 16:9, 19:18, 23:15, 25:3, 26:6, 27:23, 30:10, 53:25, 61:14, 68:6, 72:25, 82:1, 86:22, 87:13, 113:21, 128:13, 132:13
**examples** [1] - 101:7
**Excel** [1] - 86:3
**except** [3] - 14:10, 75:24, 76:14
**exception** [1] - 75:15
**excerpted** [1] - 101:17
**excerpts** [1] - 6:17
**Exchange** [2] - 68:8, 73:4
**exemplarily** [1] - 121:6
**exemplary** [1] - 136:11
**exemplified** [1] - 25:17
**Exhibit** [11] - 6:7, 38:9, 59:11, 66:7, 66:19, 88:22, 88:25, 141:13, 141:14
**exhibit** [4] - 6:17, 141:11, 141:12
**Exhibits** [1] - 141:16
**exhibits** [3] - 28:18, 82:14, 141:5
**exists** [2] - 98:10, 98:11
**experience** [1] - 80:16
**expert** [7] - 35:2, 35:14, 64:4, 64:5, 64:6, 64:10, 75:24
**explain** [1] - 49:1
**explained** [2] - 10:17, 30:21
**explaining** [1] - 50:12
**explains** [1] - 31:8
**explanation** [3] - 30:24, 32:15, 138:8
**explicit** [1] - 35:20
**explicitly** [2] - 84:16, 131:18
**expressed** [3] - 96:23, 119:15, 135:10
**expressly** [3] - 102:3, 121:6, 136:10
**extent** [8] - 49:16,

50:1, 69:2, 106:8,
126:6, 140:9, 142:3,
142:6
**extra** [8] - 19:25,
33:24, 34:6, 63:10,
81:11, 90:2, 109:1,
126:7
**extrinsic** [18] - 7:23,
24:8, 35:17, 55:4,
55:14, 57:20, 59:9,
60:7, 60:15, 60:19,
63:15, 76:1, 83:20,
84:11, 85:1, 85:8,
91:7, 139:2

## F

**face** [2] - 30:16, 61:17
**faced** [1] - 89:10
**facilitate** [1] - 130:17
**facilitating** [1] -
128:13
**facility** [2] - 39:14,
40:22
**fact** [5] - 31:12, 48:3,
83:2, 121:7, 137:6
**factor** [1] - 3:25
**factual** [1] - 142:12
**fails** [1] - 135:17
**fair** [10] - 16:18, 32:24,
40:17, 41:16, 69:15,
90:8, 90:22, 93:7,
116:3, 138:14
**Faison** [13] - 6:16,
8:12, 10:3, 10:17,
11:3, 12:2, 16:19,
24:1, 30:22, 31:7,
32:14, 35:19
**fall** [1] - 103:23
**falls** [1] - 105:22
**far** [3] - 17:1, 54:5,
67:5
**FARNAN** [1] - 1:17
**Farnan** [1] - 2:20
**fashion** [1] - 135:7
**features** [1] - 115:1
**Federal** [3] - 30:5,
91:1, 128:2
**felt** [1] - 17:8
**few** [6] - 2:8, 8:4,
37:21, 81:15, 117:2,
139:5
**field** [1] - 86:8
**fight** [3] - 44:9, 90:3,
100:22
**fighting** [1] - 139:4
**fights** [1] - 139:5
**Figure** [14] - 81:15,
81:18, 82:4, 84:13,
84:15, 113:20,

114:3, 114:9,
114:13, 114:17,
118:5, 129:16, 136:2
**figure** [2] - 114:20,
141:22
**figures** [2] - 17:17,
113:19
**fill** [2] - 27:19, 27:20
**final** [1] - 85:16
**fine** [12] - 4:22, 5:3,
5:21, 31:19, 45:15,
66:16, 76:17, 77:1,
97:11, 99:12, 141:14
**finest** [1] - 132:16
**finish** [1] - 63:25
**fire** [1] - 18:1
**FireFox** [1] - 80:3
**first** [35] - 2:8, 2:16,
3:13, 4:5, 4:6, 4:10,
5:12, 5:14, 5:20,
5:22, 5:24, 6:6,
11:11, 17:11, 17:12,
20:16, 22:18, 30:11,
31:15, 31:18, 53:9,
64:23, 73:20, 77:19,
105:6, 105:16,
105:24, 109:9,
117:7, 117:12,
120:7, 127:24,
128:15, 130:12,
134:3
**five** [2] - 12:6, 142:5
**flag** [1] - 47:6
**flipped** [1] - 33:8
**focus** [2] - 82:14,
122:20
**focused** [2] - 62:25,
91:6
**focusing** [3] - 15:21,
15:22, 18:16
**follow** [1] - 142:15
**follow-up** [1] - 142:15
**following** [3] - 2:3,
6:11, 144:14
**FOR** [1] - 1:2
**force** [1] - 97:8
**foregoing** [1] - 144:16
**forget** [1] - 88:21
**form** [1] - 43:21
**forth** [11] - 81:2,
96:23, 96:24,
101:25, 117:2,
125:24, 127:16,
135:10, 135:11,
135:20, 138:9
**fortunately** [1] - 81:1
**forward** [4] - 8:18,
44:13, 77:19, 142:21
**forwards** [1] - 117:13
**fought** [1] - 114:3

**founded** [1] - 93:11
**four** [3] - 43:8, 44:7,
44:12
**fourth** [1] - 91:12
**frame** [6] - 25:17,
46:20, 85:6, 85:19,
86:10, 96:7
**frankly** [2] - 34:9,
42:16
**friend** [3] - 33:18,
92:1, 102:13
**friends** [1] - 92:7
**front** [1] - 12:6
**full** [2] - 12:15, 42:17
**fully** [2] - 100:5,
140:18
**function** [1] - 110:17
**functionalities** [1] -
54:21
**functionality** [11] -
19:11, 39:13, 41:25,
42:3, 45:8, 53:5,
53:16, 70:17, 70:21,
70:24, 111:19
**functions** [2] - 107:8,
110:15
**fundamental** [3] -
38:4, 61:3, 79:18

## G

**game** [1] - 63:19
**gather** [1] - 26:18
**general** [5] - 20:17,
30:18, 108:14,
139:16, 139:25
**generalization** [1] -
90:13
**generally** [1] - 108:8
**generate** [7] - 19:20,
24:16, 25:6, 26:7,
26:11, 32:3, 33:16
**generated** [3] - 8:1,
18:20, 68:2
**generating** [11] -
18:17, 18:22, 18:24,
19:1, 19:18, 19:20,
19:25, 26:20, 26:23,
32:7
**generation** [2] - 20:2,
22:15
**generic** [2] - 30:6,
48:24
**geographic** [1] -
129:23
**gist** [1] - 136:24
**gloss** [1] - 98:11,
98:12
**gotcha** [1] - 75:18
**grab** [1] - 137:14

**graphic** [5] - 83:25,
86:14, 86:16, 86:19,
87:16
**graphically** [2] -
86:20, 86:21
**great** [5] - 87:9,
105:13, 127:9,
141:6, 144:2
**greater** [1] - 85:18
**grounded** [5] - 92:4,
92:23, 94:7, 95:12,
95:18
**grounding** [1] - 91:21
**guess** [30] - 9:11,
9:21, 20:14, 28:21,
33:6, 37:22, 40:14,
44:9, 44:20, 49:11,
50:7, 58:21, 61:9,
61:22, 89:23,
101:20, 107:16,
111:25, 115:6,
121:16, 121:17,
122:9, 122:19,
123:22, 129:19,
130:3, 130:9, 132:2,
134:15, 137:6
**guessing** [1] - 16:7

## H

**half** [4] - 44:16,
128:15, 128:17
**hand** [2] - 14:8, 14:21
**handle** [1] - 18:6,
91:3, 91:10, 134:24
**handler** [2] - 7:17,
15:9
**handlers** [2] - 15:14,
15:15
**handling** [1] - 15:6
**hanging** [1] - 122:16
**hangs** [1] - 93:3
**happenstance** [2] -
12:18, 12:20
**happy** [1] - 5:11
**hard** [3] - 44:12,
47:20, 141:2
**harder** [1] - 85:18
**harmonize** [1] - 66:9
**harmonizes** [3] - 43:7,
66:13, 67:10
**harmonizing** [1] -
43:11
**head** [1] - 14:20
**health** [1] - 144:7
**hear** [8] - 4:5, 4:10,
5:24, 76:17, 77:1,
96:2, 117:5, 126:23
**heard** [6] - 37:21,
52:11, 125:6, 138:1,

138:6, 140:12
**Hearing** [1] - 1:12
**hearing** [12] - 2:3,
2:10, 3:14, 4:15,
4:21, 39:18, 58:4,
69:17, 82:15,
142:19, 143:5,
143:14
**heck** [1] - 46:12
**held** [2] - 2:4, 97:1
**help** [5] - 83:6, 120:1,
126:12, 138:12,
138:19
**helped** [1] - 29:18
**helpful** [3] - 3:12,
21:13, 96:7, 144:5
**helps** [3] - 59:20, 60:1,
62:25
**hereby** [1] - 144:16
**hidden** [3] - 44:5,
58:6, 70:2
**hide** [1] - 42:21
**hiding** [1] - 42:22
**high** [43] - 20:9, 97:25,
111:16, 123:19,
127:8, 127:12,
127:19, 127:22,
128:3, 128:6,
128:10, 128:12,
128:14, 128:18,
128:19, 128:23,
128:25, 129:6,
131:4, 131:18,
132:1, 132:8,
132:15, 132:22,
132:24, 133:4,
133:6, 133:14,
134:3, 134:6,
134:11, 134:14,
134:18, 134:20,
134:24, 135:23,
137:7, 137:10,
137:17, 138:2,
138:3, 138:11,
138:21
**highlight** [1] - 20:9
**highlighted** [1] - 12:3
**highlighting** [1] - 82:9
**highly** [3] - 104:20,
125:25, 136:22
**hire** [1] - 42:25
**holder** [7] - 78:11,
78:17, 78:21, 79:7,
79:8, 79:10, 88:7
**honestly** [1] - 63:5
**Honor** [45] - 2:19,
2:24, 2:25, 3:4, 5:13,
6:4, 6:18, 12:18,
15:13, 16:19, 20:4,
20:7, 21:7, 29:19,

34:8, 36:8, 52:9,
54:13, 56:25, 57:14,
64:2, 72:1, 75:22,
77:22, 81:23, 83:9,
87:25, 88:4, 88:20,
91:15, 96:4, 102:8,
102:11, 105:17,
106:20, 110:3,
112:25, 117:6,
127:6, 127:17,
130:18, 142:25,
144:3, 144:11,
144:12
**HONORABLE** [1] -
1:14
**hopeful** [1] - 29:21
**hopefully** [2] - 38:12,
67:7
**horizontal** [6] - 49:23,
52:22, 53:6, 62:10,
62:11
**horse** [4] - 70:7, 70:8,
70:9, 88:10
**horses** [2] - 70:7
**hours** [1] - 3:15
**hurt** [2] - 44:25, 45:1

**I**

**i.e** [9] - 46:13, 48:7,
48:9, 50:14, 53:22,
56:20, 74:12, 116:1,
131:17
**icon** [7] - 79:4, 82:13,
86:17, 86:23, 87:14,
87:22, 88:5
**icons** [25] - 78:11,
78:17, 79:1, 79:8,
79:10, 79:11, 79:15,
79:16, 79:19, 79:21,
80:17, 84:4, 84:14,
84:15, 86:22, 87:4,
87:23, 88:7, 88:23,
88:24, 89:2, 89:6
**idea** [5] - 18:8, 25:8,
48:5, 48:9, 120:1
**identified** [1] - 24:10
**identify** [2] - 2:14,
136:15
**II** [1] - 1:22
**illegality** [1] -
140:18
**illustrate** [1] - 113:20
**illustrative** [7] - 80:20,
81:17, 81:19, 84:17,
84:24, 121:6, 125:17
**IM** [13] - 128:4, 128:7,
131:19, 134:10,
134:18, 134:20,
134:24, 138:3,

138:4, 138:11
**impeding** [1] - 89:10
**implementation** [2] -
120:19, 133:24
**implies** [1] - 12:18
**import** [11] - 63:6,
63:10, 117:14,
117:21, 118:23,
119:12, 121:8,
135:7, 135:13,
136:9, 136:23
**important** [5] - 6:20,
6:22, 117:13, 124:7,
139:25
**imported** [1] - 54:10
**importing** [1] - 109:23
**imprecise** [2] - 12:12,
30:19
**IN** [2] - 1:1, 1:2
**inaccurate** [1] - 77:11
**incapable** [1] - 16:23
**include** [12] - 13:23,
25:2, 34:25, 36:13,
50:10, 50:18, 55:6,
95:3, 95:4, 119:11,
121:8
**included** [4] - 44:22,
45:3, 45:4, 131:2
**includes** [12] - 44:3,
44:5, 55:17, 59:11,
62:21, 87:3, 87:4,
107:4, 108:16,
118:12, 126:9,
130:25
**including** [18] - 4:11,
23:1, 23:6, 27:9,
30:2, 31:4, 35:8,
36:2, 54:20, 55:14,
59:18, 69:22, 70:23,
85:5, 86:3, 118:16,
121:5, 128:11
**inclusion** [1] - 106:18
**incoming** [1] - 29:13
**incomplete** [2] - 67:6,
89:19
**inconsistent** [12] -
45:2, 45:3, 54:24,
58:7, 73:19, 74:24,
75:3, 77:13, 82:2,
98:24, 99:10, 120:9
**incorporate** [1] - 50:3
**incorrect** [8] - 30:14,
31:22, 69:2, 70:13,
88:19, 99:8, 114:22,
140:5
**incredibly** [1] - 86:25
**indeed** [1] - 65:20
**indicate** [6] - 21:23,
21:24, 79:11, 80:10,
84:3, 120:8

**indicates** [2] - 23:12,
111:7
**indicating** [4] - 78:11,
78:21, 79:8, 79:22
**indication** [1] - 86:20,
87:21
**indisputable** [1] -
112:9
**indisputably** [2] -
23:22, 60:20
**indisputed** [1] -
104:16
**info** [2] - 122:9,
137:14
**information** [46] -
39:24, 40:9, 41:22,
51:6, 51:18, 53:1,
53:2, 53:3, 53:12,
53:14, 56:2, 56:20,
57:18, 58:12, 60:9,
61:4, 65:18, 67:21,
68:1, 68:9, 68:13,
73:10, 73:13, 73:17,
73:20, 73:22, 74:8,
74:23, 75:1, 77:15,
80:21, 106:2,
106:13, 108:18,
109:7, 109:8,
109:12, 115:10,
115:13, 116:1,
118:17, 126:15,
126:17, 137:8,
140:11, 142:6
**information ..** [1] -
69:20
**informed** [3] - 90:17,
90:24, 91:2
**infringe** [3] - 103:2,
103:13, 103:24
**infringed** [1] - 100:16
**infringement** [4] -
63:2, 90:16, 100:20,
137:20
**infringement -related**
[1] - 63:2
**inherent** [3] - 58:24,
70:16, 70:18
**initial** [1] - 133:12
**input** [1] - 13:6
**inputs** [1] - 13:5
**inquiry** [1] - 19:10
**insert** [1] - 72:4
**inserting** [1] - 72:8
**instance** [13] - 61:9,
64:6, 64:23, 73:20,
98:20, 109:5,
110:13, 113:2,
113:20, 116:23,
128:7, 129:16, 133:1
**instances** [1] - 112:2

**instant** [2] - 27:24,
28:7
**instead** [6] - 22:8,
27:8, 48:11, 118:8,
118:25, 119:20
**intent** [4] - 96:23,
102:1, 119:15,
135:10
**interact** [1] - 13:13
**interacting** [1] - 50:23
**interactive** [1] - 65:22
**interest** [1] - 104:5
**interface** [7] - 39:15,
50:23, 50:24, 68:16,
76:21, 114:21, 137:7
**interfere** [1] - 133:19
**intermediate** [1] -
100:18
**Internet** [2] - 9:5,
115:1
**interrelated** [1] -
138:13
**interrupt** [1] - 120:12
**intertwined** [1] -
127:18
**intrinsic** [9] - 34:12,
35:1, 35:18, 57:20,
62:25, 63:15, 84:10,
91:7, 140:1
**introduce** [1] - 83:16
**introductory** [1] - 5:21
**invalidity** [3] - 63:3,
63:19, 100:21
**invalidity -related** [1] -
63:3
**invention** [2] - 48:6,
48:10
**invite** [1] - 66:16
**involves** [2] - 6:19,
133:3
**issuance** [2] - 21:25,
24:12
**issue** [36] - 8:12, 8:17,
9:9, 9:16, 10:13,
11:6, 11:10, 12:21,
17:18, 23:8, 26:5,
32:17, 34:10, 35:3,
36:23, 38:16, 38:21,
68:20, 68:21, 68:22,
71:13, 72:20, 73:2,
78:5, 91:18, 97:21,
107:14, 110:4,
111:4, 122:15,
124:24, 140:9,
140:10, 143:9,
143:24, 144:6
**issued** [2] - 35:14,
143:11
**issues** [4] - 5:10,
75:21, 83:4, 140:18

**issuing** [3] - 21:21,
26:8, 35:4
**it'd** [1] - 36:22
**itself** [28] - 15:24,
18:19, 21:25, 27:21,
38:8, 48:17, 51:6,
52:5, 67:22, 86:19,
93:11, 95:16, 97:4,
98:6, 99:3, 101:12,
103:20, 106:9,
107:24, 113:4,
114:14, 115:8,
115:12, 115:25,
116:7, 124:15,
125:25, 129:13

**J**

**JA** [2] - 6:7, 82:22
**job** [1] - 6:8
**JOHN** [1] - 1:19
**John** [3] - 2:22, 6:5,
28:9
**join** [3] - 131:19, 134:3
**joined** [8] - 128:7,
130:10, 130:15,
131:9, 131:10,
132:1, 137:21
**joining** [4] - 128:12,
130:17, 131:10,
134:6
**joins** [4] - 128:6,
130:10, 130:15,
131:9
**Joint** [7] - 6:7, 17:22,
38:9, 59:10, 66:7,
88:22, 88:25
**joint** [7] - 141:1,
142:1, 142:4,
142:11, 142:16,
143:4, 143:15
**Judge** [11] - 1:14, 5:5,
7:2, 7:6, 27:15,
61:10, 105:22,
107:23, 112:1,
122:20, 132:5
**judgment** [1] - 140:20
**jump** [1] - 36:25
**jury** [5] - 12:23, 50:4,
53:8, 92:16, 138:13
**justified** [1] - 63:11

**K**

**Kao** [2] - 3:7, 141:16
**KAO** [1] - 1:23
**keep** [6] - 3:17, 3:22,
4:18, 4:22, 7:3, 7:7
**kept** [3] - 7:5, 49:5
**key** [12] - 8:2, 8:5,

8:10, 20:19, 22:21, 23:15, 29:6, 29:8, 29:10, 79:17, 137:9, 140:10
**keyboard** [1] - 29:6
**kick** [1] - 122:15
**kind** [53] - 3:20, 3:25, 4:18, 5:10, 6:20, 7:23, 9:13, 9:22, 15:5, 16:13, 17:19, 19:6, 24:16, 28:14, 30:6, 30:8, 30:18, 30:23, 31:24, 33:23, 34:16, 42:19, 44:15, 47:7, 47:13, 47:15, 47:17, 48:18, 51:2, 51:7, 51:15, 60:22, 60:25, 67:16, 67:18, 71:9, 79:17, 85:17, 94:4, 95:4, 105:22, 110:1, 110:2, 115:19, 116:7, 129:25, 130:23, 131:14, 133:7, 137:18, 139:14, 141:24, 143:12
**kinds** [3] - 6:24, 7:13, 37:18
**knows** [1] - 96:10

## L

**label** [1] - 124:17
**lack** [1] - 19:7
**lacking** [1] - 34:7
**language** [38] - 9:25, 12:11, 12:12, 14:13, 15:23, 15:25, 17:15, 17:16, 20:22, 21:23, 22:16, 22:21, 26:3, 27:11, 27:23, 49:12, 77:10, 77:13, 101:14, 106:19, 107:17, 108:4, 108:20, 108:25, 110:19, 112:23, 118:2, 119:11, 121:8, 125:18, 126:16, 126:20, 128:2, 130:14, 130:25, 135:13, 136:14, 140:13
**laptop** [2] - 129:4, 129:5
**large** [3] - 18:6, 86:24, 87:9
**last** [15] - 12:6, 50:7, 54:20, 61:22, 74:6, 101:16, 105:10, 115:6, 117:2,

126:25, 127:8, 132:2, 132:4, 137:5
**lastly** [3] - 4:25, 56:18, 89:8
**latter** [3] - 10:15, 19:19, 107:14
**launching** [4] - 78:10, 78:17, 78:19, 79:3
**law** [17] - 60:18, 76:7, 83:13, 84:25, 90:23, 91:4, 96:21, 99:7, 101:11, 104:16, 117:21, 119:15, 123:9, 123:12, 125:21, 131:21
**laying** [1] - 6:8
**lead** [2] - 27:8, 27:9
**leads** [1] - 26:9
**least** [14] - 4:13, 7:22, 14:5, 29:21, 34:16, 38:10, 41:10, 61:16, 72:17, 118:16, 119:25, 120:16, 139:13, 140:12
**leave** [3] - 94:18, 104:25, 110:13
**leaves** [2] - 12:23, 91:22
**leaving** [2] - 122:13, 138:11
**left** [5] - 3:19, 12:6, 67:2, 110:25, 126:25
**less** [2] - 89:13, 125:1
**letter** [13] - 29:7, 29:11, 29:14, 73:6, 84:25, 99:7, 123:9, 141:11, 141:12, 142:4, 143:4, 143:8, 143:15
**level** [73] - 4:11, 16:10, 109:13, 111:16, 111:17, 123:19, 127:9, 127:11, 127:12, 127:19, 127:22, 127:24, 128:3, 128:5, 128:6, 128:7, 128:10, 128:12, 128:14, 128:19, 128:23, 128:25, 129:6, 131:4, 131:19, 131:25, 132:1, 132:8, 132:15, 132:22, 132:24, 133:4, 133:6, 133:14, 133:15, 134:3, 134:4, 134:5, 134:6, 134:11, 134:13, 134:14, 134:18, 134:19,

134:21, 134:24, 135:23, 136:18, 136:20, 137:7, 137:10, 137:11, 137:14, 137:16, 137:17, 137:22, 138:2, 138:3, 138:4, 138:11, 138:22
**lexicography** [22] - 35:13, 92:20, 96:22, 97:3, 99:9, 101:24, 102:12, 106:17, 106:22, 110:25, 117:14, 119:17, 125:6, 125:15, 131:17, 131:22, 135:5, 135:9, 135:14, 136:5, 136:12, 137:1
**licked** [1] - 12:5
**lies** [2] - 96:8, 117:7
**lieu** [1] - 73:15
**limit** [3] - 84:23, 102:6, 135:6
**limitation** [10] - 19:19, 19:20, 20:1, 26:20, 27:24, 35:3, 90:2, 95:16, 118:23, 119:12
**limitations** [25] - 19:5, 63:6, 63:11, 83:17, 83:18, 84:21, 84:24, 87:7, 89:9, 89:13, 89:14, 90:4, 90:11, 104:14, 104:17, 104:18, 117:15, 117:21, 125:20, 125:22, 125:23, 135:8, 136:9, 136:23
**limited** [9] - 13:7, 47:8, 51:24, 80:1, 80:4, 80:14, 88:18, 116:8, 136:18
**limiting** [11] - 22:2, 22:21, 28:3, 54:3, 57:8, 83:19, 84:17, 87:6, 121:7, 125:17, 136:11
**line** [5] - 2:6, 2:14, 26:23, 56:12, 140:23
**lines** [2] - 80:19, 101:18
**link** [3] - 64:18, 65:2, 85:20
**linkage** [2] - 64:10, 78:6
**linked** [1] - 89:20
**LinkedIn** [48] - 2:11, 3:5, 8:17, 10:15, 10:25, 12:11, 15:20,

17:19, 18:2, 18:15, 21:8, 30:19, 31:1, 36:15, 38:19, 46:8, 48:25, 49:11, 49:19, 63:6, 63:14, 64:21, 67:5, 67:6, 67:16, 68:5, 72:4, 72:7, 78:4, 79:24, 80:6, 80:17, 81:4, 83:19, 84:20, 85:4, 87:1, 91:20, 92:18, 93:4, 110:14, 123:11, 138:6, 138:18, 139:4, 139:6, 139:25, 140:5
**LINKEDIN** [1] - 1:7
**Linkedin's** [22] - 8:23, 12:14, 13:6, 21:18, 23:19, 23:25, 24:9, 30:23, 32:13, 46:5, 50:6, 53:4, 54:8, 54:13, 55:9, 63:12, 66:23, 67:12, 78:18, 110:5, 119:18, 127:25
**list** [28] - 102:23, 106:3, 106:13, 107:6, 109:14, 110:11, 111:8, 111:13, 112:4, 112:13, 115:10, 117:18, 118:2, 120:11, 121:1, 121:23, 125:4, 126:20, 126:22, 128:8, 128:18, 131:20, 132:9, 132:15, 133:2, 134:7, 135:21, 137:21
**listed** [2] - 28:11, 50:12
**listening** [2] - 15:9, 16:2
**lists** [1] - 89:4
**literally** [2] - 62:6, 134:17
**litigation** [1] - 35:2
**litigation-driven** [1] - 35:2
**LLP** [3] - 1:17, 1:21, 1:23
**local** [31] - 112:18, 113:10, 113:11, 113:23, 113:25, 114:6, 114:14, 114:21, 114:23, 114:24, 115:4, 118:16, 119:21, 121:13, 121:18,

123:21, 123:24, 129:3, 129:9, 129:10, 129:14, 129:15, 129:18, 129:23, 129:24, 130:6, 140:10
**locally** [13] - 105:11, 111:9, 111:13, 112:4, 115:8, 115:10, 115:13, 118:3, 119:4, 119:6, 120:5, 120:22, 124:21
**locate** [1] - 97:1
**located** [7] - 89:2, 114:6, 115:8, 115:12, 115:25, 120:5, 124:18
**location** [7] - 113:1, 120:25, 124:1, 124:3, 129:9, 129:23, 132:25
**locations** [2] - 113:6, 132:10
**log** [2] - 128:13, 134:6
**log-in** [1] - 128:13
**logging** [2] - 28:6, 133:4
**logically** [1] - 48:15
**look** [32] - 7:5, 13:18, 19:16, 37:13, 39:21, 50:13, 58:19, 61:10, 62:3, 65:1, 73:3, 82:25, 85:18, 104:13, 106:24, 107:16, 107:20, 112:1, 112:9, 113:14, 113:19, 114:4, 115:23, 121:11, 122:20, 127:21, 129:16, 132:11, 139:6, 141:1, 141:21, 142:14
**looked** [3] - 105:4, 105:5, 105:9
**looking** [5] - 8:20, 42:16, 42:17, 68:7, 86:4
**looks** [3] - 11:16, 54:2, 143:20
**loop** [4] - 15:9, 64:22, 65:3, 65:10
**loses** [1] - 122:17
**loss** [2] - 102:13, 102:14
**love** [1] - 59:24
**low** [32] - 4:11, 109:13, 111:17, 127:9, 127:11,

127:24, 128:5, 128:7, 128:12, 128:13, 131:25, 133:4, 133:5, 133:15, 134:4, 134:5, 134:11, 134:18, 134:19, 134:24, 135:23, 136:18, 136:19, 137:10, 137:11, 137:13, 137:16, 137:22, 138:3, 138:4, 138:11, 138:22

**lower** [1] - 134:13

## M

**machines** [1] - 113:23
**Magazine** [4] - 38:5, 41:8, 43:24, 66:6
**Magistrate** [1] - 1:14
**mail** [1] - 27:24
**main** [6] - 19:16, 36:9, 36:23, 49:8, 78:8, 91:18
**maintained** [1] - 133:6
**managed** [1] - 18:4
**manually** [1] - 5:6
**March** [4] - 1:12, 143:3, 143:12, 143:15
**Markman** [2] - 1:12, 2:3
**material** [4] - 9:24, 104:15, 106:16, 121:15
**materials** [3] - 3:24, 89:6, 142:16
**matter** [8] - 2:10, 72:15, 102:12, 123:12, 123:13, 143:10, 143:21
**maximize** [4] - 38:11, 39:15, 42:20, 45:9, 55:18
**maximizing** [6] - 36:10, 37:24, 54:17, 58:23, 59:5, 66:5
**maximum** [1] - 38:17
**mean** [65] - 7:11, 9:6, 14:25, 16:13, 19:9, 20:8, 20:15, 26:14, 27:5, 40:7, 40:11, 40:16, 42:15, 43:14, 45:4, 45:19, 45:23, 49:1, 51:7, 53:18, 56:13, 57:10, 58:1, 58:2, 58:3, 58:5, 62:10, 62:12, 66:13,

69:3, 69:23, 70:1, 70:22, 71:3, 71:20, 72:15, 73:3, 76:3, 76:10, 79:19, 82:12, 93:25, 94:1, 94:21, 96:10, 96:13, 103:20, 106:17, 106:21, 113:9, 115:9, 119:24, 123:25, 124:7, 124:15, 124:18, 129:8, 129:9, 132:21, 132:23, 134:15, 136:24, 137:13, 139:17
**meaning** [32] - 3:17, 8:25, 14:2, 22:5, 25:16, 34:15, 34:20, 35:9, 35:11, 35:17, 36:12, 40:10, 54:9, 56:3, 81:25, 82:6, 84:19, 86:9, 87:6, 91:20, 92:15, 92:16, 93:25, 94:1, 97:8, 97:10, 100:8, 110:8, 110:21, 127:20, 128:1
**meaningful** [3] - 87:1, 87:11, 125:1
**meaningless** [5] - 99:4, 101:15, 104:16, 104:19, 125:23
**meanings** [2] - 83:12, 87:5
**means** [24] - 17:3, 18:11, 20:1, 22:24, 27:4, 31:9, 45:5, 50:22, 54:14, 55:7, 55:15, 57:12, 59:15, 69:24, 74:11, 99:11, 110:16, 112:18, 114:21, 122:18, 129:10, 129:23, 140:22, 143:11
**meant** [24] - 4:14, 7:10, 34:14, 38:14, 40:7, 40:19, 53:20, 54:21, 56:14, 62:6, 64:7, 65:20, 65:21, 67:14, 69:3, 70:1, 71:21, 76:12, 79:3, 101:21, 140:18, 141:13, 142:2
**meat** [3] - 4:14, 10:13, 135:3
**mechanism** [1] - 109:18
**meet** [13] - 21:15, 54:20, 57:1, 57:3,

57:25, 58:8, 65:20, 68:24, 70:12, 70:14, 71:14, 94:20, 141:24
**meet-and-confer** [12] - 21:15, 54:20, 57:1, 57:3, 57:25, 58:8, 65:20, 68:24, 70:12, 70:14, 71:14, 141:24
**meeting** [2] - 28:18, 28:19
**meets** [1] - 64:8
**memory** [1] - 115:4
**mention** [3] - 5:9, 54:19, 63:6
**mentioned** [5] - 27:3, 27:7, 54:14, 66:4, 84:16
**mere** [3] - 14:8, 25:9, 25:12
**merge** [2] - 141:3, 141:6
**meritless** [1] - 97:3
**merits** [1] - 139:18
**message** [2] - 27:25, 28:7
**messaging** [3] - 109:9, 137:8
**met** [9] - 10:23, 11:23, 18:1, 32:22, 33:1, 33:3, 60:25, 61:12, 135:14
**method** [9] - 19:4, 19:12, 94:16, 94:20, 100:13, 100:16, 103:9, 111:16
**methods** [1] - 109:18
**Michele** [1] - 1:25, 144:19
**Microsoft** [49] - 23:14, 23:19, 23:23, 23:24, 25:18, 30:11, 31:12, 35:16, 36:19, 38:8, 41:9, 43:24, 47:4, 47:14, 55:10, 55:11, 59:12, 59:14, 59:15, 60:7, 61:20, 66:6, 66:22, 66:25, 80:7, 81:5, 83:24, 85:4, 85:14, 85:17, 85:21, 85:22, 85:24, 86:2, 86:3, 86:4, 86:7, 87:17, 88:12, 88:14, 88:18, 89:5, 89:18, 89:19
**Microsoft's** [1] - 83:23
**Microsoft-related** [1] - 85:22
**Microsoft-specific** [1] - 47:14
**might** [53] - 9:21,

10:14, 11:10, 12:4, 12:12, 12:13, 12:17, 12:22, 13:3, 13:4, 13:5, 13:20, 13:22, 14:11, 14:21, 21:16, 22:20, 23:3, 23:4, 24:16, 34:5, 34:7, 37:15, 39:15, 47:14, 50:13, 51:12, 51:13, 51:16, 58:20, 66:2, 67:4, 68:8, 72:25, 74:10, 78:2, 88:13, 89:3, 100:4, 101:1, 112:16, 121:23, 122:22, 130:4, 139:10, 139:23, 139:25, 140:12, 141:23
**mind** [9] - 3:22, 7:3, 7:7, 9:15, 25:12, 26:19, 27:13, 28:22, 29:23
**mindful** [1] - 132:3
**minimize** [7] - 38:6, 38:11, 38:17, 39:14, 42:20, 45:9, 55:17
**minimizing** [6] - 36:10, 37:24, 54:17, 58:23, 59:5, 66:4
**minutes** [7] - 3:17, 3:18, 3:19, 12:7, 28:19, 81:7
**missing** [4] - 66:24, 78:22, 119:13, 135:25
**misstated** [1] - 10:25
**mix** [2] - 65:17, 66:2
**mobilities** [1] - 93:18
**mobility** [2] - 94:3, 95:23
**modified** [3] - 56:20, 57:5, 76:10
**modify** [7] - 37:12, 38:14, 40:7, 40:14, 40:20, 70:15, 74:25
**modifying** [2] - 58:14, 88:23
**Monday** [1] - 54:20
**monitor** [1] - 4:22
**morning** [7] - 2:5, 2:9, 2:19, 2:24, 2:25, 3:4, 3:6
**MORRIS** [1] - 1:21
**Morris** [1] - 3:5
**most** [6] - 36:15, 36:17, 38:19, 59:16, 66:25, 126:5
**mostly** [5] - 21:18, 26:1, 43:10, 66:10, 66:21

**motion** [1] - 67:8
**motivations** [1] - 90:18
**mouse** [3] - 23:13, 23:15, 24:19
**move** [7] - 5:25, 15:4, 36:4, 74:7, 77:16, 77:19, 142:21
**movements** [1] - 23:16
**movies** [1] - 93:19
**moving** [1] - 24:20
**MR** [174] - 2:24, 2:25, 3:4, 5:13, 5:18, 6:4, 7:11, 8:11, 8:16, 10:1, 10:12, 11:20, 14:9, 15:3, 16:18, 17:12, 20:4, 20:7, 21:7, 21:12, 23:5, 24:19, 25:13, 25:25, 27:1, 27:20, 28:16, 29:2, 29:17, 29:25, 32:8, 33:18, 34:8, 34:17, 36:8, 37:2, 38:1, 38:25, 39:6, 39:8, 40:17, 41:2, 41:5, 41:8, 41:19, 42:12, 43:22, 45:1, 45:24, 46:19, 48:14, 49:10, 50:21, 52:4, 52:9, 54:6, 56:25, 58:10, 59:8, 60:2, 61:2, 61:19, 62:15, 62:19, 63:4, 63:23, 64:2, 64:20, 65:6, 65:15, 69:5, 70:5, 71:1, 71:22, 72:1, 72:9, 72:19, 73:8, 74:20, 75:8, 75:22, 76:21, 77:4, 77:7, 77:22, 77:25, 79:7, 79:18, 82:18, 82:21, 83:9, 84:15, 85:25, 86:18, 87:20, 87:25, 88:4, 90:12, 91:10, 91:15, 93:16, 94:15, 95:8, 96:4, 96:7, 97:24, 98:16, 100:1, 100:3, 101:4, 101:23, 102:8, 102:11, 103:6, 103:15, 103:19, 104:5, 104:8, 104:11, 105:17, 105:21, 106:20, 108:11, 109:5, 110:3, 111:14, 112:11, 112:19, 112:24, 113:12, 113:19, 114:1,

114:15, 115:15,
116:4, 116:14,
116:17, 117:6,
120:6, 120:18,
121:19, 123:2,
124:6, 124:25,
126:12, 127:5,
127:17, 128:24,
129:2, 129:15,
130:4, 130:16,
130:20, 131:7,
131:10, 131:21,
132:13, 132:20,
133:1, 133:21,
134:23, 135:4,
137:17, 137:25,
138:17, 139:16,
142:24, 143:2,
143:14, 143:17,
144:2, 144:11,
144:12, 144:13
**MS** [1] - 2:19
**muddied** [1] - 65:25
**multiple** [1] - 131:24
**must** [66] - 11:1, 11:2,
11:7, 11:16, 11:18,
11:21, 17:19, 20:20,
20:24, 20:25, 21:2,
21:25, 22:17, 22:24,
26:7, 26:14, 27:5,
31:16, 33:10, 33:14,
34:3, 34:10, 34:14,
35:3, 35:4, 35:11,
37:23, 38:1, 39:2,
50:10, 53:1, 54:17,
56:5, 57:9, 58:16,
58:21, 62:13, 66:19,
72:22, 76:13, 84:3,
84:6, 84:7, 84:8,
97:4, 98:19, 98:25,
99:3, 99:24, 101:12,
110:8, 111:12,
112:3, 114:21,
115:4, 118:2,
124:22, 126:19,
131:22, 132:8,
135:9, 143:9
**myriad** [1] - 24:24

## N

**name** [73] - 37:7, 37:8,
38:14, 39:25, 40:3,
45:18, 45:20, 46:1,
46:6, 46:9, 46:13,
46:16, 46:23, 46:25,
47:1, 47:3, 47:16,
48:4, 48:6, 48:7,
48:8, 48:11, 48:16,
48:21, 48:22, 48:23,
49:1, 50:8, 50:10,

50:11, 50:14, 50:18,
51:4, 51:5, 51:8,
51:13, 51:15, 51:16,
51:24, 52:15, 52:16,
52:20, 52:21, 53:6,
53:13, 53:18, 53:19,
53:20, 54:7, 54:14,
55:6, 55:16, 57:15,
57:16, 59:16, 60:8,
62:1, 62:3, 62:4,
62:5, 62:21, 67:13,
67:15, 67:17, 68:6,
68:20, 72:20, 72:24,
73:11, 74:9
**narrow** [4] - 29:18,
32:12, 33:8, 44:16
**narrowed** [1] - 29:22
**narrower** [8] - 13:25,
44:11, 44:17, 81:20,
90:1, 90:6, 90:11,
90:14
**naturally** [1] - 18:5
**nature** [1] - 18:18
**necessarily** [24] -
8:15, 9:5, 11:12,
19:23, 24:21, 24:22,
29:2, 37:9, 41:20,
45:20, 48:16, 49:23,
51:5, 51:15, 53:19,
63:2, 67:24, 74:16,
109:4, 115:9, 124:4,
124:18, 129:23,
131:3
**necessary** [2] - 33:13,
73:25
**neck** [1] - 7:13
**need** [23] - 5:10,
22:10, 22:12, 26:5,
26:10, 32:3, 39:2,
41:13, 43:5, 68:1,
68:12, 70:8, 74:7,
74:21, 75:1, 81:13,
84:18, 95:2, 118:22,
120:20, 142:3,
142:20
**needed** [6] - 17:8,
17:9, 64:18, 66:15,
101:14, 142:6
**needs** [9] - 50:1,
50:21, 73:12, 73:16,
74:23, 95:3, 95:4,
95:7, 102:21
**negate** [1] - 73:23
**network** [104] - 4:11,
105:11, 111:9,
111:13, 111:16,
111:22, 111:24,
112:5, 112:18,
113:8, 114:20,
116:5, 116:13,

116:20, 116:22,
118:3, 118:13,
118:16, 119:3,
119:6, 120:9,
120:19, 123:7,
123:19, 123:25,
124:2, 124:4,
124:12, 124:15,
124:17, 124:19,
124:20, 127:9,
127:11, 127:12,
127:19, 127:23,
127:24, 128:3,
128:4, 128:6, 128:7,
128:8, 128:10,
128:13, 128:14,
128:19, 128:23,
129:1, 129:2, 129:5,
129:6, 129:7, 129:9,
129:11, 129:13,
129:17, 130:7,
131:4, 131:19,
132:1, 132:8,
132:15, 132:22,
132:25, 133:5,
133:7, 133:14,
133:15, 134:3,
134:6, 134:14,
134:18, 134:20,
134:21, 134:24,
134:25, 135:22,
135:23, 136:19,
136:20, 137:7,
137:10, 137:11,
137:14, 137:16,
137:18, 138:2,
138:3, 138:4,
138:11, 138:22
**network's** [1] - 106:12
**networks** [27] - 106:1,
109:13, 110:9,
111:18, 117:20,
118:11, 123:24,
124:9, 124:21,
126:6, 126:15,
126:17, 128:12,
128:14, 129:14,
131:25, 133:3,
133:4, 133:6,
133:25, 134:4,
134:5, 134:10,
137:22, 138:8,
138:10, 138:13
**never** [1] - 70:11
**New** [2] - 68:7, 73:4
**new** [3] - 27:24, 57:22
**next** [10] - 15:10,
26:19, 39:23, 77:17,
77:20, 92:1, 97:13,
105:2, 122:6, 126:18

**nexus** [8] - 51:7,
51:19, 67:22, 68:14,
73:12, 102:20,
102:22, 102:23
**Nichols** [1] - 3:5
**NICHOLS** [1] - 1:21
**nilly** [1] - 51:3
**non** [2] - 112:18,
142:11
**non-argumentative**
[1] - 142:11
**non-local** [1] - 112:18
**nonclaim** [1] - 119:19
**nonlimiting** [2] -
28:17, 102:3
**nonlocal** [18] - 112:4,
113:3, 113:16,
114:2, 116:13,
119:24, 120:1,
121:16, 122:9,
122:19, 123:21,
123:25, 128:23,
129:1, 129:7,
129:14, 132:9,
132:25
**nonlocally** [8] -
115:13, 115:25,
116:1, 121:15,
123:8, 124:22,
128:18, 135:22
**nonlocalness** [3] -
122:14, 122:22,
124:5
**normal** [1] - 51:11
**normally** [1] - 126:4
**note** [3] - 81:6, 86:6,
143:2
**NOTE** [1] - 2:3
**noted** [2] - 4:9, 10:13
**notes** [3] - 11:5,
81:16, 144:17
**nothing** [9] - 18:18,
18:24, 19:1, 19:3,
31:22, 51:8, 118:4,
141:21, 142:24
**notice** [2] - 63:10,
143:17
**notification** [104] -
6:20, 6:25, 9:13,
9:23, 10:21, 11:11,
11:13, 11:24, 12:9,
12:21, 13:1, 13:2,
14:2, 14:5, 14:6,
14:13, 14:15, 14:25,
15:1, 15:17, 15:19,
15:20, 16:3, 16:4,
16:5, 16:13, 16:14,
16:16, 16:21, 16:24,
16:25, 17:4, 18:1,
18:17, 18:20, 18:22,

18:25, 19:3, 19:18,
19:21, 20:2, 20:21,
21:2, 21:3, 21:16,
21:21, 21:25, 22:5,
22:9, 22:13, 22:16,
22:21, 23:1, 23:2,
23:6, 23:8, 23:21,
24:13, 24:17, 24:22,
24:23, 25:1, 25:3,
26:5, 26:7, 26:8,
26:9, 26:11, 26:17,
26:21, 27:5, 27:8,
27:10, 28:7, 28:14,
28:19, 29:9, 29:12,
30:1, 30:2, 31:4,
31:18, 32:9, 32:17,
32:22, 33:3, 33:10,
33:14, 33:21, 34:3,
34:10, 34:15, 34:18,
34:23, 34:25, 35:3,
35:4, 35:9, 36:2,
55:2, 86:1, 88:23,
89:1, 95:9
**notifications** [12] -
12:19, 13:12, 15:12,
17:16, 17:17, 19:24,
22:10, 22:17, 23:9,
23:21, 32:5, 32:7
**notion** [10] - 26:1,
30:1, 30:11, 30:15,
31:3, 73:14, 74:1,
88:12, 92:23, 120:23
**notions** [1] - 92:5
**nowhere** [1] - 121:20
**NT** [2] - 79:25, 80:9
**number** [14] - 7:2, 9:4,
12:4, 13:4, 18:4,
52:10, 54:25, 55:1,
76:8, 78:20, 84:1,
99:9, 99:10, 104:21
**numbers** [1] - 73:6

## O

**o'clock** [1] - 81:10
**objecting** [1] - 65:7
**objection** [8] - 33:19,
33:25, 64:21, 65:9,
65:10, 65:12, 76:6,
78:6
**obscure** [1] - 83:21
**obscured** [1] - 58:20
**obtain** [1] - 134:4
**obtained** [1] - 109:8
**obviously** [4] - 20:18,
122:7, 123:21, 140:6
**occasionally** [1] -
37:15
**occur** [3] - 12:1,
12:19, 12:20

occurred [1] - 12:22
occurrence [19] -
9:19, 9:20, 10:2,
10:10, 13:19, 17:6,
21:22, 22:1, 23:11,
24:10, 25:14, 25:18,
25:21, 26:3, 29:1,
29:4, 32:19, 35:25
occurrences [3] -
13:21, 23:17, 28:22
occurring [1] - 23:17
occurs [2] - 11:11,
12:21
OF [1] - 1:2
often [5] - 5:1, 56:14,
58:5, 89:3, 90:10
old [1] - 73:3
once [1] - 103:22
one [85] - 4:16, 11:9,
12:7, 12:14, 14:8,
14:21, 18:14, 18:19,
20:21, 23:2, 25:3,
28:17, 28:25, 30:4,
31:16, 31:17, 37:3,
37:5, 37:11, 43:9,
43:10, 43:23, 44:13,
46:7, 46:11, 49:21,
50:7, 50:17, 52:11,
54:25, 55:25, 60:24,
62:2, 62:11, 64:16,
65:24, 66:21, 68:8,
68:10, 68:19, 68:20,
74:10, 78:13, 80:6,
81:4, 81:8, 84:1,
88:13, 89:12, 89:23,
91:10, 91:18, 93:15,
95:13, 97:2, 98:2,
98:15, 99:9, 99:19,
101:9, 109:24,
112:8, 114:8,
117:12, 120:25,
122:5, 124:25,
127:1, 127:5, 128:6,
128:19, 130:21,
132:5, 132:13,
133:12, 133:17,
134:10, 137:3,
137:13, 141:16,
141:17, 142:11
ones [8] - 8:10, 32:13,
37:14, 49:9, 60:13,
80:13, 80:15, 101:14
online [1] - 28:8
opaque [1] - 63:5
open [4] - 68:16,
73:25, 91:22, 122:13
opening [5] - 64:23,
65:3, 75:25, 76:4,
85:9
operating [7] - 23:22,

23:23, 30:13, 30:14,
47:9, 50:24, 80:2
operational [3] -
134:8, 134:25,
138:21
opine [1] - 75:24
opinion [1] - 63:12
opportunity [2] - 31:1,
81:12
opposed [1] - 73:6
oral [1] - 117:25
order [8] - 4:4, 4:9,
42:1, 103:13,
131:19, 143:10,
143:12, 143:24
ordinary [26] - 8:25,
22:5, 34:20, 35:9,
35:11, 35:16, 36:12,
52:18, 54:9, 68:10,
78:2, 81:24, 82:6,
83:12, 84:19, 86:9,
87:5, 89:11, 89:12,
89:17, 91:20, 93:25,
94:1, 97:8, 97:9,
129:22
orientation [1] - 62:16
original [5] - 54:16,
56:1, 56:19, 68:23,
74:7
originally [1] - 42:9
otherwise [5] - 5:9,
49:8, 56:17, 94:12,
102:22, 114:11,
130:14, 130:15,
133:19
outdated [1] - 76:2
outside [2] - 25:20,
116:8
overbroad [2] - 13:7,
92:17
overcome [1] - 141:13
overlap [3] - 125:22,
126:22, 136:20
overlapping [1] -
141:12
overlaps [1] - 104:17
overstating [1] - 18:15
overwhelm [1] - 18:7
overwhelmed [2] -
17:21, 17:24
own [11] - 26:4, 26:9,
55:14, 59:9, 59:19,
61:20, 78:4, 117:15,
120:10, 120:24,
141:5

## P

p.m [1] - 144:15
pad [4] - 78:10, 78:17,

78:19, 79:3
page [5] - 6:11, 11:9,
12:2, 15:10, 108:2
pages [1] - 142:5
papers [1] - 4:12
paragraph [1] - 6:12
Paragraphs [1] -
141:19
part [41] - 7:22, 8:9,
9:14, 11:20, 22:18,
23:13, 28:25, 29:25,
31:15, 34:11, 37:9,
41:14, 42:2, 42:5,
45:17, 46:21, 48:5,
48:9, 50:8, 53:10,
54:12, 56:6, 59:3,
65:21, 66:24, 82:11,
82:13, 84:6, 95:25,
98:6, 111:5, 119:25,
120:16, 121:3,
126:18, 130:10,
130:11, 132:21,
132:23, 140:13
particular [8] - 8:11,
16:2, 16:15, 53:23,
82:11, 82:13, 90:25,
103:11
particularly [1] -
137:11
parties [30] - 3:13,
3:15, 4:2, 4:14, 4:25,
5:1, 5:20, 9:17, 9:24,
36:10, 47:20, 57:1,
57:3, 78:9, 83:4,
83:11, 90:1, 90:16,
90:18, 106:7, 114:3,
125:6, 125:9,
125:13, 127:10,
133:25, 134:9,
140:23, 141:23,
142:3
parties' [2] - 21:14,
143:4
partly [1] - 85:18
parts [3] - 107:18,
110:1, 141:18
party [1] - 83:16
patent [51] - 7:9,
14:14, 18:16, 26:6,
27:21, 28:2, 30:12,
35:14, 58:22, 60:5,
60:16, 64:11, 80:4,
81:16, 85:20, 92:11,
94:3, 94:8, 94:12,
94:16, 98:20, 98:22,
98:25, 99:3, 99:16,
99:20, 102:2,
102:16, 102:23,
103:1, 106:9,
110:11, 110:22,

111:7, 111:11,
112:3, 112:9,
112:14, 112:15,
114:11, 114:23,
116:10, 131:17,
132:5, 132:11,
134:3, 136:1, 138:10
patentees [1] - 127:21
patents [45] - 7:5,
22:15, 24:2, 24:3,
24:4, 24:7, 27:15,
28:6, 34:22, 46:21,
55:2, 61:8, 83:21,
83:24, 85:22, 86:1,
86:5, 87:18, 101:8,
106:5, 106:24,
107:3, 107:17,
110:9, 111:15,
111:19, 112:13,
113:15, 114:16,
115:17, 115:21,
115:23, 116:21,
127:21, 127:22,
129:17, 130:13,
131:24, 133:23,
136:7, 137:20,
138:9, 138:19,
138:20
paul [1] - 12:6
pause [1] - 76:15
PC [4] - 38:5, 41:8,
43:24, 66:5
per [2] - 58:21, 61:6
percent [7] - 37:14,
46:8, 46:13, 56:5,
58:20, 59:4, 74:12
perfectly [1] - 66:16
performing [2] -
110:15, 111:19
performs [1] - 107:9
perhaps [3] - 65:25,
82:10, 102:14
period [13] - 23:25,
55:12, 59:13, 59:22,
60:6, 60:12, 60:15,
60:20, 60:21, 61:5,
76:3, 84:20, 89:21
permitted [1] - 90:23
person [2] - 64:16,
70:24, 71:19, 87:15,
89:11, 129:22
perspective [1] -
142:21
Phillips [2] - 61:3,
64:8
phrase [10] - 9:18,
35:24, 48:3, 57:5,
58:15, 76:9, 86:14,
87:2, 101:4, 101:19
phrased [1] - 79:13

phraseology [4] -
9:17, 105:7, 105:10,
107:25
pick [1] - 84:1
picked [1] - 35:21
picture [1] - 99:16
piece [16] - 9:23,
14:21, 26:24, 29:23,
56:11, 60:7, 62:9,
72:18, 74:15, 85:15,
100:23, 102:4,
109:25, 112:8,
112:22, 137:9
pieces [1] - 13:23
Piergiovanni [1] -
2:20
PIERGIOVANNI [2] -
1:17, 2:19
Pillsbury [1] - 3:7
PILLSBURY [1] - 1:23
PITTMAN [1] - 1:23
place [12] - 48:20,
75:10, 92:8, 97:17,
102:17, 103:23,
113:17, 114:6,
129:10, 129:12,
132:11, 142:11
placed [7] - 52:21,
73:15, 97:4, 98:2,
99:4, 99:5, 101:12
places [3] - 113:5,
113:8, 131:24
placing [1] - 52:25
plain [10] - 54:9, 55:7,
91:20, 93:25, 94:1,
96:10, 97:8, 97:9,
99:11, 127:20
plainly [2] - 52:16,
77:15
plaintiff [53] - 1:5,
2:20, 5:24, 6:5,
20:22, 20:23, 21:1,
21:15, 25:7, 25:23,
28:4, 56:12, 58:1,
58:4, 60:25, 63:8,
63:13, 76:20, 76:23,
77:8, 81:7, 83:21,
85:7, 90:5, 96:8,
96:17, 97:15, 98:13,
101:17, 105:18,
117:1, 117:13,
117:16, 117:23,
118:5, 118:20,
119:8, 119:11,
120:6, 121:8,
122:17, 123:16,
125:2, 135:19,
136:15, 136:17,
137:4, 137:12,
139:3, 140:2, 140:5,

142:22, 142:25
**Plaintiff** [1] - 1:20
**plaintiff's** [39] - 4:6,
5:11, 6:3, 11:6,
20:19, 21:13, 21:19,
22:3, 24:1, 26:19,
28:23, 34:18, 35:7,
36:6, 52:13, 52:24,
55:13, 55:22, 56:4,
56:19, 57:22, 65:1,
83:16, 90:10, 91:13,
96:11, 96:22, 97:2,
101:15, 104:13,
105:8, 105:10,
105:16, 120:7,
125:17, 127:14,
135:3, 136:3, 141:18
**plaintiffs** [5] - 2:17,
22:18, 24:8, 26:1,
77:24
**plan** [1] - 63:19
**pleading** [1] - 123:14
**PLLC** [1] - 1:18
**plurality** [13] - 109:13,
111:17, 130:13,
131:1, 131:5, 133:3,
136:17, 136:21,
137:8, 137:9,
137:15, 137:21
**plus** [2] - 47:2, 110:16
**point** [42] - 11:9,
18:15, 19:15, 20:8,
20:10, 20:21, 20:24,
36:11, 36:18, 46:11,
48:12, 53:9, 56:6,
62:11, 64:5, 78:23,
82:15, 85:16, 91:25,
101:24, 102:13,
102:14, 103:4,
103:9, 107:16,
112:5, 112:10,
112:11, 114:8,
121:5, 122:20,
125:5, 125:19,
126:4, 127:25,
132:16, 133:25,
135:12, 135:19,
136:5, 138:18, 143:5
**pointed** [9] - 11:25,
17:23, 64:7, 65:19,
67:24, 67:25, 82:5,
118:5, 139:17
**pointing** [8] - 8:24,
9:2, 20:22, 76:6,
89:5, 89:6, 108:4,
136:6
**points** [10] - 12:3,
15:10, 15:25, 20:9,
68:19, 75:23, 84:13,
104:11, 111:23,

125:11
**pop** [1] - 29:7
**popping** [2] - 24:23,
28:8
**portion** [11] - 25:14,
52:21, 101:17,
110:8, 116:12,
116:19, 119:10,
125:10, 125:16,
135:11
**portions** [2] - 99:18,
107:20
**POSITA** [1] - 60:21
**position** [22] - 11:1,
13:16, 44:25, 45:1,
57:22, 59:6, 61:10,
61:21, 66:2, 66:3,
67:7, 69:9, 69:18,
76:4, 76:6, 85:10,
97:2, 119:18,
120:23, 123:10,
136:3, 136:7
**positioning** [1] - 95:11
**possibility** [2] - 44:19,
122:14
**possible** [7] - 46:7,
113:11, 114:12,
115:16, 121:18,
121:19, 121:24
**possibly** [1] - 56:7
**postdates** [1] - 64:14
**potential** [1] - 86:18
**practice** [2] - 14:25,
16:1
**preciously** [1] - 57:4
**precise** [1] - 48:14
**precisely** [3] - 54:6,
61:2, 97:24
**precluded** [1] - 87:18
**predicates** [2] - 12:4,
18:3
**preferred** [3] - 10:9,
15:21, 30:13
**preliminary** [1] - 5:8
**prelude** [2] - 9:11,
20:15
**present** [5] - 45:4,
57:10, 59:24, 61:7,
76:2
**presentation** [3] -
3:21, 5:12, 21:6
**presented** [1] - 71:11
**presenting** [1] - 5:14
**press** [1] - 29:10
**presses** [1] - 23:15
**pressing** [2] - 29:6,
89:3
**presumably** [1] -
82:12
**presumed** [1] - 100:7

**pretty** [8] - 31:20,
37:7, 76:5, 76:12,
81:16, 89:3, 109:20,
117:1
**prevail** [1] - 106:17
**preview** [1] - 48:1
**previewed** [2] - 60:3,
125:2
**previous** [1] - 21:12
**primary** [9] - 10:1,
10:2, 21:18, 22:3,
22:19, 27:3, 27:7,
34:18, 35:7
**principles** [3] - 136:8,
139:1, 140:2
**problem** [11] - 26:13,
27:6, 34:9, 67:18,
77:6, 96:15, 96:16,
110:4, 133:18,
138:17, 138:19
**problematic** [5] -
33:24, 48:25, 52:25,
53:11, 53:15
**problems** [1] - 52:10
**procedural** [2] - 5:10,
142:20
**procedure** [1] - 3:12
**proceeding** [2] -
144:14, 144:18
**proces** [1] - 46:1
**process** [29] - 24:23,
37:7, 37:8, 38:14,
40:1, 40:3, 45:18,
45:20, 50:8, 50:11,
51:8, 51:14, 51:17,
52:1, 65:23, 74:9,
92:3, 98:3, 98:23,
99:21, 99:22, 100:4,
100:17, 101:6,
103:3, 104:22,
104:24, 115:4,
139:23
**processed** [1] - 29:12
**processing** [5] -
17:16, 18:23, 22:12,
23:16, 32:18
**processor** [1] - 29:14
**proffered** [11] - 36:14,
43:8, 64:23, 78:15,
79:20, 81:3, 81:4,
81:25, 89:20, 90:20,
93:23
**proffering** [1] - 61:7
**program** [29] - 10:14,
11:10, 12:13, 12:17,
13:3, 13:4, 13:20,
13:22, 14:21, 21:20,
29:7, 33:17, 33:22,
34:6, 42:24, 42:25,
43:1, 50:23, 51:12,

51:14, 51:16, 51:25,
52:4, 52:5, 53:19,
53:23, 104:24
**programmed** [1] -
16:15
**programmer** [2] -
39:9, 43:1
**programming** [20] -
6:14, 6:19, 7:4, 7:16,
7:18, 13:9, 14:3,
14:14, 15:25, 17:24,
24:4, 24:5, 26:18,
30:17, 30:20, 30:21,
31:10, 34:21, 35:21
**programs** [8] - 78:11,
78:21, 79:1, 79:5,
79:9, 79:11, 79:16,
79:22
**prominent** [2] - 86:7,
88:12
**promise** [1] - 74:6
**proper** [20] - 12:21,
15:22, 31:9, 31:11,
65:11, 75:16, 78:7,
88:6, 90:20, 91:22,
92:15, 93:24, 94:7,
95:16, 95:25,
102:19, 103:10,
103:19, 104:1
**properly** [1] - 103:22
**proposal** [3] - 24:9,
54:8, 127:25
**propose** [2] - 28:4,
63:16
**proposed** [22] - 6:15,
9:14, 12:15, 13:6,
24:1, 52:13, 58:11,
63:8, 63:13, 71:18,
77:12, 104:2,
107:12, 110:5,
110:14, 110:17,
111:2, 126:18,
131:13, 135:16,
139:3, 140:3
**proposes** [1] - 28:4
**proposing** [3] - 67:1,
104:15, 135:7
**prototypical** [1] -
27:14
**provide** [11] - 17:14,
26:7, 31:2, 31:16,
33:12, 50:25, 91:21,
108:21, 119:15,
134:8, 138:21
**provided** [17] - 7:4,
10:6, 32:14, 32:15,
78:6, 79:23, 80:6,
94:6, 103:3, 103:25,
117:23, 117:24,
117:25, 126:19,

134:12, 135:1, 139:7
**provider** [2] - 109:9,
109:10
**provides** [15] - 23:14,
93:24, 94:8, 106:2,
106:13, 107:17,
107:25, 108:5,
108:9, 109:25,
110:10, 119:8,
124:24, 126:21,
142:5
**provides ..** [3] - 105:7,
106:19, 108:25
**providing** [15] - 19:2,
19:3, 19:5, 19:7,
26:8, 26:23, 94:17,
99:20, 107:5,
107:22, 108:22,
109:3, 125:3, 142:15
**publications** [1] - 8:2
**purple** [1] - 87:15
**purpose** [1] - 17:23
**put** [15] - 6:18, 46:19,
48:6, 48:10, 51:11,
67:17, 67:21, 67:23,
74:5, 75:10, 85:16,
97:9, 97:17, 104:19,
141:2

## Q

**qualify** [2] - 14:4,
27:16
**questions** [6] - 3:24,
9:1, 55:24, 81:8,
81:14, 137:3
**quick** [2] - 4:16,
104:11
**quite** [4] - 56:13,
87:12, 90:18, 108:6
**quote** [1] - 38:9
**quoted** [1] - 17:15

## R

**raised** [2] - 9:2, 65:9
**raising** [1] - 73:2
**random** [4] - 73:6,
73:13, 85:2, 86:11
**rarely** [1] - 128:1
**reaction** [1] - 59:3
**reactivate** [3] - 40:21,
41:13, 42:8
**reactivating** [1] -
42:14
**read** [18] - 6:10, 37:1,
37:19, 43:15, 46:5,
47:25, 55:22, 55:25,
56:19, 61:17, 69:21,
73:16, 73:19, 74:10,

78:17, 111:15, 114:15, 131:23
**reading** [7] - 37:16, 69:23, 78:25, 80:9, 89:24, 93:7, 141:20
**reads** [1] - 37:6
**ready** [2] - 69:17, 77:16
**real** [7] - 15:13, 15:18, 16:5, 16:8, 24:2, 121:24, 138:1
**realize** [1] - 26:14
**really** [52] - 8:18, 9:24, 11:14, 12:14, 13:7, 17:8, 17:19, 17:23, 18:10, 20:18, 21:4, 21:13, 27:16, 28:2, 30:2, 30:21, 31:25, 33:2, 36:23, 41:25, 42:21, 46:2, 47:21, 49:18, 51:6, 57:10, 57:21, 64:9, 67:17, 80:25, 88:24, 90:8, 91:4, 92:7, 93:14, 97:14, 100:14, 100:19, 101:22, 102:18, 106:8, 110:16, 123:21, 123:22, 126:10, 126:25, 133:23, 136:24, 138:5, 139:9, 140:21, 142:17
**reappear** [1] - 41:13
**reason** [7] - 5:3, 32:2, 76:18, 85:16, 123:15, 136:13, 143:23
**reasonable** [4] - 51:19, 71:19, 76:12, 131:23
**reasons** [3] - 96:16, 122:5, 135:17
**rebut** [1] - 31:1
**rebuttal** [9] - 4:8, 5:25, 63:25, 75:20, 88:3, 91:9, 102:10, 104:10, 137:24
**rebuttals** [1] - 77:16
**receipt** [1] - 28:24
**received** [1] - 28:24
**receives** [1] - 15:20
**receiving** [1] - 18:21
**recitation** [1] - 70:6
**recited** [1] - 110:15
**recognize** [1] - 124:8
**recognized** [1] - 84:23
**recognizes** [1] - 84:3
**record** [10] - 2:7, 2:8, 2:14, 63:18, 71:11,

84:10, 90:23, 123:13, 141:25, 144:8
**red** [1] - 47:6
**redo** [1] - 77:4
**reduces** [1] - 12:14
**redundancy** [9] - 18:9, 19:7, 19:10, 103:8, 107:15, 108:1, 120:16, 126:11, 130:22
**redundant** [19] - 18:11, 18:18, 19:1, 19:3, 19:12, 19:17, 20:1, 26:19, 27:11, 94:11, 103:10, 108:3, 108:20, 116:19, 121:13, 130:14, 131:3, 137:11
**refer** [2] - 101:21, 113:15
**reference** [16] - 8:21, 10:4, 10:17, 10:18, 11:3, 12:2, 24:3, 35:19, 35:21, 59:10, 64:5, 64:7, 66:21, 82:22, 123:22, 137:6
**referenced** [7] - 15:15, 15:16, 15:17, 35:20, 116:2, 116:15, 120:4
**references** [6] - 8:19, 9:5, 17:13, 64:6, 85:21, 88:15
**referred** [3] - 12:8, 75:8, 80:2
**referring** [4] - 47:18, 80:20, 80:21, 80:22
**refers** [2] - 30:20, 101:22
**refinement** [1] - 48:18
**reflect** [1] - 57:17
**reflected** [1] - 92:12
**reflection** [2] - 86:9, 87:5
**reflects** [4] - 35:16, 52:17, 52:18, 57:16
**refuted** [1] - 49:19
**regard** [7] - 7:3, 7:24, 9:12, 102:25, 105:24, 106:18, 109:2, 109:6, 109:11, 110:24, 111:3, 128:22, 130:16
**regarding** [3] - 57:5, 123:17, 143:21
**reject** [1] - 136:13
**relate** [4] - 72:23, 79:15, 111:15, 142:8

**related** [9] - 9:22, 63:2, 63:3, 85:22, 105:6, 111:23, 122:7, 127:18, 136:2
**relatedly** [1] - 116:1
**relates** [7] - 9:13, 48:2, 53:22, 73:1, 108:24, 111:4, 131:11
**relating** [4] - 48:11, 50:15, 54:3, 108:5
**relation** [1] - 139:22
**relatively** [4] - 49:22, 50:2
**relevance** [1] - 76:2
**relevant** [19] - 8:21, 23:24, 44:15, 55:12, 59:13, 60:6, 60:7, 60:12, 60:15, 60:20, 61:5, 76:3, 84:19, 85:6, 90:18, 90:19, 107:17, 139:9, 140:18
**relied** [2] - 30:7, 38:19
**rely** [4] - 30:25, 31:6, 60:24, 64:13
**relying** [5] - 7:25, 30:19, 31:5, 43:25, 59:25
**remain** [2] - 63:14, 140:1
**remainder** [1] - 105:19
**remaining** [1] - 29:24
**remains** [2] - 30:1, 66:3
**remind** [1] - 140:25
**reminder** [1] - 27:25
**reminds** [2] - 83:2, 137:3
**remote** [7] - 117:11, 119:11, 123:4, 124:3, 124:11, 124:15, 135:15
**remove** [1] - 55:8
**render** [6] - 26:3, 99:10, 104:18, 125:18, 125:23, 136:14
**rendered** [1] - 22:16
**rendering** [1] - 27:11
**renders** [3] - 94:21, 99:4, 108:19
**repeatedly** [1] - 85:21
**replace** [3] - 91:24, 93:9, 103:21
**replaced** [1] - 53:16
**replaces** [3] - 96:12, 97:11, 99:13
**replacing** [1] - 91:23
**replied** [1] - 9:1

**reply** [6] - 8:24, 17:22, 64:21, 65:11, 78:6, 82:8
**reporter** [1] - 2:7
**REPORTER 'S** [1] - 2:3
**reporting** [1] - 90:4
**representation** [1] - 58:7
**represents** [2] - 84:18, 87:14
**reputable** [1] - 86:11
**request** [1] - 143:4
**requests** [1] - 3:16
**require** [19] - 18:22, 19:22, 20:24, 21:2, 26:22, 37:23, 61:15, 75:14, 101:1, 101:13, 104:1, 104:14, 107:21, 109:2, 120:1, 120:10, 120:24, 122:8
**required** [13] - 11:12, 14:2, 16:10, 16:12, 20:20, 37:17, 59:4, 75:16, 84:22, 120:2, 125:25, 137:20, 140:11
**requirement** [18] - 38:4, 38:15, 62:12, 98:18, 99:5, 117:10, 117:11, 117:17, 117:22, 120:22, 122:1, 123:18, 125:15, 135:21, 135:23, 136:21, 139:20, 140:15
**requirements** [4] - 21:19, 100:21, 119:19, 136:16
**requires** [17] - 11:7, 18:17, 18:23, 19:20, 26:4, 26:20, 81:1, 94:22, 96:21, 101:3, 103:12, 117:21, 118:1, 119:15, 122:14, 123:7, 125:20
**requiring** [2] - 18:19, 97:16
**rescind** [1] - 9:6
**resizing** [1] - 67:1
**resolve** [3] - 21:16, 49:17, 122:16
**resolved** [4] - 27:6, 27:12, 143:7, 143:9
**respect** [13] - 8:11, 36:9, 36:11, 36:18, 52:25, 64:3, 65:22, 67:5, 80:23, 80:24,

88:9, 88:13, 118:7
**respectfully** [1] - 85:4
**respectively** [1] - 134:25
**respond** [16] - 4:7, 10:14, 11:7, 12:13, 12:17, 13:3, 13:4, 13:20, 13:22, 13:24, 14:12, 14:22, 21:21, 24:25, 25:9, 133:11
**response** [36] - 8:22, 8:23, 9:2, 14:15, 14:16, 22:9, 22:22, 23:1, 23:2, 24:11, 24:16, 25:2, 25:3, 25:6, 25:23, 27:9, 29:8, 29:10, 30:1, 30:3, 31:3, 33:12, 33:16, 33:23, 34:5, 34:24, 35:5, 35:8, 36:1, 58:2, 64:20, 65:9, 121:10, 130:23, 131:16, 138:16
**responses** [4] - 22:11, 23:3, 32:4, 32:6
**rest** [4] - 40:5, 76:11, 87:2, 99:13
**restore** [2] - 38:7, 38:11
**restricted** [1] - 137:13
**restrictive** [1] - 67:15
**result** [13] - 14:12, 18:25, 22:13, 24:11, 24:20, 24:21, 24:22, 29:3, 29:6, 33:11, 34:5, 35:8, 107:19
**resulted** [1] - 20:2
**results** [1] - 110:18
**review** [2] - 3:13, 141:23
**rewrite** [1] - 138:19
**rightly** [2] - 84:2, 84:23
**rise** [1] - 90:24
**robust** [1] - 127:7
**rodeo** [1] - 7:13
**rodger** [1] - 3:4
**RODGER** [1] - 1:22
**Rolfe** [2] - 1:25, 144:19
**ROSEMARY** [1] - 1:17
**Rosemary** [1] - 2:20
**routinely** [1] - 115:1
**RPR** [2] - 1:25, 144:19
**rub** [2] - 38:16, 102:18
**running** [17] - 47:9, 47:11, 78:11, 78:21, 79:1, 79:5, 79:9, 79:11, 79:15, 79:22,

80:1, 80:3, 84:3, 86:2, 86:21, 87:21, 104:24

**S**

**saddle** [3] - 70:8, 70:9
**saddles** [1] - 70:7
**safety** [1] - 144:7
**saves** [1] - 123:5
**scenario** [1] - 70:23
**SCHLATHER** [40] - 1:18, 1:19, 2:24, 5:13, 5:18, 105:17, 105:21, 106:20, 108:11, 109:5, 110:3, 111:14, 112:11, 112:19, 112:24, 113:12, 113:19, 114:1, 114:15, 115:15, 116:4, 116:14, 116:17, 127:17, 128:24, 129:2, 129:15, 130:4, 130:16, 130:20, 131:7, 131:10, 131:21, 132:13, 132:20, 133:1, 137:17, 137:25, 142:24, 144:12
**Schlather** [17] - 2:22, 2:23, 15:4, 92:1, 105:18, 105:20, 106:15, 115:6, 116:24, 121:10, 125:7, 125:11, 128:22, 133:9, 137:4, 137:23, 142:23
**scope** [3] - 35:13, 121:7, 136:11
**scratch** [1] - 43:1
**screen** [8] - 5:2, 5:16, 21:9, 31:12, 47:11, 59:2, 76:20, 76:24
**scrolling** [1] - 68:9
**se** [1] - 61:6
**season** [1] - 74:1
**second** [15] - 11:20, 36:5, 49:6, 54:12, 56:11, 58:14, 99:7, 105:9, 109:9, 117:12, 124:17, 128:17, 133:10, 134:4, 136:13
**secondly** [1] - 117:10
**section** [6] - 27:21, 88:23, 117:8, 119:7, 131:17, 131:18

**see** [31] - 3:8, 7:16, 13:15, 17:15, 21:10, 25:22, 29:7, 30:17, 33:23, 39:5, 42:11, 42:13, 65:23, 68:5, 69:24, 70:1, 70:3, 70:24, 76:17, 76:18, 77:3, 78:13, 82:23, 86:20, 87:20, 88:7, 93:6, 95:19, 96:5, 112:8
**seeking** [4] - 44:17, 83:16, 90:1, 90:11
**seem** [14] - 8:1, 20:18, 25:14, 44:23, 48:24, 52:24, 53:15, 78:18, 89:15, 106:7, 108:8, 120:8, 127:10, 138:12
**seemingly** [1] - 123:7
**sees** [1] - 68:7
**select** [2] - 78:19, 79:4
**selecting** [1] - 89:3
**selection** [1] - 82:8
**sense** [16] - 3:19, 7:12, 10:18, 15:14, 16:14, 18:15, 33:19, 33:20, 45:15, 48:19, 53:20, 74:21, 100:22, 115:14, 122:4, 133:21
**sentence** [2] - 93:15, 112:8
**sentences** [1] - 76:14
**separate** [3] - 123:8, 139:11, 141:12
**separately** [2] - 107:23, 117:17
**serious** [1] - 19:10
**server** [46] - 112:14, 112:15, 112:17, 112:18, 113:2, 113:10, 113:11, 113:20, 113:22, 113:24, 114:2, 114:19, 116:2, 116:6, 116:8, 116:11, 116:12, 116:23, 118:5, 118:6, 118:21, 119:23, 120:4, 120:8, 121:11, 121:12, 121:15, 121:17, 122:14, 122:18, 122:23, 123:4, 123:18, 129:18
**servers** [6] - 113:15, 113:16, 115:1, 118:11, 124:9

**service** [2] - 109:9, 109:10
**services** [1] - 137:8
**set** [18] - 96:23, 98:3, 98:16, 99:1, 99:2, 101:25, 105:4, 115:6, 122:6, 125:24, 132:5, 135:10, 138:9, 143:3
**sets** [3] - 100:6, 105:5, 135:20
**setting** [1] - 110:15
**seven** [1] - 4:10
**seventh** [1] - 12:6
**shape** [1] - 62:20
**share** [1] - 5:16
**sharing** [4] - 5:2, 21:9, 76:19, 76:24
**SHAW** [1] - 1:23
**shift** [1] - 69:5
**shorter** [1] - 88:25
**shot** [2] - 31:12, 47:11
**show** [8] - 32:15, 60:4, 61:6, 76:1, 80:16, 88:24, 131:3, 132:12
**showing** [4] - 76:21, 83:24, 114:17, 114:18
**shown** [2] - 41:12, 118:14
**shows** [7] - 31:12, 61:20, 64:7, 76:2, 108:11, 113:20, 114:20
**side** [32] - 2:15, 2:17, 3:3, 3:16, 3:17, 4:6, 4:7, 5:11, 5:15, 5:24, 5:25, 7:25, 37:16, 44:11, 44:12, 44:17, 50:9, 71:5, 74:14, 76:20, 76:23, 96:3, 105:19, 110:17, 117:4, 133:11, 137:4, 138:6, 139:10, 142:22, 143:1
**side's** [2] - 69:18, 107:15
**sides** [6] - 2:6, 30:7, 72:21, 72:22, 81:12, 141:4
**significant** [2] - 8:9, 138:1
**similar** [6] - 17:3, 78:2, 83:10, 130:24, 132:3, 135:5
**simple** [4] - 9:22, 25:21, 52:18, 54:6
**simplified** [1] - 15:6
**simply** [29] - 13:3,

19:24, 23:11, 23:16, 24:6, 25:19, 30:14, 31:12, 42:5, 45:25, 52:20, 53:5, 54:7, 54:14, 55:5, 55:9, 55:13, 80:19, 83:25, 88:18, 91:18, 93:6, 95:19, 117:25, 135:19, 135:25, 138:10, 138:20, 139:19
**single** [7] - 20:8, 37:9, 44:22, 46:8, 97:1, 136:18, 142:5
**single-spaced** [1] - 142:5
**sited** [1] - 106:3
**sitting** [1] - 129:4
**situation** [3] - 57:8, 110:18, 126:13
**skill** [7] - 64:17, 68:11, 78:2, 89:11, 89:13, 89:17, 129:22
**Slide** [1] - 92:1
**slide** [2] - 5:7, 92:1
**slides** [4] - 4:25, 5:2, 5:5, 5:16, 80:23, 111:21, 132:18
**slight** [1] - 69:5
**slightly** [1] - 79:13
**small** [2] - 38:10, 41:10
**smiling** [1] - 87:8
**Smith** [2] - 3:5, 28:9
**SMITH** [2] - 1:22, 3:4
**so..** [3] - 12:9, 80:14, 131:14
**software** [5] - 106:1, 106:8, 106:10, 106:11, 110:14
**solely** [2] - 72:23, 91:6
**someone** [4] - 78:1, 89:16, 101:1, 124:2
**something 's** [1] - 23:12
**sometimes** [16] - 5:19, 9:17, 30:6, 40:12, 44:24, 55:19, 58:6, 58:20, 59:23, 62:25, 70:2, 74:15, 87:12, 91:1, 139:8, 141:15
**somewhat** [1] - 66:1
**somewhere** [4] - 45:22, 82:12, 97:18, 121:1
**soon** [1] - 144:6
**sorry** [7] - 66:23, 77:5, 103:15, 104:9, 120:12, 130:20, 132:20

**sort** [1] - 114:20
**sounded** [2] - 46:7, 67:13
**sounds** [13] - 16:13, 23:4, 39:1, 40:13, 59:25, 62:17, 97:10, 97:14, 99:24, 100:25, 138:24, 139:2, 139:8
**source** [2] - 64:13, 86:11, 124:19
**sources** [1] - 81:25
**space** [2] - 52:22, 53:6
**spaced** [1] - 142:5
**speaking** [6] - 4:17, 4:19, 4:21, 6:5, 49:10, 66:11
**spec** [1] - 90:4
**specific** [27] - 19:5, 28:3, 31:2, 47:5, 47:7, 47:14, 57:25, 67:15, 79:24, 80:7, 80:10, 81:5, 89:19, 94:2, 94:4, 97:17, 108:12, 108:18, 108:21, 109:18, 110:12, 110:19, 113:1, 116:12, 120:19
**specifically** [12] - 28:17, 79:21, 88:15, 91:25, 98:2, 100:15, 107:1, 109:6, 113:7, 113:13, 116:8, 116:22
**specification** [55] - 7:16, 15:15, 15:16, 15:17, 15:24, 17:14, 27:22, 31:11, 47:10, 80:18, 82:1, 88:18, 89:15, 89:22, 92:19, 92:21, 93:1, 93:22, 96:18, 96:19, 96:25, 98:7, 102:5, 105:24, 106:22, 107:7, 108:15, 109:16, 110:25, 111:20, 112:7, 118:1, 118:10, 118:19, 118:25, 119:2, 119:8, 119:10, 121:4, 121:5, 121:20, 121:21, 121:22, 121:25, 124:8, 125:7, 125:11, 125:16, 128:9, 128:11, 128:20, 132:7, 132:24, 136:2, 136:10

**specifications** [1] - 135:12

**specificity** [1] - 30:20

**specified** [3] - 21:20, 118:18, 121:2

**specify** [3] - 95:6, 116:21, 120:20

**spot** [2] - 104:21, 131:1

**spots** [1] - 139:17

**square** [1] - 42:18

**stage** [2] - 123:5, 123:14

**stages** [1] - 3:20

**stakes** [2] - 97:6, 97:25

**stand** [1] - 139:14

**standalone** [1] - 116:7

**start** [3] - 2:16, 6:9, 73:24

**started** [1] - 5:11

**starting** [1] - 6:11

**statement** [6] - 8:18, 16:18, 30:23, 32:10, 47:10, 80:4

**statements** [1] - 117:20

**STATES** [1] - 1:1

**states** [1] - 118:1

**stating** [1] - 47:15

**stay** [1] - 36:5

**stenographic** [1] - 144:17

**step** [11] - 19:1, 19:4, 20:16, 31:7, 75:16, 95:9, 95:10, 95:20, 97:13

**step-by-step** [1] - 31:7

**STEPHEN** [1] - 1:19

**Steve** [2] - 2:22, 105:17

**still** [27] - 12:10, 29:23, 29:25, 38:24, 40:20, 41:14, 41:24, 42:22, 42:23, 44:6, 54:22, 57:7, 75:6, 87:18, 109:20, 117:1, 121:14, 122:15, 122:16, 122:18, 123:3, 123:17, 126:2, 126:3, 135:19, 138:7, 143:18

**stimulus** [1] - 12:13

**stock** [1] - 68:7

**Stock** [2] - 68:7, 73:4

**stop** [2] - 38:23, 76:23

**storage** [16] - 117:11, 119:11, 120:1, 120:11, 120:25,

121:16, 122:9, 122:22, 123:3, 123:7, 123:17, 132:9, 132:25, 135:15, 139:19, 140:10

**store** [6] - 111:12, 112:4, 113:7, 115:10, 121:14, 132:9

**stored** [19] - 105:11, 112:14, 113:2, 113:5, 116:20, 116:22, 118:3, 118:18, 119:4, 119:6, 120:22, 121:1, 121:3, 121:23, 123:1, 124:21, 124:22, 135:21

**stored..** [1] - 111:5

**stores** [5] - 111:8, 115:13, 116:1, 116:4, 120:21

**stores..** [1] - 130:11

**storing** [2] - 128:17, 132:25

**straight** [1] - 50:2

**street** [1] - 78:2

**strength** [1] - 95:11

**strengthens** [1] - 85:23

**stress** [1] - 90:22

**strike** [1] - 89:25

**strikes** [3] - 87:11, 140:9, 140:11

**strip** [1] - 39:15

**stuff** [2] - 132:25, 141:8

**subject** [2] - 6:16, 31:8

**submission** [1] - 142:4

**submit** [4] - 22:7, 23:10, 85:8, 92:14

**submits** [1] - 85:4

**submitted** [7] - 5:1, 85:9, 142:15, 143:4, 143:6, 143:8, 143:15

**subscribe** [1] - 15:11

**subscribed** [1] - 15:19

**subscriber** [1] - 16:4

**subscribers** [1] - 15:11

**substance** [2] - 10:7, 10:8

**substantially** [3] - 49:4, 62:12, 62:14

**substituting** [1] - 11:1

**sufficient** [3] - 10:20,

68:14, 94:8

**suggest** [7] - 14:3, 24:6, 44:23, 70:12, 95:1, 95:17, 114:23

**suggested** [3] - 20:23, 50:5, 103:8

**suggesting** [7] - 8:20, 55:23, 71:6, 71:9, 72:2, 84:21, 140:4

**suggestion** [5] - 56:4, 88:14, 88:17, 114:24, 119:23

**suggests** [3] - 88:15, 119:4, 119:20

**sum** [1] - 35:22

**summarize** [1] - 13:16

**summarized** [1] - 57:14

**summary** [8] - 27:21, 106:4, 106:16, 119:7, 131:18, 132:17, 133:1, 140:20

**summed** [2] - 14:9, 14:17

**sums** [3] - 20:7, 20:9, 38:21

**superfluous** [13] - 18:9, 22:16, 26:3, 27:12, 94:21, 99:5, 99:10, 103:7, 104:12, 108:20, 116:19, 125:18, 136:15

**superfluousness** [1] - 18:10

**supplied** [2] - 35:2, 35:14

**supply** [2] - 35:3, 138:22

**support** [30] - 22:2, 23:7, 34:11, 35:1, 55:1, 55:13, 56:17, 57:8, 57:13, 57:21, 59:6, 61:21, 80:5, 80:25, 83:17, 84:10, 84:22, 85:9, 87:6, 87:23, 97:1, 117:19, 118:22, 120:1, 120:23, 123:10, 136:4, 136:12, 137:1, 138:20

**supported** [4] - 57:23, 63:18, 107:7, 120:19

**supporting** [2] - 80:23, 136:7

**supports** [3] - 62:22, 119:18, 120:23

**suppose** [3] - 26:1, 101:6, 115:17

**Surati** [15] - 6:6, 6:12, 9:1, 9:8, 10:18, 15:5, 15:10, 15:24, 17:21, 30:22, 31:1, 31:7, 32:15, 64:22, 141:17

**Surati's** [1] - 64:14

**surely** [1] - 129:11

**surmise** [1] - 139:21

**suspicion** [2] - 90:15, 90:17

**switches** [2] - 57:16, 57:17

**symbols** [1] - 42:19

**synonym** [5] - 52:2, 79:2, 128:25, 129:1, 129:13

**synonymous** [2] - 129:20, 130:4

**system** [46] - 6:23, 10:20, 11:7, 12:20, 16:15, 18:5, 18:7, 22:4, 22:11, 22:22, 22:25, 23:17, 23:23, 24:10, 24:11, 24:16, 24:25, 25:4, 25:6, 25:20, 26:4, 26:12, 27:9, 29:9, 30:14, 31:13, 31:17, 32:4, 32:6, 32:16, 33:10, 34:3, 34:25, 35:8, 36:1, 47:9, 50:24, 80:2, 106:1, 106:8, 106:10, 106:11, 110:14, 115:18, 125:9

**system's** [1] - 35:5

**systems** [2] - 23:8, 129:19

**T**

**table** [1] - 105:5

**tacitly** [1] - 96:17

**talks** [17] - 7:17, 13:19, 66:10, 66:21, 79:21, 79:24, 94:13, 99:20, 107:8, 107:23, 109:11, 109:16, 124:10, 128:17, 132:18, 133:2, 133:7

**tape** [1] - 68:15

**task** [59] - 49:12, 49:14, 49:25, 50:6, 77:20, 77:24, 77:25, 78:10, 78:12, 78:20, 79:15, 80:17, 80:19, 80:22, 80:24, 81:1, 81:2, 81:23, 83:15, 87:4, 87:13, 87:20,

88:6, 88:25, 89:2, 89:6, 91:17, 91:24, 92:3, 92:6, 92:13, 92:24, 93:5, 93:9, 93:10, 94:13, 95:11, 95:13, 95:19, 96:14, 97:4, 98:4, 98:21, 98:25, 99:4, 99:6, 99:17, 99:24, 100:10, 100:17, 101:2, 101:10, 101:13, 101:19, 102:16, 102:21, 103:5, 103:18, 103:22

**tasks** [1] - 107:2

**Team** [1] - 59:2

**teams** [1] - 87:14

**Teams** [2] - 42:16, 87:17

**tech** [1] - 67:4

**technical** [2] - 4:18, 30:24

**technique** [1] - 133:2

**Technologies** [2] - 2:11, 2:21

**TECHNOLOGIES** [1] - 1:4

**technology** [1] - 5:2

**Technopedia** [5] - 59:10, 59:20, 60:10, 61:11, 85:3

**Techopedia** [2] - 78:16, 79:21

**teed** [1] - 140:19

**teleconference** [2] - 143:3, 143:25

**telephonically** [1] - 2:4

**ten** [2] - 142:12, 142:14

**term** [101] - 4:1, 4:6, 4:17, 5:12, 5:20, 5:22, 5:23, 5:24, 5:25, 6:6, 6:8, 7:3, 7:5, 7:7, 7:15, 7:24, 8:12, 9:13, 17:11, 17:12, 20:14, 22:6, 23:24, 24:4, 25:9, 25:16, 28:2, 29:16, 34:21, 35:10, 35:11, 35:17, 36:5, 49:9, 52:8, 52:17, 52:18, 54:9, 55:11, 57:4, 62:15, 63:23, 64:5, 75:24, 76:3, 77:17, 77:20, 78:1, 83:8, 83:11, 84:19, 88:1, 91:12, 91:21, 91:22, 92:15, 94:7, 95:16,

96:17, 96:19, 96:24,
97:22, 98:6, 98:9,
99:1, 101:25, 102:5,
102:22, 105:1,
105:2, 108:14,
110:6, 110:19,
110:21, 110:22,
116:7, 117:18,
118:9, 118:24,
119:9, 119:13,
121:4, 121:9, 122:2,
122:12, 122:17,
122:21, 124:4,
127:19, 127:20,
128:15, 129:19,
132:4, 135:6,
135:13, 135:24,
137:18, 139:7,
140:13
**term-by-term** [1] -
5:23
**terms** [53] - 3:13, 3:23,
3:25, 4:3, 4:10, 4:12,
4:14, 5:14, 6:20,
7:18, 9:25, 10:1,
10:7, 13:10, 17:3,
33:2, 44:21, 46:3,
46:19, 53:8, 58:17,
63:7, 63:11, 63:13,
67:4, 81:9, 81:25,
83:11, 86:9, 88:10,
90:9, 92:10, 96:13,
100:7, 101:8,
105:19, 113:14,
117:2, 120:1, 122:7,
126:25, 127:8,
127:18, 128:1,
130:25, 133:16,
134:9, 137:1, 139:3,
139:14, 140:2,
140:14
**test** [1] - 135:14
**testimony** [1] - 35:2
**text** [30] - 10:7, 16:19,
47:18, 48:11, 50:15,
50:20, 53:16, 53:21,
53:22, 53:24, 53:25,
54:3, 54:15, 62:6,
72:22, 73:1, 73:3,
74:11, 86:23, 92:5,
93:25, 96:11, 97:11,
97:17, 99:13,
101:19, 101:21,
101:22, 103:21
**textbook** [5] - 6:16,
7:23, 8:8, 31:2, 31:8
**texts** [1] - 87:22
**THE** [175] - 1:1, 1:2,
2:5, 3:1, 3:8, 5:17,
5:19, 7:1, 7:21, 8:14,

9:10, 10:11, 11:4,
13:15, 14:19, 16:7,
17:10, 19:15, 20:5,
20:11, 21:11, 22:23,
24:15, 25:5, 25:22,
26:13, 27:13, 28:10,
28:21, 29:15, 29:20,
31:14, 33:6, 34:1,
34:13, 36:3, 36:25,
37:3, 38:23, 39:1,
39:7, 39:18, 40:25,
41:4, 41:6, 41:18,
42:10, 43:13, 44:9,
45:17, 46:5, 47:23,
49:2, 50:7, 52:1,
52:6, 53:17, 55:21,
57:24, 58:17, 59:20,
60:17, 61:9, 61:22,
62:17, 62:23, 63:21,
63:24, 64:12, 64:25,
65:14, 68:18, 69:13,
70:20, 71:3, 71:24,
72:7, 72:10, 72:20,
74:6, 75:5, 75:18,
76:16, 76:23, 77:6,
77:18, 77:23, 78:24,
79:14, 81:6, 81:22,
82:7, 82:19, 83:2,
84:12, 85:14, 86:13,
87:8, 87:24, 88:2,
89:23, 90:22, 91:12,
93:12, 94:10, 94:24,
96:2, 96:6, 97:6,
98:8, 99:15, 100:2,
100:11, 101:16,
102:7, 102:9,
102:24, 103:14,
103:16, 104:3,
104:7, 104:9, 105:2,
105:20, 106:15,
107:14, 108:23,
109:20, 111:3,
111:25, 112:16,
112:20, 113:9,
113:17, 113:24,
114:2, 115:6,
115:22, 116:11,
116:15, 116:24,
119:22, 120:12,
121:10, 122:3,
123:20, 124:23,
126:2, 126:23,
127:7, 128:22,
128:25, 129:8,
130:2, 130:9,
130:19, 130:21,
131:8, 131:16,
132:2, 132:19,
132:21, 133:8,
134:15, 135:2,
137:2, 137:23,

138:14, 138:24,
140:4, 143:1, 143:8,
143:16, 143:19,
144:4
**theirs** [2] - 9:18, 66:23
**theme** [1] - 63:10
**themselves** [3] - 2:14,
44:15, 107:8
**theoretically** [3] -
115:16, 115:18,
121:24
**theory** [1] - 33:21
**therefore** [7] - 76:5,
86:8, 92:19, 96:11,
102:17, 104:18,
121:25
**therein** [1] - 118:6
**they've** [7] - 35:25,
44:18, 53:13, 54:10,
58:23, 110:5, 121:2
**thinking** [3] - 14:20,
27:18, 140:23
**third** [3] - 49:7, 61:23,
62:9
**three** [5] - 3:15, 38:10,
41:10, 44:12, 95:9
**threshold** [2] - 20:17,
21:3
**threw** [1] - 65:17
**throughout** [1] - 31:11
**thrust** [1] - 133:20
**ticker** [2] - 68:7, 68:14
**tie** [8] - 35:17, 35:19,
35:20, 82:24, 82:25,
83:20, 85:22, 86:4
**tied** [10] - 12:25,
23:20, 32:21, 48:15,
51:5, 52:11, 60:16,
83:24, 89:7, 114:5
**ties** [1] - 9:9
**tighten** [1] - 83:5
**timing** [1] - 88:11
**title** [344] - 24:23, 36:5,
36:9, 36:12, 36:15,
37:9, 37:13, 37:23,
38:3, 38:4, 38:10,
38:12, 38:16, 39:2,
39:4, 39:5, 39:8,
39:12, 39:16, 39:22,
40:8, 40:11, 40:21,
40:23, 41:14, 42:5,
42:6, 42:7, 42:9,
42:10, 42:23, 42:24,
43:2, 43:4, 43:5,
43:14, 44:2, 45:5,
45:8, 45:13, 45:16,
45:24, 45:25, 46:3,
46:9, 46:10, 46:12,
46:13, 46:16, 46:22,
46:24, 47:1, 47:15,

47:17, 47:19, 48:7,
48:9, 48:10, 48:15,
48:20, 48:24, 49:3,
49:11, 50:15, 50:18,
50:19, 50:21, 50:22,
50:25, 51:1, 51:9,
51:10, 51:11, 51:12,
51:20, 51:21, 52:14,
52:15, 52:19, 52:20,
52:25, 53:5, 53:21,
53:25, 54:6, 54:7,
54:8, 54:16, 55:5,
55:20, 56:1, 56:4,
56:9, 57:15, 57:18,
57:19, 58:22, 58:24,
58:25, 59:2, 59:4,
61:16, 62:4, 62:6,
62:10, 62:13, 63:16,
66:4, 66:25, 67:9,
67:19, 67:20, 67:23,
67:25, 68:2, 68:4,
68:8, 68:10, 68:11,
68:12, 68:13, 68:14,
69:8, 69:10, 69:11,
69:12, 69:13, 70:10,
70:17, 72:22, 72:25,
73:1, 73:5, 73:9,
73:13, 73:15, 73:16,
73:20, 73:21, 73:22,
73:23, 73:24, 74:1,
74:2, 74:3, 74:4,
74:5, 74:11, 74:15,
74:16, 74:21, 74:22,
74:25, 75:1, 75:4,
75:5, 75:6, 75:7,
75:9, 75:10, 75:11,
75:12, 75:14, 75:17,
76:12, 77:9, 77:11,
77:13, 77:14, 80:20,
80:21, 81:24, 83:10,
83:15, 84:7, 87:1,
87:3, 87:9, 91:13,
91:17, 91:23, 91:24,
92:2, 92:3, 92:6,
92:8, 92:9, 92:10,
92:12, 92:18, 92:20,
92:22, 92:23, 92:24,
92:25, 93:1, 93:5,
93:8, 93:9, 93:10,
93:17, 93:19, 93:20,
93:21, 93:24, 94:2,
94:3, 94:4, 94:13,
94:14, 94:18, 94:19,
94:22, 94:23, 95:2,
95:11, 95:13, 95:15,
95:18, 95:21, 95:23,
95:25, 96:1, 96:9,
96:12, 96:14, 96:18,
97:4, 97:12, 97:17,
97:21, 98:1, 98:2,
98:3, 98:4, 98:6,

98:10, 98:14, 98:19,
98:21, 98:23, 98:25,
99:3, 99:4, 99:6,
99:11, 99:12, 99:13,
99:17, 99:21, 99:22,
99:23, 99:24, 100:4,
100:5, 100:6, 100:8,
100:9, 100:13,
100:14, 100:16,
100:17, 100:23,
101:2, 101:3, 101:5,
101:9, 101:12,
101:19, 101:21,
102:15, 102:16,
102:17, 102:18,
102:19, 102:20,
102:21, 103:3,
103:4, 103:10,
103:11, 103:12,
103:14, 103:16,
103:17, 103:18,
103:20, 103:21,
103:25, 104:2,
104:19, 104:22,
104:23, 105:1,
139:21, 139:23
**titles** [3] - 53:16,
93:17, 93:19
**today** [12] - 2:22, 3:15,
4:10, 12:5, 29:18,
56:12, 58:4, 63:7,
81:10, 117:25,
140:12, 144:9
**today's** [3] - 4:15,
142:13, 142:14
**together** [1] - 141:2
**took** [1] - 67:14
**tool** [7] - 49:14, 83:25,
86:14, 86:16, 86:19,
86:20, 87:16
**top** [9] - 39:22, 52:14,
52:22, 59:1, 62:20,
68:9, 68:15, 69:19
**total** [1] - 119:25
**totally** [3] - 31:19,
122:13, 126:11
**touch** [1] - 25:25
**track** [1] - 3:17
**transcript** [1] - 144:17
**trial** [1] - 140:20
**tricky** [1] - 71:16
**tried** [1] - 47:21
**trigger** [46] - 6:25,
9:13, 9:23, 10:14,
10:21, 10:22, 11:13,
12:8, 13:2, 13:12,
14:1, 14:5, 16:3,
16:13, 16:14, 16:16,
16:21, 16:25, 19:23,
20:20, 21:2, 21:3,

21:16, 22:4, 22:9, 22:10, 22:11, 22:17, 23:1, 23:3, 26:17, 27:5, 31:18, 32:5, 32:6, 32:9, 33:3, 33:11, 33:21, 33:22, 34:5, 34:15, 34:17, 34:23, 34:24, 36:1
**triggered** [3] - 11:24, 16:4, 17:5
**triggering** [9] - 14:6, 14:24, 15:1, 16:24, 24:17, 32:21, 33:10, 33:14, 34:3
**triggers** [4] - 6:20, 7:17, 10:16, 13:10
**trouble** [2] - 44:18, 133:22
**true** [13] - 19:19, 34:20, 59:1, 63:14, 114:9, 120:14, 120:15, 120:18, 122:19, 125:8, 140:1, 144:16
**try** [9] - 3:18, 9:15, 31:3, 60:18, 72:4, 81:11, 83:6, 140:6, 144:5
**trying** [13] - 14:20, 40:15, 60:21, 63:10, 63:14, 74:13, 86:15, 101:25, 106:25, 121:8, 126:11, 135:13, 139:25
**Tuesday** [1] - 12:5
**TUNNELL** [1] - 1:21
**turn** [20] - 4:20, 4:23, 5:7, 5:11, 6:2, 20:13, 21:5, 36:6, 52:7, 63:25, 69:10, 77:23, 83:7, 83:8, 91:13, 96:3, 105:16, 117:4, 127:14, 133:10
**turned** [4] - 66:12, 70:18, 70:22, 70:25
**tweaking** [1] - 66:15
**twice** [2] - 12:1, 65:25
**two** [36] - 6:1, 31:16, 31:21, 43:8, 44:13, 44:14, 55:1, 68:19, 76:8, 77:19, 78:3, 90:9, 97:22, 99:10, 101:8, 104:11, 104:21, 105:5, 105:6, 105:13, 105:23, 106:21, 107:10, 111:17, 113:5, 113:6, 117:13, 126:25, 127:8, 127:18,

130:9, 130:10, 133:16, 134:5, 134:9, 141:15
**type** [13] - 12:13, 12:14, 12:18, 13:5, 14:12, 23:2, 51:19, 62:16, 68:12, 73:17, 73:22, 74:13, 110:17
**types** [1] - 23:3
**typical** [4] - 28:5, 39:11, 42:2, 84:4
**typically** [57] - 15:8, 36:14, 36:17, 36:22, 37:7, 37:8, 37:11, 37:13, 37:15, 37:21, 37:25, 38:2, 38:13, 38:18, 39:25, 40:3, 40:6, 40:14, 40:19, 43:10, 43:14, 43:20, 44:3, 44:4, 45:4, 45:10, 45:14, 45:18, 45:25, 50:11, 50:13, 51:7, 53:12, 55:6, 55:7, 55:15, 55:17, 56:20, 56:21, 57:5, 58:2, 58:14, 59:11, 60:9, 65:22, 65:23, 65:24, 66:8, 66:10, 66:21, 69:4, 70:15, 74:9, 76:10, 87:2, 87:4

**U**

**U.S** [1] - 144:19
**ubiquitous** [1] - 42:19
**ultimately** [6] - 11:14, 62:24, 90:19, 133:15, 138:25, 139:6
**unclear** [1] - 100:3
**uncomfortable** [1] - 133:16
**undated** [8] - 64:6, 64:7, 64:10, 78:5, 83:22, 85:2, 85:3, 86:11
**under** [9] - 59:18, 60:18, 76:7, 81:7, 101:15, 104:16, 123:5, 123:8, 144:5
**underlying** [2] - 90:24, 91:2
**understood** [9] - 7:15, 9:10, 43:15, 72:9, 76:9, 77:8, 95:22, 108:7, 119:24
**undisputed** [2] - 85:25, 119:10
**UNITED** [1] - 1:1

**unless** [8] - 4:18, 5:9, 17:8, 29:21, 48:22, 51:11, 141:19, 144:8
**unmistakable** [4] - 117:22, 118:23, 119:9, 122:1
**unmistakably** [1] - 135:20
**unsupportable** [1] - 99:14
**untethered** [1] - 102:23
**up** [34] - 4:3, 4:11, 4:21, 4:23, 5:10, 5:14, 5:22, 14:9, 14:18, 20:8, 20:9, 24:23, 26:13, 28:8, 28:18, 29:7, 29:11, 38:21, 44:20, 64:9, 67:9, 71:13, 77:2, 83:5, 85:15, 87:10, 103:3, 104:21, 107:11, 138:18, 140:19, 141:4, 142:15, 142:20
**update** [2] - 107:25, 108:16
**updates** [16] - 106:1, 106:12, 106:19, 107:17, 107:22, 108:5, 108:9, 109:6, 109:7, 109:25, 110:9, 111:22, 124:24, 126:6, 126:15, 126:16
**updates ..** [1] - 105:7, 108:24
**updating** [7] - 107:4, 108:12, 108:22, 109:2, 109:12, 125:3, 126:8
**upfront** [1] - 8:6
**upheld** [1] - 123:14
**usage** [1] - 94:2
**useful** [1] - 92:16
**user** [11] - 23:13, 25:19, 29:6, 39:15, 41:12, 41:15, 123:22, 123:23, 129:11, 129:12, 130:4
**users** [1] - 130:2
**uses** [9] - 9:18, 9:19, 27:3, 101:18, 108:19, 118:9, 132:22, 137:7
**utilized** [1] - 72:25

**V**

**vacuum** [1] - 7:9
**vague** [1] - 117:20
**validity** [1] - 90:16
**vein** [2] - 18:12, 19:2
**verb** [1] - 76:13
**verbiage** [1] - 76:11
**version** [2] - 15:6, 42:17
**versus** [8] - 2:11, 10:14, 14:22, 17:20, 30:1, 113:7, 130:6, 134:14
**via** [1] - 98:13
**viability** [1] - 85:23
**viable** [1] - 64:16
**video** [6] - 2:9, 4:18, 4:22, 4:23, 76:19, 144:9
**view** [12] - 14:8, 14:24, 26:25, 71:18, 71:20, 81:21, 111:10, 112:17, 128:23, 134:16, 137:9, 139:13
**viewing** [1] - 37:17
**vouch** [1] - 64:22

**W**

**waiting** [1] - 4:20
**waived** [4] - 54:24, 56:16, 58:18, 76:5
**walk** [1] - 24:18
**walking** [2] - 54:11, 78:1
**wants** [3] - 44:11, 49:11, 98:13
**water** [1] - 65:25
**ways** [5] - 24:25, 55:23, 90:14, 106:21, 107:10
**wear** [2] - 70:7, 70:8
**wears** [2] - 70:8, 70:9
**web** [21] - 112:14, 112:17, 113:2, 113:10, 113:11, 113:15, 116:2, 116:6, 116:8, 116:12, 116:23, 119:23, 120:4, 120:8, 121:12, 122:14, 122:18, 122:23, 123:4, 123:17
**weber** [1] - 22:23, 27:13, 29:22, 31:21, 34:1, 53:17, 55:21, 62:23, 63:22, 71:13,

75:20, 76:25, 83:8, 84:12, 85:14, 87:24, 89:25, 91:9, 97:6, 99:15, 102:7, 104:7, 104:10, 117:4, 119:22, 122:3, 123:8, 133:11, 133:12, 137:5, 137:12, 138:15, 138:24, 143:1, 143:13
**Weber** [3] - 3:7, 21:8, 76:16
**WEBER** [66] - 1:24, 21:7, 21:12, 23:5, 24:19, 25:13, 25:25, 27:1, 27:20, 28:16, 29:2, 29:17, 34:8, 34:17, 52:9, 54:6, 56:25, 58:10, 59:8, 60:2, 61:2, 61:19, 62:15, 62:19, 63:4, 63:23, 75:22, 76:21, 77:4, 77:7, 83:9, 84:15, 85:25, 86:18, 87:20, 87:25, 91:10, 96:4, 96:7, 97:24, 98:16, 100:1, 100:3, 101:4, 101:23, 102:8, 104:11, 117:6, 120:6, 120:18, 121:19, 123:2, 124:6, 124:25, 126:12, 127:5, 133:21, 134:23, 135:4, 138:17, 139:16, 143:2, 143:14, 143:17, 144:2, 144:11
**website** [2] - 85:3, 86:11
**Wednesday** [1] - 1:12
**welcome** [1] - 2:5
**well-established** [1] - 140:1
**well-founded** [1] - 93:11
**well-informed** [1] - 90:17
**were's** [1] - 115:24
**whereas** [3] - 46:15, 51:6, 136:9
**which ..** [1] - 39:23
**whichever** [1] - 129:19
**whole** [7] - 17:23, 31:19, 48:12, 64:9, 72:16, 106:25, 127:22
**wide** [7] - 49:4, 49:20,

49:22, 53:7, 62:13, 62:14, 91:22

**willy** [1] - 51:2

**Wilmington** [1] - 1:11

**window** [43] - 23:14, 36:11, 37:24, 38:7, 39:22, 46:7, 46:23, 46:25, 47:2, 47:14, 50:10, 51:4, 51:5, 52:14, 52:16, 52:20, 52:21, 52:23, 53:6, 53:10, 53:18, 53:20, 53:21, 53:23, 54:14, 54:18, 55:6, 55:17, 57:15, 59:16, 60:8, 62:5, 62:21, 67:13, 68:6, 68:9, 68:16, 69:20, 74:13, 79:24, 80:7, 86:23

**Window** [12] - 47:3, 47:5, 47:7, 47:13, 47:16, 48:4, 48:8, 48:11, 48:21, 48:23, 49:1

**window-specific** [1] - 80:7

**Window-specific** [2] - 47:5, 47:7

**Windows** [14] - 30:14, 47:9, 47:12, 48:22, 52:12, 79:24, 79:25, 80:1, 80:8, 80:9

**windows** [8] - 38:11, 47:3, 80:3, 80:4, 80:10, 80:14, 83:25, 88:16

**Winthrop** [1] - 3:7

**WINTHROP** [1] - 1:23

**wish** [2] - 25:24, 144:7

**wonder** [1] - 140:20

**wondered** [1] - 11:14

**woods** [1] - 7:13

**word** [46] - 6:10, 7:19, 10:23, 11:1, 11:2, 11:3, 11:8, 12:17, 18:9, 18:10, 18:11, 19:8, 27:4, 28:13, 37:21, 39:23, 40:19, 45:6, 47:5, 47:13, 47:19, 49:15, 49:16, 50:3, 54:7, 65:22, 65:23, 66:8, 69:7, 69:14, 69:25, 70:12, 70:15, 70:23, 72:3, 72:4, 92:22, 92:25, 93:1, 93:16, 94:2, 102:19, 104:24, 109:22, 130:3

**Word** [2] - 29:7, 29:11

**wordier** [1] - 17:2

**wording** [1] - 41:21

**words** [49] - 10:5, 10:6, 30:17, 32:3, 34:4, 37:5, 37:12, 51:3, 55:18, 56:3, 58:16, 72:11, 72:12, 72:13, 72:14, 72:15, 74:16, 74:17, 77:12, 86:12, 87:17, 94:25, 96:10, 97:9, 97:16, 97:20, 97:22, 98:12, 109:23, 109:24, 111:11, 112:5, 112:6, 112:7, 112:9, 115:11, 118:3, 119:14, 119:16, 125:23, 126:3, 126:7, 129:10, 132:5, 132:10, 132:22, 134:16

**works** [7] - 15:7, 15:14, 15:18, 16:1, 16:5, 32:18, 72:11

**world** [9] - 15:13, 15:18, 16:6, 16:8, 39:3, 56:22, 113:9, 115:11, 121:24

**worry** [1] - 143:25

**worrying** [1] - 100:20

**worth** [1] - 140:8

**written** [4] - 96:19, 96:25, 102:4, 126:7

**wrote** [1] - 11:5

# Y

**years** [2] - 8:4, 8:10

**York** [2] - 68:7, 73:4

**yourself** [1] - 89:3

EXHIBIT B

Trials@uspto.gov                                                              Paper 18
571-272-7822                                                      Entered: July 13, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LINKEDIN CORPORATION,
Petitioner,

v.

EBUDDY TECHNOLOGIES B.V.,
Patent Owner.

———————————

IPR2022-00164
Patent 8,230,135 B2

———————————

Before JAMESON LEE, JASON M. REPKO, and
JULIET MITCHELL DIRBA, *Administrative Patent Judges.*

REPKO, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2022-00164
Patent 8,230,135 B2

# I.   INTRODUCTION

LinkedIn Corporation ("Petitioner") filed a petition requesting *inter partes* review of claims 1–3 and 6–10 of U.S. Patent No. 8,230,135 B2 (Ex. 1001, "the '135 patent"). Paper 2 ("Pet."). eBuddy Technologies B.V. ("Patent Owner") filed a Preliminary Response. Paper 11 ("Prelim. Resp.").

We authorized additional briefing on (1) whether we should exercise our discretion to deny the petition based on the parallel co-pending litigation and (2) the significance of the differences and alleged inconsistencies between Patent Owner's claim-construction brief in district court and its Preliminary Responses here. Paper 12 (authorizing the first reply and sur-reply on the first topic), Paper 15 (authorizing the second reply and sur-reply on the second topic). Petitioner filed two Replies. Paper 13 ("First Reply"), Paper 16 ("Second Reply"). Petitioner filed two Sur-Replies. Paper 14 ("First Sur-reply"), Paper 17 ("Second Sur-reply").

To institute an *inter partes* review, we must determine "that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). For the reasons discussed below, Petitioner has shown a reasonable likelihood that it would prevail with respect to at least one claim challenged in the Petition. And we have not been provided a sufficient reason to exercise our discretion to deny institution. Thus, we institute an *inter partes* review.

## A.   *Related Matters*

According to the parties, the '135 patent has been asserted in *eBuddy Technologies B.V. v. LinkedIn Corporation*, No. 1:20-cv-01501 (D. Del.). Pet. 1; Paper 3, 1. Petitioner also identifies IPR2022-00164 as related. Paper 9, 1.

IPR2022-00164
Patent 8,230,135 B2

### B. The '135 Patent

The '135 patent relates to notifications for emails, instant messages (IM), and other "events." Ex. 1001, 1:62–2:9; 4:63–64, 5:20–23. To notify the user, the system displays a message in a title bar of a window or task bar. *Id.* at 6:13–19. Figures 3C and 3D are screenshots of an example IM notification. *Id.* at 2:20–21. Figure 3C is reproduced below.



FIG. 3C

Although not readily visible from Figure 3C, above, taskbar item 306 and titlebar 308 indicate that the site www.ebuddy.com is open in a web browser. *Id.* at 5:41–65.

The system changes both the title bar and task bar when a new message is received. *Id.* at 5:65–67. In Figure 3D, the text of titlebar 312 and taskbar item 310 have been changed in response to the new message. *Id.* at 6:1–16. In particular, when "an event that calls for user notification is processed," the system generates a title string for the event. *Id.* at 9:15–26.

3

IPR2022-00164
Patent 8,230,135 B2

Title strings are stored in an array. *Id.* at 9:27–29. The string is sent from the array to a process. *Id.* at 9:35–37. The process can be an IM client in the Windows operating system, for example. *Id.* The string is then displayed as the title. *Id.* at 9:34–40. For an IM client in Windows, this means that the string is shown at least in the title bar of the open window. *Id.* at 9:40–48.

### C.   Claims

Claim 1, below, is independent, and claims 2, 3, and 6–10 depend from claim 1.

> 1. A method comprising:
>
>> receiving information of an event that calls for user notification;
>>
>> generating an event notification for the event;
>>
>> associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device;
>>
>> providing the at least one of the plurality of character strings in the title array to a process executed by a processor;
>>
>> providing an alternative title based on the at least one of the plurality of character strings to the process;
>>
>> using the alternative title as a title in association with the process.
>
> Ex. 1001, 12:42–56.

IPR2022-00164
Patent 8,230,135 B2

*D. Asserted References*

| Name | Reference | Exhibit No. |
|------|-----------|-------------|
| Eaton | US 2003/0208545 A1, published Nov. 6, 2003 | 1006 |
| Cheung | US 2004/0061716 A1, published Apr. 1, 2004 | 1007 |
| Kim | KR 2000-0036288,[1] published July 5, 2000 | 1008 |
| Odell | US 7,590,696 B1, issued Sept. 15, 2009 | 1016 |

*E. Asserted Grounds*

Petitioner asserts that claims 1–3 and 6–10 are unpatentable on the following grounds. Pet. 4–5.

| Claims Challenged | Pre-AIA[2] 35 U.S.C. § | Reference(s)/Basis |
|-------------------|------------------------|--------------------|
| 1–3, 6, 7, 9 | 102 | Eaton |
| 1–3, 6, 7, 9 | 103 | Eaton |
| 1–3, 6–10 | 103 | Eaton, Cheung, Odell |
| 1–3, 9 | 102 | Kim |
| 1–3, 9 | 103 | Kim |
| 1–3, 6–10 | 103 | Kim, Cheung |

II.  ANALYSIS

*A. Discretionary Denial Under 35 U.S.C. § 314(a)*

Under § 314(a), the Director has discretion to deny institution of a petition for *inter partes* review. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016). In determining whether to exercise that discretion on behalf of the Director, the Board considers an early trial date in related litigation, among other factors, as part of an assessment of all relevant circumstances of the case—including the merits—to balance considerations

---

[1] We refer to Petitioner's certified English-language translation of Kim.
[2] Congress amended § 103 when it passed the Leahy-Smith America Invents Act (AIA). Pub. L. No. 112–29, § 3(c), 125 Stat. 284, 287 (2011). Here, the previous version of § 103 applies.

IPR2022-00164
Patent 8,230,135 B2

such as system efficiency, fairness, and patent quality. *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 5 (PTAB Mar. 20, 2020) (precedential). For example, "concerns of inefficiency and the possibility of conflicting decisions" are implicated when the same prior art is submitted in district court and to the Board. *Fintiv*, Paper 11 at 12.

According to our precedent, one way to mitigate those concerns is for a petitioner to present a stipulation not to pursue in a parallel proceeding the same grounds or any grounds that could have reasonably been raised before the Board. *Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 19 (PTAB Dec. 1, 2020) (precedential); *accord* Katherine K. Vidal, Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation (June 21, 2022) ("Consistent with [*Sotera*], the PTAB will not discretionarily deny institution in view of parallel district court litigation where a petitioner presents a stipulation not to pursue in a parallel proceeding the same grounds or any grounds that could have reasonably been raised before the PTAB.").[3] Such a "stipulation ensures that an *inter partes* review is a 'true alternative' to the district court proceeding." *Sotera*, Paper 12 at 19 (citing *Sand Revolution II LLC v. Cont'l Intermodal Grp.*, IPR2019-01393, Paper 24, 12 n.5 (PTAB June 16, 2020) (informative, designated July 13, 2020)).

Here, it is undisputed that "the entirety of [Petitioner's] arguments in the Petition are also made in the co-pending litigation" between the parties (referred to as "the Delaware Action"[4]). First Sur-reply 4. But Petitioner

---

[3] https://www.uspto.gov/sites/default/files/documents/
interim_proc_discretionary_denials_aia_parallel_district_court_litigation_m
emo_20220621_.pdf

[4] *eBuddy Tech. B.V. v. LinkedIn Corp.*, No. 1:20-cv-01501 (D. Del.)

IPR2022-00164
Patent 8,230,135 B2

asserts that it "will file in the parallel district court litigation a stipulation that, if IPR is instituted, it will not pursue in the parallel litigation any ground that is raised or that could have reasonably been raised in an IPR." Pet. 85–86.

Although Petitioner has not yet filed a stipulation in the Delaware Action (First Sur-reply 4), Petitioner's assurances in the Petition that it will file such a stipulation are sufficient to mitigate concerns over duplication because the Petition provides Patent Owner with a written record. *See, e.g.*, *Micron Tech., Inc.*, *v. Vervain, LLC*, IPR2021-01547, Paper 13 at 39 (PTAB Apr. 8, 2022) ("With Petitioner's representations made in the Petition, Patent Owner has a written record of Petitioner's assurances and we see no reason to require more.").

Petitioner's stipulation broadly covers "any ground that is raised or that could have reasonably been raised in an IPR" (Pet. 85–86), like the one in *Sotera* (Paper 12 at 19). Such a broad stipulation "mitigates any concerns of duplicative efforts between the district court and the Board, as well as concerns of potentially conflicting decisions." *Sotera*, Paper 12 at 19; *see also Sand Revolution II*, Paper 24 at 12 n.5.

We disagree with Patent Owner that Petitioner's use of the term "ground" renders the stipulation unclear. *See* First Sur-reply 4. In the case cited by Patent Owner, the petitioner stipulated that it "will not pursue in their current district court proceedings . . . any of the same prior art grounds presented in an instituted IPR petition(s)." *Google, Inc. v. Agis Soft. Development, LLC,* IPR2020-00873, Paper 16 at 14 (PTAB Nov. 25, 2020), *cited in* First Sur-reply 4. There, the Board noted that "Petitioner could still rely on the same prior art for many of the same claim elements so long as it also includes another prior art reference in a manner that would, at least

7

IPR2022-00164
Patent 8,230,135 B2

arguably, establish the ground to be a 'different' ground than the ones presented here." *Id.* By contrast, Petitioner's stipulation covers grounds "that could have reasonably been raised." Pet. 85–86. In this way, Petitioner's stipulation is broader than the one in *Google*, and does not raise the same concerns that the Board had about limiting the stipulation to the "specific grounds asserted in the Petition." *Google*, Paper 16 at 14.

Because Petitioner's stipulation eliminates the inefficiency of duplicative efforts and the possibility of conflicting decisions, we decline to exercise our authority to deny institution of *inter partes* review based on the parallel litigation.

### B. Level of Ordinary Skill in the Art

Petitioner asserts that a person having ordinary skill in the art

> would have a Bachelor's degree in Computer Science, Computer Engineering, Electrical Engineering, or a related field, plus at least two years of professional experience in telecommunications or computer networking, and would have been familiar with popular Internet applications like web browsers, Google's Gmail, AOL Instant Messenger, ICQ, Jabber, Trillian, and Yahoo Instant Messenger; development using Microsoft Windows, Java, Linux and the X-Window System (X11); and Internet Engineering Task Force (IETF) standards including "Extensible Messaging and Presence Protocol (XMPP): Core."

Pet. 6 (citing Ex. 1004 ¶¶ 32–35).

Petitioner's alternative definition that "a PHOSITA would possess equivalent additional formal education such as graduate studies, or work experience to replace formal education" is unclear or, at best, does not meaningfully contribute to the first definition. *See id.* For example, Petitioner does not explain whether or how additional graduate studies would be both equivalent and additional to the education described in the first definition. *See id.*

8

IPR2022-00164
Patent 8,230,135 B2

Patent Owner asserts that a person having ordinary skill in the art "would be someone with a bachelor's degree in computer science or electrical engineering, along with two or more years of experience with instant messaging and web-based servers and client systems." Prelim. Resp. 15 (citing Ex. 2009 ¶ 23). Patent Owner's declarant, Dr. Surati, testifies:

> It is my belief that a POSITA [person with ordinary skill in the art] of the '135 patent would have possessed:  a bachelor's degree in computer science or electrical engineering, along with two or more years of experience with instant messaging and web-based servers and client systems. *If the qualifications of a POSITA were as stated by Petitioner's expert Dr. Willis.* As noted above and on my CV [Ex. 2017], my qualifications exceed this description.

Ex. 2009 ¶ 23 (emphasis added). The italicized sentence in the paragraph above is ungrammatical and unclear. It could be interpreted in multiple contradictory ways: The sentence could mean that, in rendering his opinions, Dr. Surati has assumed the level of ordinary skill as stated by Dean Willis. Or it could mean that, "if the qualifications of a POSITA were as stated by Petitioner's expert Dr. Willis," Dr. Surati's qualifications exceed those qualifications.

Nevertheless, we see no meaningful difference between Petitioner's definition and Patent Owner's. Rather, Patent Owner's definition appears to be a simplified version of Petitioner's. To the extent that Patent Owner disagrees, Patent Owner is encouraged to explain how the differences affect the obviousness analysis. Also, we preliminarily determine that Petitioner's definition is supported by the testimony of Dean Willis (Ex. 1004 ¶¶ 32–35) and is consistent with the level of skill reflected in the asserted references (*cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that the prior art itself can reflect an appropriate level of skill in the art)).

IPR2022-00164
Patent 8,230,135 B2

Thus, in this decision, we apply Petitioner's proposed definition, without the alternative qualifier about "equivalent additional formal education . . . or work experience." *See* Pet. 6.

### C.   *Claim Construction*

For petitions filed on or after November 13, 2018, we use the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of the claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b). The Petition was filed on November 9, 2021. Paper 5. So we apply the claim construction standard from *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Under the *Phillips* standard, claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence. *Id.* at 1312–17. But extrinsic evidence is "less significant" than the intrinsic record. *Id.* at 1317. The specification is the "single best guide" to a disputed term's meaning. *Id.* at 1315. It "may reveal a special definition given to a claim term." *Id.* at 1316. Or it may reveal "an intentional disclaimer, or disavowal, of claim scope." *Id.*

### 1.   *"title array"*

Petitioner asserts that "[t]he '135 Patent discloses that a 'title array' is simply a table or list of event information or event strings." Pet. 29 (citing Ex. 1001, 7:54–8:19).

Petitioner asserts that "[a]n 'array' is a fundamental data structure for storing information well-known to a PHOSITA." *Id.* at 67 (citing Ex. 1004

IPR2022-00164
Patent 8,230,135 B2

¶ 214). To support this assertion, Petitioner cites a definition from a reference from 1983 about the Smalltalk system: an "'array is a simple data structure object whose contents can be referenced by an integer index from one to a number that is the size of the array,' such as an exemplary 'array of seven strings described by the expression # ('food' 'utilities' 'rent' 'household' 'transportation' 'taxes' 'recreation').'" *Id.* (quoting Ex. 1015 ¶ 43).

According to Patent Owner, "title array" means "an array that contains title strings and is stored in a computer readable medium" (Prelim. Resp. 4 (citing Ex. 1001, Fig. 6, 8:11–19)), and "array" means "a list of data values, all of the same type, any element of which can be referenced by an expression consisting of the array name followed by an indexing expression. Arrays are data structures . . . ." (*id.* (citing Ex. 2009 ¶ 42, Ex. 2016)).

Patent Owner alleges that Petitioner's implied construction of "array" is "a simple data structure object whose contents can be referenced by an integer index from one to a number that is the size of the array." *Id.* at 60 (citing Pet. 67). Patent Owner agrees "that an array is a 'data structure object whose contents can be referenced by an integer index.'" *Id.* at 58 (citing Pet. 67). But Patent Owner argues that "something more than a mere displayed 'list' is required." *Id.* at 59.

We need only construe terms that are in controversy and to the extent necessary to resolve the dispute. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)). Patent Owner argues that "[i]t is not necessary for the Board to resolve this claim construction dispute for purposes of this Preliminary Response because both

IPR2022-00164
Patent 8,230,135 B2

Petitioner and Patent Owner agree, correctly, that arrays are data structures."
Prelim. Resp. 59 n.5. We agree with Patent Owner on this point. *See id.* That
is, we construe the term "title array" to require a data structure, which is not
disputed. But other than that, we need not further construe the term at this
stage.

### 2.   *"titlebar"*

In the related litigation, Petitioner argues that "titlebar" means "a
horizontal space at the top of a window that contains the name of the
window." Ex. 2001, 23–24, *discussed in* Prelim. Resp. 37. Petitioner does
not expressly construe "titlebar" in the Petition. *See, e.g.*, Pet. 5, 32–43. But
Dean Willis, Petitioner's declarant, testifies that the area at the top of a user
interface is a title bar:

> Further, [Eaton's] display 420 and its display items shown in
> Figure 4 above is at the top of the user interface *and therefore*
> corresponds to a title bar of the user interface display of IM
> device 320.

Ex. 1004 ¶ 113 (emphasis added), *discussed in* Prelim. Resp. 39. Petitioner
relies on Dean Willis's definition in its analysis of Eaton. Pet. 34–35 (citing
Ex. 1004 ¶¶ 113–114). Unlike the construction offered in district court,
Petitioner's implicit construction refers to the top of a user interface, not a
window. *Compare id.*, *with* Ex. 2001, 23–24.

According to Patent Owner, "titlebar" means "'a bar located or
positioned at the top of the window, that displays information about the
application and includes buttons for minimizing, maximizing or closing the
window displaying the application.'" Prelim. Resp. 17 (citing Ex. 2009
¶¶ 36–37; Ex. 2010). Patent Owner argues that Eaton lacks a title bar under
the proper construction. *See, e.g.*, *id.* at 36. Patent Owner asserts that

IPR2022-00164
Patent 8,230,135 B2

"[w]indows may be displayed on user interfaces, but windows are not themselves user interfaces." *Id.*

For the reasons discussed in Section II.D, we preliminarily determine that Kim discloses the "titlebar" under both the Petition's implicit construction (Pet. 34–35) and Patent Owner's construction (Prelim. Resp. 17). At this stage, the distinction between a user interface and a window does not appear to be relevant to the disputed issues connected to Eaton. *See supra* § II.F. And the question of whether the title bar must include buttons for minimizing, maximizing or closing, as in Patent Owner's construction, is not germane to resolution of any issue at this stage. *See* Prelim. Resp. 17. Thus, we need not provide a full construction of "titlebar" in this Decision. *See id.* at 36. Rather, we provide an analysis under both the Petition's implicit construction—i.e., the area at the top of a user interface—and a partial construction based on Patent Owner's argument—i.e., the area at the top of a window. Pet. 34–35; Prelim. Resp. 17.

### 3. *"taskbar"*

According to Patent Owner, "taskbar" means "a bar, usually located at the bottom of a graphical user interface, that serves as a launching pad for applications and a holder for icons in indicating running programs." Prelim. Resp. 18 (citing Ex. 2009 ¶¶ 37–38; Ex. 2011; Ex. 2012).

We do not need to construe the term "taskbar" to resolve the dispute at this stage: As discussed in Section II.F, Petitioner does not argue that Eaton discloses the recited task bar. Rather, Petitioner asserts that "[t]o the extent that it is argued or found that the event notifications provided in Eaton are not provisioned for display in a titlebar or taskbar of a display device (which they are, *at least in the titlebar . . . .*)" Pet. 39 (emphasis added). Although Petitioner uses the phrase "at least" here, Petitioner offers no

13

IPR2022-00164
Patent 8,230,135 B2

alternative rationale for why Eaton discloses, teaches, or suggests the recited "taskbar." *See id.* at 32–43. As for the other grounds, we preliminarily determine that Petitioner has shown that Kim discloses the recited taskbar even under Patent Owner's construction. *See* § II.D. Whether the other references, Cheung and Odell, teach or suggest this limitation in combination with Eaton or Kim does not affect whether we institute review here.

Thus, we do not construe "taskbar" in this decision. *Nidec*, 868 F.3d at 1017.

### 4. "event" and "event notification"

Patent Owner argues that the '135 Patent relates to "event-based programming." Prelim. Resp. 18. According to Patent Owner, "event" in this context means a "detectable condition of a system that can trigger a notification." *Id.* (citing Ex. 2009 ¶¶ 31–35; Ex. 2013; Ex. 2014; Ex. 2015). According to the Surati Declaration, "a condition must be detectable to be called an event," and a "notification" means "an event-triggered signal sent to a run-time-defined recipient." Ex. 2009 ¶ 30 (citing Ex. 2013, 3). Patent Owner argues that "an event notification is what is sent if a condition of a computer system meets the criteria for an event notification being issued by the system." Prelim. Resp. 21. Under Patent Owner's reasoning, data cannot be a notification of itself. *Id.* at 56.

Petitioner does not provide an explicit construction for "event" or "event notification." *See* Pet.

As discussed in Section II.D, Petitioner shows that Kim discloses the recited event and event notification under Patent Owner's construction. Thus, we analyze the Petition under Patent Owner's construction for those terms: (1) "event" means a "detectable condition of a system that can trigger

14

IPR2022-00164
Patent 8,230,135 B2

a notification" and (2) "an event notification is what is sent if a condition of a computer system meets the criteria for an event notification being issued by the system." Prelim. Resp. 18, 21.

On the current record, however, we are uncertain that Patent Owner's construction is the correct construction. *See id.* For example, the '135 patent explains that the method processes "an event, such as *by way of example but not limitation*, a new mail event, a new instant message event, a reminder event, a calendar event, or *some other event,* and generating a string of characters that includes information associated with the event." Ex. 1001, 1:67–2:5 (emphasis added). This sentence broadly covers "some other event." *Id.* Also, the '135 patent states that the events used in the embodiments are merely examples. *Id.*; *see also id.* at 12:26–28 ("As used herein, the term 'embodiment' means an embodiment that serves to illustrate by way of example but not limitation."). But we do not need to provide an express construction for "event," because even under Patent Owner's proposed construction, Petitioner has made a sufficient showing for institution. *See* § II.D. The parties are invited to explain, in their respective post-institution briefings, i.e., Response, Reply, and Sur-reply, their construction of "event," and in particular, address the question of whether "event" is limited to events in a computer system.

We need not construe any other terms in this decision.

### D.  Anticipation and Obviousness over Kim

#### 1.  Kim

Kim is a Korean laid-open patent publication. Ex. 1008, 12. Kim describes a system that uses a personal computer running Microsoft Windows and communicating with a server. *Id.* The user's computer receives real-time information from the server, such as stock prices,

IPR2022-00164
Patent 8,230,135 B2

advertisements, and breaking news. *Id.* at 13. Using this information, the computer changes the title bar of a currently active window. *Id.* According to Kim, the window's title bar provides a convenient way to deliver accurate real-time breaking news to investors. *Id.* at 14.

### 2. Claim 1

Petitioner asserts claim 1 is anticipated or obvious over Kim. Pet. 62–74.

### a) An Event

Claim 1 recites, in part, "A method comprising: receiving information of an event that calls for user notification." Ex. 1001, 12:42–44.

Petitioner asserts that Kim discloses this limitation. Pet. 62–63 (citing Ex. 1004 ¶¶ 203–205; Ex. 1008, 12–13). According to Petitioner, Kim receives "real-time information to be displayed on the title bar on the Windows display screen." *Id.* at 62. Petitioner asserts that "real-time information can include events such as 'stock prices, advertisements, and breaking news.'" *Id.* at 63 (citing Ex. 1008, Abstract).

Patent Owner argues that Petitioner's analysis is based on an incorrect interpretation of the claimed "event." Prelim. Resp. 51–52 (citing Pet. 62–63). In particular, Patent Owner argues that none of Kim's stock prices, advertisements, or breaking news are events because they are not detectable conditions of a system. *Id.* at 51. We disagree at this stage and on this record.

In particular, we preliminarily determine that Petitioner has shown that the information about "stock prices, advertisements, and breaking news" are detectable conditions of a system for at least the reason that the user's computer detects new information received from the corresponding server. Pet. 63. For example, the Petition explains that Kim updates the title bar

16

IPR2022-00164
Patent 8,230,135 B2

"whether new information is provided." *Id.* at 62–63 (quoting Ex. 1008, 13). Because Patent Owner does not give sufficient weight to this feature of Kim, we disagree with its argument at this stage. *See* Prelim. Resp. 51–52. During trial, Patent Owner is invited to address how the personal computer in Kim is able to update the title bar without at least detecting the new information at some point when processing it, or why the receipt of the new information is not a system condition.

Patent Owner argues that Kim merely receives and displays third-party data. *Id.* at 52–54 (citing Ex. 1008, 12–14, Figs. 7a, 7b). According to Patent Owner, Kim's system "does not make any distinction between the type of kind or information it receives and the information it displays." *Id.* at 54.

Patent Owner, though, does not explain why we should require any distinction between received and displayed information. *See id.* To the contrary, the '135 patent discloses that "[i]f a new message is received, then both the titlebar and the taskbar can be changed." Ex. 1001, 5:65–67. The "exact information in a titlebar, taskbar, or other display area is implementation specific." *Id.* at 6:4–5. In one example, the "actual message of an IM message" is displayed in the title. *Id.* at 9:5–6. In at least this case, there would be no distinction between the received IM message and the displayed message. *See id.* We see nothing in the claim that would exclude this embodiment at this stage.

Thus, we preliminarily determine that Petitioner has shown that Kim discloses the receiving step even under Patent Owner's construction of "event." *See* Pet. 62–63.

17

IPR2022-00164
Patent 8,230,135 B2

*b)   Event Notification*

Claim 1 recites, in part, "generating an event notification for the event." Ex. 1001, 12:45.

Petitioner asserts that Kim discloses this limitation. Pet. 63–65 (citing Ex. 1004 ¶¶ 206–210; Ex. 1008, 13, Figs. 2–5). According to Petitioner, Kim receives real-time information at computer 30 from real-time information server 10, as shown in the English translation of Figure 5 below. *Id.* at 64.



Figure 5, above, shows information server 10 connected to user computer 30 through the internet (20). *Id.* According to the Petition, both information server 10 and user computer 30 generate the recited notification:

18

IPR2022-00164
Patent 8,230,135 B2

> Kim discloses that its real-time information server "generat[es]
> an event notification for the event" by sending a message with
> the event notification from the server to the user's computer for
> display in the title bar of a Windows application, and the user's
> computer also "generat[es] an event notification for the event"
> by creating the message for display in the title bar, in which the
> message comprises at least a "string of characters that includes
> information associated with the event."

Pet. 65 (citing Ex. 1004 ¶¶ 206–210).

Patent Owner argues that Petitioner's analysis of this limitation is
flawed because Kim does not disclose an "event." Prelim. Resp. 54.
According to Patent Owner, an event is a "detectable condition of a system
that can trigger a notification." *Id.* Patent Owner asserts that, unlike the
claimed invention, Kim displays real-time information without generating an
event notification. *Id.* at 55 (citing Ex. 1008, 13, Fig. 3). Patent Owner
argues that Kim displays the same information that it receives. *Id.* In Patent
Owner's view, data cannot be a notification of itself. *Id.* at 56.

As for the recited "event," we disagree with Patent Owner's argument
for reasons similar to those discussed in Section II.D.2.a. For example,
Petitioner asserts that Kim's system produces messages. Pet. 63–65 (citing
Ex. 1004 ¶¶ 206–210). Kim's real-time information server sends the
messages to the user's computer. *See* Ex. 1008, 13, *cited in* Pet. 63–64. And
Petitioner has shown at this stage that the information about "stock prices,
advertisements, and breaking news" are detectable conditions of a system for
at least the reason that the user's computer detects new information received
from the corresponding server. Pet. 63.

Nor do we agree that the claim excludes methods that display received
information for similar reasons to those discussed in Section II.D.2.a. For

IPR2022-00164
Patent 8,230,135 B2

example, the '135 patent contains embodiments where the title bar displays the "actual message" that is received. Ex. 1001, 9:5–6.

Thus, we disagree with Patent Owner at this stage on the issue of whether Kim discloses the recited events (Prelim. Resp. 54, 56), and for similar reasons, we do not credit the testimony of Dr. Surati on this issue (Ex. 2009 ¶¶ 31–34).

Patent Owner argues that the correct claim construction requires that the recited event is different from the event notification. Prelim. Resp. 56. Patent Owner argues that, contrary to this requirement, Petitioner has mapped Kim's real-time information to both the claimed event and event notification. *Id.* (citing Pet. 63–65).

We disagree with Patent Owner's characterization of the Petition, at this stage and on this record. *See id.* That is, the Petition does not map the same feature to two limitations. *Id.* Instead, Petitioner explains that "the 'real-time information' displayed in the title bar of an application in Kim constitutes 'events that call for user notification'" (Pet. 63) and Kim generates an event notification "by creating the message for display in the title bar" (*id.* at 65). Thus, Petitioner maps the creation of Kim's message to the recited generation of the notification. *Id.*

Under Patent Owner's construction, "an event notification is what is sent if a condition of a computer system meets the criteria for an event notification being issued by the system." *Supra* § II.C.4. The Petition explains that Kim updates the title bar when new information is provided. Pet. 62–63 (quoting Ex. 1008, 13). That is, the receipt of new information is "a condition of a computer system [that] meets the criteria for an event notification being issued by the system."

20

IPR2022-00164
Patent 8,230,135 B2

For example, Kim provides the generated notification message "on the title bar of a Microsoft WordPad application window," as shown in the figure reproduced below. *Id.* at 65.



According to the Petition, "the event notification message is shaded in green" in the above figure. *Id.* at 64–65. Here, the message is "2:10PM Shin Chang-Won arrested (Yonhap News)." *Id.*

The basis for Patent Owner argument is that the content or information conveyed by the notification must be different than the information received to trigger the notification. Prelim. Resp. 56. We disagree. At this stage, we preliminarily determine that such a limitation is inconsistent with the embodiments in the '135 patent. For example, in one embodiment, the event may correspond to a new message (Ex. 1001, 5:54–62), and the notification can be the "actual message" (*id.* at 9:5–6).

21

IPR2022-00164
Patent 8,230,135 B2

Thus, even applying Patent Owner's interpretations of "event" and "notification," we preliminarily determine that Petitioner's analysis of these limitations (Pet. 65) is sufficient for institution.

### c)   Title Array

Claim 1 recites, in part, "associating the event notification with at least one of the plurality of character strings in a title array that includes a plurality of character strings." Ex. 1001, 12:16–48.

We construe the term "title array" to require a data structure, which is not disputed. *Supra* § II.C.1; Prelim. Resp. 58 (citing Pet. 67).

Petitioner asserts that Kim discloses, teaches, or suggests the recited associating step. Pet. 66–67 (citing Ex. 1004 ¶¶ 211–217; Ex. 1008, 13–14, Figs. 2–4; Ex. 1015, 43). According to Petitioner, Kim stores "new or combined" information in a list "so that a previously stored message can be displayed." *Id.* at 66.

Patent Owner makes two sets of arguments: one set directed to the Petitioner's anticipation ground and the other to the obviousness ground. *See* Prelim. Resp. 57–60. For the reasons that follow, we preliminarily determine that the current record favors Patent Owner's argument on anticipation, but the Petition sufficiently shows, at this stage, that the associating step would have been obvious over Kim.

### (1)   Anticipation

Patent Owner argues that Kim does not disclose an array or title array. *Id.* at 57 (citing Pet. 66–67); *see also id.* at 60. Patent Owner argues that Kim does not support Petitioner's assertion that Kim stores "new or combined event notifications" in a list. *Id.* (citing Pet. 66). According to Patent Owner, Kim does not use the words "array," "title array," or "list." *Id.* In Patent Owner's view, "Petitioner's argument that 'such information would be

22

IPR2022-00164
Patent 8,230,135 B2

stored in some type of list associated with character strings' . . . is based upon speculation and conjecture." *Id.* at 58 (citing Pet. 67).

Patent Owner argues that, even if Kim uses an array for its real-time information, it lacks "a title array that includes a plurality of character strings." *Id.* at 57. In Patent Owner's view, Kim does not need a list, and the displayed objects need not be organized in an array. *Id.* at 58. Patent Owner argues that "something more than a mere displayed 'list'" meets this requirement. *Id.* at 59. Patent Owner argues that the Petition does not explain how Kim discloses that an event notification is associated with a character string in a title array. *Id.*

The preliminary record favors Patent Owner's argument that Kim does not disclose a data structure that meets the "title array" limitation. *See id.* at 57–58.

The basis for Petitioner's position appears to be that Kim's stores the information in a "temporary memory." Pet. 66 (citing Ex. 1008, 9–2). The claim recites that the character strings are "in a title array." "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of Cal.,* 814 F.2d 628, 631 (Fed. Cir. 1987). So even accepting as true Dean Willis's assertion that an array is simple and "suitable" for storing data (Ex. 1004 ¶ 215), Petitioner must show that Kim expressly or inherently describes an array data structure to prevail on its anticipation ground.

### (2) *Obviousness*

Petitioner asserts that "[t]o the extent that it is argued or found that Kim does not disclose associating the event notification with at least one of

IPR2022-00164
Patent 8,230,135 B2

the plurality of character strings in a title array that includes a plurality of character strings, this would have been obvious." Pet. 67.

Patent Owner argues Petitioner's obviousness analysis lacks substance, has no support, and "is presented entirely without any articulated reasoning or factual bases and the Board should ignore and/or disregard it." Prelim. Resp. 62 (citing Pet. 76–85). At this stage and on this record, we disagree.

Petitioner asserts that an array would be a suitable and desired data structure for storing the event notifications with a plurality of character strings in Kim. Pet. 67 (citing Ex. 1004 ¶ 215). Petitioner explains that Kim's "temporary memory" could be used to store multiple events. *Id.* at 66. According to Petitioner, "an array would store the event notifications in a simple list of character strings that can be accessed with a known index, and the array will 'respond to messages requesting access to [its] content[].'" *Id.* (quoting Ex. 1015, 43).

Patent Owner argues that it would not have been obvious to use an array because doing so would not accomplish Kim's stated goals. Prelim. Resp. 59–60. Patent Owner argues that Kim displays information in real time, so it is unnecessary to store the data together in an array. *Id.* at 60 (citing Ex. 1008, 13).

We disagree at this stage because Patent Owner's argument (*id.*) does not squarely address Petitioner's argument and evidence about Kim's temporary memory. Pet. 67 (citing Ex. 1004 ¶¶ 211–213). According to the Willis Declaration, Kim's temporary memory stores the real time events. Ex. 1004 ¶ 213. For example, Kim states that the "Windows title bar that receives real-time information to be displayed on the title bar on the Windows display screen of the personal computer from the information

24

IPR2022-00164
Patent 8,230,135 B2

server and stores it in temporary memory." Ex. 1008, 13, *quoted in* Pet. 66.
Petitioner asserts that Kim's temporary memory allows it to display
previously stored messages with new ones. Pet. 66. At this stage, Kim's
teachings about a temporary memory (Ex. 1008, 13) and the Willis
Declaration's assertions about it (Ex. 1004 ¶ 213) lead us to favor
Petitioner's reasoning over Patent Owner's argument that it would have been
unnecessary to store the data together in an array (Prelim. Resp. 59–60).

    As discussed above in Section II.C on claim construction, both parties
agree that the claimed "array" requires a data structure. *See id.* at 59 n.5.
Patent Owner argues that "something more than a mere displayed 'list' is
required." *Id.* at 59. Even so, Petitioner's analysis does not rely solely on a
list. Instead, Petitioner has sufficiently shown that it would have been
obvious to use an array because it is a simple, fundamental data structure,
and it would respond to access requests. Pet. 66–67. And, at this stage, we
see nothing in the present record that adequately rebuts these assertions. *See
id.*

    Thus, at this stage, we preliminarily determine that Petitioner has
sufficiently shown that it would have been obvious to use an array in Kim to
arrive at the claimed associating step: "associating the event notification
with at least one of the plurality of character strings in a title array that
includes a plurality of character strings." *See id.* at 66–68.

### d)  *Character Strings*

    Claim 1 recites, in part, "a plurality of character strings for
provisioning for display in a titlebar or taskbar of a display device."
Ex. 1001, 12:48–49.

    Petitioner asserts that "Kim discloses that the event notifications
received at the user's computer from the real-time information server(s) are

IPR2022-00164
Patent 8,230,135 B2

provisioned for display in a titlebar of a display device that displays the Microsoft WordPad process." Pet. 68 (citing Ex. 1008, Abstract, 12–13).

Patent Owner does not specifically rebut this assertion. *See* Prelim. Resp.

We determine that the current record supports Petitioner's analysis. For example, Kim discloses that "the handle value on the currently active window is extracted according to the task management of the task management unit to replace the title bar value of the corresponding window with the information provided in real-time." Ex. 1008, 14, *quoted in* Pet. 69. Thus, at this stage, we preliminarily determine that Petitioner sufficiently shows that Kim discloses the recited character strings. *See* Pet. 68–69 (citing Ex. 1004 ¶¶ 218–221; Ex. 1008, 12–14, Figs. 2–4).

e)   *Providing the Character Strings*

Claim 1 recites, in part, "providing the at least one of the plurality of character strings in the title array to a process executed by a processor." Ex. 1001, 12:50–52.

Petitioner asserts that Kim's Figures 2 through 4 show event notifications being provided as recited in claim 1. Pet. 70–71 (citing Ex. 1004 ¶¶ 222–224; Ex. 1008, 12–13, Fig. 3). Petitioner argues that Kim's system receives real-time information from a title array. *Id.* at 70.

Patent Owner argues that Kim's Figure 3 merely shows displaying real-time information, not an array with character strings. Prelim. Resp. 61. Patent Owner argues that, even if Kim teaches a title array, Kim lacks a plurality of character strings in the array. *Id.* Patent Owner argues Kim does not disclose a title array for the same reasons that we analyzed and discussed in Section II.D.2.c. *Id.*

26

IPR2022-00164
Patent 8,230,135 B2

For similar reasons to those discussed above, we preliminarily determine that the current record favors Patent Owner's anticipation arguments about the "title array," but the Petition sufficiently shows at this stage that the "title array" would have been obvious over Kim. *See* § II.D.2.c. That is, as for obviousness, we preliminarily determine that Patent Owner's argument (*id.*) does not squarely address Petitioner's argument and evidence about Kim's temporary memory or rebut Petitioner's assertions about the advantages of an array. Pet. 67 (citing Ex. 1004 ¶¶ 211–213). According to the Willis Declaration, Kim's temporary memory stores the real-time events. Ex. 1004 ¶ 213. For example, Kim states that "Windows title bar that receives real-time information to be displayed on the title bar on the Windows display screen of the personal computer from the information server and stores it in temporary memory." Ex. 1008, 13, *quoted in* Pet. 66. Petitioner asserts that Kim's temporary memory allows it to display previously stored messages with new ones. Pet. 66. At this stage, Kim's teachings about a temporary memory (Ex. 1008, 13) and Dean Willis's assertions about it (Ex. 1004 ¶ 213) lead us to favor Petitioner's reasoning about the "title array" over Patent Owner's arguments to the contrary.

*f)   Alternative Title*

Claim 1 recites, in part, "providing an alternative title based on the at least one of the plurality of character strings to the process" and "using the alternative title as a title in association with the process." Ex. 1001, 12:53–56.

Petitioner asserts that "Kim discloses providing alternative titles from the title array to the process." Pet. 71. According to Petitioner, Figure 3 shows a breaking-news event notification to the title bar on the WordPad

27

IPR2022-00164
Patent 8,230,135 B2

application: "2:10pm Shin Chang-Won arrested (Yonhap News)." *Id.* at 71–

72. Petitioner asserts that Figure 4 shows the alternative title. *Id.* at 72–74.

Patent Owner does not specifically rebut this assertion. *See* Prelim.

Resp.

We preliminarily determine that the current record supports

Petitioner's analysis. Kim's windows are shown below in a reproduction of

Petitioner's English translation.

*Fig. 1*



Figure 1 is a screen shot showing a Windows title bar before the real-time

information is received. Ex. 1008, 12. In this state, the title bar only shows

the information related to the corresponding program. *Id.*

IPR2022-00164
Patent 8,230,135 B2

Figures 3 and 4, below, show the same Windows title bar after the real-time information is received. *Id.*

*Fig. 3*



IPR2022-00164
Patent 8,230,135 B2

*Fig. 4*



Figure 3 shows a title bar that displays breaking news: "210PM Shin Chang-Won arrested (Yonhap News)." *Id.* Figure 4 shows a title bar that also displays a stock price: "Hyundai Electronics 32,800 +200." *Id.* On this record, Petitioner sufficiently shows that Kim discloses "providing an alternative title based on the at least one of the plurality of character strings to the process" and "using the alternative title as a title in association with the process."

Thus, Petitioner has shown a reasonable likelihood that it would establish obviousness of claim 1 over Kim.

30

IPR2022-00164
Patent 8,230,135 B2

### 3.  *Claims 2, 3, and 9*

Petitioner asserts claims 2, 3, and 9 are anticipated by or obvious over Kim. Pet. 74–76. These claims depend from and incorporate all the limitations from claim 1.

Petitioner sufficiently addresses claims 2, 3, and 9 in the obviousness analysis. *Id.* Patent Owner does not present arguments specifically directed to Petitioner's assertions about claims 2, 3, and 9. *See* Prelim. Resp. Petitioner has shown a reasonable likelihood that it would prevail in establishing the obviousness of claims 2, 3, and 9 over Kim.

### E.  *Obviousness over Kim and Cheung*

Petitioner asserts that claims 1–3 and 6–10 are unpatentable as obvious over the combination of Kim and Cheung. Pet. 76–84; *see id.* at 62–76.

### 1.  *Cheung*

Cheung describes a "central notifications manager user interface." Ex. 1007, Abstract, ¶ 27. This interface manages notifications and alerts. *Id.* ¶ 27. Figure 3A, below, is an example of this interface. *Id.* ¶¶ 14, 27.



*FIG. 3A*

IPR2022-00164
Patent 8,230,135 B2

Figure 3A, above, shows central-notification-manager user interface 120 with title bar 122. *Id.* ¶ 30. Title bar 122 "indicates that the current notification is generated by one of the [computer's] software programs." *Id.* The figure shows that interface 120 includes lines 124–128, which provide information about the notification to a user. *Id.*

Cheung describes another notification in Figure 5B, below. *Id.* ¶ 18.



*FIG. 5B*

As shown in Figure 5B, "[w]hile the central notifications manager application is running, an icon 192 is provided in a dock (or taskbar) 190." *Id.* ¶ 38. Figure 5B shows that "count 194" is "the number of active notifications and alerts that can be accessed if the user opens the central notifications user interface." *Id.* In Figure 5B, an icon appears "in the dock or taskbar while the central notification manager is running" *Id.* ¶ 18. The icon shows the number of notifications and active alerts. *Id.*

### 2.  *Claims 1–3 and 6–10*

Petitioner asserts that "Kim anticipates and/or renders obvious Claims 1-3 and 9 of the '135 Patent as provided above in Ground 3," but "[t]o the extent that there are arguably any meaningful differences between those claims and Kim's disclosures, those differences would have been trivial and obvious modifications to make for a PHOSITA." Pet. 76–77 (citing

32

IPR2022-00164
Patent 8,230,135 B2

Ex. 1004 ¶ 254). Petitioner explains that one would have been motivated to combine Kim and Cheung because (1) both are directed to Windows notifications, (2) Cheung expressly states a motivation for improving Kim, and (3) the combination involves known techniques to improve devices in a similar way. *Id.* at 82–83. Petitioner explains that "Cheung discloses that its event notification technique and central notifications UI can be used across numerous application suites (e.g., Microsoft Outlook and Microsoft Office)," and "Kim discloses a system and techniques for providing event notifications to an active Windows application window." *Id.*

Apart from this analysis, Petitioner does not provide a mapping from Cheung's teachings to the subject matter recited in claims 1–3 and 9. *Id.* at 76–84. Nor does Petitioner fully explain how Kim would be modified by Cheung to arrive at the subject matter recited in claims 1–3 and 9. *Id.* Petitioner's obviousness rationale discusses the similarities between Cheung and Kim, not the limitations of claims 1–3 and 9. *Id.* at 82–83. Thus, at this stage and on this record, we have concerns about Petitioner's obviousness analysis of claims 1–3 and 9 under the Kim-Cheung combination.

Claim 6 depends from claim 1 and adds "alternating using the event notification as a title in association with the process with a variation of the event [notification]." Ex. 1001, 13:6–8. Petitioner additionally relies on Cheung's teaching of using an alleged event notification variation as shown in Cheung's Figure 5B, i.e., icon 192 provided in taskbar 190, with which is associated count 194 of the number of active notification and alerts. Pet. 79.

Petitioner explains:

> In this combination, the "count 194" notification icon of the "number of active notifications and alerts" [of Cheung] would be provided on the titlebar in Kim as an alternating title to show the number of notifications that Kim's system has received for

33

IPR2022-00164
Patent 8,230,135 B2

> display, such as the number of "breaking news" events. This
> variation on the event notification associated with the breaking
> news event, for example, would let a user know how many such
> events had been received for display. EX[1004], ¶¶ 258–59.

*Id.* at 78–79. But Petitioner does not identify where Cheung describes "the count 194" notification icon as an "alternating" icon relative to some other notification or alert. It appears that this icon is always on display as long as the central notifications manager application is running. Ex. 1007 ¶ 38.

Also, as for the rationale to combine the teachings, Petitioner explains that Cheung discloses that there is a clear benefit for a user of a computing device to receive information of potential value and Cheung notes a "need to better manage the various kinds of notifications and alerts that are presented to a user on a display." Pet. 82–83 (citing Ex. 1007 ¶ 3; Ex. 1004 ¶¶ 248–251). Dean Willis, Petitioner's declarant, testifies that "the prior art provides a PHOSITA with the explicit motivation to look to '716 Cheung's display techniques to improve the event notification scheme in '288 Kim." Ex. 1004 ¶ 250. Such alleged motivation to combine teachings is vague and nebulous. Neither Petitioner nor its declarant Dean Willis identifies any specific benefit or advantage to use in Kim the "count 194" notification icon of Cheung as an alternating event notification, in light of the fact that Kim's events are real-time breaking news or stock prices, which do not require a response.

Petitioner further asserts that the prior art provides one with ordinary skill in the art a reason "to look to Cheung's techniques to improve the event notification scheme in Kim." Pet. 82–83. Even so, that does not sufficiently establish what technique in Cheung, if adopted, would result in an improvement of Kim, and why Petitioner also asserts that one with ordinary skill in the art would have understood that Kim and Cheung's techniques

IPR2022-00164
Patent 8,230,135 B2

"could be implemented in Kim with a full expectation of success." *Id.* at 83. But Petitioner's accounting lacks adequate explanation of which technique of Cheung one with ordinary skill in the art would have wanted to adopt in Kim for what reason and to achieve what benefit.

Petitioner further asserts that both Kim and Cheung are directed to providing event notifications to Microsoft Windows applications, are from the same time period and field, and concern solutions to similar problems. *Id.* As for the alleged motivation to combine the teachings, these are also vague and nebulous and do not adequately support the combination of teachings.

Claim 7 depends from claim 1 and adds "generating the alternative title as a variation of the event notification." Ex. 1001, 13:9–10. Petitioner's reasoning for a variation of event notification as the alternative title is the same as its reasoning for a variation of event notification as the title. Pet. 79. Our analysis for claim 6 applies here.

Claim 8 depends from claim 1 and adds "receiving affirmation that user notification was successful; clearing the array." Ex. 1001, 13:11–13. Petitioner asserts that Cheung discloses "receiving affirmation that user notification was successful." Pet. 79. Even assuming that Cheung discloses such a feature, for the same reasons discussed above in the context of claim 6, Petitioner has not adequately explained the motivation for applying Cheung's teaching to Kim.

Claim 10 depends from claim 1 and adds "using the event notification as a title in association with the process one or more times; removing the event notification from the array." Ex. 1001, 13:17–20. Petitioner relies on Cheung's teaching of removing the event notification from storage. Pet. 82. Petitioner explains,

35

IPR2022-00164
Patent 8,230,135 B2

> [A] PHOSITA would understand that Cheung's method of removing one or more (including all) event notifications from the associated storage device would improve system performance, including by freeing up storage and processing space (e.g., garbage collection, a well-known concept would be employed in Kim as disclosed in Cheung to improve Kim's system). Ex[1004] ¶ 251.

*Id.* at 83. The articulated reasoning has rational underpinning and is supported by the cited evidence. Patent Owner has not presented arguments to the contrary for claim 10 in that regard.

As discussed above, Petitioner did not fully explain how Kim would be modified by Cheung to arrive at the subject matter recited in independent claim 1. So, in assessing the Kim-Cheung combination used in the challenge to dependent claim 10, we understand Petitioner to be asserting that Kim teaches or suggests all limitations of claim 1. That is, Petitioner asserts that Kim teaches all the limitations of claim 10 that are from claim 1, and Petitioner relies on a combination of Kim and Cheung to teach the subject matter that is exclusively recited in claim 10. During trial, the parties are invited to discuss whether the Petition adequately supports this understanding. At this stage and on this record, however, Petitioner has shown a reasonable likelihood that it would prevail in establishing obviousness of claim 10 over Kim and Cheung because (1) our concern with respect to claim 1 as obvious over the Kim-Cheung combination, as noted above, is alleviated by Petitioner's express reliance on the teachings of Cheung for claim 10, and (2) Petitioner's argument and evidence for the unpatentability of claim 10 is sufficient for institution.

### *F. Anticipation and Obviousness over Eaton*

Petitioner asserts that claims 1–3, 6, 7, and 9 are unpatentable as anticipated or obvious over Eaton. Pet. 24–53.

IPR2022-00164
Patent 8,230,135 B2

### 1. Eaton

Eaton relates to an instant-messaging system. Ex. 1006, Abstract. Figure 1, below, is a block diagram of an example system. *Id.* ¶ 14.



FIG. 1

Figure 1, above, shows server 110, server receiver 140, and events 180. *Id.* ¶ 28. Events 180 include, for example, physical events 210 such as sporting events, television or radio broadcast events 200, wireless content events 220, internet events 230, and chat session events 240. *Id.* Events 180 are associated with content 190: event icons 270 and event information 250. *Id.* ¶ 29. Server 110 may use event notifications, schedules of events, or search engines to find available events 180. *Id.* ¶ 33.

In Eaton's interface, events are represented by screen names. *Id.* ¶ 31. Figure 2, below, is a block diagram of a server memory. *Id.* ¶ 15.

37

IPR2022-00164
Patent 8,230,135 B2



# FIG. 2

Figure 2, above, shows server memory 160 storing screen names 280. *Id.*
Each screen name 290 represents an event. *Id.* ¶ 31. The server activates a
screen name "in response to the presence of" an event. *Id.* ¶ 32. To the user,
the activated screen name looks just like any other active instant-message
participant (130) in the system. *Id.*

### 2. Claim 1

Petitioner asserts that claim 1 is anticipated by or obvious over Eaton.
Pet. 24–47. For the reasons that follow, we have concerns about the clarity
of Petitioner's analysis. We, however, invite the parties to discuss this
ground further at trial.

Claim 1 recites, in part, "receiving information of an event that calls
for user notification" and "generating an event notification for the event."
Ex. 1001, 12:42–45.

As for the recited events, Petitioner asserts that "Eaton discloses a
server receiver 140 that is 'coupled to and receives information about a
plurality of events 180' that 'can include, for example, physical events 210

IPR2022-00164
Patent 8,230,135 B2

such as sporting events, television or radio broadcast events 200, wireless content events 220, internet events 230, chat session events 240, or an equivalent.'" Pet. 25 (citing Ex. 1006 ¶ 28). These passages from the Petition could be interpreted as asserting that the information about events 180 is the event. *See id.* Alternatively, this sentence could be read as asserting that Eaton's events, e.g., 210, 200, and 220, correspond to the recited events. *See id.*

In the section analyzing the events, Petitioner also asserts that Eaton's client receives "information of an event that calls for user notification" because "device receiver 330 receives messages sent within the instant message communication system 100 such as event presence notification messages." *Id.* at 26 (citing Ex. 1006 ¶¶ 36–38, Fig. 3). Here, it is unclear whether Petitioner regards the messages received by device receiver 330 as the events. *Id.* Apart from quoting Eaton directly and reproducing Figure 3, no further analysis is provided. *Id.* at 25–26.

As for the "event notification," Petitioner quotes Eaton directly and underlines the phrase that reads, "screen names 280 represent one or more events such as event 300 of the plurality of events 180." *Id.* at 28 (quoting Ex. 1006 ¶ 31). Petitioner then reproduces direct quotations from Eaton underlining the "event presence notification messages" without further analysis. *Id.* at 27–29. It is possible that Petitioner regards the "event presence notification" messages as the "event notification." But, such an interpretation would contradict the discussion of the "event presence notification messages" in the section addressing the "events" that suggests the messages are the events. *Id.* at 26.

Claim 1 further recites, "associating the event notification with at least one of the plurality of character strings in a title array that includes a

IPR2022-00164
Patent 8,230,135 B2

plurality of character strings." Ex. 1001, 12:46–49. To address this limitation, Petitioner introduces Eaton's "topic screen names" into the analysis:

> Eaton also discloses that the server memory 160 stores an array of event notifications in Figure 6, as shown with annotations below ("*the* event notification" in Claim 1 corresponding to any of them, such as "Topic N" that has associated "Event[s] AN-NN," the first one being "Event AN").

Pet. 30 (citing Ex. 1006 ¶¶ 56–58, Fig. 6) (emphasis added). Figure 6 with Petitioner's annotations is reproduced below.



Figure 6, above, is a block diagram of a server memory. Ex. 1006 ¶ 19. This embodiment shows topic screen names 520. *Id.* ¶ 57. A topic may include one or more events. *Id.* ¶ 56. The topic screen names are stored in the server memory 160. *Id.*

Petitioner asserts that Figure 6, above, shows that "the event notifications are associated with the 'Event AN,' 'Topic Screen Name N,' and 'Topic N' character strings stored in the array in server memory 160." Pet. 31 (citing Ex. 1004 ¶¶ 102–106). Petitioner asserts that Figure 4 also

40

IPR2022-00164
Patent 8,230,135 B2

shows "the event notifications are associated with 'Event N' and 'Screen Name N.'" *Id.*

At this stage and on this record, we agree with Patent Owner that the Petition's analysis of the "event" and "event notification" is vague:

> Petitioner has alternatively and vaguely appeared to claim that "activating a screen name," "event presence notification messages,' and "Events AN-NN" are event notifications. [Pet.; 27-29; 31]. Petitioner now argues that an event notification (e.g., "Event AN") is associated with the "Event AN" (i.e., it is associated with itself).

Prelim. Resp. 33. We also agree with Patent Owner that one interpretation of the Petition is that "Event AN" is both the event and event notification. *Id.* at 32. Another possible interpretation is that Eaton's screen names are events and the activated screen name is the recited event notification. *Id.* Yet another is that the event-presence notification message is the event notification. *Id.* We preliminarily determine that these ambiguities also render the Petition's analysis of the remaining limitations unclear, on this record and at this stage.

### 3. *Character Strings and Title*

Claim 1 further recites, "a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device." Ex. 1001, 12:48–49 (emphasis added). The remaining limitations refer to these character strings and recite an alternative title:

> providing the at least one of the plurality of character strings in the title array to a process executed by a processor;

> providing an alternative title based on the at least one of the plurality of character strings to the process;

> using the alternative title as a title in association with the process.

*Id.* at 12:42–56.

IPR2022-00164
Patent 8,230,135 B2

Petitioner asserts that Eaton's Figure 3 and 4 show that "each of the plurality of IM devices 120 includes 'an instant message user interface 360.'" Pet. 33 (citing Ex. 1006 ¶ 37, 45). Eaton's Figures 3 and 4 are shown below with Petitioner's annotations.



In Petitioner's view, Eaton's "user interface is shaded in purple," and "exemplary event notifications are shaded in green." *Id.* That is, in this part of the analysis, Petitioner asserts that "Event 1 Status" and "Event ID 1" are the event notifications. *Id.* According to the Petition, "the display 420 and its display items shown in Figure 4 above is at the top of the user interface and therefore corresponds to a titlebar of the user interface display of IM device 320." *Id.* at 34–35 (citing Ex. 1004 ¶¶ 112–113).

Even assuming that "Event 1 Status" and "Event ID 1" are the event notifications—putting aside any potential contradictions with other parts of the Petition—the claim requires associating the notifications with "at least one of the plurality of character strings in a title array that includes a plurality of character strings for provisioning for display in a titlebar or taskbar of a display device." Ex. 1001, 12:45–49. At this stage, we agree with Patent Owner that Petitioner does not "tie the alleged plurality of character strings in the title array that are associated with an alleged event

42

IPR2022-00164
Patent 8,230,135 B2

notification to the character strings that it claims are displayed in Eaton."
Prelim. Resp. 35. In fact, the preliminary record does not indicate that the
purple-shaded area in Figure 4 is a title bar at all. Pet. 33. Rather, the
boundaries are defined by Petitioner with no clear basis in Eaton's teachings.
*See id.* at 34–35.

We preliminarily agree with Patent Owner that the Willis Declaration
offers little support for Petitioner's assertions about Figure 4 because it
refers to "the top of the information displayed below any arguable titlebar,
not to a titlebar" (Prelim. Resp. 39):

> Further, the display 420 and its display items shown in Figure 4
> above is at the top of the user interface and therefore corresponds
> to a title bar of the user interface display of IM device 320.

Ex. 1004 ¶ 113. This paragraph suggests that Figure 4 shows the actual
window displayed to the user. But Eaton's Figure 4 could be interpreted as a
block diagram of an interface, with the elements represented by labeled
boxes, not the actual interface elements. So, on this preliminary record, we
see little support for the assertions made in paragraph 113 of the Willis
Declaration. For these reasons, at this stage, we have concerns about
Petitioner's explanation under either the Petition's implicit construction of
title bar—i.e., the area at the top of a user interface—or a partial
construction based on Patent Owner's argument—i.e., the area at the top of a
window. *See* Pet. 34–35; Prelim. Resp. 17; *supra* § II.C.2 (Claim
Construction: "titlebar").

Thus, for these reasons, the preliminary record favors Patent Owner's
arguments about the limitations to displaying the character strings and titles.
*See* Prelim. Resp. 35–50.

IPR2022-00164
Patent 8,230,135 B2

### 4.  *Claims 2, 3, 6, 7, and 9*

Petitioner asserts that claims 2, 3, 6, 7, and 9 are anticipated by or obvious over Eaton. Pet. 47–53. Petitioner relies on the analysis of independent claim 1 and Eaton based on anticipation. *See id.* So, for the reasons discussed above, we have concerns about the clarity of Petitioner's analysis of Eaton. *See supra* § II.F. But we invite the parties to discuss this further at trial.

### G.  *Obviousness over Eaton in combination with Cheung, and Odell*

Petitioner asserts that claims 1–3 and 6–10 are unpatentable as obvious over the combination of Eaton, Cheung, and Odell. Pet. 56–62; *see id.* at 24–55. Petitioner relies on the analysis of independent claim 1 and Eaton based on anticipation. *See id.* We have reviewed the Eaton-Cheung-Odell combination and preliminarily determine that the additional references do not address the issues discussed above in connection with the ground that relies on Eaton alone. *See supra* § II.F. But we invite the parties to discuss this further at trial.

## III. CONCLUSION

Petitioner has shown a reasonable likelihood of prevailing as to the unpatentability of at least one of the challenged claims. Thus, we institute an *inter partes* review on all claims challenged in the Petition and on all grounds.

IPR2022-00164
Patent 8,230,135 B2

## IV. ORDER

It is

ORDERED that, under 35 U.S.C. § 314(a), an *inter partes* review of claims 1–3 and 6–10 of the '135 patent is instituted for all grounds in the Petition; and

FURTHER ORDERED that, under 35 U.S.C. § 314(a), *inter partes* review of the '135 patent is instituted on this Decision's entry date, and under 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is given of the trial's institution.

IPR2022-00164
Patent 8,230,135 B2

FOR PETITIONER:

Matthew W. Hindman
Christopher Kao
Brock S. Weber
PILLSBURY WINTHROP SHAW PITTMAN LLP
linkedin-135ipr@pillsburylaw.com
matthew.hindman@pillsburylaw.com
christopher.kao@pillsburylaw.com
brock.weber@pillsburylaw.com


FOR PATENT OWNER:

Stephen F. Schlather
John J. Edmonds
EDMONDS & SCHLATHER, PLLC
sschlather@ip-lit.com
jedmonds@ip-lit.com

Tarek Fahmi
Ascenda Law Group, PC
tarek.fahmi@ascendalaw.com

EXHIBIT C

Trials@uspto.gov                                                  Paper 20
571-272-7822                                          Date: July 13, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LINKEDIN CORPORATION,
Petitioner,

v.

EBUDDY TECHNOLOGIES B.V.,
Patent Owner.

_____

IPR2022-00165
Patent 8,402,179 B1

_____

Before JAMESON LEE, JASON M. REPKO, and
JULIET MITCHELL DIRBA, *Administrative Patent Judges.*

LEE, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2022-00165
Patent 8,402,179 B1

## I.    INTRODUCTION

### A.    *Background*

LinkedIn Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–3 and 6–10 ("challenged claims") of U.S. Patent No. 8,402,179 B1 (Ex. 1001, "the '179 patent").  Paper 2 ("Pet.").  eBuddy Technologies B.V. ("Patent Owner") filed a Preliminary Response.  Paper 11 ("Prelim. Resp.").  Petitioner filed an authorized Preliminary Reply.  Paper 13 ("Prelim. Reply").  Patent Owner filed an authorized Preliminary Sur-reply.  Paper 14 ("Prelim. Sur-reply").

We have authority to determine whether to institute an *inter partes* review, under 35 U.S.C. § 314 and 37 C.F.R. § 42.4.  An *inter partes* review may not be instituted unless it is determined that "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a) (2018); *see also* 37 C.F.R § 42.4(a) (2021) ("The Board institutes the trial on behalf of the Director.").  The "reasonable likelihood" standard is "a higher standard than mere notice pleading," but "lower than the 'preponderance' standard to prevail in a final written decision."  *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 13 (PTAB Dec. 20, 2019) (precedential).

For the reasons provided below and based on the record before us, we determine that Petitioner has demonstrated a reasonable likelihood that it would prevail in showing the unpatentability of at least one challenged claim.  Accordingly, we institute an *inter partes* review on all challenged claims and on each ground set forth in the Petition.

IPR2022-00165
Patent 8,402,179 B1

B.     *Real Parties in Interest*

Petitioner states that its real parties in interest are LinkedIn Corporation and Microsoft Corporation.  Pet. 1; Paper 9, 1.  Patent Owner states that its real party in interest is eBuddy Technologies B.V.  Paper 3, 1.

C.     *Related Proceedings*

Petitioner and Patent Owner each identify the following related litigation involving the '179 patent:  *eBuddy Technologies B.V. v. LinkedIn Corporation*, No. 1:20-cv-01501 (D. Del.).  Pet. 1; Paper 3, 2.  U.S Pat. No. 8,230,135 B2, a related patent, is the subject of *inter partes* review proceeding IPR2022-00164.  U.S. Pat. No. 8,510,395 B2, a related patent, is this the subject of *inter partes* review proceeding IPR2022-00176.  U.S, Pat. No. 9,854,453 B2, a related patent, is this the subject of *inter partes* review proceeding IPR2022-00177.

D.     *The '179 Patent (Ex. 1001)*

The '179 patent is directed to a technique for user notification involving "modifying a title associated with a process to include information about an event that calls for user notification."  Ex. 1001, 1:65–67.  "A method according to the technique may include running a process, such as, by way of example but not limitation, an IM client process, a browser, or some other process that has a title associated therewith."  *Id.* at 1:67–2:3.  The method may further include "processing an event, such as by way of example but not limitation, a new mail event, a new instant message event, a reminder event, a calendar event, or some other event."  *Id.* at 2:3–7.  The method also may further include "generating a string of characters that includes information associated with the event," and "displaying the string of characters as a title associated with the process."  *Id.* at 2:7–10.

3

IPR2022-00165
Patent 8,402,179 B1

Figure 6 is reproduced below:



FIG. 6

Figure 6 depicts an example of a system for programmed text event-specific title provisioning.  *Id*. at 7:58-60.  Computer 610 includes interface 612, event processing engine 614, title provisioning engine 616, title array 618, multiplexer 620, and client 622.  *Id*. at 8:1-3.  In this example, title provisioning engine 616 inputs title strings, which are strings of characters, to title array 618.  *Id*. at 8:18-20.  Title array 618 includes title array strings, which are referenced as title array string [0] to title array string [N]. *Id*. at 8:20-23.  Client 622 also includes title string 624 and title generator 626. *Id*. at 8:44-45.  Client 622 may include, by way of example but not limitation, an IM client, an email client, a VoIP client, or some other communications-related client.  *Id*. at 8:45-48.  Client 622 may include a

4

IPR2022-00165
Patent 8,402,179 B1

window, panel, or some other display that includes a title. *Id.* at 8:48-49.
The title generator 626 generates a title for the display. *Id.* at 8:49-51.

Figure 7 is reproduced below:



FIG. 7

Figure 7 depicts flowchart 700 of an example of a method for
displaying programmed text titles. *Id.* at 9:20-21. In step 702, an event that
calls for user notification is processed. *Id.* at 9:21–23. In step 704, a first
string of characters associated with the event is generated. *Id.* at 9:26–28.
In step 706, the generated string of characters is stored in an array. *Id.*
at 9:31–33. In step 708, the first string of characters is provided from the

IPR2022-00165
Patent 8,402,179 B1

array to a process.  *Id*. at 9:37-39.  The process may include an IM client operating in a Windows® environment.  *Id*. at 9:39-41.

In step 710, the first string of characters is used as a title in association with the process.  *Id*. at 9:42–44.  For example, if the process is an IM client operating in a Windows® environment, the first string of characters could be used such that the window associated with the IM client includes the first string of characters in the titlebar.  *Id*. at 9:44–50.  Alternatively, the first string of characters could be displayed in a taskbar associated with the IM client.  *Id*. at 9:50–52.  In step 712, a second string of characters is provided from the array to the process; the second string of characters could be associated with the same event, an earlier event, or a later event.  *Id*. at 9:53–61.  In step 714, the second string of characters is used as a title in association with the process.  *Id*. at 9:65–67.

E.    *Illustrative Claims*

Of the challenged claims, only claim 1 is independent and it is reproduced below:[1]

> 1. [Preamble:]  A method comprising:
>
> [i]     processing an event that calls for user notification;
>
> [ii]    generating an event notification for the event;
>
> [iii]   storing the event notification in an array;
>
> [iv]    providing the event notification from the array to a process executed by a processor;
>
> [v]     using the event notification as a title in association with the process;

---

[1] The preamble and element captions are added and used by Petitioner to reference the preamble and claim elements.  *See* Pet. 24–43.  We use the same captions here for ease of reference, understanding, and consistency.

IPR2022-00165
Patent 8,402,179 B1

      [vi]    providing an alternative title from the array to the process;

      [vii]   using the alternative title as a title in association with the process.

Ex. 1001, 12:46–56.

F.    *Evidence Relied on by Petitioner*

Petitioner relies on the following evidence:[2]

| References | | Date | Exhibit |
|---|---|---|---|
| Eaton | U.S. Pub. App. 2003/0208545 A1 | Published Nov. 6, 2003 | Ex. 1006 |
| Cheung | U.S. Pub. App. 2004/0061716 A1 | Published Apr. 1, 2004 | Ex. 1007 |
| Odell | U.S. Pat. 7,590,696 B1 | Issued Sept. 15, 2009 | Ex. 1016 |
| Kim | Korean Pub. App. 2000-0036288 | Published July 5, 2000 | Ex. 1008[3] |

Petitioner also relies on the Declaration of Dean Willis (Ex. 1004).[4]

---

[2] The '179 patent issued from Application 13/554,996, filed July 20, 2012, which is a continuation of Application 13/165,709, filed June 21, 2011, now Pat. No. 8,230,135. Ex. 1001, codes (21), (22), (63).

[3] Exhibit 1008 includes the reference itself together with a certified English translation thereof. The actual reference appears on pages 3–11 of the Exhibit. Hereinafter, we cite to the English translation within the same exhibit, appearing on pages 12–20 of the exhibit.

[4] Patent Owner submits the Declaration of Rajeev Surati, Ph.D. in support of its Preliminary Response. Ex. 2009.

IPR2022-00165
Patent 8,402,179 B1

G.    *Asserted Grounds of Unpatentability*

Petitioner challenges the patentability of claims 1–3 and 6–10 of the

'179 patent based on the following grounds:

| Claims Challenged | 35 U.S.C. §[5] | Reference(s)/Basis |
|---|---|---|
| 1–3, 6, 7, 9 | 102 | Eaton |
| 1–3, 6–10 | 103 | Eaton or<br>Eaton and Cheung, or<br>Eaton and Odell, or<br>Eaton and Cheung and Odell |
| 1–3, 9 | 102 | Kim |
| 1–3, 9 | 103 | Kim |
| 6, 7, 8, 10 | 103 | Kim |
| 1–3, 6–10 | 103 | Kim and Cheung |

## II.    PATENT OWNER'S REQUEST FOR DENIAL
## UNDER 35 U.S.C. § 314(A)

A.    *Background*

Patent Owner contends that the Board should exercise its discretion

under 35 U.S.C. § 314(a) to deny the Petition in light of parallel district

court action involving the '179 patent.  Prelim. Resp. 58–64.  For the reasons

that follow, we decline to exercise our discretion to deny the Petition.

---

[5] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  Based on the record before us, the '179 patent has an effective filing date prior to the effective date of the applicable AIA amendments (March 16, 2013).  Therefore, we apply the pre-AIA version of 35 U.S.C. § 103.

8

IPR2022-00165
Patent 8,402,179 B1

> B.    *Fintiv Factors*

The Board's precedential decision in *Apple Inc. v. Fintiv Inc.*,
IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("*Fintiv*"),
identifies a non-exclusive list of factors parties may consider addressing
where there is a related, parallel district court action to determine whether
such action provides any basis for discretionary denial.  *Fintiv*, Paper 11
at 5–16.  Those factors include:

> 1. whether the court granted a stay or evidence exists that
> one may be granted if a proceeding is instituted;

> 2. proximity of the court's trial date to the Board's
> projected statutory deadline for a final written decision;

> 3. investment in the parallel proceeding by the court and
> the parties;

> 4. overlap between issues raised in the petition and in the
> parallel proceeding;

> 5. whether the petitioner and the defendant in the parallel
> proceeding are the same party; and

> 6. other circumstances that impact the Board's exercise
> of discretion, including the merits.

*Id.* at 5–6.  In evaluating the factors, we take a holistic view of whether
efficiency and integrity of the system are best served by denying or
instituting review.  *Id.* at 6.

The Director of the U.S. Patent and Trademark Office has issued, on
June 21, 2022, a guidance memorandum regarding the application of *Fintiv*
factors for purposes of determining whether to exercise discretion to deny a
petition.  Interim Procedure for Discretionary Denials in AIA Post-Grant
Proceeding with Parallel District Court Litigation, *available at*

IPR2022-00165
Patent 8,402,179 B1

https://www.uspto.gov/sites/default/files/documents/interim_proc_discretion
ary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf
("Guidance Memo").  The Guidance Memo states:  "[T]he PTAB will not
discretionarily deny institution in view of parallel district court litigation
where a petitioner presents a stipulation not to pursue in a parallel
proceeding the same grounds or any grounds that could have reasonably
been raised before the PTAB."  Guidance Memo at 3.

   Petitioner states:  "Petitioner already stipulated that if IPR is
instituted it will not pursue in the parallel litigation *any ground that is raised
or that could have reasonably been raised in an IPR*.  This favors institution.
*Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 19
(PTAB Dec. 1, 2020) (precedential)."  Prelim. Reply 5 (emphasis added).
With regard to this representation by Petitioner, Patent Owner asserts:
"There is no such stipulation of record in this matter or in the District Court,
[*See* EX2018], nor has Petitioner ever provided any such stipulation by any
other means."  Prelim. Sur-reply 4.

   Petitioner's averment itself constitutes written representation to the
Board that if *inter partes* review is instituted in this proceeding it will not
pursue in the parallel litigation any ground that is raised or that could have
reasonably been raised in this proceeding.  Because Petitioner has
represented to the Board that if *inter partes* review is instituted it will not
pursue in the parallel litigation any ground that is raised or that could have
reasonably been raised in an IPR, we decline to deny the Petition
discretionarily.  Guidance Memo at 3.

IPR2022-00165
Patent 8,402,179 B1

## III.    ANALYSIS

*A.    Level of Ordinary Skill in the Art*

Petitioner contends that a person of ordinary skill in the art at the time of the alleged invention "would have a Bachelor's degree in Computer Science, Computer Engineering, Electrical Engineering, or a related field, plus at least two years of professional experience in telecommunications or computer networking, and would have been familiar with popular Internet applications like web browsers, Google's Gmail, AOL Instant Messenger, ICQ, Jabber, Trillian, and Yahoo Instant Messenger; development using Microsoft Windows, Java, Linux and the X-Window System (X11); and Internet Engineering Task Force (IETF) standards including 'Extensible Messaging and Presence Protocol (XMPP): Core.'"  Pet. 5–6 (citing Ex. 1004 ¶¶ 32–35).

Petitioner further asserts:  "Alternatively, a PHOSITA [person having ordinary skill in the art] would possess equivalent additional formal education such as graduate studies, or work experience to replace formal education."  *Id.* (citing Ex. 1004 ¶ 34).  The alternative statement is confusing because it uses the term "equivalent additional" as a modifier to refer to formal education as well as work experience, because something cannot at once be both equivalent and additional to something else.  As such, the alternative statement does not contribute meaningfully to Petitioner's expressed level of skill.  We rely, instead, on Petitioner's primary statement.

Patent Owner's declarant, Dr. Surati, testifies:

It is my belief that a POSITA [person with ordinary skill in the art] of the '179 patent would have possessed:  a bachelor's degree in computer science or electrical engineering, along with two or more years of experience with instant messaging and

IPR2022-00165
Patent 8,402,179 B1

> web-based servers and client systems.  If the qualifications of a
> POSITA were as stated by Petitioner's expert Dr. Willis.

Ex. 2009 ¶ 23.[6]  Based on the language "[i]f the qualifications of a POSITA were as stated by Petitioner's expert Dr. Willis," we read the above-quoted testimony of Dr. Surati as indicating that in rendering his opinions, he has assumed the level of ordinary skill as stated by Mr. Willis, and that he has restated that level of ordinary skill more simply as:  "a bachelor's degree in computer science or electrical engineering, along with two or more years of experience with instant messaging and web-based servers and client systems."

Petitioner's assertion is supported by the testimony of Mr. Willis. Ex. 1004 ¶¶ 32–35.  Petitioner's assertion also appears consistent with the content of the applied prior art references.  *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).  Given that Patent Owner has not disputed Petitioner's assertion of the level of ordinary skill in the art, we adopt Petitioner's primary statement of the level of ordinary skill in the art, but exclude Petitioner's "alternative" statement for reasons discussed above.

B.    *Claim Construction*

We use the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b).  The

---

[6] The curriculum vitae of Dean Willis, however, does not indicate that Mr. Willis received a Ph.D. degree.  Ex. 1004 ¶ 3.

IPR2022-00165
Patent 8,402,179 B1

claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d
1303 (Fed. Cir. 2005) (en banc) is applicable.

Claim terms are generally given their ordinary and customary
meaning as would be understood by one with ordinary skill in the art in the
context of the specification, the prosecution history, other claims, and even
extrinsic evidence including expert and inventor testimony, dictionaries, and
learned treatises, although extrinsic evidence is less significant than the
intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is
dispositive, and it is the single best guide to the meaning of a disputed term.
*Id.* at 1315.

The specification may reveal a special definition given to a claim term
by the patentee, or the specification or prosecution history may reveal an
intentional disclaimer or disavowal of claim scope by the inventor. *Id.* at
1316. If an inventor acts as his or her own lexicographer, the definition
must be set forth in the specification with reasonable clarity, deliberateness,
and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d
1243, 1249 (Fed. Cir. 1998). The disavowal, if any, can be effectuated by
language in the specification or the prosecution history. *Poly-America, L.P.
v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

Only those claim terms that are in controversy need to be construed,
and only to the extent necessary to resolve the controversy. *Nidec Motor
Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed.
Cir. 2017); *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed.
Cir. 2011); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803
(Fed. Cir. 1999).

IPR2022-00165
Patent 8,402,179 B1

Petitioner has not proposed a specific construction for any claim term, and states that no express construction is necessary.  Pet. 5.  Further, Petitioner states that it interprets claims according to the standard set forth in *Phillips*.  *Id.*  Patent Owner has proposed an express construction for the term "event."  Also, the parties' arguments reveal conflicting understanding and interpretation of the term "alternative title."

Patent Owner argues that in the context of the '179 patent, an event is a "detectable condition of a system that can trigger a notification."  Prelim. Resp. 16.  On the current record, however, we are uncertain that Patent Owner's construction is the correct construction.  For example, the '179 patent explains that the method possesses "an event, such as *by way of example but not limitation*, a new mail event, a new instant message event, a reminder event, a calendar event, or *some other event*, and generating a string of characters that includes information associated with the event."  Ex. 1001, 2:3–7 (emphasis added).  The quoted text appears broad.  The '179 patent states that the events used in the embodiments are merely examples.  *Id.*; *see also id.* at 12:30–32 ("As used herein, the term 'embodiment' means an embodiment that serves to illustrate by way of example but not limitation.").

We have no need, however, to provide an express construction for "event," because even under Patent Owner's proposed construction for event, as explained in the discussions of the alleged grounds of unpatentability below, Petitioner has made a sufficient showing for institution purposes.

Petitioner asserts that Patent Owner proposed a different construction in district court litigation for "event," which is broader than what Patent

14

IPR2022-00165
Patent 8,402,179 B1

Owner proposes here because the proposed construction in district court "is not necessarily (or fairly) limited to actions that originate internally in a computer." Paper 16, 1–2. But the same construction proposed by Patent Owner here is one of two constructions proposed by Patent Owner in district court. Ex. 1043, 6. Thus, Patent Owner has not narrowed its construction.[7]

*"alternative title"*

The term "alternative title" appears in independent claim 1. Ex. 1001, 12:54–55. It is evident from Petitioner's arguments regarding limitations 1[vi] and 1[vii] that Petitioner treats any additional second title, where a first title already exists, as satisfying the claimed "providing an alternative title" in limitation 1[vi] and the claimed "using the alternative title as a title" in limitation 1[vii]. Pet. 41–43. Patent Owner, on the other hand, contends:

> Petitioner appears to argue that merely displaying the additional topic information for second event 680 would constitute an "alternative title" as claimed. Rather than providing an alternative title (*i.e.*, one that *replaces* a title), at most, Eaton discloses displaying simultaneous but separate, *additional* information related to separate, additional screen names. That Eaton does not disclose an alternative title is further shown in Figure 7 of Eaton which clearly illustrates that multiple, additional information may be shown (*e.g.*, as highlighted in yellow and green in Figure 7 below); however, information about a first event (highlighted in green) is shown in *additional to and does not replace* information about a second event (highlighted in yellow) – *not as an alternative*:

---

[7] Patent Owner asserts that Petitioner's Second Preliminary Reply (Paper 16) exceeded the authorized scope of that submission. Paper 17, 1. We disagree. Our Order dated May 27, 2022 (Paper 15) authorized Petitioner to explain the significance of the alleged differences between Patent Owner's district court claim construction and Patent Owner's proposed construction before the Board.

15

IPR2022-00165
Patent 8,402,179 B1



## FIG. 7

[The Figure illustrates an embodiment of the user interface of Eaton and is color annotated by Patent Owner to show a first event in green and a second event in yellow.]

Prelim. Resp. 38–39.

The specification of the '165 patent does not specially define "alternative" or "alternative title."  Neither party contends that "alternative" or "alternative title" is a term of art with an art recognized meaning.  In plain English, "alternative" as an adjective designates something that is another option, another choice.  Dictionary.com (accessed June 23, 2022), https://www.dictionary.com/browse/alternative (Ex. 3002) ("affording a choice of two or more things, propositions, or courses of action," "(of two things, propositions, or courses) mutually exclusive so that if one is chosen the other must be rejected: *The alternative possibilities are neutrality and war*.").

16

IPR2022-00165
Patent 8,402,179 B1

The specification of the '179 patent also consistently uses the word "alternative" to mean something in lieu of or in place of another choice. For instance, the '179 patent describes:

> Advantageously, data associated with the event can also (or in the alternative) be provided to the title provisioning engine 616.

Ex. 1001, 8:15–17 (distinguishing "also" from "alternative").

> A given event may cause the title provisioning engine 616 to rewrite the entire title array 618 with title strings associated with the most recent events. Alternatively, a given event may cause the title provisioning engine 616 to append title strings to the end of the title array 618.

*Id.* at 8:24–28 (using "alternative" in mutually exclusive context).

> Blinking can be accomplished by, conceptually, making every other title array string blank. Alternatively, a NULL string could be periodically provided instead of a title array string.

*Id.* at 9:12–15 (using "alternative" in mutually exclusive context).

For the foregoing reasons, we agree with Patent Owner that an "alternative title," when used as a title, must be in lieu of or in place of another title, one which the alternative title replaces.

C.    *Alleged Anticipation of Claims 1–3 and 9 by Kim*

1.    *The Law on Anticipation*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). The anticipation inquiry takes into account the literal teachings of the prior art reference, as well as inferences the ordinarily skilled person would draw from it. *Eli Lilly & Co. v. Los Angeles Biomedical Res. Inst. at*

17

IPR2022-00165
Patent 8,402,179 B1

*Harbor-UCLA Med. Ctr.*, 849 F.3d 1073, 1074–75 (Fed. Cir. 2017); *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991).

Although the elements must be arranged in the same way as is recited in the claim, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990)). Thus, identity of terminology between the prior art reference and the claim is not required.

   2.   *Overview of Kim*

Kim discloses a system and method to enable a user to obtain information whenever necessary by accessing real-time information service servers and receiving information therefrom such as stock prices, advertisements, and breaking news, and placing the received information on the title bar of the currently active window on a display screen. Ex. 1008, Abstr.

Figures 2 of Kim is reproduced below:



18

IPR2022-00165
Patent 8,402,179 B1

Figure 2 depicts what is displayed on the display screen in Kim's real-time information system, particularly in a title bar, when stock price information is received.  *Id* at 12.

Figure 3 of Kim is reproduced below:



*Fig. 3*

Figure 3 depicts what is displayed on the display screen in Kim's real-time information system, particularly in a title bar, when breaking news is received.  *Id*.

Figure 4 of Kim is reproduced below:



*Fig. 4*

IPR2022-00165
Patent 8,402,179 B1

Figure 4 depicts what is displayed on the display screen in Kim's real-time information system, particularly in a title bar, when stock price information and breaking news have been received. *Id*. Here, the breaking news has replaced the initial title "Document-Wordpad" in the title bar, and the stock price has been placed also within the title bar, in a position previously occupied by the breaking news.

Kim provides a user the ability to select desired information from the title bar of the active window according to his or her preference and to obtain such desired information by clicking on the corresponding icon in the title bar. *Id.* at 14. Kim states "the present invention has the effect of providing convenience to the user in that real-time information can be searched without interference with other programs by presenting information provided in real-time on the title bar of the currently active window of Windows." *Id.*

### 3.    *Independent Claim 1*

Claim 1 begins with this preamble: "A method, comprising." *Id.* at 12:46. Petitioner asserts that Kim discloses a method to enable a user to obtain information whenever necessary by accessing a real-time information server, and receiving data such as stock prices, advertisements, and breaking news on the title bar of a currently active window. Pet. 62–63 (citing Ex. 1008, 13). Patent Owner does not dispute that Kim describes such a method. Petitioner has sufficiently accounted for the preamble recitation.

Limitation 1[i] recites "processing an event that calls for user notification." Ex. 1001, 12:47. Petitioner asserts that Kim discloses such processing in the form of receiving, storing, and displaying real-time information to be displayed in an application's title bar. Pet. 63 (citing Ex. 1004 ¶ 196). Petitioner explains:

IPR2022-00165
Patent 8,402,179 B1

> For example, Kim discloses "receiv[ing] real-time information
> to be displayed on the title bar on the Windows display screen of
> the personal computer from the information server and stor[ing]
> it in temporary memory, and display[ing] the information on the
> title bar whenever new information is provided to allow the users
> to easily obtain information at any time." Ex[1008], 9–2
> (emphasis added).

*Id.* With regard to "event that calls for user notification," Petitioner

explains: "Kim discloses that this real-time information can include events

such as 'stock prices, advertisements, and breaking news' (EX[1008],

Abstract) *received* at the user's computer from, for example, 'a stock

information server, an advertisement server, a breaking news server, [] a text

broadcasting server, or a combination thereof.' *Id.*, 9-2." *Id.* at 63–64

(emphasis added).

Petitioner's assertions are supported by the cited evidence. As

indicated by Petitioner, the "event that calls for user notification" is the

receipt at the user's computer of a stock price or breaking news. Pet. 63–64.

The purpose of receiving real-time stock price and real-time breaking news

is to inform the user about such stock price and breaking news. Thus, these

receptions are events that call for user notification. Notwithstanding Patent

Owner's arguments to the contrary, discussed below, Petitioner has

sufficiently established that Kim discloses limitation 1[i].

Patent Owner argues that in the context of the '179 patent, an event is

a "detectable condition of a system that can trigger a notification." Prelim.

Resp. 16. However, even under the construction proposed by Patent Owner,

Petitioner has made a sufficient showing for limitation 1[i].

We read the Petition as having identified the receipt at the user's

computer of real-time information from outside servers as the claimed event.

Pet. 63–64. Patent Owner does not explain why that receipt of real-time

IPR2022-00165
Patent 8,402,179 B1

information at the user's computer is not a "detectable condition of a system that can trigger a notification."  We find that it is.  Even a dictionary definition submitted by Patent Owner supports a finding that it is.  Note, for example, Exhibit 2015 (https://www.computerhope.com/jargon/e/event.htm) which states:

> In programming, an **event** is an action that occurs as a result of the user or another source, such as a mouse click.  An **event handler** is a routine that deals with the event, allowing a programmer to write code that is executed when the event occurs.
>
> **Other common event examples**
>
> - A web browser completely loading a web page.
> - A file being created or modified on a filesystem.
> - A hardware sensor such as a webcam or microphone receiving sensory input.
> - The arrival of incoming network traffic.
> - The occurrence of an error at the program or system level.

Ex. 2015, 1.  The receipt of real-time information likens the loading of a web page or the arrival of incoming network traffic.  Further, examples in the '179 patent of events include a new mail event and a new instant message event.  Ex. 1001, 2:10–12.  The reception of real-time information also likens receiving new email or new instant message at the computer.

Patent Owner also argues that because Kim displays whatever information it receives, it does not disclose and is not directed to "receiving information of an event that calls for user notification."  Prelim. Resp. 49. Patent Owner adds that the system of Kim "does not make any distinction between the type [or] kind [of] information it receives and the information it displays."  *Id.*  The arguments are non-availing because what is displayed by

IPR2022-00165
Patent 8,402,179 B1

Kim, stock price and breaking news, is information of an event that calls for user notification, i.e., the receipt by Kim's system of real-time information.

Accordingly, Petitioner has sufficiently shown that Kim discloses limitation 1[i].

Limitation 1[ii] recites "generating an event notification for the event." *Id.* at 12:48.

Petitioner identifies in Kim's Figure 3 the text "2:10pm Shin Chang-Won arrested (Yonhap News)" provided on the title bar of a Microsoft WordPad application window as the event notification that is generated after the computer receives that breaking news. Pet. 65. Figure 3 of Kim, color annotated by Petitioner, is reproduced below:



Annotated Figure 3 depicts what is displayed on the display screen in Kim's real-time information system, particularly in a title bar, when breaking news is received, and Petitioner has colored green the received breaking news that is now placed in the title bar. Ex. 1008, 12; Pet. 66.

Petitioner explains that the user's computer, which has received the breaking news, generates an event notification for the event by creating a

IPR2022-00165
Patent 8,402,179 B1

message for display in the title bar, which message is a string of characters that includes information associated with the event.  Pet. 66 (citing Ex. 1004 ¶¶ 199–203).  Petitioner's assertions are supported by the cited evidence.

Patent Owner argues that because Kim does not disclose an event within the scope of claim 1, Kim also does not disclose the step of generating an event notification for the event.  Prelim. Resp. 51.  We have already addressed above Patent Owner's argument that Kim does not disclose an event within the scope of claim 1 and disagree with Patent Owner's contention that Kim does not disclose an event within the scope of claim 1.

Patent Owner argues that Kim merely displays real-time information that it receives and thus does not generate an event notification.  Prelim. Resp. 50.  Patent Owner asserts that Petitioner conflates "information of an event" with "generating an event notification for the event."  *Id.* at 51.  According to Patent Owner, simply displaying received information, even in the task bar of an open window, does not constitute generating event notification, because event notification and event or event information cannot be the same.  *Id.*  We disagree.  Event information may be the most direct notification of the event.  There is no requirement that event information may not serve as event notification.  Further, Petitioner has regarded reception by Kim's system of real-time information, not just the information content, as an event.  In that context, the event and the event notification are not the same, even as applied by Petitioner.

Petitioner has sufficiently shown that Kim discloses limitation 1[ii], "generating an event notification for the event."

24

IPR2022-00165
Patent 8,402,179 B1

Limitation 1[iii] recites "storing the event notification in an array." *Id.* at 12:49. Petitioner explains that the event notification in Kim has to be stored by noting that alternative event notifications are depicted "in Figures 2–4 of Kim (in which the title bar alternates between a stock price update, a breaking news event, and a combination of both, respectively)." Pet. 67. Petitioner further explains:

> Thus, Kim discloses that a list of real-time information events is "store[d] in temporary memory" so that the title bar can be updated as new information is received, including with new or combined event notifications (the combination showing that events are stored in a list so that a previously stored message can be displayed with the most recent event, as in Figure 4). A PHOSITA would understand that such information would be stored in some type of list in Kim's "temporary memory," which the '179 Patent indicates is a type of array. Ex[1004], ¶¶ 204–206.

Pet. 67–68. Although we agree that the information would be stored in temporary memory, Petitioner does not sufficiently persuade us that Kim discloses a "list" stored in memory, even assuming that a list constitutes an array. Kim makes no mention of any "list" or "array." The fact that two event notifications are shown in the title bar does not mean they are stored as a list, and the fact that Kim's series of event notifications have to be stored in memory does not mean they have to be stored in a list type data structure. Mr. Willis, Petitioner's expert witness, provides no explanation in that regard. Ex. 1004 ¶¶ 204–206.

Accordingly, Petitioner has not sufficiently shown that Kim discloses limitation 1[iii].

> *4.    Dependent Claim 2, 3, and 9*

Claims 2, 3, and 9 each depend from claim 1. Ex. 1001, 12:57–67, 13:14–16. As such, they each incorporate all of the limitations of claim 1.

IPR2022-00165
Patent 8,402,179 B1

Accordingly, the deficiency of Petitioner's assertion of anticipation of claim 1 by Kim equally applies to claims 2, 3, and 9.

> 5.      *Conclusion*

We have substantial doubt and concern about Petitioner's assertion that claims 1–3 and 9 are anticipated by Kim.

D.      *Alleged Obviousness of Claims 1–3 and 9 over Kim*

> 1.      *The Law on Obviousness*

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations, including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). "[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Kahn*, 441 F.3d at 988.

> ### 2. Independent Claim 1

Kim discloses the preamble of claim 1 as well as limitations 1[i] and

1[ii] as discussed above in Section II.C.3.

Limitation 1[iii] recites "storing the event notification in an array."

*Id.* at 12:49. Petitioner asserts that storing an event notification in an array

would have been obvious to one with ordinary skill in the art. Pet. 68.

Petitioner explains:

> An "array" is a fundamental data structure for storing
> information well-known to a PHOSITA. *Id.*, ¶ 207. For
> example, as explained in a 1983 reference on the related
> Smalltalk system, an "array is a simple data structure object
> whose contents can be referenced by an integer index from one
> to a number that is the size of the array," such as an exemplary
> "array of seven strings described by the expression#('food'
> 'utilities' 'rent' 'household' 'transportation' 'taxes'
> 'recreation'). *Id.* (quoting EX[1015], 043). In addition to their
> simplicity, a PHOSITA would understand that an array would be
> a suitable and desired data structure for storing the event
> notifications in Kim. Ex[1004], ¶ 208. After all, an array would
> store the event notification sin a simple list of character strings
> that can be accessed with a known index, and the array will
> "respond to messages requesting access to [its] content[]." *Id.*
> (quoting Ex[1015], 043). A PHOSITA would also know that an
> array is a simple and routine design choice, with applicability in
> this context, based on the teachings in Eaton of event arrays
> stored in memory, as explained for Claim 1[iii] in Ground 1.
> Ex[1004], ¶ 209.

*Id.*

Patent Owner argues "Kim does not describe a list and, in fact, would

have no use for any list or array because the real-time information is simply

passed through to be displayed." Prelim. Resp. 54. Patent Owner also

asserts "there is no disclosure in Kim that an array would, in any way, be

required or even desirable to accomplish the stated objectives of Kim to

IPR2022-00165
Patent 8,402,179 B1

display real-time information." *Id.* Patent Owner explains that Kim's real-time information is only stored in temporary memory and is displayed whenever the information is provided, and thus there is no meaningful or rational motivation to use any array for storage in Kim. *Id.* at 54–55.

Although it is true that Kim's real-time information that is received, e.g., stock price and breaking news, need not be permanently stored, it is equally true that the information has to be stored in temporary memory. Indeed, Kim describes the information is stored in temporary memory (Ex. 1008, 13) and Patent Owner does not explain how Kim can display more than one such information if it does not have in storage previously received information. Also, in an obviousness analysis, Kim does not itself have to describe that it is useful to use an array to implement the temporary memory. It is sufficient if one with ordinary skill in the art would have had reason to use an array as such temporary memory and have a reasonable expectation of success. Petitioner has sufficiently made such a showing, for institution purposes. Petitioner asserts that one with ordinary skill in the art would have used an array to store Kim's event notifications because an array is a simple data structure and one with ordinary skill in the art would have understood that an array would have been a suitable and desired data structure for storing the event notifications in Kim. The assertions are supported by the testimony of Petitioner's expert, Mr. Willis. Ex. 1004 ¶ 208. Patent Owner does not argue that an array is not a simple data structure, even if used as temporary memory. Nor does Patent Owner argue that an array would not work to serve as the temporary memory in Kim.

IPR2022-00165
Patent 8,402,179 B1

Accordingly, Petitioner sufficiently has accounted for limitation 1[iii], for institution purposes, in the context of alleged obviousness of claim 1 over Kim.

Limitation 1[iv] recites "providing the event notification from the array to a process executed by a processor." *Id.* at 12:50–51. Having sufficiently established that one with ordinary skill in the art would have desired to implement Kim's temporary memory with an array for storing the event notification, as discussed above in the content of limitation 1[iii], Petitioner asserts:

> Figures 2–4 of Kim show event notifications being provided ("from the array as discussed in Claim 1[iii]) to a process executed by a processor  (namely, the Microsoft WordPad process executed by a processor on the user's IPB-PC-based personal computer). Ex[1008], Abstract, 9–1, 9–2; Ex[1004], ¶¶ 211–13.  For example, Figure 3 below shows that a breaking news event notification ("2:10PM Shin-Won arrested (Yonhap News)") is provided on the title bar of a Microsoft WordPad application window (the event notification message is shaded in green).



Pet. 69–70.

IPR2022-00165
Patent 8,402,179 B1

Annotated Figure 3 depicts what is displayed on the display screen in Kim's real-time information system, particularly in a title bar, when breaking news is received, and Petitioner has colored green the received breaking news that is now placed in the title bar.  Ex. 1008, 12; Pet. 69.

Petitioner's assertions are supported by the cited evidence.  Patent Owner makes several argument, many of which already have been addressed above in the context of other limitations of claim 1, e.g., that Kim does not disclose an array, that Kim does not disclose an event notification, and that Kim does not disclose storing an event notification in an array, and need not be discussed again here.  Further, although Kim does not expressly state that the event notification stored in its temporary memory is provided to the WordPad process for display, what a reference discloses reasonably can be inferred based on other disclosure.  *See Eli Lilly and Co. v. Los Angeles Biomedical Res. Inst. at Harbor-UCLA Med. Ctr.*, 849 F.3d 1073, 1074–75 (Fed. Cir. 2017); *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003).

Patent Owner does additionally argue that "there is also no disclosure in Kim of a plurality of character strings in the array."  Prelim. Resp. 56.  But limitation 1[iv] does not require storing a plurality of character strings in the array.  In any event, even if limitation 1[iv] does require storing a character string in the array, the event notification "2:10PM Shin-Won arrested (Yonhap News)" sent to the process for display does appear to be a character string.  Ex. 1008, Fig. 3.

Accordingly, Petitioner sufficiently has shown that Kim discloses limitation 1[iv].

IPR2022-00165
Patent 8,402,179 B1

Limitation 1[v] recites "using the event notification as a title in association with the process."  *Id.* at 12:52–53.  Petitioner explains that this limitation is met by Kim because the breaking news event notification is placed in the title bar of the Microsoft WordPad application window as shown in Kim's Figure 3.  Pet. 70–72 (citing Ex. 1008, 12–14, Figs. 2–4; Ex. 1004 ¶¶ 214–18).  The assertion is supported by the cited evidence.  Patent Owner reiterates its argument that Kim does not disclose generating an event notification and thus does not disclose using an event notification as a title.  Prelim. Resp. 57.  The argument that Kim does not disclose generating an event notification already has been addressed above in the context of limitation 1[ii] and need not be repeated here.  It does not undermine Petitioner's assertion.

Accordingly, Petitioner sufficiently has shown that Kim discloses limitation 1[v].

Limitation 1[vi] recites "providing an alternative title from the array to the process."  *Id.* at 12:54.

Petitioner provides (Pet. 74) an annotated Figure 4 of Kim, reproduced below:



31

IPR2022-00165
Patent 8,402,179 B1

Annotated Figure 4 depicts what is displayed on the display screen in Kim's real-time information system, particularly in a title bar, when stock price information and breaking news have been received, and Petitioner has colored green the breaking news and the stock price information in the title bar. Ex. 1008, 12; Pet. 74. Here, relative to what was previously shown in Kim's Figure 3, the breaking news has replaced the initial title "Document-Wordpad" in the title bar, and the stock price has been placed within the title bar, in a position previously occupied by the breaking news.

Petitioner explains:

> Figure 4 of Kim shows that an alternative title is provided from the array to the process (the WordPadprocess). In this example, the user's computer replaces the "Document - WordPad" title in the WordPad title bar with the breaking news alternative title, "2:10pm Shin Chang-Won arrested (Yonhap News)," and replaces the previous title showing that same message on the right side of the title bar with the new, alternative title based on a stock price event, "Hyundai Electronics 32,800+200." Ex[1008], 9-1; *see also id.*, 9-3 ("the handle value on the currently active window is extracted according to the task management of the task management unit to replace the title bar value of the corresponding window with the information provided in real-time").

Pet. 73–74.

Petitioner's assertion is supported by the cited evidence. Patent Owner does not present arguments not already addressed above. Petitioner has sufficiently shown that Kim discloses limitation 1[vi].

Limitation 1[vii] recites "using the alternative title as a title in association with the process." *Id.* at 12:55–56. Petitioner's assertions for limitation 1[vi], discussed immediately above, also sufficiently accounts for limitation 1[vii]. Patent Owner does not present separate arguments for

IPR2022-00165
Patent 8,402,179 B1

limitation 1[vii].  Petitioner has sufficiently shown that Kim discloses limitation 1[vii].

For the foregoing reasons, Petitioner has shown a reasonable likelihood that it would establish obviousness of claim 1 over Kim.

### 3. *Dependent Claims 2, 3, and 9*

Claims 2, 3, and 9 each depend, directly or indirectly, from claim 1. Each dependent claim incorporates all the limitations of the claim on which it depends.

Petitioner sufficiently address claims 2, 3, and 9 on pages 75–77 of the Petition.  Patent Owner does not present arguments for claims 2, 3, and 9, additional to those it presents for claim 1 which we already addressed above.  Petitioner has shown a reasonable likelihood that it would prevail in establishing obviousness of claims 2, 3, and 9 as obvious over Kim.

### E. *Alleged Obviousness of Claims 6, 7, 8, and 10 over Kim*

Claim 6 depends from claim 1 and adds:  "further comprising alternating using the event notification as a title in association with the process with a variation of the event notification."  Ex. 1001, 13:6–8. Petitioner explains:

> It would have been obvious to a PHOSITA that this event notification could alternate with the variation of "breaking news" as the title, because the system in Kim already has this information available to it (knowing that the information came from a "breaking news" server) and because a PHOSITA would be motivated to provide this variation to inform the user of the type of event information that is being displayed.  [Ex. 1004] ¶ 251.

Pet. 78 (citing Ex. 1004 ¶ 251).  Petitioner's assertion is supported by the cited evidence and Patent Owner has not presented contrary argument for

33

IPR2022-00165
Patent 8,402,179 B1

this claim.  Petitioner has shown a reasonable likelihood that it would prevail in establishing obviousness of claim 6 over Kim.

Claim 7 depends from claim 1 and adds:  "further comprising generating the alternative title as a variation of the event notification." Ex. 1001, 13:9–10.  For the same reasons it put forth with respect to the additional limitation of claim 6, Petitioner asserts that one with ordinary skill in the art would have had reason to generate and use a variation of the event notification as the alternative title.  Pet. 80 (citing Ex. 2004 ¶¶ 255–56). Petitioner's assertion is supported by the cited evidence and Patent Owner has not presented contrary argument for this claim.  Petitioner has shown a reasonable likelihood that it would prevail in establishing obviousness of claim 7 over Kim.

Claim 8 depends from claim 1 and adds:  "further comprising: "receiving affirmation that user notification was successful; clearing the array." Ex. 13:11–13.  Petitioner explains:

> Kim discloses that "the handle value on the <u>currently active</u> <u>window</u> is extracted according to the task management of the task management unit to <u>replace the title bar value of the</u> <u>corresponding window with the information provided in real-</u><u>time</u>, the title bar value of the <u>current window is restored and the</u> <u>process described above is repeated if the user executes a task</u> <u>switch</u> and the active control is given to a different window, and the desired information is controlled by providing  part that controls the registered information and the type of real-time information displayed in the form of a tray icon of the Windows system to promote user convenience."   Ex[1008], 9-2, 9-3 (emphasis added).  In other words, the user's selection of a different window than the currently active one (which clears the event title on the titlebar) shows that the event notification was successfully received by the user and that this information is relayed to the PC's operating system.  *See also* Ex[1004], ¶¶ 257–58.

IPR2022-00165
Patent 8,402,179 B1

Pet. 80–81.  The assertions are supported by the cited evidence and Patent

Owner has not presented arguments to the contrary in that regard.  Petitioner

sufficiently has shown that Kim discloses "receiving affirmation that user

notification was successful; clearing the array," assuming that the temporary

storage is implemented by an array as discussed above in the context of

limitation 1[iii].

Petitioner has shown a reasonable likelihood that it would prevail in

establishing obviousness of claim 8 over Kim.

Claim 10 depends from claim 1 and adds:  "further comprising:  using

the event notification as a title in association with the process one or more

time; removing the event notification from the array."  Ex. 1001, 13:17–20.

Petitioner already sufficiently explained above how event notification is

used one time as a title in association with the process, in the context of

limitation [v].  Petitioner also explains that because Kim describes its

memory as "temporary memory," it would have been obvious to one with

ordinary skill in the art, where the temporary memory is implemented as an

array and event notification is stored in the array, to remove the event

notification from the array.  Pet. 81–82.  Patent Owner has not presented

separate arguments to the contrary for claim 10.  Petitioner has shown a

reasonable likelihood that it would prevail in establishing obviousness of

claim 10 over Kim.

F.   *Alleged Obviousness of Claims 1–3 and 6–10 over Kim and Cheung*

1.   *Overview of Cheung*

Cheung discloses a central notifications manager user interface for

presenting and managing notifications and alerts received from a plurality of

different sources.  Ex. 1007, code (57).  For example, the different sources

IPR2022-00165
Patent 8,402,179 B1

can be a spreadsheet program, email application, or messaging service that produce alerts transmitted over the Internet. *Id.* Pop-up reminders are displayed to notify the user when a task becomes due. *Id.* An entire list of notifications and alerts that are active can be selectively displayed, thus enabling the user to manage the notifications and alerts. *Id*.

Figure 3A of Cheung is reproduced below:



**FIG. 3A**

Figure 3A depicts an exemplary central notification user interface 120 that automatically pops open for display on the user's monitor. *Id.* ¶ 30. The user's focus does not shift to the central notification user interface until the user clicks on one of the options displayed therein. *Id.* ¶ 32. "A title bar 122 indicates that the current notification is generated by one of the OFFICE™ software programs." *Id.* ¶ 30.

Figure 5B of Cheung is reproduced below:



**FIG. 5B**

Figure 5B illustrates icon 192 that appears in the dock or taskbar while the central notification manager is running. *Id.* ¶¶ 18, 38. Icon 192 shows count

IPR2022-00165
Patent 8,402,179 B1

194 shows a count of the number of active notifications and alerts that can be accessed if the user opens the central notification user interface. *Id.* ¶ 38.

Figure 5A of Cheung is reproduced below:



*FIG. 5A*

Figure 5A illustrates active notifications and alerts provided by Cheung's central notification manager for review by the user when the user opens the central notification user interface. Ex. 1007 ¶¶ 17, 35. Notifications and alerts 160 through 174 are displayed to a user in a central notification manager user interface. *Id.* ¶ 35. Adjacent to the shown display are descriptions identifying the particular alert or notification that appears in the user interface immediately to the left. *Id.*

2.   *Claims 1–3 and 6–9*

We have reservation and concern for Petitioner's assertion of unpatentability of claims 1–3 and 6–9 over Kim and Cheung.

37

IPR2022-00165
Patent 8,402,179 B1

With respect to claims 1–3 and 9, Petitioner notes that they already would have been rendered obvious by Kim alone as explained in Petitioner's discussion of alleged obviousness of claims 1–3 and 9 over Kim.  Pet. 77. Petitioner does not identify or add anything from Cheung on which it relies to combine with the teachings from Kim.  *Id.* at 77–78.  Thus, the alleged obviousness of claims 1–3 and 9 over the combined teachings of Kim and Cheung is not supported by reasoning with rational underpinning.

Claim 6 depends from claim 1 and adds:  "further comprising alternating using the event notification as a title in association with the process with a variation of the event notification."  Ex. 1001, 13:6–8. Petitioner already has alleged obviousness of claim 6 over Kim.  We addressed that assertion above and determined that Petitioner has made a sufficient showing of obviousness over Kim alone.  Here, Petitioner additionally relies on Cheung's teaching of using an alleged event notification variation as shown in Cheung's Figure 5B, i.e., icon 192 provided in taskbar 190, with which is associated count 194 of the number of active notification and alerts.  Pet. 79.

Petitioner explains:

> In this combination, the "count 194" notification icon of the "number of active notifications and alerts" [of Cheung] would be provided on the titlebar in Kim as an alternating title to show the number of notifications that Kim's system has received for display, such as the number of "breaking news" events.  This variation on the event notification associated with the breaking news event, for example, would let a user know how many such events had been received for display.  EX[1004], ¶¶ 252–53.

Pet. 79–80.  But Petitioner does not identify where Cheung describes "the count 194" notification icon as an "alternating" icon relative to some other

38

IPR2022-00165
Patent 8,402,179 B1

notification or alert.  It appears that this icon is always on display so long as the central notifications manager application is running.  Ex. 1007 ¶ 38.

Also, as motivation to combine teachings, Petitioner explains that Cheung discloses that there is a clear benefit for a user of a computing device to receive information of potential value and Cheung notes a "need to better manage the various kinds of notifications and alerts that are presented to a user on a display."  Pet. 83 (citing Ex. 1007 ¶ 3; Ex. 1004 ¶¶ 242–245). Mr. Willis testifies that "the prior art provides a PHOSITA with the explicit motivation to look to '716 Cheung's display techniques to improve the event notification scheme in '288 Kim."  Ex. 1004 ¶ 244.  Such alleged motivation to combine teachings is vague and nebulous.  Neither Petitioner nor its expert Mr. Willis identifies any specific benefit or advantage to use in Kim the "count 194" notification icon of Cheung as an alternating event notification, in light of the fact that Kim's events are real-time breaking news and/or stock price which do not require a response.

Petitioner further asserts that the prior art provides one with ordinary skill in the art a reason "to look to Cheung's techniques to improve the event notification scheme in Kim."  Pet. 83–84.  Even if so, that does not sufficiently establish what technique in Cheung, if adopted, would result in an improvement of Kim, and why.  Petitioner additionally asserts that one with ordinary skill in the art would have understood that Kim and Cheung's techniques "could be implemented in Kim with a full expectation of success."  *Id.* at 84.  But Petitioner's accounting lacks adequate explanation of which technique of Cheung one with ordinary skill in the art would have wanted to adopt in Kim for what reason and to achieve what benefit.

IPR2022-00165
Patent 8,402,179 B1

Petitioner further asserts that both Kim and Cheung are directed to providing event notifications to Microsoft Windows applications, are from the same time period and field, and concern solutions to similar problems. Pet. 83. As alleged motivation to combine teachings, these are also vague and nebulous and do not adequately support specific combinations of teachings.

Claim 7 depends from claim 1 and adds: "further comprising generating the alternative title as a variation of the event notification." Ex. 1001, 13:9–10. Petitioner already has alleged obviousness of claim 7 over Kim. We have addressed that assertion above and determined that Petitioner has made a sufficient showing for institution purposes. Here, Petitioner additionally relies on Cheung's teaching of using an event notification variation as shown in Cheung's Figure 5B, i.e., icon 192 provided in taskbar 190, with which is associated count 194 of the number of active notification and alerts. Pet. 79–80.

Petitioner's reasoning with respect to a variation of event notification as alternative title is the same as its reasoning for a variation of event notification as the title. *Id.* at 80. The same analysis for claim 6 applies here and need not be reiterated.

Claim 8 depends from claim 1 and adds: "further comprising: "receiving affirmation that user notification was successful; clearing the array." Ex. 1001, 13:11–13. With respect to "receiving affirmation that user notification was successful," Petitioner asserts that Cheung discloses this functionality. Pet. 81. Even assuming that Cheung discloses such a feature, for the same reasons discussed above in the context of claim 6, Petitioner

40

IPR2022-00165
Patent 8,402,179 B1

has not adequately explained the motivation for one with ordinary skill in the art to apply that teaching of Cheung in Kim.

    *3.*    *Claim 10*

    Claim 10 depends from claim 1 and adds: "further comprising: using the event notification as a title in association with the process one or more times; removing the event notification from the array." Ex. 1001, 13:17–20. Petitioner already has alleged obviousness of claim 10 over Kim. We have addressed that assertion above and determined that Petitioner has made a sufficient showing for institution purposes. Here, Petitioner additionally relies on Cheung's teaching of removing the event notification from storage. Pet. 82. Petitioner explains:

> [A] PHOSITA would understand that Cheung's method of removing one or more (including all) event notifications from the associated storage device would improve system performance, including by freeing up storage and processing space (e.g., garbage collection, a well-known concept would be employed in Kim as disclosed in Cheung to improve Kim's system). Ex[1004] ¶ 245.

*Id.* at 84. The articulated reasoning has rational underpinning and is supported by the cited evidence. Patent Owner has not presented arguments to the contrary with respect to claim 10 in that regard.

    As discussed above, Petitioner did not fully explain how Kim would be modified by Cheung to arrive at the subject matter recited in independent claim 1. So, in assessing the Kim-Cheung combination used in the challenge to dependent claim 10, we understand Petitioner to be asserting that Kim teaches or suggests all limitations of claim 1. That is, Petitioner asserts that Kim teaches or suggests all the limitations of claim 10 that are from claim 1, and Petitioner relies on a combination of Kim and Cheung to teach the subject matter that is exclusively recited in claim 10. During trial,

IPR2022-00165
Patent 8,402,179 B1

the parties are invited to discuss whether the Petition adequately supports
this understanding.  At this stage and on this record, however, Petitioner has
shown a reasonable likelihood that it would prevail in establishing
obviousness of claim 10 over Kim and Cheung because (1) our concern with
respect to claim 1 over the Kim-Cheung combination, as noted above, is
alleviated by Petitioner's express reliance on the teachings of Cheung for
claim 10 and (2) Petitioner's argument and evidence in support of the
alleged unpatentability of claim 10 is sufficient for institution.

### 4.    *Conclusion*

Petitioner has shown a reasonable likelihood that it would prevail in
establishing obviousness of claim 10 over Kim and Cheung.

### G.    *Alleged Anticipation of Claims 1–3, 6, 7, and 9 by Eaton*

### 1.    *Overview of Eaton*

Eaton discloses an instant message communication system that
provides notification of one or more events.  Ex. 1006, code (57).  Figure 1
is reproduced below:



*FIG. 1*

42

IPR2022-00165
Patent 8,402,179 B1

Figure 1 is a block diagram of one embodiment of an instant message communication system. *Id.* ¶ 14. Instant message communication system 100 includes server 110 and a plurality of instant message devices 120 selectively communicating as active instant message participants 130. *Id.* ¶ 26. Server receiver 140 within server 110 is coupled to and receives information about a plurality of events 180. *Id.* ¶ 28. Regarding what can be events, Eaton states as follows:

> It will be appreciated by those of ordinary skill in the art that the plurality of events 180 can include, for example, physical events 210 such as sporting events, television or radio broadcast events 200, wireless content events 220, internet events 230, chat session events 240, or an equivalent.

*Id.* ¶ 28.

Figure 2 of Eaton is reproduced below:



*FIG. 2*

Figure 2 illustrates a server memory in Eaton's instant message communication system. *Id.* ¶ 15. Server memory 160 stores a plurality of screen names 280. *Id.* ¶ 31. Each screen name 290 of the plurality of screen names 280 represents one or more events such as event 300 of the plurality of events 180. *Id.*

IPR2022-00165
Patent 8,402,179 B1

Figure 4 of Eaton is reproduced below:



Figure 4 illustrates one embodiment of instant message user interface 360. *Id*. ¶ 45. Instant message user interface 360 includes information displayed regarding one or more events of interest 420. *Id*. For each event of interest, at least one of event identifier 430, event status 440, event presence indicator 450, and/or event availability indicator 460 can be displayed within instant message user interface 360. *Id*. Each event identifier 430 preferably has associated event status 440. *Id*. ¶ 47. Event status 440 provides visual and/or audible notification to the device user of the presence of event 300. *Id*.

IPR2022-00165
Patent 8,402,179 B1

Figure 6 of Eaton is reproduced below:



Figure 6 is a block diagram of an alternate embodiment of a server memory for use within a server of the instant message communication system. *Id.* ¶ 19.  Server memory 160 preferably stores a plurality of topic screen names 520.  *Id.* ¶ 57.  Each topic screen name 530 of the plurality of topic screen names 520 represents topic 540 including a plurality of topic events 550.  *Id.*  Topic screen name 530, topic 540, and the plurality of topic events 550 are stored within server memory 160.  *Id.*

Figure 7 of Eaton is reproduced below:



IPR2022-00165
Patent 8,402,179 B1

Figure 7 illustrates an alternate embodiment of an instant message user interface for use within the instant message device of Figure 3. *Id*. ¶ 20. For each topic 540, topic screen name indicator 560, topic screen name status 570, and topic screen name history 580 can be displayed within instant message user interface 360. *Id*. ¶ 59. Topic screen name indicator 560 represents topic 540 of the plurality of topics of interest to the device user. *Id*. ¶ 60. Each topic screen name indicator 560 has an associated topic screen name status 570. *Id*. ¶ 61. Topic screen name status 570 provides visual and/or audible notification to the device user of the presence of the information associated with topic 540. *Id*. Topic screen name history 580 preferably includes information associated with the plurality of topic events 550 such as topic screen name history 580 includes event identifier 430, event status indicator 440, event presence indicator 450, and event availability indicator 460 for event 300 of the plurality of topic events 550. *Id*. ¶ 62.

> ### 2.   *Independent Claim 1*
>
> #### a)   *Limitation 1[i]*

Claim 1 recites limitation 1[i] as follows: "processing an event that calls for user notification." Ex. 1001, 12:47. Petitioner asserts that Eaton discloses limitation 1[i]. Pet. 24. Petitioner explains:

> Eaton discloses a server receiver 140 that is "coupled to and receives information about a plurality of events 180" that "can include, for example, physical events 210 such as sporting events, television or radio broadcast events 200, wireless content events 220, internet events 230, chat session events 240, or an equivalent." EX[1006] at [0028]. "Each event can be separately designated within the instant message communications system 100, or alternatively can be grouped within one or more topics (not shown)."

46

IPR2022-00165
Patent 8,402,179 B1

Pet. 25.  Petitioner presents (*id.* at 26) an annotated version of Eaton's
Figure 1, reproduced below:



Figure 1 is a block diagram of one embodiment of an instant message
communication system of Eaton, and Petitioner has shaded green what
Petitioner regards as a plurality of events, shaded blue server 110, and
shaded red server processor 150.  Ex. 1006 ¶ 14.  Petitioner further explains:
"Eaton discloses that the 'server processor 150 utilizes conventional signal
processing techniques for processing received signals from the server
receiver 140,' such as the events described above."  Pet. 26 (quoting
Ex. 1006 ¶ 30).

Petitioner's assertions are supported by the cited evidence.  Patent
Owner argues, however, that Petitioner has not shown that what are labeled
as events in Eaton, actually "are events in the context of an event-driven
system."  Prelim. Resp. 27.  Patent Owner argues that in the context of the
'179 patent, an event is a "detectable condition of a system that can trigger a
notification."  Prelim. Resp. 16.  However, even under the construction
proposed by Patent Owner, Petitioner has made a sufficient showing for
limitation 1[i].  It is manifestly evident that, as identified by Petitioner,

47

IPR2022-00165
Patent 8,402,179 B1

Eaton's receipt of "information about a plurality of events 180," i.e., television or radio broadcast events 200, wireless content events 220, internet events 230, and chat session events 240, is a "detectable condition of a system that can trigger a notification."

      *b)*    *Limitation 1[ii]*

Claim 1 recites limitation 1[ii] as follows: "generating an event notification for the event." Ex. 1001, 12:48. Petitioner asserts that Eaton discloses this step. Pet. 28. However, it is unclear precisely what Petitioner has identified as the event notification that it asserts Eaton generates.

Petitioner explains:

> The "server processor 150 is coupled to the server memory 160," and the "server processor 150 . . . is programmed to <u>activate</u> at least one of the plurality of screen names 280 such as the screen name 290 stored in the server memory 160 <u>in response to the presence of one or more events such as the event 300 represented by the screen name 290</u>." *Id.*, [0031], [0032] (emphasis added); *see also id.*, [0034]. After a screen name that represents an event is activated, the screen name functions as "one of the active instant message participants 130 of the instant message communication system 100," depicted in Figure 1 above. *Id.* This means that "server transmitter 170 is coupled to and receives one or more command signals 310 from the server processor 150, and in response to a command signal, communicates instant messages as an active instant message participant." *Id.*, [0035]. As such, the server transmitter will send "event presence notification messages" for events activated by the server processor 150 to an instant message device 320, as depicted in Figure 3, above. *See id.*, [0035]-[0038]. These "<u>event presence notification messages</u>" can be received by the device receiver 330 <u>from the server 110</u>." *Id.* (emphasis added).

Accordingly, Eaton discloses "generating an event notification for the event" by "activating" an event (the first one being "Event 1" shown in Figure 2 as being stored in the server memory 160) in a server in response to the presence of event

48

IPR2022-00165
Patent 8,402,179 B1

> information and sending a message with the event notification
> from the server to an IM device, in which the message comprises
> at least a "string of characters that includes information
> associated with the event." *See also* Ex[1004], ¶¶88-93.

Pet. 29–30.

We understand from the above-quoted explanation that two things occur in response to the presence of an event, i.e., the activation of a screen name that represents an event, with resulting functional effects or consequences, and the sending of an event presence notification message for the activated event. Petitioner does not clearly state what it regards as the claimed generated event notification. Viewed in light most favorable to Petitioner, we continue the analysis by assuming the event presence notification message as the claimed event notification.

c)      *Limitation 1[iii]*

Claim 1 recites limitation 1[iii] as follows: "storing the event notification in an array." Ex. 1001, 12:49.

Petitioner contends that the '179 patent discloses that an array is simply a table or list of event information or event strings. Pet. 30. On that basis, Petitioner asserts that Eaton discloses server memory 160 which stores a plurality of screen names 280 and that each screen name 290 of the plurality of screen names 280 represents one or more events such as event 300 of the plurality of events 180. *Id.* In that regard, Petitioner produces an annotated version of Eaton's Figure 2, placed side-by-side to an annotated portion of Figure 6 of the '179 patent, reproduced below (Pet. 31):

IPR2022-00165
Patent 8,402,179 B1



Figure 2 of Eaton illustrates a server memory in Eaton's instant message communication system and Petitioner has shaded the EVENT 1–N column green and the words "SERVER MEMORY" red.  Ex. 1006 ¶ 15. The portion of Figure 6 of the '179 patent produced above illustrates a title array in the system of the '179 patent and Petitioner has shaded green the multiple entries of the array.  Ex. 1001, 2:30.

According to Petitioner, the EVENT 1–N column in Eaton's Figure 2, reproduced above, are "event messages / strings 300 (shaded in green)."  Pet. 30 (citing Ex. 1006 ¶ 31).  But the cited evidence does not sufficiently support that assertion.  Paragraph 31 of Eaton describes the referenced column simply as "associated event 300."  Ex. 1006 ¶ 31.  Further, even if the column stores associated event messages, Petitioner cites nothing to show that the associated messages in the server memory column 300 are the event presence notification messages discussed above in the context of limitation 1[ii].

Alternatively, Petitioner relies on Eaton's Figure 6 embodiment.  Pet. 31.  Petitioner asserts (*id.*) that in the Figure 6 embodiment server memory 160 stores an array of event notifications, referencing an annotated version of Eaton's Figure 6, reproduced below:

IPR2022-00165
Patent 8,402,179 B1



Figure 6 is a block diagram of an alternate embodiment of a server memory for use within a server of the instant message communication system, and Petitioner has shaded the EVENT AN–NN column green and the words "SERVER MEMORY" red.  Ex. 1006 ¶ 19.

Petitioner asserts that both the TOPIC N column 540 and the EVENT AN-NN column 670 as the stored event notifications.  Pet. 31 (citing Ex. 1006 ¶¶ 56–58).  But the assertion is not supported by the cited evidence.  Paragraphs 56–58 of Eaton do not indicate that either topic entries 540 or event entries 670 are the event presence notification messages discussed above in the context of limitation 1[ii].

   d)    *Limitation 1[iv]*

Claim 1 recites limitation 1[iv] as follows:  "providing the event notification from the array to a process executed by a processor."  Ex. 1001, 12:50–51.  On pages 33–34 of the Petition, Petitioner reiterates the same assertions it makes to account for limitation 1[ii], i.e., "generating an event notification for the event."  Pet. 33–34.  On that basis, Petitioner asserts:

> Therefore, the event notification array 280 that is stored in the server memory 160 is coupled and provided to the server processor 150 for processing, including the creation of an event notification message—including for the "Event 1" of Figure 2

51

IPR2022-00165
Patent 8,402,179 B1

> and the "Event AN" of Figure 6—that is sent from the server to
> an IM device. And, again, the IM device includes a "device
> processor 340 [that] utilizes conventional signal processing
> techniques for processing received signals from the device
> receiver 330 including the event presence notification messages"
> sent from the server 110. *Id.*, [0040]. Accordingly, Eaton
> discloses this claim limitation because the event notification
> array 280 is provided to a process executed by a processor on the
> server (server processor 150) as well as to a process executed by
> a processor on the IM device (device processor 340). *See also*
> Ex[1004], ¶¶ 98–100.

*Id.*

The assertion is circular and not understood. In the discussion above about limitation 1[ii], the "event presence notification message" is the event notification allegedly stored in the claimed array. Here, Petitioner contends that the array is provided to the server processor for the purpose of creating the event notification message.

> e)      *Limitation 1[v]*

Claim 1 recites limitation 1[v] as follows: "using the event notification as a title in association with the process." Ex. 1001, 12:52–53. Petitioner cites to instant message user interface 360 shown in Eaton's Figures 3 and 4. Pet. 35. Figures 3 and 4 of Eaton, annotated by Petitioner (*id.*), are reproduced below:





IPR2022-00165
Patent 8,402,179 B1

Figure 3 illustrates a block diagram of one embodiment of Eaton's instant messaging device, and Petitioner has shaded the Instant Message User Interface purple.  Ex. 1006 ¶ 16.  Figure 4 illustrates one embodiment of instant message user interface 360, in which Petitioner has shaded an area labeled "Instant Message User Interface" purple and two blocks, labeled "Event 1 Status" and "Event ID 1," green.  *Id*. ¶ 45.  According to Petitioner, the "Event 1 Status" box and the "Event ID 1" box in Figure 4 together constitute the event notification that is used as the title in association with the process.  Pet. 36.  In that regard, Petitioner asserts that EVENT ID N column 430 in Figure 4 is the same as the SCREEN NAME N column 290 in Figure 2.[8]  Pet. 36 (citing Ex. 1006 ¶ 46).  But Petitioner has not shown that EVENT N STATUS column 440 is the same as anything within server memory 160 shown in Figure 2.  Thus, the alleged title in Figure 4 has not been shown to have an exact counterpart stored within server memory 160 in Figure 2.

Petitioner presents an alternative argument for limitation 1[v] based on Eaton's other embodiment shown in Figures 6 and 7.  Pet. 37–41.  Figures 6 and 7 of Eaton, annotated by Petitioner (*id.* at 39), are reproduced below:

---

[8] Eaton indicates that screen names in server memory 160 of Figure 2 are stored in the server memory even prior to the occurrence of any event.  Ex. 1006 ¶ 45.  That would mean screen names in server memory 160 cannot be the generated event notification.

IPR2022-00165
Patent 8,402,179 B1



Figure 6 illustrates a block diagram of another embodiment of a server memory in Eaton's instant message communication system, and Petitioner has shaded green the first element in a column, labeled "EVENT AN 670." Ex. 1006 ¶ 19.  Figure 7 illustrates an alternate embodiment of an instant message user interface for use within the instant message device of Figure 3, and Petitioner has shaded green each one of four boxes, labeled "TOPIC SCREEN NAME STATUS 570," "TOPIC SCREEN NAME INDICATOR 560," "EVENT 1 STATUS 590," and "EVENT ID 1 600."  *Id.* ¶ 20.

According to Petitioner, "each of the 'topic screen name indicator 560,' 'topic screen name status 570,' 'event identifier 600,' and 'first event status indicator 590' shown in Figure 7 (all shaded in green) disclose 'using the event notification as a title in association with the process."  Pet. 40–41. But Petitioner has not shown that any one of "TOPIC SCREEN NAME STATUS 570," "TOPIC SCREEN NAME INDICATOR 560," "EVENT 1 STATUS 590," and "EVENT ID 1 600" is the same as anything within server memory 160 shown in Figure 6.  Thus, the alleged title in Figure 7 has not been shown to have an exact counterpart stored within server memory 160 in Figure 6.

IPR2022-00165
Patent 8,402,179 B1

Further, as discussed above in the context of limitation 1[iii], Petitioner has not shown that event notification is stored within the server memory shown in either Figure 2 or Figure 6.

  *f)  Limitations 1[vi] and 1[vii]*

Claim 1 recites limitation 1[vi] as follows: "providing an alternative title from the array to the process." Ex. 1001, 12:54. Claim 1 recites limitation 1[vii] as follows: "using the alternative title as a title in association with the process." *Id.* at 12:55–56.

Petitioner presents (Pet. 42) another set of annotated Figures 6 and 7 of Eaton, reproduced below:



Figure 6 illustrates a block diagram of another embodiment of a server memory in Eaton's instant message communication system, and Petitioner has shaded green the second element in a column, labeled "EVENT BN 680." Ex. 1006 ¶ 19. Figure 7 illustrates an alternate embodiment of an instant message user interface for use within the instant message device of Figure 3, and Petitioner has shaded green each one of four boxes, labeled "TOPIC SCREEN NAME STATUS 570," "TOPIC SCREEN NAME

55

IPR2022-00165
Patent 8,402,179 B1

INDICATOR 560," "EVENT 2 STATUS 630," and "EVENT ID 2 640."

*Id*. ¶ 20.  Petitioner identifies each of these four shaded elements 560, 570, 630, and 640 in Figure 7 as an alternative title provided from the array to the process and used as a title.  Pet. 42–43.

As in the case of limitation 1[iv] discussed above regarding using the event notification as a title, Petitioner has not sufficiently shown that any one of elements 560, 570, 630, and 640 has an exact counterpart in server memory 160 shown in Figure 6.  Further, Petitioner has not shown that any of 560, 570, 630, and 640 constitutes an "alternative title," because none has been shown to replace or stand in lieu of another title.  It appears that the title Petitioner identified in the context of  limitation 1[v], i.e., elements 560, 570, 590, and 600, has not been replaced by the alleged new title provided for a second event, EVENT BN 680 in Figure 6, which belongs to the same TOPIC N as first event EVENT AN 670.  Note also that elements 590 and 600 are still displayed when elements 630 and 640 are displayed.

 3. *Dependent Claims 2, 3, 6, 7, and 9*

Claims 2, 3, 6, 7, and 9 each depend, directly or indirectly, from claim 1.  Thus, each of these claims includes all of the limitations of claim 1.  The deficiencies of the Petition, as discussed above in the context of claim 1, equally applies to claims 2, 3, 6, 7, and 9.

 4. *Conclusion*

For the foregoing reasons, we have substantial doubt and concern regarding Petitioner's assertion that claims 1–3, 6, 7, and 9 are anticipated by Eaton.

IPR2022-00165
Patent 8,402,179 B1

H.     *Alleged Obviousness of Claims 1–3 and 6–10 over Eaton*

     1.     *Independent Claim 1*

Petitioner conclusorily asserts that to the extent that Eaton discloses various, distinct embodiments, it would have been obvious to one with ordinary skill in the art to combine Eaton's teachings into a single system. Pet. 49. Petitioner also conclusorily asserts that one with ordinary skill in the art would understand that Eaton discloses possible configurations and/or operations of the same system, and the multiple different functions would have been obvious to one with ordinary skill in the art to combine. *Id.*

Even assuming that the disclosures of Eaton's different embodiments are properly combinable, there still remains the other deficiencies, discussed above in the alleged anticipation of claim 1 by Eaton, relating to the step of storing the event notification in an array, and the step of providing the event notification from the array to a process executed by a processor, and the step of providing an alternative title from the array to the process.

     2.     *Dependent Claims 2, 3, and 6–10*

Claims 2, 3, and 6–10 each depend, directly or indirectly, from claim 1. Thus, each of these claims includes all of the limitations of claim 1. The deficiencies of the Petition, as discussed above in the context of claim 1, equally applies to claims 2, 3, and 6–10.

     3.     *Conclusion*

We have substantial doubt and concern regarding Petitioner's assertion that claims 1–3 and 6–10 would have been obvious over Eaton.

I.     *Alleged Obviousness of Claims 1–3 and 6–10 over Eaton and Cheung*

Cheung, as applied by Petitioner, does not make up for the deficiencies discussed above with regard to the alleged obviousness of claims 1–3 and 6–10 over Eaton. We have substantial doubt and concern

57

IPR2022-00165
Patent 8,402,179 B1

regarding Petitioner's assertion that claims 1–3 and 6–10 would have been obvious over Eaton and Cheung.

J.    *Alleged Obviousness of Claims 1–3 and 6–10 over Eaton and Odell*

    1.    *Overview of Odell*

Odell discloses a graphical user interface on a display device of a computer.  Ex. 1016, code (57).  Figure 16A of Odell is reproduced below:



**FIG. 16A**

Figure 16A depicts notification 1600 which is presented on the display after occurrence of one of a specified series of events relating to the accounts listed on the buddy lists of a set of linked accounts.  *Id.* 19:44–46.  Header 1602 of notification 1600 contains screen name of the linked account whose buddy list contains the account that triggered the notification.  *Id.* 19:46–49.  Body 1604 of the notification contains the screen name of the account that triggered the notification as well as a description of the event that triggered the notification.  *Id.* 19:49–52.

    2.    *Analysis*

Odell, as applied by Petitioner, does not make up for the deficiencies discussed above with regard to the alleged obviousness of claims 1–3 and 6–10 over Eaton.

IPR2022-00165
Patent 8,402,179 B1

### 3.    Conclusion

We have substantial doubt and concern regarding Petitioner's assertion that claims 1–3 and 6–10 would have been obvious over Eaton and Cheung.

### K.    Alleged Obviousness of Claims 1–3 and 6–10 over Eaton, Cheung, and Odell

Cheung and Odell, as applied by Petitioner, do not make up for the deficiencies discussed above with regard to the alleged obviousness of claims 1–3 and 6–10 over Eaton.  We have substantial doubt and concern regarding Petitioner's assertion that claims 1–3 and 6–10 would have been obvious over Eaton, Cheung, and Odell.

## IV.    CONCLUSION

After considering the evidence and arguments presented in the current record, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that at least one of the challenged claims of the '179 patent is unpatentable.  We also decline to discretionarily deny the Petition based on 35 U.S.C. § 314(a).  We therefore institute trial on all challenged claims and grounds raised in the Petition.  *See PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (indicating that a decision whether to institute an *inter partes* review "require[s] a simple yes-or-no institution choice respecting a petition, embracing all challenges included in the petition").

At this stage of the proceeding, we have not made a final determination as to the patentability of any challenged claim or as to the construction of any claim term.

## V.    ORDER

In consideration of the foregoing, it is hereby:

IPR2022-00165
Patent 8,402,179 B1

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–3 and 6–10 of the '179 patent is instituted with respect to all grounds set forth in the Petition;

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '179 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial; and

FURTHER ORDERED that the parties are invited to explain, in their respective post-institution briefings, i.e., Response, Reply, and Sur-reply, (1) their construction of the claim term "title," and in particular address the question: what conditions (if any) make the text displayed on a computer screen outside of a titlebar and taskbar a title, and (2) their construction of the claim term "event," and in particular, address the question: whether "event" is limited to events in a computer system.

IPR2022-00165
Patent 8,402,179 B1

For PETITIONER:

Matthew W. Hindman
Christopher Kao
Brock S. Weber
PILLSBURY WINTHROP SHAW PITTMAN LLP
matthew.hindman@pillsburylaw.com
christopher.kao@pillsburylaw.com
brock.weber@pillsburylaw.com


For Patent Owner:

Stephen F. Schlather
John J. Edmonds
EDMONDS & SCHLATHER, PLLC
sschlather@ip-lit.com
jedmonds@ip-lit.com

Tarek Fahmi
Ascenda Law Group, PC
tarek.fahmi@ascendalaw.com