# EXHIBIT 2

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————

LINKEDIN CORPORATION,
Petitioner
v.
EBUDDY TECHNOLOGIES B.V.,
Patent Owner

——————

IPR2022-00164 (Patent 8,230,135 B2)
IPR2022-00165 (Patent 8,402,179 B1)

—————

Record of Oral Hearing
Oral Hearing Held: April 12, 2023

——————

Before JAMESON LEE, JASON M. REPKO, and JULIET MITCHELL
DIRBA, Administrative Patent Judges.

APPEARANCES:

ON BEHALF OF THE PETITIONER:

BROCK S. WEBER, ESQ.
of: Pillsbury Winthrop Shaw Pittman LLP
4 Embarcadero Center
22nd Floor
San Francisco, CA 94111
(415) 983-1059
brock.weber@pillsburylaw.com

ON BEHALF OF THE PATENT OWNER:

STEVE SCHLATHER, ESQ.
JOHN J. EDMUNDS, ESQ.
of: Edmunds & Schlather PLLC
2501 Saltus Street
Houston, TX 77003
(713) 364-2371
(713) 364-5291 (Edmunds)
sschlather@ip-lit.com
jedmunds@ip-lit.com

The above-entitled matter came on for hearing Wednesday, April 12, 2023, at 600 Dulany Street, Alexandria, Virginia, commencing at 1:00 p.m. EDT.

1          P-R-O-C-E-E-D-I-N-G-S

2                                          1:00 p.m.

3          JUDGE REPKO:  Okay.  This is a consolidated oral hearing for

4   IPR2022-00164, 2022-00165.

5          I'm Judge Repko.  I'm joined by Judge Lee and Judge Dirba is

6   joining us via video.

7          Judge Dirba, can you see us?  Can you hear us?

8          JUDGE DIRBA:  Yes, I can.  Can you see and hear me as well?

9          JUDGE REPKO:  Yes.

10         So at this time we'd like counsel to introduce themselves and

11  anyone with them.

12         Petitioner, we'll begin with you.

13         MR. WEBER:  Thank you, Your Honors.  Good afternoon.

14  Brock Weber of Pillsbury Winthrop Shaw Pittman for Petitioner,

15  LINKEDIN Corporation.  And with me is my colleague Patrick Doody, a

16  partner at the same firm.

17         JUDGE REPKO:  Thank you.

18         Patent Owner counsel?

19         MR. SCHLATHER:  Good afternoon, Your Honors.  Steve

20  Schlather for Patent Owner, eBuddy Technologies, B.V.  And with me is my

21  partner John Edmunds.

22         JUDGE REPKO:  Thank you.

23         All right.  So our oral hearing order gave each party 75 minutes

24  to present their arguments.  We'll be using the close behind me to time you.

25  Petitioner's counsel will begin followed by Patent Owner's.  Both parties

1   may reserve some rebuttal time but a party may not reserve more than half

2   their total time for rebuttal unless there are specific circumstances.

3           If you have objections, please raise them during your time.

4           We have copies of the demonstratives; we don't need physical

5   copies here.

6           And there are members of the public listening to our oral

7   hearing today, so if you have any confidential information, please let us

8   know so we can make sure we don't violate that confidentiality.

9           So with that, I'm going to invite Petitioner's counsel to begin,

10  and I need to know how much time you'd like to reserve for rebuttal?

11          MR. WEBER:  Thank you, Your Honors.  Brock Weber,

12  counsel for Petitioner.  I would like to reserve 25 minutes for rebuttal.

13          JUDGE REPKO:  Okay.

14          MR. WEBER:  May it please -- Oh, I'm sorry.

15          JUDGE REPKO:  You may begin.

16          MR. WEBER:  Thank you.  May it please the Board, again I'm

17  here on behalf of Petitioner, LINKEDIN Corporation, as Your Honors

18  referenced, in a consolidated hearing today on the 135 and 179 patents.

19  Petitioner LINKEDIN has shown that the challenged Claims 1 through 3 and

20  6 through 10 of both of these patents are unpatentable under four grounds.

21  Those grounds are based on the Kim reference as a base reference; that's

22  Grounds 3 and 4, and then the Eaton prior art reference, which is the primary

23  reference for Grounds 1 and 2.

24          In response Patent Owner has forwarded some claim

25  construction arguments that seek to import limitations either found nowhere

26  in the specification nor from extrinsic evidence that is in opposite.  And

1    Patent Owner has also attempted to imbue the claims that we're challenging

2    here with additional limitations or requirements that are not found therein.

3            I will start our presentation with a brief overview of the patents

4    that we're challenging here.  The 135 patent and the 175 -- 179 patent are

5    related and share essentially the same --

6            JUDGE REPKO:  Excuse me, Mr. Weber.  Can you speak

7    closer to the microphone because I can barely hear you?

8            MR. WEBER:  Sorry about that.  Is that better?

9            JUDGE REPKO:  Yes, a lot better.

10          MR. WEBER:  Thank you.  Again we're here to talk about the

11    135 and 179 patents.  These are related and essentially share the same

12    specification.  The 179 patent is a continuation of the 135 patent and these

13    patents are directed in general to providing event notifications.  As explained

14    in the abstract of these patents, this involves modifying a title associated

15    with the process, one application; in other words, to include information

16    about an event.

17           This basic summary of the patents is repeated in the summary

18    section of the specification in which it is repeated that the alleged invention

19    includes modifying a title associated with an application, also called a

20    process, to include information about an event.  The patents define or

21    describe what a process is in broad non-limiting terms.  It can be an instant

22    messaging client or application, a web browser, or some other application

23    that has a title associated therewith.

24          Likewise the patents describe what an event is in broad non-

25    limiting terms.  It can be a new mail event for example, a new instant

26    messaging event, a reminder event, a calendar event, or some other event.

1      The idea here is as exemplified in figures 3C and 3D of the

2   event patents is to modify the title of an application with information about

3   an event.  Here they're showing the example of the original title of the

4   Firefox browser being www.ebuddy.com.  And then after a new message

5   event the string new message is placed into the title of the Firefox browser.

6      JUDGE LEE:  Mr. Weber, can you help me understand why in

7   the reference Kim -- why do you say that figures 1 through 4, or in particular

8   figures 2 through 4 are a sequence of displays that are in progression?  In

9   other words, first you have one. A few minutes later you have another and

10  then you have another then you have another.  Because it's the other party's

11  contention they're not related to each other.   But I think it's implicit in your

12  presentation and in the briefings that you think they are related.  It's a

13  sequence of related images one after another after another.  Can you explain

14  why you believe it's that way?

15     MR. WEBER:  Sure.  Thank you.  Kim discloses that that can

16  be a progression of the system and Kim receiving event information and

17  displaying it in the title of the WordPad application.  I don't believe that a

18  person of ordinary skill in the art would view it as limited to just the

19  progression, but that is an example of what Kim could be disclosing.  Say

20  you receive in figure 2 a stock information event, figure 3 is a breaking news

21  event, and then figure 4 is if you had received those at different times or --

22  the system at some point had received both a breaking news event and a

23  stock information event displaying both of those together.  I think a person

24  of ordinary skill in the art would understand that that could be a progression.

25     JUDGE LEE:  I'm not sure where the explanation is.  You're

26  just telling us your view.  I know that is your position, but when I read Kim I

1    don't see a description that that is what it is describing.  It's not describing

2    that I'm running an app here and here is a sequence of displays the app

3    generates.  I'm not seeing that.  I'm seeing what the Patent Owner says that

4    Kim doesn't say anything in that regard.  So my question to you is why do

5    you think it's the way you describe it.  What you've done is just reiterate

6    what your position is.  Can you tell us why your position is supported by the

7    description in Kim rather than just to say, well, I think that's what it is.

8            MR. WEBER:  Understood.  What I'm referencing is the

9    evidence that we set forth in the petition.  So I set forth in the petition the

10    system in Kim receives information, real-time information from an

11    information server and then displays that information in the title bar.  And so

12    if it's receiving real-time information and displaying that in the title bar,

13    that's disclosing a progression.  As information is received it's detected and

14    put up in a message on the title bar.  So it's describing the process of

15    receiving real-time information and then displaying it.  And so there's this

16    concept disclosed in Kim of real-time information.  There's a timing

17    component and that's where the progression comes from.

18            JUDGE LEE:  Yes, I can see that, but I can also see it from the

19    other party's point of view.  Just playing the devil's advocate on them and I'd

20    say I can see it differently.  If you have the stock price coming in, figure 2

21    shows you display the stock price.  It describes that.  Now if you have the

22    breaking news come in, I'll will display that.  And it's not related to the

23    earlier one.  Now it describes that.  Now as another example if I have both of

24    those information coming in relatively closely, oh, I'll show both of them.

25    So in that way I can read it that way as well.

1    I mean, I can see it your way; I can see it their way, but both

2    ways are consistent with Kim.  In their way they're not related.  They're just

3    three separate instances of examples where you have real-time information.

4    You get it and you display it.  You get it and you display it.  But they're not

5    related.  In your view they are related.  So I don't think you've answered my

6    question why does it have to be the way you describe?

7    MR. WEBER:  I would say that, like I said to begin with, a

8    person of ordinary skill in the art, as we set forth in the petition would view

9    these as a possible sequence of events, but if it -- I don't believe it is limited

10    that way.  And I think what we're talking about here is the disclosures of

11    Kim in relation to some dependent claims that talk about repeating an

12    alternative title, for instance.  And in that instance a person of ordinary skill

13    in the art could say, look, breaking news information came in, and then a

14    stock information came in.  And they get repeated in figure 4, again as a

15    combination.

16    But I don't believe that anywhere in the petition that we've said

17    that it's limited that way.  I think that for this obviousness ground we've

18    showed that, look, a person of ordinary skill in the art would understand that

19    this would obviously -- could encompass a progression because the

20    information is described as real-time information coming into the system of

21    Kim and then being displayed as it's received.  And that's where the timing

22    and the progression concepts I think are disclosed in Kim.

23    JUDGE LEE:  Okay.  I understand what you're saying, but if I

24    recall correctly your petition does not say we realize Kim doesn't say which

25    way it is, but under the standard of obviousness the POSITA would have

26    known that you would do it this way.  I don't think your petition presents it

1   like that.  Your petition kind of described Kim as actually disclosing a

2   sequence of related images.  So --

3        MR. WEBER:  Well, I -- sorry to cut you off, sir.

4        JUDGE LEE:  So I don't think we can just say because it's

5   obvious you can do it because your petition didn't describe that story.  Your

6   petition described it as Kim discloses a sequence of time-progressed events.

7   So whether or not it's broad enough to encompass is not the issue here.  The

8   issue is you allege Kim describes a sequence.  My question is why does it

9   describe a sequence?

10       MR. WEBER:  I believe it is the appropriate interpretation as

11  we've presented in the petition that the figures are sequenced for a reason.

12  Figures 2, 3, and 4 are sequenced for a reason.  You have the stock

13  information notification in figure 2, the breaking news figure -- event

14  notification in figure 3, and then the combination in figure 4.  I think that the

15  interpretation that this is showing of a progression is borne out by that

16  labeling and progression of the figures as well as the description in Kim as

17  we put forth in the petition that you're getting this information and

18  displaying it as you get it.

19       JUDGE REPKO:  Thank you.

20       JUDGE DIRBA:  Mr. Weber, I have a question.  If we were to

21  disagree with you on that point, if we were to find that Kim does not

22  disclose that there's a progression from figure 2 to figure 4, what does that --

23  where does that leave your case insofar as Claim 1?  In other words, as my

24  colleague was referencing, I understand the petition to be premised on an

25  assumption that there is a progression from figure 2 to figure 4, and that's

26  why it would have been obvious to a person skilled in the art to have used an

1    array to store the information, the real-time information that had been

2    received in the past. If there is no -- or if we were to find there's no

3    progression, where does that leave us as far as your case?

4             MR. WEBER: Thank you. If you were to find that, it does not

5    have any effect on Claim 1. The fact that Claim 1 -- or that Kim discloses

6    and/or would have been obvious to use an array is not premised on the

7    progression.

8             What's happening in Kim is that multiple events can come into

9    a system. And in figure 4 it's showing that multiple events did come in.

10    And so it would have been stored in a list. It had to have been stored in the

11    list. There's no way else to do that. And in any event it would have been

12    obvious. And so having them be an actual sequence from figures 2 through

13    4 would not affect the analysis under Claim 1. I believe it would affect the

14    analysis under the dependent claim that talks about repeating the event

15    notification. And my position would be we've alleged that that's obvious.

16    But if you're saying if you found that the petition does not set forth that as

17    being an obviousness ground must be in anticipation or an actual disclosure

18    ground, that's the claim that it would affect.

19             JUDGE DIRBA: So if you don't mind I'd like to dive more into

20    Claim 1 and specifically -- so if I understood your answer, you're looking at

21    figure 4 and saying figure 4 gives you everything that you need for Claim 1

22    insofar as it shows two different, sort of, pieces of information that are being

23    put into the title bar of Kim.

24             You've said in your answer that it would have been necessary to

25    have put that in an array, I suppose. Could you tell me about why that

26    would have been necessary to put in the array? In other words, if Kim's

1  client receives that information from the server as a packet of information

2  with both the information about the arrest and the information about the

3  stock price, why does that need to be in an array?

4         MR. WEBER:  Right.  And I can address the construction of an

5  array.  But an array is simply a list data structure, or a table data structure

6  that you can access with a number into the list or a number into the table.

7  And what we've set forth in the petition supported by paragraph 213 of Dean

8  Willis' Expert Declaration is that, look, Kim is disclosing multiple sources of

9  information coming into Kim's system and Kim says that it stores those in

10  memory.  Figure 4 shows that you've received information from two

11  different sources.  Those have to be stored in an list in order for the Kim

12  system to then put them up into, for example, figure 4.

13         JUDGE DIRBA:  So you said that figure 4 shows information

14  received from two different sources.  How do we know that from Kim's

15  disclosure?

16         MR. WEBER:  I can go to a slide on this.

17         So I'm on slide 38 of Petitioner's presentation.  And this is an

18  example, an excerpt from the patent that is quoting Kim.  And it's saying that

19  the events in Kim are received at the user's computer from a stock

20  information server and an advertisement server, a breaking news server, a

21  text broadcasting server, or a combination thereof.

22         In the figure shown below that excerpt on this slide there's the

23  diagram, the architectural diagram disclosing Kim in which the information

24  server is labeled Element 10.  So that can be one of the servers that I

25  mentioned or that server would be a logical combination of such servers.

1    And so the information as disclosed is coming from separate servers.  That's

2    different information sources.  That's how we know that.

3          JUDGE DIRBA:  Okay.  So we have Kim saying that there are

4    different pieces of information that it's getting in figure 4 and it's receiving

5    that -- let's assume for the sake of argument that we agree with you that it's

6    receiving that information from these different servers.

7          So you mentioned the definition of an array, and if I understand

8    you correctly you would agree that an array has to be indexed in some way.

9    I know that the parties have argued somewhat about how that indexing is

10   done.  It's not apparent to me that we need to decide that aspect.  But an

11   array needs to be indexed.

12         So why would a person of skill in the art have used an array

13   with Kim or have understood Kim to disclose an array?  Why would it need

14   that indexing if it just needs to keep this data, display it, and the presumably

15   get rid of it at some point in time?

16         MR. WEBER:  Right.  And so on the anticipation ground that

17   Kim necessarily discloses this it's because those information -- those

18   separate sources of information are coming in.  They need to be stored and

19   they're stored -- they would have been stored in a list.  A list is indexed by

20   the number into the list.  And so when Kim's system -- and a person of

21   ordinary skill in the art wouldn't understand this as our expert declarant

22   explained, that the system in Kim would need to access both list elements;

23   here there's disclosed two, but that's not limited to two, to put them up

24   together.  So it gets the breaking news element from the first index in the

25   list, the first list element, an gets the stock price event notification from the

26   second.  It has to access those with the numbers in the list.  I mean a list --

1          JUDGE DIRBA:  Why --

2          MR. WEBER:  Go ahead.

3          JUDGE DIRBA:  Why is that?  Why does it have to access -- in

4    other words, you're assuming that it's in a list that -- a list that's indexed

5    specifically as opposed to for example like a linked list or something else

6    that wouldn't be indexed, or some other kind of data.  In other words, there

7    are lots of other data structures that don't require any kind of indexing.  Why

8    is that -- let me ask the question this way:  Is that indexing important to

9    Kim?  And if so, why?

10          MR. WEBER:  The indexing is important to Kim because it's

11    disclosing embodiments in which multiple event notifications from multiple

12    sources can be put up into the title bar.  And so for instance, it could be the

13    first and third one.  You need to get to the first and third one.  You do that

14    with an index.  I mean, this is a very basic data structure and a list in this

15    context, as both parties agree, is an array.  I mean, so --

16          JUDGE DIRBA:  And so assume for the sake of answering my

17    question that an array is -- we agree that an array is a known data structure

18    and it's old, right?  You're saying that Kim wants to get at the first and third

19    one in a list, and that's where I'm stuck.  That's what I'm not understanding

20    very clearly.  Why does Kim want to get at the first and the third one?  I

21    thought Kim says it displays real-time information which presumably means

22    it displays it as soon as it gets it.  Why does it need to go to the third and the

23    first?  Does that make sense?

24          MR. WEBER:  That does make sense.  It has to do with the fact

25    that -- and again, you're getting it from multiple sources and they're coming

26    in not necessarily at the same time, but they're being stored in memory.  And

1    so what's shown in figure 4 is two separate entries in the list.  That's how

2    you get to those separate entries is with an index saying I want the first one,

3    I want the second one.  That's how you get to those.  And it's shown because

4    that had to be done to show the example in figure 4 of Kim.

5             JUDGE DIRBA:  Thank you.

6             JUDGE LEE:  Mr. Weber, you said earlier that if Kim's figures

7    are not a progression you still would prevail on Claim 1.  My question is

8    how can you because your entire accounting for the alternative title depends

9    on progression from figure 3 to figure 4?  You explained that you have an

10    alternative title because figure 4 shows the stock price replacing the news in

11    figure 3.  That's one possibility.  And then as another possibility you say,

12    well, then in figure 4 the criminal news replaced the WordPad document

13    things.  Those are your only two assertions.  But that absolutely requires a

14    progression.  So if we don't agree with you it's a progression, I think you lost

15    that argument because you can't relate back.  Figure 4 is figure 4.  Figure 3 is

16    figure 3.  I mean, they're not in sequence.  So you can't rely on a time

17    sequence to account for your alternative title.

18             MR. WEBER:  Right.  I would have to respectfully disagree.

19    So figure 4 on its own without the previous progression, as you just

20    mentioned and as explained in the petition, shows the alternative title.  The

21    original title is the WordPad name of the application.  It's replaced by the

22    breaking news information.

23             JUDGE LEE:  Okay.  So that's your answer.  Anything else

24    before I ask follow up?  So that's your answer?  Because the WordPad is the

25    initial title.  And then figure 4 shows something covering the initial title.

26             MR. WEBER:  Yes, and for instance --

1           JUDGE LEE:  Except your Claim 1 calls for the first title has to

2    be event notification.  It says you got a notification as a title.  That's your

3    first title.  So Document-WordPad, that's not an event.  That's not an event

4    notification.  Your event notification is the receipt of either the breaking

5    news or the receipt of a stock price.  So I don't think you can suddenly say

6    my Document-WordPad is my title.  You can't do that because when you

7    were accounting for the first title in your petition you didn't point to that.

8    And I think you can't because it has to be an event notification and

9    Document-WordPad doesn't notify you of an event.

10          MR. WEBER:  The alternative title must be based on the event

11    notification.  The event notification is the message breaking news.  That

12    replaces the title of the application.  It's

13    also --

14          JUDGE LEE:  So element 5 --

15          MR. WEBER:  I'm sorry.

16          JUDGE LEE:  Element 5 says using the event notification as a

17    title.  And the way you accounted for that is by pointing to the receipt of the

18    news.  At 2:30 -- 2:10 p.m. somebody got stabbed.  So that's got to be your

19    first title.  Your first title cannot be Document-WordPad.

20          MR. WEBER:  Right.  So I mean this also goes to the

21    construction of event and say that it must -- that what Kim is disclosing as

22    the stock price information, the breaking news information, the

23    advertisement information are not events is based on Patent Owner's

24    erroneous construction of --

25          JUDGE LEE:  Well, let's not make it too complicated.  You

26    never in your petition identified Document-WordPad as your title.

1           MR. WEBER:  Well, that's the title of the application that gets

2    replaced by the event notification alternative title.

3           JUDGE LEE:  When you accounted for element 5 you never

4    pointed to Document-WordPad as your title.  You pointed to breaking news.

5

6           MR. WEBER:  When we explained what was being replaced

7    we did specifically mention that the breaking news event notification was

8    replacing the WordPad title.

9           JUDGE LEE:  I know, but you can't do that because when you

10    accounted for the title you pointed to the news.  so Document-WordPad

11    cannot be the title.  And according to this claim the title has to be your event

12    notification.  So in what way is Document-WordPad an event notification?

13    You never said that either in your petition.  You've never said Document-

14    WordPad is an event notification.

15           MR. WEBER:  Okay.  So I think what we're talking about here

16    is the 179 patent, and this is under a theory in which you would reject the

17    progression analysis of Kim.  Do I have that understood correctly?

18           JUDGE LEE:  Right.  The simple question is if we don't go

19    along with you on the progression, I think you would lose on the basis of the

20    alternative title because you're accounting for it depends on something in

21    figure 4 replacing something in figure 3.

22           MR. WEBER:  Right.  And so I think in the 179 patent instance

23    that's correct.

24           JUDGE LEE:  So I'm correct, right?  If we disagree with you on

25    the progression thing, you wouldn't make Claim 1?

1     MR. WEBER:  I mean, I think that the titles are still getting

2     replaced in figures 2 and 3 because there's nothing there and it's replacing

3     the title bar.

4     JUDGE LEE:  But they're all separate.  They're not replacing

5     anything.  That's my point.

6     MR. WEBER:  Well, nothing was there before.  I mean, it's --

7     that's what's getting replaced.  It's replacing this blank space, this blank

8     character screen with the --

9     JUDGE LEE:  I know, but that's not your theory.  The way you

10    explained it is figure 4 replaced figure 3.  You can't shift to a different theory

11    while -- even if it replaces nothing it's still an alternative title.  That would

12    be a new argument.

13    MR. WEBER:  Okay.  So I think for the 179 patent the

14    progression analysis shows that figure 4 --

15    JUDGE LEE:  Shows the alternative title.

16    MR. WEBER:  Correct.

17    JUDGE LEE:  But if we disagree with you on that, you

18    wouldn't prevail on Claim 1.

19    MR. WEBER:  I believe that's correct, but I think that -- as we

20    have discussed earlier, Kim does disclose the progression.  Thank you.

21    JUDGE LEE:  Thank you.  I'm glad we got to the -- got this

22    clarified.

23    But let's talk about the array a little bit.  It seems like the parties

24    disagree for no reason.  The parties don't really disagree what an array is

25    because the way I see it you said an array is a data structure indexed with an

26    integer index starting from one, right, something like that.  And they come

1   back and say, oh, no, that's totally wrong because the index can start from

2   zero.  You're not going to disagree that the index can start from zero.  It

3   really doesn't matter.  It's an index, right?  Like array name and then some

4   indexing expression.  Or are you really telling us, no, it has to absolutely

5   start with an index of one?  Can you clarify that?

6            MR. WEBER:  No, an array does not have to start at an index

7   of --

8            JUDGE LEE:  Right.  And --

9            MR. WEBER:  -- one.

10           JUDGE LEE:  -- your definition says it can start from zero.  So

11   I don't think you ever said it must start from zero.

12           MR. WEBER:  Correct.  No.

13           JUDGE LEE:  So really there is no difference between the

14   parties on what an array is.  You never said that it has to start from one—it

15   cannot start from zero.

16           MR. WEBER:  Correct.  It can start at zero or it can start at one.

17           JUDGE LEE:  And then another potential difference is your

18   definition says it's got to be like an integer index.  Their definition doesn't

19   use the word integer.  They go it's with some index.  I'm not sure what the

20   real difference is.  Are you saying the -- in an array designation the index

21   has to be a number?  In other words, it can't be a general index like A -- like

22   array name, bracket, A?  That would not be an index just because it used the

23   alphabet rather than a numeral?

24           MR. WEBER:  No, our construction is not limited in that

25   fashion.  We have said that it can be accessed with an index value.  And it --

1          JUDGE LEE:  A value, right?  Even you are not saying it's got

2  to be -- the index has got to be a number, right?

3          MR. WEBER:  No, an integer is an example of the value, but as

4  we've set forth in our construction it's just a value.

5          JUDGE LEE:  So with those explanations there really is no

6  difference then, right, between the two parties on what an array is?

7          MR. WEBER:  I'm not seeing a meaningful difference as it

8  relates --

9          (Simultaneous speaking.)

10          JUDGE LEE:  -- kind of agree with them that it's an index

11  expression that can start from zero or it doesn't even have to be a number as

12  long as it's some kind of index?

13          MR. WEBER:  Yes, and I believe we also agree because both

14  parties appear to agree that it can be a list of data values and then you index -

15  - you have an index value into that list.  A list is a data structure.  Both

16  parties are agreeing that it can be a list.  Both parties agree that it can be an

17  indexed list.  We're saying it's an indexed value.  It's not limited to an

18  integer.  And we're certainly not saying it has to start at zero or one.  All the

19  evidence shows that it can start at either.

20          JUDGE LEE:  Great.  Thank you.  I'm glad we clarified that

21  also.  And sorry for taking up your time, but this is an important thing.  Even

22  on event I don't think the parties disagree.  You might be surprised because I

23  don't think the parties disagree because they define event as a detectable

24  condition with -- I forgot -- what is -- a detectable condition of the computer.

25  Oh, for which a notification can be generated.  And your definition is

26  something like something the computer may respond to.

1        MR. WEBER:  Yes, it's up on slide 23.  It's the plain and

2   ordinary meaning: action or occurrence to which a --

3        JUDGE LEE:  Yes, action or occurrence to which a computer

4   may respond to, but I don't think you really mean something that happens on

5   the moon, the computer has no way of knowing it, that's an event.  I mean

6   it's implicit in your definition the computer has got to know about it.  If

7   there's no communication the computer is unaware of whatever is

8   happening, then you can't respond to it.  So because your definition says to

9   which the computer may respond, it implies that the computer is receiving

10  information about that event.  Am I right?

11       MR. WEBER:  You're correct.  And I don't believe -- so an

12  event is -- in this context is something that is received obviously at some

13  point by a computer system.

14       JUDGE LEE:  Right.

15       MR. WEBER:  It just doesn't have --

16       JUDGE LEE:  So it's implicit.  The computer has to receive

17  whatever -- the action or occurrence, not only have knowledge about it.

18  Otherwise it can't respond to it.  I mean --

19       MR. WEBER:  Correct.  And in both -- in all the prior art that's

20  what's happening.

21       JUDGE LEE:  All right.  So that's why there's no difference

22  between the parties.  They say it's a detectable condition, which is the same

23  as you saying the computer receiving notice of this event, the same as

24  detecting the action or occurrence.  They say it's detecting the condition and

25  you implicitly say the computer has got to know of it.  So where really is the

26  difference between the parties?

1           MR. WEBER:  That is a great question.  I think that the

2   difference is when they're trying to say that the detectable condition must

3   originate or arise in a computer system.  So it must be some type of system-

4   generated event.

5           JUDGE LEE:  No, no, no.  But they admit it can be an IM, it

6   can be an email, it could be something sent to the computer.

7           MR. WEBER:  Well, I think their position; and they can help

8   clarify it, is that those would possibly be events because they were generated

9   by a system, like -- because they were computerized events.

10         JUDGE LEE:  I'll ask them about that later, but assuming for

11  the moment anything received by the computer is a detectable condition,

12  then there is no difference between the parties because the spec says IM,

13  email, internet event, or something event.  So I don't think they can deny that

14  an incoming email or incoming text or incoming web page is a detectable

15  condition.  Assuming that from my question where is the difference between

16  the parties?

17         MR. WEBER:  I think the difference is when they allege that

18  the stock price information in the server that that server also received from a

19  system -- it's always been computerized.  The stock information, the

20  breaking news, the advertisement information.  That's coming from a server.

21   Those are server events.  They would allege, and they have in their

22  response, that those are not events because they didn't originate or weren't

23  system-generated.

24         And so I think we're just trying to make clear that you can't

25  distinguish Kim or Eaton on that basis.  Eaton discloses wireless events and

26  internet session events, other computerized events as well, which they

1    ignore.  But I believe that there would not be a meaningful difference

2    between the parties' construction as you've pointed out based on the fact that

3    the prior art discloses this and that they're all computerized events.  It's not

4    just some action on the moon that no system can receive.  In Kim and Eaton

5    all the things that are being received are computer events.  They're

6    computerized.  They're receiving information.

7           JUDGE LEE:  And exactly.  A stock price is there.  Unless the

8    computer knows about it you wouldn't even say that stock price is an event,

9    right, because in your scenario the computer has to receive it.  Then it

10    becomes an event.

11           MR. WEBER:  Correct.  And in Kim it's showing a stock price

12    change just as in -- as we've shown the patent from their own expert in this

13    space that he pointed out in which a value of a stock price is the event.  The

14    notification includes the stock price.

15           JUDGE REPKO:  Okay.  Thank you so much.  So looking at

16    your construction here in the 135 patent, we have receiving information

17    about an event.  So it's a stock price.  Who's receiving the information in

18    Kim, what actor?

19           MR. WEBER:  Well, there's multiple actors that receive it.  It's

20    the real-time information server had to receive that, but it's also the computer

21    -- the user's computer system.  I'll show you the architecture diagram.

22           So here it's slide 38 again.  That's a user computer -- computers,

23    30; they're showing multiple here.  Those receive those stock price

24    information.  And as excerpted here that's what we said in the petition,

25    received at the user's computer from the information -- stock information

26    server, an advertisement server, a breaking news server, a text broadcasting

1    server, or a combination thereof.  And again that's the server or combination

2    of servers depicted as element 10 in that architectural diagram.  So it's

3    received at the user's computer and the user's computer creates that message

4    that's put up in the Word application associated with that event.

5                JUDGE REPKO:  All right.  So what's actually received from

6    the server to the computer, or from the server and by the computer?

7                MR. WEBER:  The user's computer, 30, receives the real-time

8    information, which would be the stock price.

9                JUDGE REPKO:  Is it a string?  Is it a number?  Is it a data

10    structure?  Just kind of go into any detail about that.

11               MR. WEBER:  It just says information.  And so the user's

12    computer must take that information and put the message up on the user's

13    computer.

14               JUDGE REPKO:  And so generating an event notification,

15    what's generated exactly and by which actor?

16               MR. WEBER:  Again in Kim there's multiple actors generating

17    the message.  The information server, say in this instance the stock

18    information server, sends the information to the user's computer.  That

19    information likely constitutes a notification. It's a message.  And then the

20    user's computer after receipt of the real-time information it creates the text

21    string that we see up in figures 2 through 4.

22               JUDGE REPKO:  So it's creating a text string at the user's

23    computer and that becomes the notification, but what's then sent to the user's

24    computer?  What needs to be generated?

25               MR. WEBER:  The thing that is sent to the user's computer as

26    disclosed in Kim is the real-time information.  And

1    so --

2              JUDGE REPKO:  It's just real-time information from the server

3    to the computer?  That's your receiving information of an event, the event

4    being -- is that the stock price?  Is that the stabbing, the breaking news?

5              MR. WEBER:  Correct.

6              JUDGE REPKO:  In your petition you said -- and I'm quoting

7    from page 63 of the petition -- it says, Kim discloses that this real-time

8    information can include events such as stock prices, advertisements,

9    breaking news received at the user's computer.  So one of the things that

10   kind of -- the parties discussed in their briefing was whether the receipt of

11   the information was the event.  What of the contents of that message was the

12   event?  So which is it?  Because that sentence says received in connection

13   with the event.  So which two things is it?

14             MR. WEBER:  The reception of the information at the user's

15   computer is certainly an event that then causes the user's computer to create

16   the corresponding notification text stream that's displayed up in the title bars

17   of figures 2 through 4.  I think that it's incorrect to say that the stock price

18   information or the breaking news information are not events themselves.

19   That's computerized information that was received by the server and by the

20   user's computer.  They're also actions that are occurrences to which Kim's

21   system is responding.

22             JUDGE REPKO:  So it's actually Kim's computer, the client

23   computer, that's receiving information from a server and then something is

24   being generated, and you're saying that's the text string is being generated at

25   the user's computer.  Is there a specific place in Kim that explains that a text

26   string is generated by the user's computer?

1          MR. WEBER: It doesn't go into those details. What we know

2    is that it must do that because it's receiving the information and displays it

3    for -- according to a set of conditions that the user set. And so the

4    information comes in, the system detects it, and displays it according to

5    those set of conditions. And so there's a set of conditions that are being

6    analyzed. It's detecting that incoming event, or it's detecting the information

7    which is the event. And then it must have generated the event notification

8    text string because we're seeing that in the figures. That's what it's showing

9    as being done.

10         And this is conventional processing. I mean, the event

11    notification patents themselves, the 135 petition and the 179 patent, do not

12    describe how you generate an event notification. There's no implementation

13    steps because this is well-known conventional technology. As we pointed

14    out in the petition all it says is that you create a notification in some known

15    or convenient way. I mean, so this is what's happening in the Kim. It's just -

16    - it's known and -- it's known processing to take information and create a text

17    string to put up into the title of your Word application.

18         JUDGE REPKO: So you're assuming that the information is

19    not the text string itself? Like is it possible that the server generates the text

20    string, sends it to the client computer, and the client computer really has

21    nothing to generate. It just displays the text string? Is that a possibility?

22         MR. WEBER: Well, I mean if it's receiving text string

23    information, it still has to process that and generate it up in the claim

24    application. That's being done at the user's computer. And there has to be

25    process -- I think generation for that to happen in figures 2 through 4.

26    However, Kim is disclosing receiving information and then the text string is

1   displayed up in figures 2 through 4.  So it's processing information and

2   creating the text that we can plainly see in those figures.

3              JUDGE REPKO:  Yes, I'm just kind of focusing on that word

4   generating.  You gave me a couple generating -- things that were generating.

5   I mean you talked about the display being generated and I think in the past

6   you were talking about the actual text string being generated.  So which is it?

7   Is it display or is it the generation of the actual text string, the characters?

8              MR. WEBER:  I might be confused, but I think the user's

9   computer, which is running a suite of Microsoft Office applications, must be

10  generating that window itself and whatever is displayed in the title bar of

11  that application.  That's being done by the user's computer.

12             JUDGE REPKO:  Okay.  So they're generating -- the event

13  notification is generating the window?

14             MR. WEBER:  Well, that's part of the graphical user interface.

15  That's part of the application.  So yes, the user's computer is doing that.  The

16  event notification generation is generating the text string display up in the

17  title bar based on the real-time information that came in from the

18  information server.

19             JUDGE REPKO:  So that information may or may not include

20  the text string itself, like the actual words, right?  Hyundai Electronics,

21  32,800, those characters, those words you believe they could either be

22  generated by the user's computer or generated at the server?  Does it matter

23  for your analysis?

24             MR. WEBER:  No, I don't think it matters for the analysis, but I

25  think that what Kim is saying is just it's a succinct disclosure, as we're all

26  aware.  It says the real-time information comes in and then we see the text

1   string displayed up in the Word application.  The user's computer had to

2   have generated that text string to put up in there.  That's being disclosed as

3   functionality on the user's computer.

4               JUDGE REPKO:  Okay.  And what about the strings then?  So

5   Claim 1 of the 135 patent talks about associating notification with the

6   plurality of character strings.  And so you're saying those are being

7   generated.  That's the event notification generation.  So we have a couple of

8   different pieces of information.  We have the information that's for the event.

9   We have the notification that's generated.  You're saying it's generated at the

10  user's computer.  So then what's the association at that point?  So we've

11  already generated this notification.  You're pointing to the title bar.  So

12  where is the association with these character strings that are being stored in

13  the array?

14              MR. WEBER:  Right.  And that goes back to what is described

15  in the 135 and 179 patent is saying that this array can be empty or already

16  have strings in it.  And so there's no limitation on what that would mean.

17  And so the generation of the event notification message is the -- it associates

18  that with the characters.  Those are the characters that are stored in the title

19  array.

20              JUDGE REPKO:  So it seems like there's two steps: the

21  generating event notification and associating that event notification.  You're

22  saying it encompasses a single action in Kim?

23              MR. WEBER:  Well --

24              JUDGE REPKO:  Two distinct actions in Kim?

25              MR. WEBER:  I mean, I think that it would be distinct actions.

26  And so you get the information at the user's computer

1     for --

2              JUDGE REPKO:  That's the receiving.  Okay.

3              MR. WEBER:  Receiving.  You're generating the text string

4     that gets displayed up in the title bar.

5              JUDGE REPKO:  Okay.

6              MR. WEBER:  That then gets associated with character strings.

7     It's stored in memory and that's the --

8              JUDGE REPKO:  Well, you just said it was generated, right?

9     You just said the text string was generated.  So what do need to associate

10    with one?  So if the text string itself is the notification, then what are we

11    associating with the notification because you're generating the text string at

12    the client computer?

13             MR. WEBER:  Right.  I mean, you're associating it with entries

14    in the array.  And so that entry as explained in the event notification patents

15    can be empty or not.  And so that event notification text string is stored in

16    the memory.  And that's the association step.

17             JUDGE REPKO:  Storing the string you generated in the

18    generating step?  Is that what you're saying?  I want to kind of clarify.  So

19    it's in the generating step.  We now have a string.  We created that event

20    notification.  You're saying it is a string.  Is that correct?

21             MR. WEBER:  Yes, that's the string of text that we see

22    displayed in figures 2 through 4.

23             JUDGE REPKO:  Notification.  So we're associating the string

24    of text with at least one of the character strings.  So we already have the

25    string of texts.  Where's the association then?

1       MR. WEBER:  The association happens during the storage step

2   when those character strings are stored in the array.

3       JUDGE REPKO:  So associating an event notification with

4   characters strings storing the character string you generated in the generating

5   step?

6       MR. WEBER:  Well, I mean, yes.  Again, like there's no

7   limitation on -- that there are -- I guess what we're talking about here is does

8   the array already have to have all these character strings in it and then you

9   take this event notification and associate it with it?  What's happening in

10  Kim is that you're generating this text string.  That's the event notification.

11  The associating with character strings in the array happens when you store

12  the array.  Excuse me, when you store that event notification string into the

13  array.

14      JUDGE REPKO:  Storing in the array?  Okay.

15      MR. WEBER:  That's the association step.  The event

16  notification don't disclose at all what this association step means other than

17  to say that this array can have characters in it or not.

18      JUDGE REPKO:  Okay.  Thank you.  I have no further

19  questions on that.

20      JUDGE LEE:  Can you talk about Claim 2?  I have trouble

21  following your explanation.  I don't know how the stock price as an

22  alternative title -- how that would be associated with the, quote, event, which

23  is the 2:10 p.m. news.

24      MR. WEBER:  So Claim 2 recites generating the alternative

25  title associated with the event.  And there it's the generation of the breaking

26  news event.  It then -- wait, let me -- I got to go back to figure 4.

1        JUDGE LEE:  It requires the alternative title to be associated

2   with the event.  And the way you presented it the alternative title is the stock

3   price and the event would be the initial receipt of the 2:10 breaking news.

4   So I don't see how the stock price is associated with the news event.

5        MR. WEBER:  Well, in figure 4 it's showing the breaking news

6   event notification being used as the alternative title and it's associated with

7   the breaking news event.

8        JUDGE LEE:  What's the relationship between the stock price

9   and the news?

10       MR. WEBER:  The relationship is that they're displayed

11  together.  They're associated by --

12       JUDGE LEE:  Can you speak into the microphone?

13       MR. WEBER:  Oh, I'm sorry.  The association is between those

14  two received events is that they're displayed together.  They're associated.

15       JUDGE LEE:  Well, because they are displayed together they're

16  associated?  Is that --

17       MR. WEBER:  They're also stored together on the title array, so

18  --

19       JUDGE LEE:  No, but that's not an intrinsic association.  It's

20  like -- I'm not sure what you're saying.  I mean, there's no relationship

21  between somebody got stabbed and the price of a Hyundai, right?  You're

22  saying but because the computer shows them together they're now related?

23       MR. WEBER:  Well, I think that's reasonable.  I mean, I don't

24  think the event patents again describe at all what associating means.  It's a

25  very broad term.  They're related.  They're --

1    JUDGE LEE:  That sounds like a stretch.  I mean, we're both in

2    the same room, but I'm not associated with you.

3    MR. WEBER:  I would say that we're associated in this

4    proceeding, but I get your point.  And I might be confused on the question,

5    but claim 2 says --

6    JUDGE LEE:  Yes, but I'm confused by your petition because

7    you don't have much of an explanation.  The claim requires the alternative

8    title to be associated with the event.  So I'm giving you an opportunity to

9    explain.  I don't see an association between the stock price and whatever

10   news that's coming in.  But I think your answer is because the computer

11   shows them both in one place, so they are associated?

12   MR. WEBER:  That's an association.  I think storing them

13   together is an association.  These are not anything that's disclaimed or not

14   allowed by the claim language.  And also again the alternative event, it could

15   be the breaking news event notification shown here on figure 4, which is

16   associated with the breaking news event from Claim 1.  So that's just -- that

17   title is also generated and it's associated with the event, the breaking news

18   event that was received at the --

19   JUDGE LEE:  Well, the event is the news.  And then the

20   alternative title is the stock price.

21   MR. WEBER:  I think it could be, but also figure 4 shows that

22   the -- again the breaking news event notification is an alternative title.

23   JUDGE LEE:  We've covered this before.  I mean, the other one

24   doesn't work.  The news covers up Document-WordPad. That's your other

25   alternative.  That one doesn't work because Document-WordPad was not

26   your original title.

1  MR. WEBER:  Again that's only a distinction made for the 179

2  patent, but for both patents the association is that they're here associated here

3  together.  They're shown to the user together and they're also stored together

4  in the array.  That's an association.

5  JUDGE LEE:  Well either way the stock price and the news is

6  not associated with WordPad.  Or are you saying because it's displayed in a

7  title bar of WordPad -- so now they are associated?

8  MR. WEBER:  You mean associated with like the name of the

9  application WordPad?

10  JUDGE LEE:  Yes.

11  MR. WEBER:  No, that's not what I'm saying.  I mean, that

12  WordPad title -- I mean, that's not the event and it's not the --

13  JUDGE LEE:  Right, so you're only left with stock price

14  replacing news.  I don't see an association, but you're saying they are

15  associated because what, they're now both displayed in the bar?

16  MR. WEBER:  Yes, correct.  And they're also stored together or

17  received together.

18  JUDGE LEE:  And stored together in an array?

19  MR. WEBER:  And stored together in an array and received

20  together, yes.

21  JUDGE LEE:  So that's the association?

22  MR. WEBER:  Correct.

23  JUDGE LEE:  Okay.  Thank you.

24  MR. WEBER:  I see that I'm over time.  Should I cease the

25  presentation and reserve the rest for rebuttal?

1                 JUDGE REPKO:  Yes, you're getting into your rebuttal time,

2  but yes.

3                 MR. WEBER:  Any further questions from the Board?

4                 JUDGE REPKO:  Yes, I don't have any further questions.

5  Judge Lee, do you have any further questions?

6                 JUDGE LEE:  (No audible response.)

7                 JUDGE REPKO:  Judge Dirba?

8                 JUDGE DIRBA:  No, none.

9                 JUDGE LEE:  Very quickly, this is important, too.  How does a

10  user get notified that the notification was successful?  I can't figure it out.

11  Can you quickly tell us?  One of the dependent claims requires that the user

12  be notified that there's some affirmation that the user notification was

13  successful.

14                 MR. WEBER:  Yes, that's Claim 8.

15                 JUDGE LEE:  Just quickly tell us how does that happen in

16  Kim?

17                 MR. WEBER:  Yes, so what Kim discloses is that when a user

18  clicks on a non-active window the title bar value of that previously active

19  window is replaced.  That's indicating that the user switched off that and saw

20  it.  I mean, the claim only requires receiving affirmation.  It doesn't say what

21  entity receives it or how exactly it's done, but if a user switches off an

22  application that had an event notification, the user got the notification.  It's

23  successful.  That's encompassed by the claim language.  There's no reason to

24  limit the claims any further as requiring a certain type of --

25                 (Simultaneous speaking.)

1           JUDGE LEE:  -- user and I never saw the notification.  I'm just

2   done with WordPad.  Now I want to go watch my emails, so I close

3   WordPad but I never saw the stock price or the news.  So you're treating me

4   going to another app as the notification was successful when in fact you

5   don't know whether I saw it or not.

6           MR. WEBER:  I don't think that these claims could possibly be

7   limited to a situation in whether a user subjectively saw something.  What

8   we're talking --

9           JUDGE LEE:  How is this successful?  Why is this successful

10  then?

11          MR. WEBER:  Because the user's actions on a computer

12  indicated that they switched off the active window, that they were looking at

13  it.  I mean, just switching off of it and clearing that notification is -- has to be

14  indication that the notification was successful.  That's what Kim is

15  disclosing.  I mean, if it wasn't successful, why would -- clear it?  I mean, it

16  cannot be based on whether a user actually saw it or not.  It has to be based

17  on what's happening in the system and what's subjectively observable

18  happening in the system.  And if Kim is disclosing that thing was cleared,

19  the user had to see it, or we're assuming that they saw it, we're receiving

20  affirmation that it was successful.

21          JUDGE LEE:  Okay.  Thank you.  No more questions.

22          JUDGE REPKO:  Patent Owner, if you could approach the podium

23  and let me know how much you would like for rebuttal.

24          MR. SCHLATHER:  Twenty minutes please, your Honor.

25          JUDGE REPKO:  All right, you may begin.

1    MR. SCHLATHER: Thank you, your Honors.  Good afternoon, Steve

2    Schlather for the Patent Owner.

3    Let me see if I can fix my technical difficulties here quickly.

4    JUDGE REPKO:  Go ahead and start.

5    MR. SCHLATHER:  So let me start off the event as eBuddy has set

6    forth in detail in its briefing, including its response at pages 9-10 and its

7    Expert Declaration at paragraphs 44-46.

8    The 135 and 179 patents are directed to event-driven systems and

9    event-based programming.

10    The language in the 135 and 179 patents would have been readily

11    recognized by a POSITA to be referring to events in the context of such

12    event-based programming.

13    Figures 1-4 and -- 1 and 4-6 are examples of this.  Additionally, the

14    passages quoted in the – in the specification, including event processing

15    engine, event queue, and event notification, show that these patents are

16    directed to describing claim event-driven systems.

17    I won't go through each of the examples that are shown here in slides

18    2 and 3, but I wanted to include them for the Board's reference and to show

19    that there will be no doubt that these patents describe event-based systems.

20    In the context of an event-driven system like those in the 135 and 179

21    patents, the proper construction for the term event bin is a detectable

22    condition of a system that can trigger a notification.

23    Importantly, events in the context of these patents are limited to

24    conditions of a computer system.

1        The intrinsic evidence supports this construction, including the

2    citations and evidence that I've shown here on slides 2 and 3 and as eBuddy

3    has forth in its response, for example at pages 9 and 10.

4        The patents provide examples of conditions that are events such as

5    new – a new mail event and a new instant message event, a reminder event, a

6    calendar event.  These are all actions or conditions occurring in a computer

7    system.

8        JUDGE LEE:  Mr. Schlather, it's Judge Lee.  So really, there's no

9    difference between the parties on meaning of event because I talked about it

10    with opposing counsel earlier and he agrees, it's got to be something that the

11    computer is made aware of, which is the same you're saying the detectable

12    condition.  And you just said a email, receiving email, receiving text or – is

13    an event.  So what is the difference?

14        MR. SCHLATHER:  Well, I would say the difference is that under

15    our construction, an event is a detectable condition of a system that can

16    trigger a notification.

17        And so computer systems receive all types of information. But in this

18    context, an event is something that is both detectably by the – by the system

19    and then can generate a notification thereof.

20        And so even with regard to the examples that are given in the patent,

21    there could be situations where those do not necessarily generate a

22    notification.

23        JUDGE LEE:  I see that, but your definition says that can generate.

24    Even your definition does not require generating a notification.

25        You say a detectable condition which can cause the computer – which

26    can generate.  You're not saying it must.

1       And Kim does generate, you know, a display.

2       So I'm wondering why are the parties arguing something over which

3  there's actually no dispute over?

4       MR. SCHLATHER:  Well, I think it for two reasons, and I'll address

5  them in reverse order.

6       One, to make clear that it wasn't clear from the petition and

7  Petitioner's briefing that their position was that an event was limited to a

8  computer system.

9       I've heard the argument now and it sounds like maybe they've

10  narrowed their view or changed their view of what an event might be, so

11  that's –

12       JUDGE LEE:  Yeah, that's fair.   That's fair.  They were a little

13  ambiguous in the petition.  But we read it and we thought it was fair that -- it

14  was doubly presented.

15       I mean, they presented it like an unrelated event, but they've also put

16  enough in the petition that at least we saw it as fairly there.

17       And we explained it in our decision.  So you were on notice that we

18  also saw that part of unarticulated but implicitly there presentation.

19       So I don't think you can say you weren't made aware of that position.

20   But now that everybody's aware, why are we still arguing that about an

21  event to which the computer knows nothing about?

22       Obviously Kim – Kim's computer knows about something that was

23  sent to it.  So wouldn't you agree that the receipt of the stock price and

24  receipt of the news, even under your definition, is an event?

1    MR. SCHLATHER:  In the context of Kim, no I wouldn't agree with

2  that.  Because Kim is silent on really how most of – most of its system

3  works.

4         And so what it says is that the user's PC receives a character stream

5  real – of real-time information.  And that that information is then displayed.

6         That's really the totality of the disclosure of Kim.  And so –

7         JUDGE LEE:  You don't think that's -- the computer receiving that,

8  that's not an event?

9         MR. SCHLATHER:  Kim doesn't disclose that.  I mean, there are –

10  there are different ways that computers can receive and process information,

11  event-based processing like we have in the 135 and 179 patents is one way,

12  and that's the way that those inventors chose to construct their system and

13  claim what's claimed.

14         In Kim it just doesn't say.  It's silent on how that system works.

15         JUDGE LEE: Yeah, but your definition just says a detectable

16  condition.  So the real-time information, when received by the computer,

17  why doesn't that meet your definition?

18         MR. SCHLATHER:  Because there's no disclosure in Kim that it's an

19  event-based system.  And that's how that system functions.  There's just no

20  way to know that.

21         So it could – there are – as – and we discuss in our briefing that there

22  are – there are different ways that those systems can work, pulling, pushing.

23   So –

24         JUDGE LEE:  Whatever way it is, the computer still receives it.  So

25  the computer just detected that information.  So why wouldn't that meet

26  your definition?

1        MR. SCHLATHER:  Because in this instant – in this instance with

2   regard to these 135 and 179 patents, in an event-based system, that's where

3   the – that can trigger a notification comes in.

4        To be an event, it has to be a detectable condition and it has to be able

5   to trigger a notification. It's both of those things.

6        JUDGE LEE: So you're hinging it on the other half, the letter half to

7   generate notification.

8        Of course you say, well, just regurgitating what you receive is not a

9   notification.  But they say it is.  So we're down to that.

10       You know, you say it's not an event because it doesn't generate a

11  separate notification.  So that's what you're saying.  It's not because that –

12  it's not a condition detected by the computer.  It obviously is.

13       MR. SCHLATHER:  I would say that, again, for – you have to look at

14  it in the context of how that system is constructed to operate or function.

15       And with regard to the 135 or 179, it's an event-based system where

16  you have these detectable conditions that can generate a notification and you

17  have – then you have – when that event comes in, it then generates a

18  notification.

19       Versus Kim, which just says that it receives real-time information.  It

20  doesn't say how it was received, how it – how it was caused to be sent.

21       JUDGE LEE: It doesn't matter how it – they receive it.  That's already

22  a detectable –

23       MR. SCHLATHER:  Because that's –

24       JUDGE LEE: Already a detectable condition.  I received it, so I just

25  detected the receipt.  So that meets that first half of your definition.

1    MR. SCHLATHER:  Well, I don't think in – when we talk about

2    detectable conditions of a system, for instance if your system is set up to

3    operate in a different way.

4        For instance, pushing information or pulling or request response, for

5    example. Those – those types of systems don't have events like we're

6    talking about here for the 135 and 179 patents.

7        And so in that case, there would be no event.

8    JUDGE LEE:  Well –

9    JUDGE DIRBA:   Counsel –

10   JUDGE LEE:  Go ahead.

11   JUDGE DIRBA: Oh, I apologize.  I was going to say, Mr. Schlather, I

12   heard you -- this is Judge Dirba.  I heard you in your answer to my

13   colleague's questions, you talked a lot about how Kim is not an event-based

14   system.

15       The problem with that, though, is that's not required by your

16   construction.

17       So what my colleague is asking you, and one of my questions is:

18   claim 1 of the 135 patent, for example, requires receiving information of an

19   event that calls for a user notification.  Why – even under your construction

20   of event, why does Kim not disclose that by virtue of the fact that Kim

21   receives this real-time information?

22       MR. SCHLATHER:  We – because Kim just doesn't, that's not what

23   Kim discloses.  It just doesn't say that.  It doesn't say that's how – that's

24   how the system of Kim operates.

25       JUDGE DIRBA:  What are you – that's not a very helpful answer to

26   my question. It doesn't help me.

1   I mean, I understand you to be articulating what your position is, but

2   it's not helping me understand why I should agree with your position or why

3   your position is correct.

4   In other words, what is it – what is –which of those claim limitations,

5   which of those words that is recited in the claim or required by your

6   construction is Kim not satisfied by virtue of receiving real-time

7   information?

8   MR. SCHLATHER:  So, it would not – it would not be necessarily a

9   detectable condition of a system.

10   If that's – so – for example, in an event-based system, you could have

11   what's referred to I think as a listener.

12   So you have – you have something in the system that's listening for a

13   particular piece of information to come in.

14   And when that comes is, that's an event, that generates a notification.

15   And the system proceeds on from there with whatever it needs to do.

16   As opposed to something like a request response, where the system

17   reaches to in this case, for instance, the user's PC reaches out and says hey,

18   do you have any new information for me.

19   And if the server does, it can send it.  Or it can be like a push system

20   where there is no listener, the information just comes in and it's – it's

21   processed however that particular system would work.

22   But it's not – it's not a system where there's kind of this listening

23   function, an event occurs, and then it generates a notification of that event.

24   JUDGE DIRBA:  You're assuming that those other systems that

25   you've described wouldn't meet your construction of this claim limitation,

1    which I don't know that you've established that. And fundamentally it

2    sounds to me like all of that is a little bit beside the point.

3          My question is: what is Kim not doing that the claim requires or that

4    your construction requires?

5          And the answer that I heard from you is that Kim's receipt of the real-

6    time information is not a detectable condition of the system.

7          So in other words, if I understand correctly, Kim's client receives the

8    real-time information, and you're saying that that's not a detectable

9    condition of Kim's client.

10          And that I don't understand. Can you explain to me why you think --

11   a computer receives information, it receives a packet of data. How is that not

12   detectable by the computer that received that information?

13         MR. SCHLATHER: So I think – so it has to be both a detectable

14   condition and it has to generate a notification.

15         And so our position is as well that there is no generation of a

16   notification in Kim. So.

17         JUDGE DIRBA: So, and that's a separate point. As Judge Lee also

18   pointed out, the arguments he made about whether or not it's generating a

19   notification. I'd prefer to take those separately.

20         I understood you to be saying, though, that it's not a detectable

21   condition also. Is that correct, and if so why is receiving this information

22   not a detectable condition?

23         MR. SCHLATHER: Because that's not a – and well, at least in the

24   system of Kim, it just – it doesn't disclose that that's how that system is

25   operating.

1       And I know that's not – maybe that's not helpful and maybe I'm not

2   articulating it well.

3       But for an event-based system, it has to have this concept of the

4   system waits for something to occur.  And in this case we just don't know if

5   that's how Kim is functioning.

6       JUDGE DIRBA:  So if I understand your answer correctly, the –

7   you're now saying that the – that the claim construction requires that the

8   system be an event-based system, which includes some other requirements.

9       Can you point me to where that argument was in your response or

10  where that argument is in your construction?

11      MR. SCHLATHER:  Yes, so, and that's what I covered I think in the

12  first, in slides 2 and 3 here, with several examples of why the 135 and the

13  179 patents are specifically directed to event-based systems and event-based

14  programming.

15      And there's numerous examples here, and we point those out in our

16  135 response, for example, at pages 9-10, our Expert's Declaration, which is

17  Exhibit 2020, at paragraphs 44-56.

18      And so what we have – all these concepts of event processing, it talks

19  about event queues, event processing engines.  Event notifications.

20      All of those, all of that type of language is what would inform a

21  POSITA that these patents are directed event-based systems and event-based

22  programming.

23      JUDGE DIRBA:  But the issue is not whether the patents are directed

24  to event-based systems and event-based programming.

25      The issue is whether the claim term event requires the receiving

26  system to be an event-based system and whatever it is that that must entail.

1    And that the challenge that I have is I don't see that in your

2    construction.

3    MR. SCHLATHER:  Well –

4    JUDGE DIRBA:  But if I, but to step back, if I understand you

5    correctly, you have basically two reasons why you believe Kim is not

6    disclosing the receiving limitation on the 135 patent, for example.

7    And that is number one, the notification arguments that are made

8    separately and discussed in more detail.

9    And then number two, that Kim is not an event-based system.  Is that

10   correct?

11   MR. SCHLATHER:  That's correct.

12   JUDGE DIRBA:  And that's – and there aren't other – sort of if we

13   reject those two arguments, that resolves your sort of objections to what

14   Petitioner had shown for this particular notification.

15   MR. SCHLATHER:  It may, I think.  But I think that the issue with

16   Kim – well, two things.

17   One, I think that the 135 and the 179 patents are very clearly directed

18   to event-based programming.

19   And I think – but I'm not sure that there's even a dispute between the

20   parties on that, including in view of the evidence that's been cited by

21   Petitioner, both extrinsic, intrinsic, and from their expert.

22   But secondly, the –

23   JUDGE DIRBA:  It is your contention that the fact of patent directed

24   to something, therefore the prior art references therefore must have that same

25   thing?

1         In other words, if a patent is directed to X, the prior art for instance

2    must also disclose X, even if it's not recited in the claim?

3         MR. SCHLATHER:  No, the – I think the importance here of the fact

4    that these patents are directed to these event-based type systems is where we

5    get to then the meaning of what is an event.

6         And so, and what – and more specifically, what is an event in the

7    context of that type of system.

8         So within event-based programming, event has this specific meaning

9    that we've – that we've laid out here.

10        And so it's not – it's not just kind of this nebulous thing of where –

11   anything that comes into a computer is somehow an event.  That's not how

12   these systems work.

13        And so in computers, as you may know or certainly could imagine,

14   that receive all kinds of information all the time.

15        And not all of that information constitutes an event. Even if it is

16   received, it doesn't necessarily mean it's an event.

17        JUDGE LEE:  Let me put it this way.  I know you tried to answer, but

18   it really hasn't been helpful and just confuses matters more for me.

19        It seems like now we have to construe what you mean by detectable

20   condition.  It just adds another level to the construction.

21        It seems like whatever the other party says meets your detectable

22   condition, you're going to say oh no it doesn't.  And we ask you why, and

23   you're going to say, oh, because they don't do it the way we do it.

24        Do you see how that makes it really difficult for us?  I don't know

25   what you really think have to be met to meet event.  Because whatever we

1    can come up with and ask you about it, you go, oh, that doesn't do it because

2    they don't do it the way we do it.

3          You kind of leave an open-ended list.  I don't know what one has to

4    do to meet your definition.

5          Usually a party would say, oh, it means this, you have to do this and

6    you have to do this.  After our exchanges, it seems like I'm still totally

7    unclear.

8          Because hypothetically we'll come up with something, and you go,

9    oh, no, that doesn't meet it because it's not the way we do it.  You know,

10    you have an open-ended bottomless bucket that you can just at will throw in

11    elements.

12          And oh, it doesn't meet it because it – they don't do it the way I do it.

13     You can always go to your spec and say oh, here's one thing I do that they

14    don't do, and therefore they don't meet the claim.

15          And that's very unhelpful.  Usually you go the claim means this, it has

16    to have this, have this, and have that.  And so far, you haven't given us –

17    given us anything like that to work with.

18          I thought your definition was good, you say a detectable condition.

19    So usually that means someone comes up with a detectable condition, oh,

20    and you go, oh, yeah, that is one.

21          Like, the computer just realized it received information.  That's a

22    detectable condition.

23          But you refuse to say that is.  And when we ask you, you always

24    resort back, well, they don't do it the way we do it.

25          So right now, I don't know what you mean by a detectable condition,

26    because you always go back to your bottomless pail of stuff and say, well,

1    there's something in my spec. They don't do it the way I do it, so they don't

2    meet my claim. That's why it's all very unhelpful to us.

3            MR. SCHLATHER: So –

4            JUDGE LEE: Can you just list what are the things a prior art system

5    have to have to meet your definition? And have a cutoff at that, and don't

6    just say, well, they don't do it the way we do it.

7            MR. SCHLATHER: So there are some examples that the –

8            JUDGE LEE: Don't give me examples. I want precisely what does

9    the art have to have to make the claim.

10          MR. SCHLATHER: So it needs to have a system that is able to detect

11    a condition.

12          JUDGE LEE: Well, they do, they detect the receipt of something. So

13    that's met. So what else?

14          MR. SCHLATHER: I respectfully disagree with that. But then the

15    other piece of it is that it needs to be able to trigger a notification that that –

16          JUDGE LEE: But, they do. I mean –

17          MR. SCHLATHER: Condition happened.

18          JUDGE LEE: -- what can trigger a notification? Anything received

19    by the computer technically can trigger a notification if desired. There's no

20    computer that can just detect and say unable to trigger something as a result

21    of it.

22          Like it's a dummy computer, I'll detect it, but I'm restricted. I'm not

23    able to do anything with it. So that's not realistic.

24          Anytime a computer receives and detects something, it's

25    automatically met that it can trigger something if it wants to. So that doesn't

26    make it – you haven't given us anything real.

1    MR. SCHLATHER: My understanding of the ways that computer

2    systems can operate is that not, like I've said, not all information that's

3    received is an event.

4    And so there are ways that computers can receive information without

5    necessarily –

6    JUDGE LEE: Well just -- you see now, you're generalizing.

7    MR. SCHLATHER: Triggering a – triggering a notification.

8    JUDGE LEE: Let's go back on the track. What other things? So far

9    you've given us a couple of things, but I think they're met because when a

10   computer detects it receives something, it can do something as a result of it.

11   So what exactly – what else?

12   MR. SCHLATHER: Well, that is – that is the definition of event. I

13   mean, that's what we have, is it has to be a detectable condition and it has to

14   be able to generate a notification.

15   JUDGE LEE: So that's it. You have to receive something and you

16   have to be able to do something with it.

17   MR. SCHLATHER: Yes. I would agree with that.

18   JUDGE LEE: That's it. Anything else?

19   MR. SCHLATHER: That – no, that is our – that is our construction

20   on that.

21   JUDGE LEE: Thank you.

22   MR. SCHLATHER: And so then with specific regard to Kim,

23   though, obviously our position is that that's not what's disclosed.

24   JUDGE REPKO: Do you use the term event-based programming in

25   the spec of any of these patents?

1    MR. SCHLATHER:  I don't know that event – the specific phrase

2    event-based programming is used.

3    I have examples here of the – some of the language that is used, where

4    it talks about event processing engines, event queues, things of that nature.

5    So but I don't believe it uses the specific phrase event-based

6    programming.

7    JUDGE REPKO:  And you contrasted event-based programming with

8    something that polls for things?  Like if the client was polling the server,

9    you're saying that's not the event-based programming?

10   MR. SCHLATHER:  That's correct, and that's what our expert has set

11   forth.  And I believe that's at paragraph 47 of his declaration.  Let me see if I

12   can just scroll through and find it.  I had it – right.

13   So here on paragraph 47, where we talk about there's these other

14   models that can be used to receive and to handle information, the request

15   response, push notifications, those types of systems, which are distinguished

16   from what we're arguing is an event-based system.

17   JUDGE REPKO:  So in column 4 of the 135 patent, you discuss

18   polling from messages or events.

19   So you're just – is there any contrast between what's in line 10 in

20   column 4, with the polling you're describing here, or you're trying to

21   distinguish here on this slide?

22   MR. SCHLATHER:  I'm sorry, column 4 and what was the line?

23   JUDGE REPKO:  So column 4, lines 9-11.  And I'll read it out loud

24   for the benefit.

25   It says, With Ajax, appropriately configured clients from 14 can

26   execute actions and poll from messages or events using only Java Script.

1    So does that describe an event-based programming model?

2    MR. SCHLATHER:  I am – I'm not sure of the answer to that

3    question.  I know, like I said, our –what we have in our – in our Expert

4    Declaration is these request response model and push notification models.

5    I note that it doesn't look like polling is included in there.  So I'd have

6    to go back and re-read that section in context.  That's not something that we

7    had – that I don't think either party addressed in their briefing.

8    So I'd have to go back and read that in context and consider whether

9    that would be part of the event-based processing that we're talking about

10   here.

11   JUDGE REPKO:  Yeah, because the next sentence says, The method

12   is based on using the XMLHttpRequest object to make the request to the

13   server.

14   So then it seems like there's no explicit definition of event-based

15   programming in the – in the specification of this patent.

16   And here, in column 4, you're describing polling and making

17   requests.  And then in your slide here, you're trying to distinguish that.

18   So it seems like at some point during that paragraph, you might say

19   this is not event-based programming or this – you know, it seems like you

20   would just try to distinguish this in some way.

21   I would expect to see that if event-based program was actually defined

22   in your –

23   MR. SCHLATHER:  So I think what's being described here is this

24   Ajax system which allows for polling of events. But that, I think that

25   presupposes that an event has already occurred.

1       So if you, and I'm looking at I guess it's column 4, maybe starting at

2    line 9, that it can execute actions and poll from messages or events using

3    Java Script.

4       So that presupposes that the event is something that's already

5    occurred, right. Because it's polling for the event.

6       JUDGE REPKO: Polling for the event. So the event's occurred, and

7    the client needs to know about that event, right? In some way. Just like

8    Kim's client, it needs to know about the event in some way.

9       MR. SCHLATHER: Well, that presupposes that there's an event in

10    Kim, but.

11       JUDGE REPKO: Okay, so let's say the – Kim's client polls, that was

12    one of your theories, right, that Kim's client could possibly poll the server,

13    right.

14       And that would maybe distinguish it from the event-based program.

15    Am I accurately characterizing your argument?

16       MR. SCHLATHER: I don't think so. And if I misspoke, I apologize.

17       But what I – what I was referring to when I was making those

18    comments was what I have here on the screen and from our Expert

19    Declaration, where it talks about these other systems that could be used, a

20    request response model or a push notification system.

21       I don't know if I – I said polling. But what I --- what I was referring

22    to was this request response and a push notification as being distinguishable

23    from the event-based system that we're talking about.

24       JUDGE REPKO: Well, there is the request here in column 4, right,

25    that's how the client checks. Doesn't it send you – send you request, isn't

26    that what that's saying?

1　　　　MR. SCHLATHER:  Well, I think that's part of the polling process,

2　but I understand that that's different than a request response model.

3　　　　JUDGE REPKO: Okay, so what's the difference between what's in

4　column 4, lines 17-43, and the request response model?  Because I see

5　request there, and I see polling there.  And checking for events.

6　　　　MR. SCHLATHER:  Well, again, I'm not sure that I can give you an

7　answer here on the fly because that's not – that's not an issue that either

8　party discussed in its briefing.

9　　　　So I don't want to speak out of turn on kind on the fly without having

10　read this in context.

11　　　　JUDGE REPKO:  I have no further questions on that.  Thank you.

12　　　　JUDGE DIRBA:  Mr. Schlather, I have a follow-up question.  This is

13　Judge Dirba.

14　　　　You've pointed us to paragraph 47 of your Expert's Declaration,

15　Exhibit 2020, where he distinguished event-based programming from the

16　request response model and the push notifications.

17　　　　Does your expert also, at any point, testify that Kim either is directed

18　to a request response model or a push notification?

19　　　　In other words, does your expert's testimony tie this testimony in with

20　Kim and its disclosure?

21　　　　MR. SCHLATHER:  I don't believe so, and I think the reason for that

22　is that there's just no – there's no information in Kim to make a

23　determination of what type of system model that it uses.  It, again, it's silent

24　on how that – how that works.

25　　　　JUDGE DIRBA:  It discloses in Figure 7 that the client logs in,  and

26　then let's see where that is, Figure 7.

1    The client logs in and then receives information from the real-time
2  server, which does not sound like a request response or a pushing
3  notification, irrespective of whether there are event notifications.
4    So I suppose I guess I'm not seeing, you know, even – even assuming
5  that the claim were to require this event-based programming, which is not
6  apparent in your construction, but even if it were, to find that this claim
7  required event-based programming or a client that operated according to
8  event-based programming, I don't see any basis for us to find that Kim is –
9  that that somehow distinguishes Kim.
10    MR. SCHLATHER:  Well, I think it – computers can receive
11  information through a number of ways.  And so just saying that it receives
12  information from the real-time server is not – is not indicative of the type of
13  system or model that it uses.
14    JUDGE DIRBA:  And just to make sure that I'm clear on it, did you
15  expert opine on this issue at all?
16    MR. SCHLATHER:  Again, I don't believe that he did because there
17  was not enough information in Kim to render an opinion one way or the
18  other of how that – how that particular system described in Kim operates,
19  what type of model it uses.
20    JUDGE DIRBA:  You say that, did you expert also say that?
21    MR. SCHLATHER:  No, I don't – I don't believe he opined on that
22  issue.
23    JUDGE DIRBA:  So when you're saying that Kim doesn't give us
24  information, that's your attorney assessment of what Kim does or does not
25  disclose rather than the expert's opinion.  I just want to be clear about
26  whether there's evidences in the record on that point.

1       MR. SCHLATHER:  I think – I think it's just based on what is

2   disclosed in – or in this case what's not disclosed in Kim.  It doesn't say

3   what type of system that it uses.

4       It says that it receives real-time information.  That's really all gives

5   us.  It doesn't go beyond that.

6       JUDGE DIRBA:  I understand.

7       JUDGE LEE:  Mr. Schlather, it's Judge Lee.  Can you – am I

8   understanding you correctly when Patent Owner says in Kim that multiple

9   embodiments, Figures 2, 3, and 4, they're all separate.

10      That means in Figure 2, you get, say the stock price. Something came

11  in, so we show the stock price.

12      And then you go to Figure 3, and that's completely separate.  Like

13  forget about Figure 2, here's another example, and you get the news then

14  you show the news.

15      And then Figure 4 is another separate example not related to the two

16  earlier ones.  It's a standalone example where, hey, these two items came in

17  relatively close to each other, the news and the stock price.

18      So it's going to show them both because of relative closeness,

19  proximity in time.

20      So they don't really relate.  It's not like you go from one to the next to

21  the next.  Is that what you're saying?

22      MR. SCHLATHER:  So we are definitely saying that it doesn't show

23  a progression.

24      Beyond that, we're saying that all three of those examples are

25  independent of each other.

1       And so for instance in the first example, and I may get them

2  backwards, but the first one I believe is the Hyundai, in yeah, Figure 2.

3       So it shows the Hyundai stock quote.  So that's one piece of real-time

4  information that the system can –

5       JUDGE LEE:  And why would the Figure 4 show them both?  Is that

6  because they both came in relatively close to each other and that would be

7  why it's showing both?

8       MR. SCHLATHER:  Well, I don't think they came in relatively close

9  to each other.  I think they both came in together in the single piece of real-

10  time information that Kim says that it receives in displays.

11       JUDGE LEE:  Oh, I see.  So in your view, both of those items came in

12  together.

13       MR. SCHLATHER:  Correct.

14       JUDGE LEE:  From somewhere.

15       MR. SCHLATHER:  Correct.

16       JUDGE LEE:  But doesn't Kim say they come from different servers?

17  There's a news server and then there's like a stock server.

18       MR. SCHLATHER:  So yes, and let me just go to that figure.

19       So that's – so what we have – what Kim says is that it has multiple – it

20  could have multiple sources of information, like you said, a stock server, a

21  real-time news server.

22       But those servers interact with – and it's shown here in Kim's Figure

23  5 – those are the sources of real-time information down here at the bottom of

24  this figure.

1        And those communicate with the – with the single information server

2    10.  And it's that single information server, then, that communicates with the

3    user PC.

4        JUDGE LEE:  I see, so in your view, everything comes from the

5    consolidated server.

6        MR. SCHLATHER:  Well, I don't think it's just Patent Owner's view,

7    I think that's also what Kim specifically discloses, including here in Figure

8    5.

9        And I believe the specification that discusses Figure 5 also makes

10    clear that it's those sources of information interact with the real-time

11    information server, not with the – with the user's PC.

12        JUDGE LEE:  I see, so the Figure 4 shows two items because it came

13    as one package, one package.

14        MR. SCHLATHER:  One piece of real-time information, that's the

15    language that Kim uses, is it receives real-time information.

16        So yes, those – what's shown in Figure 4 is a single piece of real-time

17    information.

18        JUDGE LEE:  I see, okay, so all of that support your view that they

19    are separate and independent, right?  They're separate instances of receiving

20    real-time information.

21        MR. SCHLATHER:  Yes.

22        JUDGE LEE:  I can see that now.  How do we – how do you say their

23    view is not reasonable, you know?  In their view, first you have the stock

24    price.  Sometime later you get the news.

1      And I'm not sure what their story is about how you ended up with

2 both. But what's the argument from your side saying, no, that can't be what

3 it is?

4      MR. SCHLATHER: So the –

5      JUDGE LEE: It can't be a progression, is what I'm looking for.

6 What's your argument against their view?

7      MR. SCHLATHER: So the way that Kim works is is that it receives a

8 piece of real-time information, and that information is then displayed.

9      And so it's real-time information. And it's sent, it's – and it's

10 displayed.

11     So there is no – there is no concept in Kim of keeping old information

12 around. At that point, it's not real-time anymore, right.

13     So there is no – there is no disclosure or really concept in Kim that the

14 – that there's – this information is kept so that it can be combined at some

15 point later to show multiple pieces of what could then be something other

16 than real-time information.

17     JUDGE LEE: Yeah, I'm just playing devil's advocate. I see what

18 you're saying, but just playing devil's advocate, do they – saying, I'm them

19 now.

20     I'm saying – I'm not saying to keep this forever, just for a few

21 minutes. That's still relatively real-time.

22     So I give the stock price, I'm showing the stock price. The next

23 minute I get the news.

24     Well, the stock price has been shown for a minute, I want to keep that

25 longer. So right now for the next piece, I'm showing the news.

1        And then the computer thinks, hey, both of these are relatively new, I

2    don't want to wipe them out yet. So I'm going to show them both in Figure

3    4.

4        So what do you say that? You know, why is that not a reasonable

5    reading of Kim?

6        I know Kim doesn't expressly say so, but they're saying that's how a

7    POSITA would read it.

8        MR. SCHLATHER: Well, so if we look at -- if we look at those

9    figures, we have – there's simply not a progression, right.

10        So for instance, from 2, from Figure 2 to Figure 3, where you have

11    first you have just the Hyundai stock quote.

12        And then the Hyundai stock quote is gone, and now have the arrest –

13        JUDGE LEE: The news, right, yeah.

14        MR. SCHLATHER: News. There's no – there's nothing that

15    suggests that that's any kind of progression. Those are just two completely

16    unrelated, separate pieces of real-time information.

17        JUDGE LEE: Well, why can't it just be like the second piece came in

18    a minute later and then first piece?

19        MR. SCHLATHER: Because there's this concept in Kim that when it

20    receives a piece of real-time information, it displays that information. That's

21    what we know about how Kim works.

22        JUDGE LEE: Yeah, that's consistent with him. Kut the stock price

23    came in, I'm showing it. I keep showing it.

24        And then the news came in about somebody getting stabbed. I'm

25    showing that.

26        So it's also consistent, what they're saying.

1      MR. SCHLATHER:  Well, I don't think it is, including because what

2  Kim says is that the real-time information comes in, and it replaces the title

3  bar value for the active window.

4      And so there just is not – there's just no disclosure in Kim that there's

5  any way that these multiple pieces of information are stored that there's any

6  kind of motivation or reason to store them.

7      I think that's just reading in far more than what Kim reasonably

8  discloses.

9      JUDGE LEE:  Okay.  So you're saying it's not reasonable for a

10  POSITA to think that way, reading Kim that way.

11      MR. SCHLATHER:  It's not.  There's just no disclosure of that type

12  of a system in the Kim reference.

13      JUDGE LEE:  I recall your expert has a couple of paragraphs saying

14  this, saying that it's not a progression.  I don't think the reply – the reply

15  didn't come in with the declarant countering your expert, right?

16      MR. SCHLATHER:  That's correct that the reply, neither the reply for

17  the 135 or 179 included an additional expert declaration.

18      JUDGE LEE: Yeah, the reply had a reply declarant, but it's only there

19  to authenticate some items.  There's no substantive testimony in the reply

20  declarant, is that right?

21      MR. SCHLATHER:  That's my understanding, yes.

22      JUDGE LEE:  Okay, thank you.

23      JUDGE REPKO:  I had a question about the progression issue too.  If

24  you look on Figure 2 of Kim and Figures 3, 4.

25      If you look at the times in the lower righthand corner, it says 11:32

26  p.m., 11:35 p.m., 11:37 p.m.  Well, what do you make of those times?

1    MR. SCHLATHER:  I think those are just the times that these screen

2    shots were taken showing these different – the different options that Kim

3    allows for when it receives this real-time information.

4    I think it – what these figures illustrate is that the real-time

5    information can be a single news or stock item.

6    So for, instance, it could be that the single, you know, Shinchang

7    arrested.  Or it could be the single Hyundai Electronics.

8    Or if the server – or the server can send multiple pieces of information

9    at once, in which case you have Figure 4.

10    But I don't think – I don't think the timing of the time here shows a

11    progression.

12    And again, there's nothing in Kim that suggests that it has the

13    functionality or any capability to create a progression like that.

14    JUDGE LEE:  The question does Kim – do you read Kim as, Kim's

15    figures as just illustrations?

16    Or is that an actual reproduction of an actual running app that does

17    that?

18    Do you see what I'm saying?  Is there an actual application that's

19    actually running Kim and Figures 2,3, and 4 are screenshots of whatever the

20    application is producing on the screen?

21    Is that – or is – or that's not it.  It's just some draftsman creating some

22    illustrations on the screen.

23    MR. SCHLATHER:  It appears that these are more likely to be a

24    draftsman creating these.  Because if you look for instance at Figure 1,

25    which I have here on the screen, the time on that is 11:34.

1    So that, if we're -- if we were going to go with this progression

2    theory, that would mean that we had an 11:32 with the Hyundai quote, and

3    then we went back to a, quite of the original screen here.  And then came

4    back with the arrest breaking news.

5    And so it seems to me that those are not a progression.  They're not

6    likely a running program.  Those are just individual screen shots to illustrate

7    the time of the –

8    JUDGE LEE:  You see nothing in Kim that says these are actually

9    displays of a running app.

10    MR. SCHLATHER:  I don't believe that I've seen anything that

11    suggests that Kim had a – had a running app or that these screenshots are

12    illustrative of it.

13    JUDGE LEE:  Thank you.

14    MR. SCHLATHER:  So I want to skip a little bit ahead and I want to

15    briefly touch on array. And I think that I heard that the parties are largely in

16    agreement here.

17    The dispute I think may have been from the petition, where it sounded

18    like Petitioner was arguing that an array could be simply a table or list.

19    And that is not correct, and Patent Owner certainly would disagree

20    with that.

21    But I think an array is, the key concept of the array is that it has these

22    – this index to the contents of it.  And it now sounds from what I heard that

23    the parties are in agreement on that issue.

24    JUDGE LEE:  So there's really no dispute now, right?

25    MR. SCHLATHER:  I believe that's correct, I believe that's correct.

1    With regard to – so then with regard to title array, which is just used

2    in the – in the 135 patent, having properly construed array, then a tile array,

3    which is a coined term in these patents, means an array that contains the title

4    strains.  And it's stored in a computer-readable medium.

5    JUDGE LEE:  Well, you can talk a little bit about alternative title.

6    MR. SCHLATHER:  Okay.

7    JUDGE LEE:  It doesn't – it's not met by putting on an additional

8    title, right?  It's got to be in lieu of some other title to be an alternative title,

9    right?

10    MR. SCHLATHER:  Correct.  So it replaces a title.  It replaces a title,

11    that's kind of one of the, I guess the key concepts.

12    So yeah, it's displayed in lieu of or replaces the title.

13    JUDGE LEE:  So all of your embodiments are like that.  It's not like

14    simply putting on another title.

15    MR. SCHLATHER:  Right, so what – right, so what you'd – what

16    you'd see, and I think it was shown in Petitioner's slides, and the examples

17    that were shown that you had "www.ebuddy," and then that is replaced by

18    "new message."

19    So that would be an example of an alternative title or an alternate title.

20    It's not something that's displayed alongside of or along with.

21    JUDGE LEE:  Yeah, I don't know if we need to reach this, but the

22    issue is there.  We don't know where the outer bounds of a title is.  The only

23    examples are putting something in the title bar or the taskbar.

24    But it may not be limited to that, I don't know.  If you just put some

25    strings on the display somewhere.

1       But it's not in the title bar, it's not in the taskbar, but it is on the

2   display.  Then how do you determine whether that string is used as a title or

3   not? Can you elaborate?

4       MR. SCHLATHER:  Well, so what we've described in our briefing is

5   that a title is a – is a descriptive name or a distinguishing name of a written,

6   printed, or filmed production.  Or it's something in the title bar.

7       So excluding that, I think if it's in the title bar, it's certainly a title at

8   that point, but.

9       JUDGE LEE: Well, we don't have that problem in Kim., because we

10   have a title bar.

11       And Eaton, whatever it's showing is not in any kind of bar. It's just on

12   the display.

13       MR. SCHLATHER:  So I think that the – Eaton doesn't disclose that

14   any of the information that it – that it displays is a title.

15       And so I think the – as initial premise, not all information that's

16   displayed is a title.

17       And so here, and if we look at the – I think we need to look at the

18   language for the – let me if is says for instance – providing an alternative

19   title from the array.

20       And setting aside that Eaton doesn't show an array, what's shown

21   even that even LinkedIn argues is a title, is this section, these topics screen

22   name status 570, and top screen name indicator 560.

23       And in those instances, that information is not disclosed in Eaton as

24   being from any array.

1    And so that's kind of a back – a back way to come at it with specific

2  regard to Eaton as to why that's not a title. But it also doesn't – it's also

3  doesn't --

4    JUDGE LEE:  Yeah, it is a backward way -- it's not really what I'm

5  looking for.  I can also see that in Eaton just puts in additional thing on it as

6  a title, you know, which may not be an alternative title.

7    But I really would like to know how you determine when something is

8  used as a title in a straightforward way, not in a back-door way or some

9  indirect way.  Because I can't tell.

10    MR. SCHLATHER:  Well, I think – I think it has to be something that

11  would indicate the – what the event was in this case.

12    So for instance, and I think in the example in the patent, right, so it

13  has new message.

14    So that is – that's the – setting aside that that's in the title bar, but that

15  could be a title because it tells you what the event was, right, that it was a

16  new message that was received.

17    JUDGE LEE:  That doesn't make sense, because then anything can be

18  a title now.  It doesn't matter where you put it as long as you say what you

19  just received, then it's a title.

20    MR. SCHLATHER:  Well, I think that that's why – and that's why I

21  started off I think my comments with it's not just -- the term title isn't kind

22  of considered in a – in a vacuum.

23    It has to – with regard to the claims, you have to look at what it – what

24  it relates and where it comes from.

25    So for instance, it has to come from this array, it has to relate to, you

26  know, the event.

1       JUDGE LEE:  No, but what is it?  The array's got nothing to do with

2    it if something is a title or not.  It's a much higher level concept.

3       I mean, it would be great if you can just say, well, if it's not in the title

4    bar, it's not in the title.  Or if it's not in the taskbar, it's not a title.

5       But you're not willing to say that.  So that means it can be anywhere

6    on the screen and you apparently agree.  Then how do you tell if a string I

7    see on my screen is the title or not?

8       You know, if I have an email, is any word in the email a title?

9       MR. SCHLATHER:  Well, I think no, because not – because like I

10   mentioned, not all displayed text is a title.

11       JUDGE LEE:  Exactly.  Okay, so there you would agree.  But if it's

12   not in an email, how do I tell?

13       MR. SCHLATHER: I'm not sure I understand your question if –

14       JUDGE LEE:  It's easy to tell when I give you the example of an

15   email, because there's a subject part and then there's a body part.  You

16   would say, well, everything in the body is not a title.  I agree.

17       Well, that's an easy case, right.  So let's say we don't have an email as

18   an example, we just have, say, whatever Eaton's showing, you know.

19       It's showing a box, a few boxes on the screen.  And they're calling

20   one box a title.

21       MR. SCHLATHER:  Well, so –

22       JUDGE LEE:  Why do you say that's not a title?

23       MR. SCHLATHER:  So I think for instance, for box 570, that's

24   relatively easy to deal with because that's not what Eaton describes as a – as

25   box 570 is either an audible or visual icon.

1    Either, so a sound or the example that Eaton gives is a lightbulb.  So a

2    lightbulb icon wouldn't be a title.

3    But with regard to the topic screen name indicator, it's whether that is

4    a descriptive name.

5    And so it depends on what's shown there.  In this case, it describes,

6    you know, what the event was.

7    And so with regard specifically to Eaton, that's not what's shown in

8    this box.  But a title is a title if it's, for instance, a descriptive name.

9    And that's what we – that's kind of what we said in our briefing.

10    JUDGE REPKO:  Okay, thank you.  You have about a minute left.

11    Then you get to your rebuttal time.

12    MR. SCHLATHER: So, just quickly, then, I want to go back and for,

13    for Kim, and specifically point out that there just is no disclosure of an array

14    in Kim.  And as we've discussed, because of the way Kim operates in terms

15    of receiving this single piece of, of information, it also would not have been

16    obvious to a POSITA.to implement an array in the system of Kim because

17    there's only ever this single piece of data, or single piece of real time

18    information that is being displayed.

19    There is no reason to, to store multiple pieces of information.

20    With regard to Eaton, so, Petitioner points to certain Figures of

21    Eaton as disclosing an array.  Specifically, and I don't, I don't have the, I

22    don't have the figure here, but it's the block diagrams of server memory.

23    And that, that's how Eaton describes it's Figures 2 and 6 are block diagrams

24    of server memory.  What it doesn't say is what the data structure of that

25    memory is.  And it certainly doesn't say that there's any array disclosed.

1    JUDGE LEE: What about the claim that requires confirmation that the

2    notification was successful, do you think the user actually has to have seen

3    the notification, or something to indicate that?

4    MR. SCHLATHER: Yes. I think there has to be something to

5    indicate. Well, that, and that's what the claim language says is that's its

6    affirmation that user notification was successful. So, I think that does

7    require that the user was notified.

8    And, so, with regard to the example that Petitioner has provided

9    of switching windows, there just – there you could switch windows for any

10   number of reasons, but that doesn't indicate at all that the use actually was

11   notified or saw the notification. And, in fact, there's nothing, for example, if

12   the system had a glitch, for instance, maybe it didn't display it at all, well,

13   then switching windows wouldn't –

14   JUDGE LEE: Yeah. How does your patent describe the

15   confirmation?

16   MR. SCHLATHER: So, there's different ways that it could be done, I

17   believe. But –

18   JUDGE LEE: Just tell me one, and where is that?

19   MR. SCHLATHER: Yeah. I'm not sure I have an, I'm not sure I have

20   an example for you on the fly. But let me see if I can find the Figure 8 slide.

21   I think that the – and I don't have a specific example from the

22   specification off the top of my head. But I think that the what's –

23   JUDGE LEE: All I'm trying to check is that your spec is not like the

24   way they said, just changing windows is confirmation.

25   MR. SCHLATHER: Well, it certainly doesn't say that. That, that I do

26   know.

1    But I think that the real distinction with what Petitioner has offered is

2    that switching windows doesn't at all provide any notification at all that the

3    user notification was successful. All it, all it shows is that the –

4    JUDGE LEE: What you're saying, your spec actually describes an

5    actual acknowledgment that it was actually received?

6    MR. SCHLATHER: Well, I think that, I think that is what's required

7    by the claims is that it's affirmation that user notification was successful.

8    So, just switching windows isn't an affirmation that user notification was

9    successful.

10    JUDGE LEE: Or that your spec is equally vague, right, but you're

11    telling us your spec is not like that?

12    MR. SCHLATHER: Well, I'm saying, I'm saying that what the claim

13    language requires is that the user, there's affirmation that user notification

14    was successful. And so, even, even if we accept that, that – and I believe

15    what Petitioner argues in his reply is that what the system is notified of when

16    there's a switch of windows is that the user switched windows.

17    So, that's what, that's the notification that's provided in that example,

18    not that there was any user, that user notification was successful.

19    If there are, you know, questions, I see I'm already into my rebuttal

20    time.

21    JUDGE LEE: I have no further questions.

22    My colleagues?

23    JUDGE REPKO: No further.

24    JUDGE DIRBA: None from me.

25    MR. SCHLATHER: Thank you, Your Honors.

1    JUDGE REPKO: All right. Petitioner, you have 20 minutes for

2    rebuttal.  Time to begin.

3    MR. WEBER: Thank you, Your Honors.  Just a few quick points if I

4    can get my slides up here.

5    So, I wanted to discuss for a little bit this element of receiving

6    information of an event that calls for user notification.. That's the language

7    of the 135 patent.  Or processing an event that calls for user notification.

8    That's the 179 patent.

9    And in particular, the construction of event.

10   I didn't see anywhere in Patent Owner's response that any type of

11   messaging model or notification model was required by their construction.

12   That type of construction wouldn't be supported in the intrinsic evidence,

13   which is all detailed description.  Doesn't even say the word "event

14   programming."

15   It's not an operating system patent.  This patent is, is very basic. You

16   received information of an event, and you generate an event notification

17   after you received it.  That's what Kim does.  That has to be a detectable

18   condition of a system under their construction.  It's also an action or

19   occurrence under the way that we have viewed this claim term in its plain

20   and ordinary meaning.

21   That's what the 135 and 179 patents also explain as a possible event is

22   receiving a message and then putting up a notification that says, "new

23   message," meaning the receipt of the message was the event.  That's what

24   Kim discloses.

25   I'm not sure of any other requirement to be a detectable condition of a

26   system.

1        In the petition and Kim expressly disclosed that the real time

2  information was received at the user's computer, and then something was

3  done with it according to a set of conditions. That's here on Slide 38 as well

4  as Slide 39, which says, "displaying the received information on the title bar

5  according to a set of conditions."

6        This action in Kim meets both Patent Owner's construction and ours.

7  And some nebulous concept that there must be some type of model in Kim is

8  not supported in the event notification packets. Kim receives information

9  and provides notification to the user. That's all that's required of the claims.

10       I'd like to touch again briefly, not to beat a dead horse, on this issue of

11  progression and the Figures 2 through 4 of Kim. And I have them depicted

12  on Slides 43, 44, and 45 respectively in our slide presentation.

13       And, again, the support in Kim, as pointed out in the petition, for

14  showing that this is a progression or events or sequences in Kim is that Kim

15  is disclosing receiving real time information and putting it up on the title bar.

16  That's also shown in Figure 7 describing the same process. You get the

17  information as the user clicked on another window. No. Okay, go back.

18  Get more information, display it.

19       This is the sequence of events being shown here. That's the

20  justification for this.

21       And regarding Figure 4, Patent Owner's position appears to be based

22  on an interpretation of real time information being a singular piece of

23  information. Kim doesn't disclose that. There's no support for saying that it

24  has to be one little string. That's not what's happening.

25       In fact, Kim, as we've discussed, discloses inform – multiple pieces of

26  information coming in from multiple servers. That's the construction, that's

1   the makeup of the real time information Server 10.  And Kim says directly

2   that Kim's user's computer 30 receives that information from the real time

3   information server.  There are multiple sources disclosed here.  And that's

4   what's being shown here in Figure 4.

5          This is also the underpinning of their argument that Kim does not

6   disclose an array, and that it wouldn't have been obvious to use an array

7   with Kim.  But there's only one piece of information ever intercepted at

8   Kim, and comprising only one single character string.  And that's just

9   simply not what Kim says.

10         If you reject that view of Kim, their argument against both

11  anticipation or explicit or inherent disclosure of the array, even the

12  obviousness of using an array in Kim falls away because everybody,

13  everybody acknowledges that arrays are very fundamental.  They've been

14  around forever.  There's reason to use them in this context.  And that it was a

15  routine design decision providing benefits in these contexts.  This is all

16  established.  This was established during cross-examination of their expert.

17         JUDGE REPKO: I have a question about these Figures.  What do you

18  make of the times in the lower-right.  Do you have any position on that in

19  this Figure?

20         MR. WEBER: I think the times are, frankly, further confirmation that

21  this is a progression, a sequence of events.  I mean, it goes hand-in-hand

22  with what Kim is saying.  Which, again, you're taking real time information

23  from this collection of  servers and displaying event notifications, you know,

24  as it's received up on the bar.

25         I mean, the one in Figure 4, I don't understand how this could be the

26  same string.  I mean, that these  things happened in the real world, are stored

1    on the server at exactly the same time and sent on one string, that, that

2    makes no sense and is not what Kim is saying. There's different sources.

3    They got received at some point, were stored in temporary memory, and here

4    they are being put up as event notifications in the title bar of Kim.

5           JUDGE DIRBA: Mr. Weber, as far as the timestamps in the bottom

6    corner, you said that they're further – you said that we should look at those

7    timestamps as that's the order that these Figures were sort of meant to occur.

8    Is that correct?

9           MR. WEBER: That's correct. That's, you know, that's how we

10    presented it in the petition, yes.

11           JUDGE DIRBA: So, then I don't believe you said anything about the

12    timestamps on the bottom in the petition. But I have trouble with that.

13           So, then my question, though, is Figure 2 says, in the bottom right-

14    hand corner, 11:32 p.m. And Figure 1 is 11:34 p.m. And then Figure 5,

15    11:35 p.m.

16           So, following your logic you're saying that Kim says that you go from

17    Figure 2 to Figure 1 to Figure 3 to Figure 4. Is that right?

18           MR. WEBER: No, not exactly. I think the explanation there is that

19    Figure 1 is a diagram of the system just by itself.

20           What Kim discloses are Figures 2 through 4 as a group. That's what.

21    They're grouped together in the disclosure. Kim is saying, look, this is what

22    happens when you get real time information, you go Figures 2 through 4.

23    That's what, that's what Kim says.

24           I can pull that up where Kim doesn't loop in or group together 1 or 2

25    through 4. Two through 4 kind of presents it as an example of progression.

26    That's why they're referred to together.

1        JUDGE DIRBA: But you, you were just saying in your response to

2  my colleague's question that the timestamp on the bottom right-hand corner

3  of these Figures is indicative of the order in which they occur.  But the

4  timestamp on the bottom right-hand corner shows that Figure 1 should occur

5  after Figure 2 and before Figure 3.

6        I'm afraid I don't understand the position that those timestamps

7  support the progression.  Is that right?

8        MR. WEBER: Well, 2 through 4 do support the progression there.

9  Those are sequenced in time: 2 is first, 3 is next, 4 is last.  That's what

10  happens.

11        First is not grouped together in Kim in this fashion.  But if it was to

12  fall into the sequence it would also, it could still make sense.  Right?  So,

13  you get your event notification in 2.  It gets cleared.  And then you get 3, and

14  then you get 4.

15        Kim also discloses, you know, when you switch away from the active

16  window the thing gets cleared.  And so that could be the progression.

17  However, again, Kim is talking about 2 through 4 together.

18        JUDGE LEE: Counsel, then why would you bring it back?  If the

19  computer already decided it should clear the stock price, and then you clear

20  it, that means, you know, no more use for it.  Then why would it suddenly

21  bring it back later?

22        MR. WEBER: I mean, this is information coming into the system, the

23  user's computer from the real time information system.  I, I'm not real sure.

24  I mean, these things, events, they are titled the same.  You're getting this

25  information, you're throwing it up on 3, then you're throwing up what you

26  receive next on 4.

1    I think the main point is that Kim discloses Figures 2 through 4 – let's

2    skip to the right spot.

3    JUDGE LEE: What I'm trying to say is I don't believe you can

4    cherry-pick your timestamp. Either they're all in a progression or it's not.

5    You can't just say, oh, so the Figure 1 timestamp doesn't work for me so I'm

6    just going to carve that out and use, use only the other three like a

7    progression, but I'll carve out the one that doesn't fit my story.

8    MR. WEBER: Well, I think it, it's supported in Kim. So, they say as

9    shown in Figure 1, this is up on the screen, only information related to the

10    corresponding application program file name is presented on the title bar in a

11    conventional window. But the present invention is for displaying the

12    information received from the information server on an active window, as

13    shown in Figures 2 through 4.

14    So, the present invention is supposed to be indicated in Figures 2

15    through 4. That's, that's what's trying to be shown.

16    JUDGE LEE: I can't hear you.

17    MR. WEBER: The disclosure of Kim is saying look at Figures 2

18    through 4 as a grouping. That's where we're depicting the present

19    invention.

20    Figure 1 is showing the conventional system.

21    JUDGE LEE: Okay. What about, I still can't understand why would

22    the computer show the stock price, and then it shows the news by itself, and

23    then puts them both together?

24    I mean, if I was a computer I'd decide, oh, I got the news now, so I

25    want to show the news and the stock price together. I would just show them

1    both. I wouldn't, like, go through an extra iteration of showing the news and

2    then I'd put the two together again.

3          So, what's the logic?

4          MR. WEBER: I mean, the logic is kind of I'm just going off of what

5    Kim is disclosing here. I mean, I think some of it is, like, the same text

6    string is being shown to us. But the logic is you, you get information and

7    you put it up in the window as it's received.

8          Figure 4 I think is trying to depict a situation in which you have

9    received these at some point, probably closely in time, and they're both

10    being displayed. I mean, that's just what Kim says. The logic of –

11          JUDGE LEE: You have too much speculation. We don't know what

12    Kim said— you know, you can forward a blank. How do I know that's what

13    really is being described?

14          MR. WEBER: We just know based on the description here. I mean,

15    it's showing us the information is coming from multiple servers, real time

16    information. And it's displayed as it's received.

17          JUDGE LEE: It's displayed on the one server. You have to meet, do

18    you have a counter-argument for that?

19          MR. WEBER: Yes. It's right here on this, it's right here on the same

20    page, that we've put in our petition and in our reply. It's in our slides.

21          Real time information Server 10 uses any one of the stocks

22    information server, and advertising server, a breaking news server, a text

23    broadcasting server, or a combination thereof. Those are multiple sources

24    being disclosed right there.

1    JUDGE LEE: So, you're saying that it's all being filtered through
2    common servers.  Everything that's received is coming from information
3    Server 10.  Is that correct?
4    MR. WEBER: Information Server 10 is what I've just described.
5    That's what Kim is disclosing as information Server 10.
6    JUDGE LEE: Right.  So, why can't the whole situation be as they
7    described?
8    MR. WEBER: I think it could be.  But that's not what Kim is saying.
9    Kim is disclosing right here that real time information Server 10 are these
10   other servers.  It's depicted as one block.  But as we know, that can be a
11   logic – there's logical servers within there.  And that's what Kim is saying
12   right here.
13   Their way, sure, they like that way because it can tell them that they
14   can maybe win.  But that's not what Kim says.  Kim says there are multiple
15   sources.  It's right here.
16   JUDGE DIRBA: Are you saying that Kim says there are multiple
17   sources for the information?  Or are you saying that Kim says that Server 10
18   can be one or more of these servers?
19   MR. WEBER: It says, uses any one of stock information server, an
20   advertising server, or breaking news server, and a text broadcasting server.
21   We see in what they've depicted in Figures 2 through 4 that
22   information Server 10 is comprised of a stock information server and a
23   breaking news server.
24   JUDGE DIRBA: Let me ask you to break that apart a little bit more
25   for me.

1       So, if you start out by reading Kim, which I see the – I actually don't

2    know what slide you're pointing to because you didn't identify that for the

3    record, so I don't know, I can't see which one you're looking at, but I am

4    looking at the same portions of Kim in front of me.  Is it your position that

5    that sentence in Kim which – to be clear what I'm talking about – the real

6    time information Server 10 uses any one of a stock information server, an

7    advertising serving, a breaking news server, a text broadcasting server, or a

8    combination thereof.  That's the quote that I'm talking about.

9       Are you saying that that discloses that Kim uses information from

10   those servers, in other words it receives information from those servers?  Or

11   are you saying that that disclosure says that Kim's Server 10 can be one or

12   more of those servers?

13      MR. WEBER: Sorry, I wasn't on that slide.  I'm actually looking at

14   Kim, same spot as you.  Exhibit 1008 at page 13 that we've stamped there.

15      And it's Kim is disclosing that the information server is comprised of

16   these servers or a combination thereof.

17      What we see disclosed in the Figures 2 through 4 that the Petitioners

18   pointed out is that the real time information server is, is shown or is clearly

19   comprised of at least a stock information server and a breaking news server.

20      JUDGE DIRBA: So, you're saying that it's – and I guess I'm trying to

21   figure out, you're -- if I understand you correctly, you're saying that Kim

22   discloses that Server 10 can be one or more of these servers.  Is that correct?

23      MR. WEBER: It doesn't – I'm just getting caught up on the words

24   "can be."  I think it says "uses" any one of these.  And so that's what it is.

1      JUDGE DIRBA: You're saying that Kim discloses that the server uses

2 these other servers. And then you said and, therefore, that's what it is. What

3 do you mean by and "that's what it is"?

4      I suppose I'm not sure that I'm following what your argument is, if

5 I'm not articulating it correctly back to you.

6      MR. WEBER: Yeah, well, I'm just saying that this page 13 of Kim

7 discloses what comprises the information Server 10. And so, clearly, it can

8 be all of these servers or a combination thereof.

9      And then what we're showing in the embodiments of Figures 2

10 through 4 which, again, is described as the present invention in Kim, is that,

11 obviously, at least a stock information server and a breaking news server,

12 that's what's being disclosed. That information is coming in to Kim.

13      JUDGE DIRBA: So, Figures 2 through 4 definitely show us that the

14 Server 10 is getting information about a news server and a stock information

15 server. In other words, it's getting -- presumably, it's getting information

16 from those two different places.

17      Where I'm not following you is how you go from there and from what

18 this sentence says to saying, okay, therefore Server 10 includes or comprises

19 those two servers, as opposed to, as my colleague was pointing out, Patent

20 Owner's contentions and pointing -- they point to Figure 4 in support of this,

21 Patent Owner's contention is that these servers, the stock information server

22 and the news server, are the sources of the information, but all of that

23 information is sent through Server 10.

24      MR. WEBER: Right. I mean, there's – Kim doesn't disclose anything

25 about some type of consolidation and combining. What it says is that you're

26 getting information from the real time server from a stock information server

1     – all these separate servers, or a combination thereof.  The combination

2     thereof which is the combination of those separate servers, that's the source.

3           There's no disclosure in Kim of any combination, or consolidation, or

4     that this is just one packet of information.  It's disclosing that reasonably and

5     clearly that there is multiple packets of information.  That's what's being

6     shown in Figure 4.  And then, and that lines up with the fact that there's

7     delineated servers providing this information.

8           JUDGE DIRBA: So, assume I agree with you that there is disclosure

9     in Kim that different pieces of information with regard to Figure 4 has two

10    different pieces of real-time information, at least as I define it.  I suppose I

11    still don't see that that necessarily means that those two piece of information

12    were received by the client from different locations.

13          In other words, the fact that there are two pieces of information

14    doesn't speak to where those two pieces of information came from, whether

15    they came from the same source or whether they came from different

16    sources.  And by source I should clarify.  In that context I'm referring not to

17    the original source of the information but, for example, the server that it

18    came most recently from to go to the client.

19          MR. WEBER: Okay.  Thank you.  That's helpful to break that down.

20          I mean the location is from the real time information server.  That's,

21    that's the common location.  That, that is true.

22          But what Kim is saying is that information coming through the real

23    time information server is coming from a delineated assortment of other

24    servers.  And so, there are multiple sources.  Yes, it's being – it's coming

25    from a common location but it's multiple sources.  There's multiple pieces

26    of information coming in.

1        JUDGE DIRBA: Okay.

2        MR. WEBER: That's the relay.  That's where it's coming from, yes.

3        JUDGE DIRBA: Let me pivot to another question that I wanted to ask

4    you.

5        Does Kim teach or suggest that this information is stored for any

6    longer than is needed to display real time?

7        So, Kim says display this information real time on a client title bar.

8    And it shows that in Figure 4 displaying, or presume, you know, for the sake

9    of this question, it's displaying two pieces of information in that title bar.

10   Does Kim teach or suggest that it needs to maintain that information or keep

11   that information for later use at all?

12        MR. WEBER: Later use.  I mean, it discloses that it keeps those

13   separate pieces of information, real time information in temporary memory.

14   And what we know, it doesn't say for what duration, other than that we

15   know that the message will get cleared if the user changes focus on that from

16   the active window.

17        We also know from Figure 4 that information is, is stored long enough

18   that at least some kind of contemporaneously received information that

19   cannot be instantaneous is displayed together.  That's another, that's another

20   embodiment or implementation of the claim.

21        So, it's long enough to store it to receive multiple pieces of

22   information coming at some relatively real time, you know, overlap or, you

23   know, close in time so that those can be displayed together.  That's what we

24   know from, from Kim.  There's no specific permanence or time limit.

25        JUDGE DIRBA: So, Kim is storing this information while it needs to

26   display the information.  But Kim doesn't say anything to lead us to believe

1   that it's keeping this information after it's done displaying the information.

2   Would that be fair?

3        MR. WEBER: Well, as long as – I mean, it's displayed, I believe, as

4   long as the user doesn't move focus.   And that's why multiple pieces can

5   come in.  Right?  And so, we're getting multiple pieces in.  It needs to store

6   multiple pieces of information, the motivation for an array, so that they can

7   be stored.  And we see that in Figure 4.

8        I mean, after the user moves focus then, then there's no need to store

9   it anymore.

10       JUDGE DIRBA: So, you answered, you provided a longer answer to

11  my question.  And I still am not clear on whether or not I have correctly

12  understood your position.

13       So, if understand your position correctly, Kim keeps this information,

14  maintains it in temporary memory so that it can be displayed.  But Kim gives

15  us no reason to think that Kim keeps the information after it's done being

16  displayed.  In other words, once Kim decides that it's not displaying it

17  anymore, we have no reason to believe that Kim keeps this information

18  around.  Is that accurate?

19       MR. WEBER: Yeah, Kim doesn't say one way or the other.  But I

20  believe that to be accurate.  When Kim's system is done with it, yes.

21       JUDGE DIRBA: Okay.

22       JUDGE REPKO: So, first of all a question on that.  I mean, it seems

23  that that would contradict your interpretation of Figures 2 through 4 where

24  we have one piece of information, the stock price in the title bar.  In Figure 3

25  we have the arrest in the title bar.  And in Figure 4 we have them both.

1       So, as part of your title array, how does your title array work with
2   respect to this progression?

3       MR. WEBER: Well, because the system can receive and display
4   multiple pieces of information, the information is stored in the list or it
5   would be obvious to do so. Just because one example only has one
6   notification doesn't mean that the system isn't implemented or configured
7   for multiple pieces of information.

8       JUDGE REPKO: It's a progression you're saying. Right? You're
9   saying it goes from Figure 2 to Figure 3 to Figure 4. That's the way you're
10  dealing with the ultimate title analysis in the petition; right? There's 2, 3,
11  and 4, in order, that's what you receive?

12      If you receive one title in Figure 2 and another title in Figure 3, and
13  then both of them in Figure 4, so, then your array how does that, how does
14  that work with respect to the title array in Kim?

15      MR. WEBER: How does it work? I mean, --

16      JUDGE REPKO: It's going to take, and you're saying generate a
17  notification where you're actually displaying a title. So, then we have an
18  alternative title. An alternative title in 3 and 4 shows both strings. So, how
19  does that alternative fit – alternative title stored in the array?

20      You have two strings, the arrest and the stock price.

21      MR. WEBER: There's separate character string entries in there.
22  Right?

23      JUDGE REPKO: So, you just said once where they're displaying, you
24  get rid of it; right? It's temporary memory, it's gone. How could it be gone
25  if in Figure 2 we see it, and we don't see it in Figure 3, and we see it again in
26  Figure 4?

1       MR. WEBER: I, I don't think the system is done with them at this

2    point. I mean, the user hasn't changed focus. Or, I mean, these are

3    information pieces coming in. They're stored. And they're kept there as

4    long as the system needs them.

5       We don't know when exactly that they're erased. But they need them,

6    and they need to be kept for as long as information is coming in and still

7    being displayed to the user before the user changes focus.

8       JUDGE REPKO: Okay. So, the user changing focus, then they clear

9    it out.

10       But here we have, you're saying, possibly two strings in the array: the

11    arrest and the stock price. In Figure 4, we're going back to that array and

12    generating title using the two strings from that array?

13       MR. WEBER: Those strings are provided, I mean they're generated

14    already. But they're provided up to the title bar.

15       JUDGE REPKO: Okay. Thank you.

16       MR. WEBER: And on that point, I mean, I would say this goes back

17    to Figure 4. We're talking about replacing this. So, if this Figure 3 we see

18    document dashboard that you may see the breaking news notification, again

19    harkening back to the 135 and 179 patents, we see in Figures 3C and 3B that

20    the title of the browser, [www.ebuddy.com](http://www.ebuddy.com), is replaced with two messages.

21    It's the same thing.

22       JUDGE REPKO: The 3 to 4. But Figure 2, is that part of your

23    progression, too, or just 3 and 4?

24       MR. WEBER: I mean, I think Figures 2 – again, Figures 2 through 4

25    are described as the present invention embodying or illustrating the present

26    invention in Kim. And so, they're a part of the progression.

1        I was kind of harkening back to the point of, like, well, this title is

2    replacing something but it's not your event title.  Or I'm just showing that

3    Kim is operating in this regard as one of the examples that is in the 135 and

4    179 patents.

5        JUDGE REPKO: If that indeed happens after, if Figures 4 happens

6    after Figure 3; right?

7        MR. WEBER: Correct.

8        JUDGE REPKO: That's the only way the – and then Figure 2, does

9    Figure 2 have to happen before Figure 3?

10        MR. WEBER: Well, sorry about that.  Let me clarify.

11        Figure 4 in the breaking news example, that's replacing document title

12    regardless if it came after 4 – or, excuse me, came after 3.  But our view of

13    this is that there's 2 through 4 is showing progression.

14        JUDGE REPKO: I have no further questions.

15        JUDGE LEE: Mr. Weber, it's Judge Lee.

16        So, the one point I can sum up, and that is, so, information Server 10

17    is not an abstraction, it's an actual hardware device as shown in the Figure.

18    Right?

19        MR. WEBER: Shown on Slide 38.  It's described as the real time

20    information Server 10.

21        JUDGE LEE: Right.  It's not an abstraction, it's a real hardware

22    device?

23        MR. WEBER: I mean, yeah, it's described as a hardware.

24        JUDGE LEE: And all the information the client receives is coming

25    from that server?

26        MR. WEBER: It is coming from that location.  Correct.

1        JUDGE LEE: Okay.  Thank you.

2        MR. WEBER: I'm out of time.  But are there any other pending

3    questions from the board, or any other questions otherwise?

4        JUDGE REPKO: I have no further questions.

5        My colleagues?

6        MR. WEBER: No?  All right, thank you.

7        JUDGE DIRBA: I have none.

8        MR. WEBER: Then I appreciate your time and consideration.  Thank

9    you.

10       JUDGE REPKO: Patent Owner, you've got 15 minutes.

11       MR. SCHLATHER: Thank you, Your Honor.

12       So, let me just pick up, I think, where the discussion left off with

13   Petitioner.

14       What's shown in Kim and what's specifically described in Kim is a

15   single information Server 10 that communicates with PC 30, and is disclosed

16   by Kim.  That's, including in Figure 5, that is the only server that

17   communicates with – Let me rephrase that.  The only server that

18   communicates with the user's PC is information Server 10.

19       What Figure 5 shows is that multiple sources of real time information

20   may come in to Server 10.  And that's what's described on page 13 of Kim

21   where it says the real time information Server 10 uses any one of these other

22   servers.  It doesn't say that it is those others, any one or more of those other

23   servers.  It says it uses it.

24       So, I don't think there, I don't think there's any reasonable

25   interpretation where information Server 10 really comprises multiple

26   different servers.

1        With regard to the Figures 2 through 4, what these show are

2    alternative examples of the types of real time information that can be

3    received.  And so, for instance, in Figure 2 you have the Hyundai stock

4    quote.  That's one example of the type of real time information that can be

5    received.

6        In Figure 3 we have the arrest information.  That's another example.

7        And then, finally, in Figure 4 you have an example of two different

8    pieces of information that are received simultaneously.

9        And the reason that we know that those are not two different pieces

10    that are somehow cobbled together at different times, as Petitioner has

11    suggested, is that this information is provisioned to the what's called the title

12    bar value, which is a value that's disclosed or that's displayed in the title bar

13    of, of the window.  And so that is why it can disclose.  It received the piece

14    of real time information, and that piece of information is displayed.

15        There is no disclosure in here about some type of system that is

16    storing multiple of information and then assembling them over time, and at

17    one point it discloses this piece, another time it discloses another piece, and

18    then at some other time it decides it needs to disclose, to show both of them,

19    so it somehow pulls those together and cobbles them into one string that can

20    be displayed as  the title bar value.  That's just not what's disclosed in Kim.

21        JUDGE LEE: Did you have a chance to find out how your spec

22    describes getting confirmation?

23        MR. SCHLATHER: I do.  I have it on my list, Judge Lee.  Thank you

24    for bringing that up.

25        So, in the 135 patent, looking at column 7, it looks like about line 35,

26    it talks about a determination of whether to continue displaying a title may

1    be based upon by way of example, but not limitation, and a user action or

2    some other action that is sufficient to indicate that the title associated with

3    events should no longer be displayed.

4        And that, I think, is where it talks about that that user action is what

5    would, what would indicate that the notification was successful. It's I think

6    just switching windows, again, that that's not indicative that any notification

7    was successful.

8        JUDGE LEE: Because switching windows you still might need that

9    info in the task bar of the other window; right?

10       MR. SCHLATHER: Well, I think that is what Kim described, that it

11   can, it can move that information. But more importantly, just because that

12   information was displayed in the title bar of the window doesn't mean that

13   the user was actually notified. But maybe, maybe you weren't paying

14   attention to that window, or maybe, like I said, there was some other issue

15   that it wasn't properly displayed. There could be a number of reasons that

16   the user was not actually notified of the, of that information.

17       JUDGE LEE: From what you just read it sounds like you don't have a

18   specific confirmation that the user read it either.

19       MR. SCHLATHER: Well, it talks about user action. So that's one of

20   the –

21       JUDGE LEE: User action. Well, that could be changing a window.

22       MR. SCHLATHER: Well, I think it's in the context of when it

23   determines whether to continue displaying the title. And so, what would the

24   –

25       JUDGE LEE: Oh, okay. Something more, more pertaining to –

26   something indicating the user doesn't want to see it anymore?

1    MR. SCHLATHER: Or that they had, or at least that they had seen it.

2    JUDGE LEE: Where is that, what column?

3    MR. SCHLATHER: I was looking at this.  It's column 7 of the 135

4    patent, column 7, 32 through 40.

5    JUDGE LEE: Thank you.

6    MR. SCHLATHER: So, I heard, and I think for the first time, this

7    concept that the reason that, according to Petitioner, the reason that Kim

8    discloses storing multiple pieces of information is this concept that it has to

9    keep it, it has to keep all the information that comes in while the focus is on

10   a single window.

11       I don't believe I've seen that theory advanced in any of the briefing.

12   But nonetheless, there's no disclosure in Kim that it is queuing, or storing, or

13   maintaining multiple pieces of real time information as they come in.  What

14   it discloses is the real time information comes in and it's displayed.

15       That's, that's what we know about Kim.

16       So, there just is no concept, and Kim would have no need for building

17   up this collection of different real time pieces of information because it,

18   what Kim tells us is that it displays the real time information when it's

19   received.

20       JUDGE REPKO: There has to be at least some collection in the sense

21   that Figure – the Figure shows two pieces of information, two pieces of

22   breaking news, or one piece of breaking news and one stock price.  So, it is a

23   collection by definition; right?

24   MR. SCHLATHER: Well, that it – No.  It's still a single piece of

25   information that the PC received from the information server.

1    JUDGE REPKO: You're saying the information server is taking one

2    string that comes in and the string has the entire title already?

3    MR. SCHLATHER: Right.  And so, in case I wasn't clear in my

4    comments previously, in Figures 2 through 4 of Kim what those show are

5    that the system can receive a single string with a stock quote, or it could

6    receive a single string with a  breaking news, you know, arrest event.  Or it

7    could receive a single string with both of those things together.

8    But it's still one piece of real time information that is then displayed.

9    JUDGE REPKO: And the string is not the array?

10   MR. SCHLATHER: The string is not the array.

11   JUDGE REPKO: Okay.  Is it fair to say that I understand your

12   argument as saying Kim is showing just one input from Server 10, not like

13   multiple separate inputs from this group of servers?  Everything is coming

14   from 10.  So, even when you have two pieces of info, it's still supplied by

15   information Server 10 in one communication?

16   MR. SCHLATHER: That is what Kim discloses.  Correct.

17   JUDGE REPKO: Okay.

18   MR. SCHLATHER: So, I heard Petitioner discuss in rebuttal that Kim

19   discloses certain logic or conditions for performing certain actions first.  But

20   the terms "logic or conditions" don't appear in the petition.  So, I don't think

21   that that argument is properly before the board.

22   But, nonetheless, the conditions that are discussed in Kim relate to the

23   types of information that Kim's server uses to determine what texturing is

24   sent to the user's PC.

25   So, for example, the user could specify I only want to see stock

26   quotes, or I want to see stock quotes and breaking news, or I want to see

1    sports scores, whatever the case may be.  Those are the conditions that Kim

2    is talking about.  It's not talking about conditions where multiple pieces of

3    real time information are sent and then stored in some type of array.

4          JUDGE REPKO: So, with respect to Claim 1 of the 135 patent, what's

5    the generating step happening before the associating step?  So, we're

6    generating the event notification.  And we can read it as associating the

7    generated event notification or do they have to happen one right after the

8    other?  Or associating after the event notification?

9          MR. SCHLATHER: I think to be able to associate the event

10    notification with one of the plurality of strings, the event notification would

11    have to first, have first been generated.  Otherwise, there wouldn't be an

12    event notification to associate.

13          JUDGE REPKO: Well, in your event-based programming, though,

14    couldn't you just, like, before the logic is tossed out where, for example, if

15    we receive this type of notification we're going to do this or that

16    beforehand?

17          (Simultaneous speaking.)

18          MR. SCHLATHER: Well, I think – I'm sorry.  I think that in, in the

19    135 that's, that could be an example of what you have where you have

20    certain strings, certain, this plurality of character strings that are in the, in the

21    array.

22          And so, for instance, if the event is a new IM message came in, the

23    system could then generate, it received the IM message and generates an

24    event notification saying a new IM message has arrived.  And then it could

25    have – it could associate that with, for example, a character string in the

26    array that says new message or new IM message.

1       JUDGE REPKO: Right.   And so, in that case I'm wondering if the

2 associating notification could be associating generally new IM messages so

3 it's in the abstract.  Generating new notification could be actually receiving

4 the event or receiving the IM notification itself.

5       So, can that have, maybe the association previously to say this class of

6 event, IM notifications for example, we're going to do this, we're going to

7 associate with this title string which is new message.  And then once that

8 event or once that notification was generated, we then do the other stuff in

9 the column.

10       MR. SCHLATHER: No, well, I think this is talking about it needs to

11 be in this order.  I think that, if that's the real crux of your question, but --

12       JUDGE REPKO: Yes.

13       MR. SCHLATHER: Okay.  So, I think, I think the event notification

14 needs to be generated before the associating step.

15       JUDGE REPKO: And then, so in terms of association, so is that a data

16 structure that does that association?  You know, it maps these notifications

17 to the strings.  Or is that something that, you know, happens

18 programmatically?  What's the nature of this association?

19       MR. SCHLATHER: Well, it, so it has, it has the array.  And so there

20 would be, there would be programming that says, for example, if the, if the

21 event is receipt of an IM message, one example would be that it, the

22 programming would know that, okay, I need to associate this event

23 notification with this element in the array, whatever that is.

24       And that's kind of one of the reasons for having the array that allows

25 you to point to a specific entry in that data structure versus an unindexed

26 type of structure.

1     JUDGE REPKO: So, then you're saying Kim doesn't teach that

2  because it's just receiving that string from the server.  Receiving the, you

3  know, whatever it is and taking it in the server and then generating the actual

4  prompt itself?

5     MR. SCHLATHER: Well, I don't think Kim generates – I don't think

6  that the PC of Kim generates anything.  But what happens in Kim is that it

7  receives a, the single data string, the real time information, what Kim refers

8  to as real time information.  So, it receives real time information and then it

9  displays that information.  So, there is no associating, there's nothing to

10  associate with, there's no data structure, for example an array, to associate a

11  character string with.

12     JUDGE REPKO: Well, you're generating a title.  Isn't it generating

13  the title log, it's rendering something that goes on the string based on the

14  information received from the server?

15     MR. SCHLATHER: Well, I think that that's – that would, that would

16  go, if anything, to the provisioning step of the 135 patent.  I don't think that

17  goes to the generating step.

18     The event notification, right, is what's generated.  And so, I don't, I

19  don't think that the display of the information meets the generating step of

20  the 135.

21     JUDGE REPKO: It says for provisioning.  Does it actually require

22  provisioning?

23     MR. SCHLATHER: It doesn't, I guess, it does not.  It has to be, it has

24  to be associated for provisioning.  It has to be an event notification has to be

25  associated with at least one of the character strings for provisioning.  But the

26  provisioning step, if we took that to its conclusion, you know, for example

1    would be the display in the title bar, that will be an example if the for

2    provisioning step was taken to its conclusion.

3        But that's not the, that's not the generating the event notification step.

4        JUDGE REPKO: Thank you. I have no further questions on that.

5        JUDGE LEE: Mr. Schlather, it's Judge Lee.

6        Why do – I'll start over.

7        If receipt of news or receipt of stock price is the event, why wouldn't

8    displaying the stock price or displaying the news be notification of that

9    event? Seems to me like that is a perfect notification.

10        MR. SCHLATHER: I'm not sure I completely follow. I think it, I

11    think it could, it could be. And that's, so, I think, I think it could be.

12        JUDGE LEE: Could be. That's what they're saying. And I think the

13    reason your brief said you don't think that's notification. You're saying

14    they're too close to each other. It's the same notice of event. You want

15    something like "You've got mail." Three, like you've got three new mail.

16    That would be notification for sure, according to you. But that requires

17    another level of indirection.

18        You have to click on it and then receive it, the news or whatever.

19        But they're saying I just received this, so my notification is the news

20    itself. I thought you disagreed with that.

21        Are you now agreeing that that could be notification?

22        MR. SCHLATHER: No. I see, I think I better understand your

23    question.

24        So, what our issue there is, that what's displayed in Kim is just

25    whatever is received from the server. So, our position is that there is no,

26    there is no generation of an event notification in that case because the PC of

1    Kim doesn't generate anything, it just passes through whatever information

2    it receives to the title bar.

3         JUDGE LEE: I see.  So, you believe just passing it through is not

4    generating?

5         MR. SCHLATHER: Correct.

6         JUDGE LEE: Okay.

7         JUDGE REPKO: Why didn't you just say generating could be a

8    display?  Displaying notification is not generating notification?

9         MR. SCHLATHER: No.  I, I, and if I wasn't clear, I don't think just

10   displaying, displaying the text is generating the event notification.

11        JUDGE REPKO: All right.  You said that.

12        MR. SCHLATHER: So, in the case of the 135 and 179 patents it's

13   the, it's the event that must trigger the notification.  And Kim is just silent

14   on, on that, on what – it doesn't generate a notification and it's silent on

15   how, how that information is ultimately, I guess, processed, if at all.  It's just

16   passed through.

17        It looks like I'm out of time.  So, if there's any questions, happy to

18   address them.

19        JUDGE REPKO: I don't have any further questions.

20        Do my colleagues have?

21        JUDGE LEE: No.

22        JUDGE DIRBA: No, I don't.

23        JUDGE REPKO: They have no further questions.  Thank you.

24        MR. SCHLATHER: Thank you, Your Honors, Patent Owner.  Thank

25   you for your time.

1          JUDGE REPKO: Okay.  With that, the oral hearing is concluded, and

2    the case is submitted.

3              (Whereupon, at 3:44 p.m., the hearing was concluded.)

PETITIONER:

Patrick A. Doody
Christopher Kao
Brock Weber
PILLSBURY WINTHROP SHAW PITTMAN LLP
Patrick.doody@pillsburylaw.com
Christopher.kao@pillsburylaw.com
Brock.webe@pillsburylaw.com


PATENT OWNER:

Stephen Schlater
John Edmonds
EDMONDS & SCHLATHER, PLLC
sschlater@ip-lit.com
pto-edmonds@ip-lit.com
Tarek Fahmi
ASCENDA LAW GROUP, PC
tarek.fahmi@ascendalaw.com